# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| PAULA BAILEY, KRYSTAL CLARK, and HOPE ZENTZ, on behalf of themselves and others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| HEIDI WASHINGTON, in her official and individual capacity, JEREMY HOWARD, in his individual and official capacity, SHAWN BREWER, in his official and individual capacity, KENNETH MCKEE, in his individual and official capacity, JEREMY BUSH, in his individual and official capacity, LIA GULICK, in her individual and official capacity, ED VALLAD, in his individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OSTERHOUT, in her individual and official capacity, JOSEPH TREPPA, in his official and individual capacity, DAN CARTER, in his official and individual capacity, RICHARD BULLARD, in his official and individual capacity, and TONI MOORE, in her official and individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 2:19-cv-13442 VAR-EAS

District Judge Victoria A. Roberts
Mag. Judge Elizabeth A. Stafford

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48326
P: (313) 777-7LAW
jon@jmarkolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0387013)
Nicole J. Schladt (MN0400234)
80 South Eight Street, Suite 4600
Minneapolis, MN  55402
P: (612) 256-3200
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**PITT  MCGEHEE  PALMER  &
RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes
(P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**MI DEP'T OF ATTORNEY GEN.**
Scott A. Mertens (P60069)
Kristen M. Heyse (P64353)
Michael Dean (P71333)
Kristie A. Sparks (P79177)
John L. Thurber (P44989)
Zachary A. Zurek (P80116)
MDOC Division
P.O. Box 30217
Lansing, MI  48909
P: (517) 335-3055
mertensS@michigan.gov

*Attorneys for Defendants*

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656

sradner@excololaw.com

***Attorneys for Plaintiffs and the
Putative Classes***

## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs Paula Bailey, Krystal Clark, and Hope Zentz, on behalf of themselves and members of the proposed Classes below, and by and through counsel Marko Law, PLLC, Nichols Kaster, PLLP, Pitt McGehee Palmer & Rivers, P.C., Law Offices of David S. Steingold, PLLC, and Excolo Law, PLLC, state as follows for their Amended Complaint against the above-named Defendants:

### <u>INTRODUCTION</u>

1.      Huron Valley Correctional Facility for Women ("WHV") is operating under a state of degradation, filth, and inhumanity, endangering the health and safety of incarcerated women and staff alike daily.

2.      WHV is underfunded, understaffed, poorly administered, poorly managed and maintained, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the prison walls.

2

3.    Incarcerated women are regularly denied hygienic conditions and movement at WHV, in part because the facilities have been allowed to deteriorate beyond their useful lives, and because WHV's facilities were not originally designed to house the number of incarcerated women they currently house. In some cases, WHV's facilities were not originally designed to house incarcerated women at all. Haphazard retrofitting through the years has placed enormous strain on WHV's aging units and has resulted in dangerous living conditions for the incarcerated women.

4.    Many of the facilities at WHV suffer from roof leaks and other forms of water penetration, leading to damp and damaged carpets and ceilings, as well as a generally humid environment.

5.    Inadequate ventilation and exhaust systems further compound the problem. In 2018, WHV's Annual Physical Plant Report recommended replacing the HVAC system in Housing Units 1, 2, 3, 4, and 5, noting, "The typical life expectancy of an industrial/commercial HVAC system is 20-25 years with proper maintenance. This system is 43 years old. Essentially, the entire HVAC system needs to be replaced." The report also referenced aging HVAC in the Emmett, Filmore, Gladwin, and Lenawee Units. For these four units, the report suggested that "[r]estroom and shower exhaust systems need to be upgraded to accommodate their use." In 2018, air handlers needed to be replaced in 15 different buildings at WHV.

3

6.      As a result, the women incarcerated in WHV suffer ongoing exposure to harmful varieties of mold, including Ochroconis, Cladosporium, Chaetomium, and Stachybotrys ("mold"), caused by WHV's unclean, dilapidated conditions and lack of ventilation.

7.      The mold has taken a significant toll on the women incarcerated in WHV, both physically and mentally. The mold has caused respiratory infections, coughing, wheezing, rashes, dizziness, and fatigue—all symptoms which, in turn, impact the inflicted's mental health and which may lead to serious, long-lasting physical effects, such as asthma, life-threatening secondary infections, insomnia, memory loss, trouble concentrating and confusion.

8.      The women have complained about the presence of mold in the facility for years, and continue to do so, but their pleas have been ignored. Defendants have failed to remove the mold, remedy the conditions causing the mold, and otherwise protect Plaintiffs and the putative Classes from exposure to mold and from suffering symptoms and health conditions caused by mold exposure.

9.      As discussed below, conditions at WHV have deteriorated to such a degree as to expose Plaintiffs and the proposed Classes to an excessive risk of serious harm to their health and safety, in violation of the rights guaranteed to them under the United States Constitution.

4

10.    The constitutional violations complained of herein are not isolated incidents impacting a few inmates and caused by a few correctional personnel. Rather, the mold infestation at WHV and related lack of medical care has persisted for more than six years and impacted prisoners housed in numerous units.

11.    Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at WHV yet have failed to remedy the deplorable state of affairs.

12.    This is a civil rights class action, brought under 42 U.S.C. § 1983, challenging the inhumane, dangerous, and unconstitutional conditions endured by the women locked inside WHV.

13.    Plaintiffs Paula Bailey, Krystal Clark, and Hope Zentz (collectively "Plaintiffs"), on behalf of themselves and members of the proposed Classes, seek monetary damages and injunctive and declaratory relief.

## JURISDICTION AND VENUE

14.    Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, and jurisdiction is therefore proper pursuant to 28 U.S.C. §§ 1331 and 1343.

15.    Venue is proper in this District under 28 U.S.C. § 1391. The parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district. Defendants are subject to this Court's personal jurisdiction.

## PARTIES

### I.    PLAINTIFFS

16.    Plaintiff Paula Bailey ("Bailey") is a woman currently incarcerated in WHV. She brings this Complaint on behalf of herself and the proposed Classes, as described herein.

17.    Plaintiff Krystal Clark ("Clark") is a woman currently incarcerated in WHV. She brings this Complaint on behalf of herself and the proposed Classes, as described herein.

18.    Plaintiff Hope Zentz ("Zentz") is a woman currently incarcerated in WHV. She brings this Complaint on behalf of herself and the proposed Classes, as described herein.

### II.    MDOC DEFENDANTS

19.    Defendant Heidi Washington ("Washington"), at all relevant times, was the Director of the Michigan Department of Corrections. As Director, Washington oversees Michigan's correctional system, including WHV. Washington is named as a Defendant in both her official and individual capacity.

20.    Defendant Kenneth McKee ("McKee"), at relevant times, has been the Deputy Director for Correctional Facilities Administration ("CFA") at MDOC. McKee is named as a Defendant in both his official and individual capacity.

21.     Defendant Jeremy Bush ("Bush"), at relevant times, has been the Assistant Deputy Director of the Jackson Region for CFA at MDOC. Bush is named as a Defendant in both his official and individual capacity.

22.     Defendant Lia Gulick ("Gulick"), at relevant times, has been the Acting Deputy Director for Budget and Operations Administration ("BOA") at MDOC. Gulick is named as a Defendant in both her official and individual capacity.

23.     Defendant Ed Vallad ("Vallad"), at relevant times, has been the Physical Plant Division Administrator at MDOC. Vallad is named as a Defendant in both his official and individual capacity.

24.     Defendant Toni Moore ("Moore"), at all relevant times, was the State Administrative Manager. Moore is named as a Defendant in both her official and individual capacity.

## III.    WHV DEFENDANTS

25.     Defendant Jeremy Howard ("Howard"), at relevant times, has been the acting Warden of WHV. Howard is named as a Defendant in both his official and individual capacity.

26.     Defendant Shawn Brewer ("Brewer"), at relevant times, was the Warden of WHV. Brewer is named as a Defendant in both his official and individual capacity.

27.    Defendant David Johnson ("Johnson"), at relevant times, has been the Deputy Warden of WHV. Johnson is named as a Defendant in both his official and individual capacity.

28.    Defendant Karri Osterhout ("Osterhout"), at relevant times, has been the Deputy Warden of WHV. Osterhout is named as a Defendant in both her official and individual capacity.

29.    Defendant Joseph Treppa ("Treppa"), at all relevant times until on or about October of 2017, was a Physical Plant Supervisor. Treppa is named as a Defendant in both his official and individual capacity.

30.    Defendant Dan Carter ("Carter"), at all relevant times, was a Physical Plant Supervisor. Carter is named as a Defendant in both his official and individual capacity.

31.    Defendant Richard Bullard ("Bullard"), at all relevant times, was the Physical Plant Superintendent. Bullard is named as a Defendant in both his official and individual capacity.

## FACTUAL ALLEGATIONS

32.    Plaintiffs and the proposed Classes by reference incorporate the preceding paragraphs as though fully set forth herein.

33.    Plaintiffs Bailey, Clark, and Zentz are inmates of WHV and bring this action on behalf of similarly situated former, current, and future inmates of WHV.

34.    WHV houses pretrial detainees as well as convicted women. The facility houses substantially more than 2,000 women at any given time.

35.    WHV is currently the only women's prison in the state of Michigan.

36.    At all material times, the actions and/or omissions alleged herein occurred under color of state law, and the individual employees of the Defendants were acting within the scope and course of their employment.

37.    At all material times, MDOC employed Defendants Washington, Brewer, Howard, McKee, Bush, Gulick, Vallad, Johnson, Osterhout, Treppa, Carter, Bullard, Vallad, and Moore (collectively "Defendants"), all of whom initiated and carried out the policies, practices, and customs of MDOC, and are also liable for their own actions and/or omissions.

38.    Defendants' policies, practices, customs, actions and/or omissions related to mold at WHV stand in stark contrast to their affirmative duty and obligation to quickly address issues with mold exposure and inadequate ventilation in the facility.

39.    For example, Defendants have an affirmative duty and obligation to provide prisoners with "[l]ighting, ventilation, heating, and noise levels that are adequate for comfort."[1]

---

[1] MDOC's Humane Treatment and Living Conditions for Prisoners Policy Directive 03.03.130.

40.    Importantly, "[p]reventive and emergency maintenance shall be performed at all state-owned correctional facilities to ensure the proper functioning of all electrical, mechanical and plumbing equipment and systems as well as the facility's physical plant."[2] Defendants have an affirmative duty and obligation to provide for emergency maintenance programs that result in the "immediate restoration of equipment and facilities to such a condition that human life or structural soundness of equipment or facilities is not endangered."[3]

41.    Additionally, "[w]ardens shall ensure that a housekeeping plan is developed and maintained for all areas of their respective facilities."[4] In particular, "[n]ecessary cleaning materials and equipment shall be issued by housing unit staff" so that inmates may clean their individual living areas, including walls, floors, sinks, toilets, windows, beds, lockers, and property.[5]

42.    "Deficiencies which may threaten the health or welfare of staff or offenders shall be corrected immediately whenever possible. If the deficiency cannot be immediately corrected, the Regional Environmental Sanitarian shall be contacted to determine appropriate temporary corrective measures to be implemented."[6]

---

[2] MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100.
[3] *Id.*
[4] MDOC's Sanitation and Housekeeping Standards Policy Directive 04.03.102.
[5] *Id.*
[6] *Id.*

43. Despite Defendants' affirmative duties and obligations, the conditions at WHV continue to deteriorate without meaningful intervention, threatening the health and safety of all incarcerated women at the facility on a daily basis.

## I. THE FACILITIES

### A) <u>Conditions at WHV</u>

44. As is, the prison and its bunkrooms lack proper ventilation, leading to a general moist environment and dampness in most of WHV's units. At all material times the facility has been overcrowded, and the conditions at WHV have been filthy and dangerous, providing a breeding ground for microscopic fungi and spore-producing mold. In particular, the facility's haphazard retrofitting, leaky roofs, inoperable windows, inadequate ventilation, and outdated HVAC systems all contribute to the mold problem at WHV.

### *1) Haphazard Retrofitting*

45. In the mid-2000's, the WHV facility began operating exclusively as an all-women's prison. At various points in time before, it had operated as a mental institution, as well as a male and female prison.

46. The facility's infrastructure is outdated and badly in need of repair. To combat over-crowding, the institution has undergone retrofitting that has further exacerbated issues with ventilation and mold throughout WHV facilities.

47.    For example, Defendants have converted many structures that were not designed for sleeping and bathroom facilities into housing units without repairing the roofs, adequately ventilating the spaces, or updating the HVAC systems.

48.    The gymnasium in the Jennings Building/School was converted into housing and renamed the Lenawee Temporary Housing Unit in 2015.

49.    At least four former TV rooms at WHV were converted into cell areas in 2015, as well as 44 former offices.[7] The prison also opened a building once used for storage and food services as a cell area in 2015.[8]

50.    Storage closets without windows or ventilation are now being used as group rooms. These retrofitted facilities have become ideal breeding grounds for mold.

### 2)    Leaky Roofs

51.    Further contributing to the mold problem, many units have leaky roofs and/or widespread water damage from flooding.

52.    Water leaks through the roof of WHV units regularly. Defendant Bullard submitted Annual Physical Plant Reports to Defendant Moore from 2013 to 2018 that detailed extensive problems with leaking roofs and water damage to ceilings and carpets at WHV.

---

[7] Paul Egan, "State's female inmates crowded," *Livingston County Daily Press and Argus* (November 26, 2015).
[8] *Id.*

12

53.     For example, according to plant reports, roofs needed replacement in the Calhoun, Dickinson, and Lenawee units from 2013 through at least 2018.

54.     The Kent Building's roof needed replacement from 2013 through 2017.

55.     The MSI Building's roof needed replacement from 2015 through at least 2018.

56.     Leaks continue in at least the Lenawee unit, some of which are directly dampening occupied beds.  Leaks have also occurred in at least Units 1, 2, 4, 5, 6, Harrison A and Dickinson B, the Field House, MSI Programs Building, and the Chow Hall.

57.     Women have complained to Defendants, including specifically Defendant Brewer, that the leaks lead to mold.

58.     A former facility worker reported that "the roof leaks so badly it has shorted out the lights."[9] Others described the leaks by saying, "when it would rain, it looked like coffee coming out of the ceiling."[10]

59.     One inmate reported using "10 to 20 buckets" to capture leaking water in one part of the prison alone.[11]

---

[9] Paul Egan, "Ex-officer says Michigan's only prison for women is crowded, dangerous," *Detroit Free Press* (July 25, 2019).
[10] *Id.*
[11] *Id.*

60.     This water damage has not been properly cleaned or remediated.  In fact, the 2016 flood in the fieldhouse was cleaned up by inmates without proper protective gear.

### 3)     *Inoperable Windows, Grading, and Gutters*

61.     Many housing units have needed window replacements since 2013, either because the windows do not open, limiting ventilation in the units, or because the windows allow water to come into the facility, increasing humidity and promoting a wet environment for mold to proliferate.

62.     Windows needed replacement in Housing Units 1, 2, and 3 from 2016 through at least 2018.

63.     Windows needed replacement in Housing Units 4 and 5 from 2014 through at least 2018.

64.     Additionally, the lawn areas surrounding WHV units are improperly graded, causing drainage to flow toward the buildings and through cracks in the windows and other parts of the building. Drainage issues due to soil grading plagued the facility from 2013 through 2018. This has been a recurrent problem and directly contributes to the damp environment experienced by incarcerated women at WHV.

65.     Further, gutter systems above the windows were "leading to more serious problems" by 2016 in the Dickinson, Emmett, Filmore, Gladwin, Harrison, and Lenawee units, as well as the Kent Building. Gutter systems were leading to

14

"water damage" in those structures by 2017. Gutters needed replacement in most buildings throughout the facility from 2013 through at least 2018.

### 4)      *Inadequate Ventilation*

66.     By approximately 2018, several housing units on the compound were experiencing a failure in the operation of ventilation and air conditioning units wherein the units were "not functioning properly or at all," according to Defendant Bullard's 2018 Annual Physical Plant Report.

67.     Air handlers, which are responsible for regulating and circulating air, have needed replacement in almost every housing unit since 2013, as well as the Administration Building, Programs Building, Field House, Prisoner Services Building, and the Kent Building.

68.     Mold is a common problem for air handlers, as they frequently build up condensation that encourages growth of mold spores.

69.     Air handlers needed replacement in Housing Units 1, 2, 3, 4, and 5 from 2013 through at least 2018.

70.     Air handlers needed replacement in the Emmett, Filmore, Gladwin, and Harrison units, as well as the Kent Building, from 2014 through at least 2018.

71.     In 2018, the restroom and shower exhaust systems were deemed inadequate for the spaces they serviced in the Dickinson, Emmett, Filmore, Gladwin, Harrison, and Lenawee units.

72.     "In restrooms and shower rooms in eight [out of 14] residential units at Women's Huron Valley Correctional Facility, 'existing exhaust fans are beyond repair, resulting in limited to no ventilation,' [the Michigan Department of Technology, Management, and Budget] said in an unsigned memo received July 9 by the Building Committee of the State Administrative Board."[12]

73.     The shower unit in Gladwin-B has particularly poor ventilation causing condensation to drip on the women's clothes while they shower.

74.     The poor ventilation further provides an environment conducive for mold to develop and grow throughout the facility.

75.     Additionally, Defendants do not adequately clean this antiquated ventilation system further shortening its useful life and exasperating the conditions for inmates and detainees.  WHV's Housekeeping Plan requires ventilation ducts be cleaned four times annually.  Yet, for example, Defendants failed to clean the ducts at all in the west side units for several years.

### 5)     *Outdated HVAC Systems*

76.     As acknowledged by Defendants Bullard and Brewer, the HVAC system needs to be replaced and is nearly 20 years past its peak life expectancy in most WHV buildings, including Housing Units 1, 2, 3, 4, and 5; the Emmett, Filmore, Gladwin, Harrison, and Lenawee units; the Administration Building; the

---

[12] *Id.*

Programs Building & Unit 6; the Field House; the Prisoner Services Building; and the Kent Building.[13]

77.     Upon information and belief, the HVAC system in Housing Units 1, 2, 3, 4, and 5; the Administration Building; the Programs Building & Unit 6; the Field House; and the Prisoner Services Building reached its peak life expectancy at some point from approximately 1995 to 2000.

78.     In 2017, Defendant Bullard wrote in his Annual Physical Plant Report: "The typical life expectancy of an industrial/commercial HVAC system is 20-25 years with proper maintenance. This system is 42 years old. The entire HVAC system needs to be replaced." He repeated the same comment multiple times throughout the report for various buildings at WHV, including with respect to Housing Units 1, 2, 3, 4, and 5, as well as the Administration Building, Programs Building, and Field House.

79.     Defendant Bullard's Annual Physical Plant Report in 2018 contained the exact same statement for all of the same buildings (updating to note that the system was now forty-*three* years old).

80.     For the Emmett, Filmore, Gladwin, and Lenawee units in 2018, Defendant Bullard simply wrote, "The typical life expectancy of an

---

[13] Paul Egan, "State agency does about-face on why women's prison is getting $488,000 fix," *Detroit Free Press* (July 15, 2019).

industrial/commercial HVAC system is 20-25 years with proper maintenance." Upon information and belief, the HVAC systems for those buildings exceeded their life expectancy as well.

81.    Defendants were actually aware of the conditions and actually aware that a substantial risk of serious inmate harm would result from the conditions.

82.    Defendants disregarded that risk by failing to take reasonable measures to abate the problem.

**B)    Mold**

83.    Mold is a large group of microscopic fungi. Most types of mold produce spores that can be air-, water-, or insect-borne.

84.    Mold thrives in humid, damp spaces that are poorly ventilated.

85.    As mold grows, spores can be released into the air where they become easy to inhale.

86.    Exposure to mold spores can cause symptoms such as skin rash and itching, respiratory infections, headaches, dizziness, nosebleeds, nasal stuffiness, throat irritation, coughing, watery eyes, or wheezing. Mold exposure may also lead to muscle cramps, numbness in extremities, weight gain, light sensitivity, and hair loss. Some individuals develop serious infections in their lungs when they are exposed to mold, causing shortness of breath, chest tightness, and diseases like pneumonia or a pulmonary hemorrhage.

87.     Mold can also lead to asthma, or trigger allergies or asthma attacks in those who already suffer from these ailments. People with serious allergies or problems with asthma may have more severe reactions to mold exposure.

88.     Mold exposure may also lead to or contribute to insomnia, anxiety, depression, loss of appetite, confusion, and trouble concentrating.  Long-term exposure to toxic mold can affect the brain and lead to nervous-system challenges and cognitive and emotional impairments.

89.     Prolonged exposure to mold may exacerbate the severity of the reaction and result in perturbation of the immunological system.

90.     Mold-colonized environments often harbor bacteria and dust mites that release toxins and contribute to "toxic mold" and "sick building syndrome."

91.     Mold also emits volatile organic compounds that produce strong fumes directly into the air. These fumes are linked to symptoms such as headaches, dizziness, fatigue, nasal irritation, and nausea.

92.     Assessments for mold exposure include environmental assessments for the presence of mold and allergy testing. Allergy testing can be accomplished through skin or blood tests. Some physicians recommend testing for mold-specific antibodies.

93.     Removing affected individuals from damp places where mold exists is a necessary part of preventing and treating mold exposure.

94.     The best practice in addressing mold growth is to remove the mold and work to prevent future growth. This includes controlling humidity levels with dehumidifiers and/or exhaust fans; proper air circulation; promptly fixing leaky roofs, windows, and pipes; thoroughly cleaning and drying after flooding or water damage; and ventilating shower, laundry, and cooking areas.

95.     Small amounts of mold can be removed with commercial mold removers or with water and bleach, ammonia, Borax, or hydrogen peroxide.  Large amounts of mold, though, require specialized removal techniques and personal protective equipment.

96.     Defendants were actually aware of the physical dynamics of mold and its growth as set forth above, and the substantial risk of serious inmate harm that would result, including the physical symptoms set forth above.

**C)     Mold at WHV**

97.     Upon information and belief, testing in the WHV would disclose the presence of various molds such as:

> a.  Ochroconis is known to grow principally in soil and can cause infections under the skin.
>
> b.  Cladosporium is known to grow on decaying paint and textiles and is generally regarded to be allergenic. Cladosporium can cause extrinsic asthma, skin lesions, sinusitis, and pulmonary infections.
>
> c.  Chaetomium is known to grow on water-damaged paper and drywall. Several species of Chaetomium

20

are toxigenic and known to cause systemic, cerebral, skin (and under the skin), and pulmonary infections.

d. Stachybotrys is known to grow on water-damaged drywall. Several species of Stachybotrys are toxigenic and can specifically produce Stratoxin H, which is poisonous upon inhalation. Individuals with chronic exposure to Stratoxin H experience cold and flu symptoms, sore throats, diarrhea, headaches, fatigue, dermatitis, hair loss, and general malaise. Stratoxin H is also a liver and kidney carcinogen. Areas with relative humidity above 55% and that are subject to temperature fluctuations are ideal for Stratoxin H production.

98.     MDOC personnel, including Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Bullard, Vallad, and Moore, were actually aware of the extensive mold problem as it was readily visible, and they actually observed it. Likewise, they received numerous complaints about mold by detainees and inmates at WHV.

99.     For example, Defendants Brewer and Osterhout inspected the showers in Filmore-B on or about December 2018.

100.   Many inmates filed grievances about the mold, bringing mold directly to the attention of Defendant Brewer on many occasions during Step Two of the inmates' grievance process.

101.   The mold in shower units, including those in Gladwin-B, Unit 4 and others, has been especially extreme for more than five years, visibly covering the walls, ceilings, and floors.

102.   Mold also grows in storage closets and other closets adjacent to the shower units.

103.   The mold looks green, black, and fuzzy. Many inmates describe the mold as looking "alive." The mold is flakey and slimy to the touch. It can also have a sticky, gum-like feeling.

104.   In some instances, the mold has "eaten" through bricks and door frames. The mold has also caused tiles throughout the units to peel up from the ground.

105.   As early as 2013, detainees and inmates at WHV began complaining to Defendants—including multiple guards, nurses, nurse practitioners, and doctors— about the presence of visible mold in shower units, in sinks, around toilets in cells, near the windows, around door casings, in the hallways, and in the air vents.

106.   For example, inmate/detainee members of the Warden's Forum Committee wrote a letter to Defendant Brewer in 2018, complaining that women were "experiencing health problems due to environmental hazards within [unit #2 westside housing].  Due to the improper function of HVAC units, compounded by lack of proper cleaning agents to kill the mold arising from the poor

22

ventilation/unwarranted condensation on walls/windows in housing/cell areas and unit (base-hallways, etc.) continuously moist areas breed mold leeching levels of toxins into the air."

107.   The Warden's Forum Committee exists to assist Defendant Brewer in identifying and resolving problems in the general population of WHV. The Committee consists of WHV's housing unit representatives, and the Committee meets at least monthly to discuss inmate concerns with Defendant Brewer. According to MDOC's Prisoner Housing Unit Representatives/Warden's Forum Policy Directive, 04.01.150, "the Warden shall provide the Warden's Forum with written responses to each agenda item, copies of which shall be posted in each housing unit and forwarded to the appropriate Regional Prisoner Administrator (RPA) and to the Grievance Section in the Office of Legal Affairs." Inmates at WHV complained regularly about mold at Committee meetings.

108.   Plaintiffs and other women have also complained about symptoms, such as skin rash and itching, nasal stuffiness, throat irritation, coughing, watery eyes, wheezing, and respiratory conditions and infections, which are known to be caused by the types of mold present in WHV.

109.   Plaintiffs and other women complained about these symptoms, but their requests for treatment were largely ignored by guards, nurses, physician assistants, or physicians.

110.   Several women were explicitly told by doctors and/or nurses that their symptoms were caused by mold exposure, and yet the appropriate repairs, maintenance, and cleanup has not yet taken place.

111.   Several MDOC employees complained to women about their own allergies and headaches triggered by working in the facility. They attributed their symptoms to mold in the building and said their symptoms cleared up when they went home at the end of the day. New MDOC guards are placed in buildings with the worst mold problems because seasoned guards refuse to work in them.

112.   MDOC personnel, including Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Bullard, Vallad, and Moore have failed to take appropriate measures to eradicate the mold despite actual knowledge of its existence and prevalence, and Defendants have disregarded the substantial risk of serious inmate harm that resulted from long-term mold exposure.

## II.   THE PLAINTIFFS

### A)   <u>Plaintiff Paula Bailey</u>

113.   Plaintiff Paula Bailey ("Bailey") is an inmate at WHV currently housed in Unit Filmore-B.

114.   Plaintiff Bailey has noticed mold in at least three units during her time at WHV, including Gladwin-B, Dickinson-B, and Filmore-B.

115.   Plaintiff Bailey first noticed mold at WHV in 2016 when she lived in Gladwin-B. In Gladwin-B, the windows remained closed, causing the windows to sweat and creating a musty odor.

116.   Eventually, brown and black mold formed in Gladwin-B, dripping from the ceiling in the shower onto Plaintiff Bailey's face and body. She developed a rash that left visible scars on her face, chest, and legs.

117.   Plaintiff Bailey noticed similar mold in the showers during her time in Dickinson-B. However, after transferring to Filmore-B, Plaintiff Bailey began experiencing even more severe symptoms such as wheezing, chest pain, and coughing due to mold.

118.   Mold is visibly present in Filmore-B.

119.   Plaintiff Bailey developed a respiratory infection on or around April of 2018 when she was housed in Filmore-B.

120.   Plaintiff Bailey suffered from the respiratory infection for several months. Plaintiff Bailey continues to suffer from excessive coughing and difficulty breathing. Her symptoms subside only when she leaves the Filmore-B facility.

121.   Plaintiff Bailey has been seen by MDOC healthcare for her symptoms on many occasions. When she complained about her symptoms, Plaintiff Bailey was told that her medical conditions were caused by exposure to mold at WHV.

Specifically, Nurse Tinsley, Nurse Porter, and Nurse Smith all separately said her symptoms were related to mold.

122.   Plaintiff Bailey complained about the presence of mold to other MDOC personnel, including Prison Counselor Schilling, Resident Unit Manager Jackson, and Officer Norris, on numerous occasions.

123.   Despite repeated complaints, Defendants failed to take reasonable steps to eradicate the mold from the unit or to keep it from returning by, for example updating the WHV's ventilation system, following Defendants' housekeeping protocols, or by making desperately needed repairs.

124.   Plaintiff Bailey has suffered, and continues to suffer from, physical injuries and emotional distress related to the mold and her associated health symptoms.

**B)** **Plaintiff Krystal Clark**

125.   Plaintiff Krystal Clark ("Clark") is an inmate at WHV currently housed in Unit 4.

126.   Plaintiff Clark observed mold in at least three units during her time at WHV, including Gladwin-A, Gladwin-B, and Unit 4.

127.   Plaintiff Clark first observed mold at WHV in Gladwin-A and Gladwin-B. The fuzzy, brown and black mold dripped down on her while she showered.

26

128.   During Plaintiff Clark's time at WHV, she has developed significant respiratory problems and other mold-related symptoms. While Plaintiff Clark experienced headaches prior to incarceration, they have exponentially worsened.

129.   The conditions at WHV have also exacerbated Plaintiff Clark's shortness of breath, chest tightness, allergies and asthma. It is hard for Plaintiff Clark to breathe anywhere at WHV, but she experiences some relief when she is allowed to be outside.

130.   Plaintiff Clark suffers from coughing fits so severe that she has been provided with a facemask to wear when visiting with other people. She also wheezes when she talks.

131.   Plaintiff Clark's respiratory problems continue to persist without improvement.

132.   Plaintiff Clark's symptoms are caused by exposure to mold at WHV.

133.   Plaintiff Clark complained about the presence of mold to MDOC personnel on numerous occasions. She complained directly to Defendant Brewer during Step 2 of the grievance process. She has also submitted multiple kites in an effort for relief from her mold-related symptoms. When Plaintiff Clark asked for WHV to conduct an allergy test, the nurses said WHV did not give allergy tests in the facility.

134.   Despite Defendants' actual knowledge of the mold problem and actual knowledge of its substantial risk of harm to Plaintiff Clark as a result of exposure to it, Defendants failed to take reasonable steps to eradicate the mold from the unit or to keep it from returning by, for example updating the WHV's ventilation system, following Defendants' housekeeping protocols, or by making desperately needed repairs.

135.   Plaintiff Clark has suffered, and continues to suffer from, physical injuries and emotional distress caused by exposure to mold at the WHV.

### C)   <u>Plaintiff Hope Zentz</u>

136.   Plaintiff Hope Zentz ("Zentz") is an inmate at WHV currently housed in Unit 2.

137.   Plaintiff Zentz first observed mold at WHV during her time in Unit 2. The mold is present on the windows, showers, heat registers, and vents.

138.   Patchy black mold drips from the ceiling in the shower onto Plaintiff Zentz's face and body. She developed a rash on her body in the places where the mold dripped.

139.   After a year-and-a-half in Unit 2, Plaintiff Zentz began experiencing chronic headaches and dizziness. Her symptoms subsided only when she left the facility for fresh air.

140. Plaintiff Zentz also suffers from trouble breathing, coughing, and wheezing, which worsens at night.

141. In 2019, Plaintiff Zentz suffered from a nose infection for two months without relief.

142. Plaintiff Zentz complained about her symptoms to the health care unit on many occasions, including Nurse Practitioner Olmstead.

143. Plaintiff Zentz was told by MDOC health care, including Nurse Porter, that her respiratory problems were probably caused by exposure to mold at WHV. Nurse Porter told Plaintiff Zentz that her allergies start to act up every time she comes to work in the facility.

144. Mold is visibly present in Unit 2.

145. Plaintiff Zentz complained about the presence of mold to MDOC personnel, including Defendant Brewer, on numerous occasions.

146. Despite repeated complaints, effective steps were not taken to eradicate the mold from the unit or to keep it from returning by, for example updating the WHV's ventilation system, following Defendants' housekeeping protocols, or by making desperately needed repairs.

147. Once, Plaintiff Zentz had a conversation with a maintenance man who said the ventilation systems at WHV were covered in mold. He told Plaintiff Zentz

that administration kept asking him to put a "band-aid" on the problem by painting over mold throughout the facility.

148.   Plaintiff Zentz has suffered, and continues to suffer from, physical injuries and emotional distress related to the mold and her associated health symptoms.

## III.   THE DEFENDANTS

### A)   The Decisionmakers at WHV

#### 1)   Wardens Brewer and Howard

149.   Defendant Brewer, at relevant times, has been the Warden of WHV, until approximately January of 2020.

150.   Defendant Howard became acting Warden of WHV in approximately January of 2020.

151.   The Warden at WHV is responsible for overseeing the operation of WHV, development of WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, including housekeeping staff, and ensuring that Defendants enforced and abided by policies and regulations at the MDOC, the State of Michigan, and the United States.

152.   The Warden is further responsible for the care, custody and protection of individuals including Plaintiffs.

153.   The Warden of WHV reports directly to the Jackson Region Assistant Deputy Director, Defendant Bush.

154.   The Warden supervises many WHV employees, including Deputy Wardens Johnson and Osterhout.

### 2)   Deputy Wardens Johnson and Osterhout

155.   Defendant Johnson and Defendant Osterhout have at relevant times served as Deputy Wardens of WHV.

156.   In this capacity, Defendants Johnson and Osterhout have upon information and belief been responsible for the operation of WHV, development of budget recommendations and WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, and ensuring that Defendants enforced and abided by policies and regulations at the MDOC, the State of Michigan, and the United States.

157.   The Deputy Wardens are further responsible for the care, custody and protections of inmates including Plaintiffs.

158.   The Deputy Wardens report directly to the WHV Warden.

159.   The Deputy Wardens supervise many WHV employees, and are directly involved in the hiring, training, disciplining, counseling and grievances of WHV employees, including corrections officers who maintain regular contact with the inmates housed at WHV.

### 3)    *Physical Plant Supervisors Treppa and Carter*

160.    Defendant Treppa and Defendant Carter have at relevant times served as Physical Plant Supervisors at WHV.

161.    In this capacity, Defendants Treppa and Carter have, upon information and belief, been responsible for the overall maintenance of the WHV facility physical plant, including building, electrical, mechanical, power plant, sewage lift station, and grounds maintenance.

162.    As Physical Plant Supervisors, Defendants Treppa and Carter were responsible for planning and coordinating the work of a variety of trades persons and their supervisors in maintenance activities. Maintenance activities include the installation, maintenance, and repair of electrical, steam, water, and sewer systems, such as ventilation and HVAC systems.

163.    Defendants Treppa and Carter coordinated the ordering process for materials and tools needed to maintain the WHV facilities.

164.    Defendants Treppa and Carter also directed custodial services responsible for cleanup, painting, and other projects.

165.    As Physical Plant Supervisors, Defendants Treppa and Carter reported directly to the Physical Plant Superintendent.

### 4) *Physical Plant Superintendent Bullard*

166. Defendant Bullard, at relevant times, has served as Physical Plant Superintendent of WHV.

167. The Physical Plant Superintendent is responsible for overseeing and maintaining the conditions and logistical operations of WHV and further serves as the direct supervisor to the Physical Plant Supervisors.

168. As Physical Plant Superintendent, Defendant Bullard is also responsible for preparing the Annual Physical Plant Report each year for WHV, a responsibility which requires inspecting the facilities' roof, HVAC system, and ventilation with an eye toward preventative maintenance and necessary repairs.

169. Upon information and belief, the Physical Plant Superintendent reports to the MDOC's Physical Plant Division Administrator, Defendant Vallad.

### B) __MDOC Control over WHV__

170. The MDOC is a Michigan governmental agency that operates WHV.

### 1) *Director Washington*

171. Defendant Washington has served as Director of the MDOC since approximately July of 2015, overseeing Michigan's correctional system, including WHV.

172. Her duties and responsibilities include developing and implementing policies and procedures for the operation and management of the MDOC and its employees, as well as managing the MDOC's budget.

33

173.    She is responsible for the care, custody and protection of prisoners under the jurisdiction of the MDOC.

174.    Defendant Washington has full power and authority in the supervision and control of the MDOC's affairs.

175.    Defendant Washington ensures MDOC enforces and abides by the laws, policies, and regulations of State of Michigan, and the United States.

176.    Defendant Washington supervises many MDOC employees, including the BOA headed by Deputy Director Gulick and the CFA headed by Deputy Director McKee.

### 2)    Deputy Director McKee

177.    The CFA at the MDOC is responsible for the operation of all correctional institutions operated by the MDOC.

178.    As Deputy Director for CFA at MDOC, Defendant McKee is a principal decisionmaker as to the management and operation of MDOC facilities, including WHV.

179.    Defendant McKee is responsible for promulgating and administering MDOC's policies related to preventive and emergency maintenance.

180.    Defendant McKee reports directly to Defendant Washington.

181.   Defendant McKee supervises many MDOC employees including Jackson Region Assistant Deputy Director Bush, who, in turn, supervises the WHV Warden.

### 3)   *Jackson Region Assistant Deputy Director Bush*

182.   Jackson Region Deputy Director Bush oversees the MDOC facilities in the Jackson, Michigan region, including WHV.

183.   As Jackson Region Deputy Director, Defendant Bush is aware of the state and conditions of a Jackson-area facility like WHV and is responsible for ensuring the maintenance and improvement of critical infrastructure.

184.   The Warden of WHV reports to Defendant Bush.

185.   Defendant Bush reports directly to Defendant McKee.

### 4)   *Deputy Director Gulick*

186.   The BOA at MDOC provides oversight of staff support functions and oversees the MDOC's budget.

187.   As Deputy Director for the BOA at MDOC, Defendant Gulick is a principal decisionmaker in determining the MDOC's budget and the allocation of funds as to prisoner healthcare and facility improvements among other matters.

188.   As the MDOC's principal administrator of the Department's budget and allocation of funds, Defendant Gulick exercises significant control over facility maintenance and improvements at MDOC facilities, including WHV.

189.   Defendant Gulick reports directly to Defendant Washington.

190.   Defendant Gulick supervises many MDOC employees, including the Physical Plant Division Administrator, Defendant Vallad.

### 5)   *Physical Plant Division Administrator Vallad*

191.   Upon information and belief, the Physical Plant Division is responsible for administering the MDOC's facilities' physical maintenance and repairs, promulgating policies and practices related to physical maintenance and repairs of MDOC facilities, training maintenance and repair employees, and contracting with maintenance and repair subcontractors.

192.   As Physical Plant Division Administrator, Vallad is aware of the state and conditions of the MDOC's facilities, including WHV, and would be responsible for ensuring the maintenance and improvement of critical infrastructure.

193.   Administrator Vallad is a principal decisionmaker as to the physical maintenance and improvement of MDOC facilities, including WHV.

194.   Defendant Vallad reports directly to Defendant Gulick.

195.   Defendant Vallad supervises many MDOC employees, including, upon information and belief, Physical Plant Superintendent Bullard.

36

### 6)    *State Administrative Manager Moore*

196.   As State Administrative Manager, Defendant Moore oversees the administration of Michigan's correctional system, including WHV, and serves as Bullard's supervisor.

197.   Defendant Moore signs off on order requests submitted by the Physical Plant Supervisors at WHV for maintenance materials and supplies, thereby controlling the flow of necessary repairs at WHV. Upon information and belief, Defendant Moore is also responsible for managing relationships with vendors that supply cleaning supplies, for example.

## IV.    DELIBERATE INDIFFERENCE

198.   Defendants failed to test the mold present at WHV, despite actual knowledge of its existence, women's health complaints, and actual knowledge of the causal link between the two.

199.   For example, Warden's Forum Committee notes from January 2016 indicate that the inmates' complaints of mold were "unfounded," yet the mold continues to proliferate to this day.

200.   Defendants have failed—for more than twenty years—to replace the inadequate and failing HVAC system; instead allowing vents to fill up with mold and electing to use floor fans causing the mold to circulate in the air, further sickening inmates and staff.

201.   Defendants have failed to replace the inadequate and failing air handlers, directly contributing to poor ventilation and condensation levels that encourage mold growth.

202.   On or about September 2018, a member of the Warden's Forum Committee wrote a letter to Defendant Washington, RUM Lopez, Deputy Johnson, and Deputy Halliwell regarding the failure of the ventilation system.

203.   In many cases, Defendants have failed to properly repair roof leaks and grading issues throughout WHV, choosing instead to cover up ceiling and carpet damage caused by regular water infiltration into the units.

204.   At one point in time, the law library had approximately 20 buckets catching water from a leak in the roof. The water soaked the carpet below, and inmates used shower curtains to protect the books. When inspections occurred, Defendant Osterhout told the inmates to remove the buckets and curtains in the law library so that the inspectors would not examine the problem more closely.

205.   Similarly, on or about September 2018, Defendant Brewer was informed of the leaking ceilings in Lenawee. Upon information and belief, the leak was not repaired until late 2019. In Filmore-B, Defendants instructed guards to wear masks and/or gloves to help minimize the impact of mold exposure on those employees.

206.   Rather than abate the mold, MDOC personnel, at the direction of Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Bullard, Vallad, and Moore, have elected instead to conceal it.

207.   Defendants have painted over the mold, including directly painting ventilation screens in order to conceal its existence from the inmates, increasing the likelihood that the inmates would be unknowingly exposed to it.

208.   Upon information and belief, the Warden and Deputy Wardens, including Defendants Brewer, Johnson, and Osterhout, complete regular building inspection walkthroughs. During these walkthroughs, they state that the mold is not harmful and instruct maintenance crews, including Defendants Treppa, Carter, and Bullard, to paint over it.

209.   For example, Defendant Brewer walked through Filmore-B on or about December 2019, noting areas of the facility that had the most noticeable signs of mold. The next day, a painting crew of inmates painted over the areas identified by Defendant Brewer.

210.   Inmates have even been awoken in the middle of the night by MDOC personnel painting over mold before a morning inspection in an effort to conceal the problem.

211.   Maintenance workers under the supervision of Defendants Treppa and Carter have covered mold in the showers with grout to conceal the problem.

212.   Notwithstanding, the mold, particularly in the shower units, has penetrated through. The mold bubbled and burst through the paint. It continues to spread and be visible in the units.

213.   As the mold problem continued to spread, worsen, and proliferate throughout the units, Defendants exacerbated the problem further by prohibiting shower porters from using bleach and other stringent cleaners when cleaning the showers. At one Warden's Forum Committee meeting, inmates alerted the Warden that mold was growing in the unit as a direct result of WHV's decision to remove fungicide and bleach. When inmates requested another fungus remover called Wexide to combat the problem, Defendant Brewer denied the request. Defendant Brewer told the inmates that if they scrubbed harder, the mold would be gone. At other times, Defendant Brewer has denied the mold's existence.

214.   On one occasion, a guard instructed inmates to instead scratch the mold off the shower tiles and wall with their fingernails.

215.   In December 2014, the Warden's Forum Committee requested stronger, undiluted disinfectant and cleaning supplies to help ameliorate health issues related to wet cells.  Administration responded that there was "absolutely no need to replace the current cleaning supplies with stronger products."

216.   Defendants have required on occasions inmates to clean showers from 11:00 pm until 5:00 am straight "or else."  Of course, without changes to building

ventilation and without the appropriate cleaning supplies, the mold will never truly be eradicated and continues to spread in the bathrooms, showers, and cells.

217.   Defendants' failures and inactions amount to deliberate indifference towards Plaintiffs' Constitutional rights as well as deliberate indifference to the human feelings and physical safety of Plaintiffs and the proposed Classes they seek to represent.

218.   Defendants have intentionally ignored complaints made by Plaintiffs and the putative Class regarding the presence of mold and symptoms caused by mold exposure and in some instances intentionally sought to cover up or conceal the problem.

219.   As early as 2009, Warden's Forum Committee members began voicing concerns regarding a "vent cleaning" project which had been put on hold.   The Committee voiced the concerns again in 2013 while the project remained on hold, specifically indicating concern for the health effects related to lack of vent maintenance. WHV responded by requiring inmates to clean the vents themselves and paint over the moldy vents prior to inspections.

220.   In fact, in December 2019, Defendant Brewer told inmates that they needed to stand on chairs and clean the vents.

221.   Defendants have gone as far as to proactively prohibit inmates from talking about the mold problem, indicating that such discussions could cause a riot.

In fact, Defendant Brewer told inmates/detainees during the Warden's Forum Committee that they could not refer to the "mold problem" and instead had to discuss "mildew."

222.   MDOC personnel and contractors are actively prohibited by Defendants from talking about the mold problem.

223.   Upon information and belief, Defendants would not allow medical staff to conduct allergy tests to identify mold allergies for inmates who requested the tests.

224.   Despite continuous complaints—including many kites and many filed grievances—over the past several years, Defendants maintained a policy, custom, pattern, and practice of utterly failing to remedy their gross failures and ignoring, denying, and then deflecting responsibility onto the inmates for the conditions at WHV causing deprivation of Plaintiffs' constitutional rights.

225.   For example, when inmates complain about the conditions at WHV, including mold and inadequate ventilation, Defendant Brewer tells inmates he is "waiting on the call from Heidi," indicating that Defendant Washington is responsible for fixing such problems.

226.   Mold remains a continuing condition and threat to the health of women incarcerated at WHV thereby necessitating this Court's intervention to enjoin Defendants from continuing to violate Plaintiffs' and the Class Member's constitutional rights and to hold Defendants accountable to current, former, and

future incarcerated women who were forced or who will be forced to suffer unbearable pain and horrendous, inhumane, and deplorable conditions within the walls of WHV.

### A)   **The Decisionmakers at WHV**

#### 1)   *Deputy Warden Johnson*

227.   As Deputy Warden of WHV, Johnson was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including dangerous forms of mold.

228.   As Deputy Warden of WHV, Johnson was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

229.   Upon information and belief, Deputy Warden Johnson read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

230.   As Deputy Warden of WHV, Johnson was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

231.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Warden Johnson failed to advocate for

necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

232.   As Deputy Warden of WHV, Johnson was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

233.   Upon information and belief, Deputy Warden Johnson was aware of the presence of mold at WHV at all relevant times.

234.   Upon information and belief, Deputy Warden Johnson was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

235.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Deputy Warden Johnson was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

236.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Deputy Warden Johnson was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

a.   Failing to coordinate and administer effective testing of the mold present at the facility;

b.   Failing to coordinate and administer effective methods to eradicate the mold at the facility;

c.   Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of mold in the facility;

d.   Attempting to cover up the presence of mold at the facility;

e.   Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster a breeding ground for dangerous species of mold;

f.   Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

g.   Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

## 2)   *Deputy Warden Osterhout*

237.   As Deputy Warden of WHV, Osterhout was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other

things, preventable environmental health hazards, including dangerous forms of mold.

238.  As Deputy Warden of WHV, Osterhout was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

239.  Upon information and belief, Deputy Warden Osterhout read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

240.  As Deputy Warden of WHV, Osterhout was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

241.  With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Warden Osterhout failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

242.  As Deputy Warden of WHV, Osterhout was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

243.   Upon information and belief, Deputy Warden Osterhout was aware of the presence of mold at WHV at all relevant times.

244.   Upon information and belief, Deputy Warden Osterhout was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

245.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Deputy Warden Osterhout was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

246.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Deputy Warden Osterhout was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

      a. Failing to coordinate and administer effective testing of the mold present at the facility;

      b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;

47

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of mold in the facility;

d. Attempting to cover up the presence of mold at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster a breeding ground for dangerous species of mold;

f. Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 3)   Warden Brewer

247.   As Warden of WHV, Brewer was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including dangerous forms of mold.

248.   As Warden of WHV, Brewer was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

249.   As Warden of WHV, Brewer was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

250.   Upon information and belief, Warden Brewer read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

251.   The grievances women filed, complaining of mold in the facility, brought the infestation directly to the attention of Defendant Brewer during Step Two of the inmates' grievance process.

252.   Warden Brewer has also presided over Warden's Forum Committee Meetings, during which, on several occasions, inmates have voiced complaints about the presence of mold in the facility and of medical symptoms related to mold, and requests for cleaning agents to eradicate the mold.

253.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Warden Brewer failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

254.   As Warden of WHV, Brewer was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

255.   Upon information and belief, Warden Brewer was aware of the presence of mold at WHV at all relevant times.

256.   Upon information and belief, Warden Brewer was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

257.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Warden Brewer was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors

258.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Warden Brewer was deliberately indifferent to the health and safety of the WHV inmates and worked to instead cover up the existence of mold at the facility by directing employees to paint over the visible mold in the facility's bathroom and directing inmates, during at least one Warden's Forum Committee Meeting, to refrain referring to a "mold problem" and instead to refer to the visible mold as mildew.

259.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Warden Brewer was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

    a.  Failing to coordinate and administer effective testing of the mold present at the facility;

    b.  Failing to coordinate and administer effective methods to eradicate the mold at the facility;

    c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of mold in the facility;

    d.  Attempting to cover up the presence of mold at the facility;

    e.  Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster a breeding ground for dangerous species of mold;

    f.  Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

    g.  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 4)   *Warden Howard*

260.   As Warden of WHV, Howard was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including dangerous forms of mold.

261.   As Warden of WHV, Howard was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

262.   As Warden of WHV, Howard was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

263.   Upon information and belief, Warden Howard read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

264.   The grievances women filed, complaining of mold in the facility, brought the infestation directly to the attention of Defendant Howard during Step Two of the inmates' grievance process, as early as January of 2020.

265.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Warden Howard failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

266.   As Warden of WHV, Howard was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

267.   Upon information and belief, Warden Howard was aware of the presence of mold at WHV as early as January of 2020.

268. Upon information and belief, Warden Howard was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

269. Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Warden Howard was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

270. Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Warden Howard was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

       a. Failing to coordinate and administer effective testing of the mold present at the facility;

       b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;

       c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility; and

       d. Attempting to cover up the presence of mold at the facility;

e.  Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

f.  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 5)  *Physical Plant Supervisor Treppa*

271.  As Physical Plant Supervisor of WHV, Treppa was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

272.  In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Treppa was responsible for ensuring that a preventable health hazard, such as mold, was identified, reported to his superiors, and eradicated from the facility.

273.  As Physical Plant Supervisor of WHV, Treppa was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

274.  Upon information and belief, Defendant Treppa read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

275.  With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Supervisor of WHV Treppa failed to advocate for necessary budgetary expenditures to improve the facility and eliminate

the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

276.   As Physical Plant Supervisor of WHV, Treppa was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

277.   Upon information and belief, Physical Plant Supervisor of WHV Treppa was aware of the presence of mold at WHV at all relevant times.

278.   Upon information and belief, Physical Plant Supervisor of WHV Treppa was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

279.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Physical Plant Supervisor of WHV Treppa was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

280.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Physical Plant Supervisor of WHV Treppa was

deliberately indifferent to the health and safety of the WHV inmates and directed

maintenance employees to paint over visible mold present on the facility's bathroom

wall and to grout over visible mold in the facility's shower.

281.   Despite the duty owed to WHV inmates and knowledge of the mold and

related health risks at WHV, Physical Plant Supervisor of WHV Treppa was

deliberately indifferent to the health and safety of the WHV inmates and failed to

take effective action to test and eradicate the mold and prevent further growth and

spread of the mold by, among other things:

> a. Failing to coordinate and administer effective testing of the mold present at the facility;
>
> b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;
>
> c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of mold in the facility;
>
> d. Attempting to cover up the presence of mold at the facility;
>
> e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster a breeding ground for dangerous species of mold;
>
> f. Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 6) *Physical Plant Supervisor Carter*

282. As Physical Plant Supervisor of WHV, Carter was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

283. In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Carter was responsible for ensuring that a preventable health hazard, such as mold, was identified, reported to his superiors, and eradicated from the facility.

284. As Physical Plant Supervisor of WHV, Carter was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

285. Upon information and belief, Defendant Carter read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

286. With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Supervisor of WHV Carter failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated

and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

287.    As Physical Plant Supervisor of WHV, Carter was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

288.    Upon information and belief, Physical Plant Supervisor of WHV Carter was aware of the presence of mold at WHV at all relevant times.

289.    Upon information and belief, Physical Plant Supervisor of WHV Carter was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

290.    Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Physical Plant Supervisor of WHV Carter was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

291.    Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Physical Plant Supervisor of WHV Carter was deliberately indifferent to the health and safety of the WHV inmates and directed

maintenance employees to paint over visible mold present on the facility's bathroom wall and to grout over visible mold in the facility's shower.

292.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Physical Plant Supervisor of WHV Carter was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold, by, among other things:

      a.  Failing to coordinate and administer effective testing of the mold present at the facility;

      b.  Failing to coordinate and administer effective methods to eradicate the mold at the facility;

      c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of mold in the facility;

      d.  Attempting to cover up the presence of mold at the facility;

      e.  Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster a breeding ground for dangerous species of mold;

      f.  Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

      g.  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 7)   *Physical Plant Superintendent Bullard*

293.   As Physical Plant Superintendent of WHV, Bullard was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

294.   In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Bullard was responsible for ensuring that a preventable health hazard, such as mold, was identified, reported to his superiors, and eradicated from the facility.

295.   As Physical Plant Superintendent of WHV, Bullard was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

296.   Bullard's own Annual Physical Plant Report of WHV detail the significant infrastructural deficiencies at WHV.

297.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Superintendent of WHV Bullard failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

60

298.   As Physical Plant Superintendent of WHV, Bullard was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that mold was present in WHV.

299.   Upon information and belief, Physical Plant Superintendent of WHV Bullard was aware of the presence of mold at WHV at all relevant times.

300.   Upon information and belief, Physical Plant Superintendent of WHV Bullard was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

301.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Physical Plant Superintendent of WHV Bullard was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

302.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Physical Plant Superintendent of WHV Bullard was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

a. Failing to coordinate and administer effective testing of the mold present at the facility;

b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of mold in the facility;

d. Attempting to cover up the presence of mold at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster a breeding ground for dangerous species of mold;

f. Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

**B)** **The Decisionmakers at MDOC**

**1)** ***Director Washington***

303. As MDOC Director, Washington was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including dangerous forms of mold, and ensuring that the WHV facility was a well-maintained, healthy environment.

304. Washington knew that the MDOC had not utilized its budget to invest in infrastructural improvement and, consequently, that the conditions at the facility

were likely to, and did in fact, provide a breeding ground for mold, which could pose a serious health risk to WHV inmates.

305.   Upon information and belief, Defendant Washington read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

306.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Director Washington failed to administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

307.   As MDOC Director, Washington was in a position to learn via inmate grievances or from her subordinates that mold was visible and persistent at WHV as early as January of 2015

308.   The grievances women filed, complaining of mold and mold-related symptoms, brought the issue directly to the attention of Defendant Washington during Step Three of the inmates' grievance process, as early as January of 2015.

309.   As MDOC Director, Washington was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

310.  Upon information and belief, Director Washington was aware of the presence of mold at WHV as early as January of 2015.

311.  Upon information and belief, Director Washington was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

312.  Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Director Washington was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, and secure facility improvements so as to prevent further growth of mold in the facility.

313.  Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Director Washington was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

      a.  Failing to coordinate and administer effective testing of the mold present at the facility;

      b.  Failing to coordinate and administer effective methods to eradicate the mold at the facility;

    c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility;

    d.  Attempting to cover up the presence of mold at the facility;

    e.  Budgeting money in such a way that necessary structural and mechanical repairs went unfunded, resulting in damp conditions and an environment ripe for mold proliferation;

    f.  Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

    g.  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 2)   *Deputy Director McKee*

314.   As CFA Deputy Director, McKee was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including dangerous forms of mold, and ensuring that the WHV facility was a well-maintained, healthy environment.

315.   Upon information and belief, Defendant McKee read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

316.   McKee was in a position to know that the MDOC had not utilized its budget to invest in infrastructural improvement and, consequently, that the

conditions at the facility were likely to, and did in fact, provide a breeding ground for mold, which could pose a serious health risk to WHV inmates.

317.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Director McKee failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

318.   As Deputy Director, McKee was in a position to learn from his subordinates that mold was visible and persistent at WHV at all relevant times.

319.   As Deputy Director, McKee was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

320.   Upon information and belief, Deputy Director McKee was aware of the presence of mold at WHV at all relevant times.

321.   Upon information and belief, Deputy Director McKee was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

322.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Deputy Director McKee was

66

required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, and secure facility improvements so as to prevent further growth of mold in the facility.

323.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Deputy Director McKee was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

> a.  Failing to coordinate and administer effective testing of the mold present at the facility;
>
> b.  Failing to coordinate and administer effective methods to eradicate the mold at the facility;
>
> c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility;
>
> d.  Attempting to cover up the presence of mold at the facility;
>
> e.  Failing to promulgate and administer MDOC policies related to preventive and emergency maintenance;
>
> f.  Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 3) *Jackson Region Assistant Deputy Director Bush*

324.   As Jackson Region Assistant Deputy Director, Bush was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including dangerous forms of mold, and ensuring that the WHV facility was a well-maintained, healthy environment.

325.   Upon information and belief, Defendant Bush read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

326.   Bush was in a position to know that the MDOC had not utilized its budget to invest in infrastructural improvement and, consequently, that the conditions at the facility were likely to, and did in fact, provide a breeding ground for mold, which could pose a serious health risk to WHV inmates.

327.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Jackson Region Assistant Deputy Director Bush failed to advocate for or administer any budgetary expenditures to improve the facility and eliminate or lessen the risk of the growth and spread of a harmful species

of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

328.  As Jackson Region Assistant Deputy Director, Bush was in a position to learn from his subordinates that mold was visible and persistent at WHV at all relevant times.

329.  As Jackson Region Assistant Deputy Director, Bush was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

330.  Upon information and belief, Jackson Region Assistant Deputy Director Bush was aware of the presence of mold at WHV at all relevant times.

331.  Upon information and belief, Jackson Region Assistant Deputy Director Bush was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

332.  Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Jackson Region Assistant Deputy Director Bush was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, and secure facility improvements so as to prevent further growth of mold in the facility.

69

333.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Jackson Region Assistant Deputy Director Bush was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

> a. Failing to coordinate and administer effective testing of the mold present at the facility;
>
> b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;
>
> c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility;
>
> d. Attempting to cover up the presence of mold at the facility;
>
> e. Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and
>
> f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### 4)   *Deputy Director Gulick*

334.   As BOA Deputy Director, Gulick was the principal decisionmaker in determining the MDOC's budget and the allocation of funds as to prisoner healthcare and facility improvements, among other things.

335.   Upon information and belief, Defendant Gulick read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

336.   Gulick knew that the MDOC had not utilized its budget to invest in infrastructural improvement at WHV and, consequently, that the conditions at the facility were likely to, and did in fact, provide a breeding ground for mold, which could pose a serious health risk to WHV inmates.

337.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Director Gulick failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

338.   As Deputy Director, Gulick was in a position to learn from his subordinates that mold was visible and persistent at WHV at all relevant times.

339.   As Deputy Director, Gulick was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

340.   Upon information and belief, Deputy Director Gulick was aware of the presence of mold at WHV at all relevant times.

71

341.   Upon information and belief, Deputy Director Gulick was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

342.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Deputy Director Gulick was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, and secure facility improvements so as to prevent further growth of mold in the facility.

343.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Deputy Director Gulick was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

> a. Failing to coordinate and administer effective testing of the mold present at the facility;
>
> b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;
>
> c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility;
>
> d. Attempting to cover up the presence of mold at the facility;

72

e.  Budgeting money in such a way that necessary structural and mechanical repairs went unfunded, resulting in damp conditions and an environment ripe for mold proliferation;

f.  Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

g.  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### *5)   Physical Plant Division Administrator Vallad*

344.   As Physical Plant Division Administrator, Vallad was responsible for the overall physical condition of MDOC facilities, and overseeing the maintenance, repair, and improvement of the facilities, including WHV.

345.   In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Vallad was responsible for ensuring that a preventable health hazard, such as mold, was identified, reported to his superiors, and eradicated from the facility.

346.   Upon information and belief, Defendant Vallad read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

347.   As Physical Plant Division Administrator, Vallad was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

73

348.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Division Administrator Vallad failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

349.   As Physical Plant Division Administrator, Vallad was in a position to learn via observation of the facility, or from his subordinates, that mold was present in WHV.

350.   Upon information and belief, Physical Plant Division Administrator Vallad was aware of the presence of mold at WHV at all relevant times.

351.   Upon information and belief, Physical Plant Division Administrator Vallad was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

352.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, Physical Plant Division Administrator Vallad was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility

improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

353.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, Physical Plant Division Administrator Vallad was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

> a. Failing to coordinate and administer effective testing of the mold present at the facility;
>
> b. Failing to coordinate and administer effective methods to eradicate the mold at the facility;
>
> c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility;
>
> d. Attempting to cover up the presence of mold at the facility;
>
> e. Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and
>
> f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

### *6)   State Administrative Manager Moore*

354.   As State Administrative Manager, Moore was responsible for overseeing the administration of Michigan's correctional system, including WHV In overseeing the physical condition of WHV, as well its maintenance, repair, and

75

improvement, Defendant Moore was responsible for ensuring that a preventable health hazard, such as mold, was identified, reported to his superiors, and eradicated from the facility.

355.   Upon information and belief, Defendant Moore read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

356.   As State Administrative Manager, Moore was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, foster species of mold.

357.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, State Administrative Manager Moore failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate the risk of the growth and spread of a harmful species of mold, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards related to the mold.

358.   As State Administrative Manager, Moore was in a position to learn from his subordinates, that mold was present in WHV.

359.   Upon information and belief, State Administrative Manager Moore was aware of the presence of mold at WHV at all relevant times.

360.   Upon information and belief, State Administrative Manager Moore was, at all relevant times, aware that mold at WHV posed a potential significant health risk to WHV inmates.

361.   Upon learning of the presence of mold at WHV and further significant health risk posed to the WHV inmate population, State Administrative Manager Moore was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the mold, by, among other things, coordinating and effectuating a plan to test and eradicate the mold, secure facility improvements so as to prevent further growth of mold in the facility, and report the presence of mold to his superiors.

362.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, State Administrative Manager Moore was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to test and eradicate the mold and prevent further growth and spread of the mold by, among other things:

    a.  Failing to coordinate and administer effective testing of the mold present at the facility;

    b.  Failing to coordinate and administer effective methods to eradicate the mold at the facility;

    c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent further growth and spread of mold in the facility;

d. Attempting to cover up the presence of mold at the facility;

e. Knowing about the substantial risk of harm mold and other environmental conditions posed to Plaintiffs and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect to prevent and control mold.

## CLASS ACTION ALLEGATIONS

363. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure 23.

364. Plaintiffs assert their claims on behalf of the former inmate class defined as follows:

### Current and Former Inmate Class

All current and former detainees and inmates in WHV who, while incarcerated at WHV, experienced symptoms consistent with mold exposure since November 20, 2016.

365. Plaintiffs assert their claims on behalf of the injunctive relief class defined as follows:

### Injunctive Relief Class

All detainees and inmates of WHV who were incarcerated at WHV since November 20, 2016.

(collectively referred to as "the proposed Classes").

366. The proposed Classes exclude Defendants' officers, directors, and employees, as well as any judicial officer who presides over this action and members of the judicial officer's immediate family.

367. **Fed. R. Civ. P. 23(a)(1)—Numerosity / Impracticality of Joinder:** The proposed Classes are so numerous that joinder of all proposed Class Members is impracticable. On information and belief, there are hundreds of Class Members in the proposed Classes, all of whom are or were subject to the conditions set forth herein and therefore face a significant risk of serious illness and injury.

368. Class members are identifiable using records maintained in the ordinary course of business by WHV.

369. **Fed. R. Civ. P. 23(a)(2)—Commonality**: Common questions of law and fact exist as to all proposed Class Members. Among the common questions are, including but not limited to:

       a. Whether inmates have experienced chronic exposure to mold-covered showers, inadequate ventilation, and prolonged exposure to mold.

       b. Whether the unhygienic and dangerous conditions at WHV subject the proposed Classes to an ongoing, substantial, and imminent risk of physical and psychological harm, illness, and death;

       c. Whether the conditions at WHV violate the Eighth Amendment's prohibition of cruel and unusual punishment;

       d. Whether the unhygienic and dangerous conditions at WHV, and Defendants' refusal to effectively

    remedy the conditions, result in constitutionally cognizable harm or present a constitutionally excessive risk of harm;

e.  Whether Defendants knowingly instituted or condoned the dangerous and unhygienic conditions at WHV;

f.  Whether Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of proposed Classes;

g.  Whether Defendants maintain a policy, custom, and/or widespread practice of violating proposed Classes' constitutional rights through exposure to the dangerous conditions at WHV;

h.  The nature, scope, and operation of Defendants' practices, policies and customs as applied to prisoners incarcerated at WHV; and

i.  Whether Defendants failure to hire, train, and/or supervise competent WHV staff and agents resulted in violations of proposed Classes' constitutional rights.

370.  **Fed. R. Civ. P. 23(a)(3)—Typicality:** The claims of the Plaintiffs are typical of other members of the proposed Classes, as their claims from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

371.  Further, Defendants are expected to raise common defenses to these claims, so that final relief is appropriate for both Classes.

372.  **Fed. R. Civ. P. 23(a)(4)—Adequacy of Representation**: Plaintiffs will fairly and adequately represent the interests of the proposed Classes and will

serve diligently as class representatives. Their interests are aligned with those of the purported Classes and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

373.   This action is maintainable as a class action because Defendants have acted or refused to act on grounds that generally apply to the proposed Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the proposed Classes as a whole.

374.   **Fed. R. Civ. P. 23(b)**—The Current, Former, and Future Inmate Class should be certified under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The illegal conduct is standardized; the proposed Classes do not have an interest in individually controlling the prosecution of the case.

375.   Proceeding as a class action would permit the large number of injured parties to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and judicial resources. A class action is the only practical way to avoid the potentially inconsistent results that numerous individual trials are likely to generate. Numerous repetitive individual actions would also place an enormous burden on the courts, as

they would be forced to take duplicative evidence and repeatedly decide the same issues concerning Defendants' conduct.

376.   The proposed Classes should also be certified under Federal Rule of Civil Procedure 23(b)(1) and/or (b)(2) because:

> a.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or  varying  adjudication with respect to individual Class Members that would establish incompatible standards of conduct for Defendants;

> b.   The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

> c.   Defendant has acted or refused to act on grounds generally applicable to the proposed Classes, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

377.   Alternatively, this case can be maintained as a class action with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4).

## CAUSES OF ACTION

## COUNT I: VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
*(Against All Defendants)*

378.   Plaintiffs and the proposed Classes, by reference, incorporate the preceding paragraphs as though fully set forth herein.

379.   Defendants had actual knowledge through personal observation that there was a substantial risk of serious harm to the proposed Classes due to exposure to mold but failed to take reasonable measures to abate it.

380.   In addition to actual knowledge by personal observation, numerous complaints were filed by Plaintiffs and members of the proposed Classes and submitted to Defendants and other prison officials, all of which were inadequately addressed and many of which were intentionally ignored. Defendants knew there was a substantial risk of serious harm to the proposed Classes but failed to take reasonable measures to abate it and instead actively worked to conceal the problem.

381.   Despite actual knowledge of the presence of mold in the facility, Defendants did not take reasonable steps to eradicate or prevent mold growth to protect Plaintiffs or the proposed Classes from serious injury.

382.   Defendants had actual knowledge of the mold present at WHV. These individuals had actual knowledge of Plaintiffs' and proposed Classes' asserted serious needs but disregarded them by failing to take reasonable measures to abate them.

383.   Defendants created a policy or custom under which the unconstitutional practice of intentionally failing to take reasonable steps to abate the mold condition and intentionally attempting to conceal the mold problem with actual knowledge that

83

the inmates faced a substantial risk of serious harm as a result and/or Defendants allowed the continuance of such a policy or custom.

384.   The conduct of Defendants, as alleged in the preceding paragraphs, violates the rights guaranteed to Plaintiffs and the proposed Classes they represent under the Eighth Amendment to the United States Constitution and laws in violation of 42 U.S.C. §1983, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this Complaint.

385.   Such actions and decisions on the part of Defendants, individually, separately, and/or jointly, were done in a knowing, willful, or in a reckless manner and in bad faith.

386.   By virtue of the special relationship of the state-imposed custodial setting, Defendants were under an affirmative obligation to spend their resources to protect Plaintiffs and proposed Classes from harm.

387.   Defendants' policies, practices, and customs violate Plaintiffs' basic human rights and dignity, and their right to be free from unconstitutional unhygienic and dangerous conditions and cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

388.   These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law,

in their official and individual capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the proposed Classes.

389.   Defendants have been and are aware of the unconstitutional and dangerous conditions of the WHV and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the proposed Classes.

390.   Defendants have failed to prevent, caused, and continue to cause Plaintiffs and the proposed Classes tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the proposed Classes as set forth above.

391.   Defendants' failure and refusal to eliminate the mold present at WHV directly exposed Plaintiffs and the proposed Classes to an excessive risk of serious illness and injury caused by mold.

392.   As a result of the Defendants' actions and/or omissions, Plaintiffs and the proposed Classes were deprived of their fundamental rights guaranteed by the U.S. Constitution, when they were knowingly exposed to dangerous varieties of mold known to cause serious illness and injury while in the custody of the state.

393. As a result of Defendants' unlawful conduct, Plaintiffs and the proposed Classes are entitled to all damages and relief available at law and equity.

## COUNT II: GROSS NEGLIGENCE
### *(Against All Defendants)*

394. Plaintiffs and the Proposed Classes hereby incorporate by reference the preceding paragraphs as thought

395. As a result of Defendants' unlawful conduct, Plaintiffs and the proposed Classes are entitled to all damages and relief available at law and equity.

396. The acts and conduct of Defendants alleged in the above stated cause of action when considered under the laws of the State of Michigan, constitute gross negligence and the Defendants are not entitled to the immunity of MCL 600.1407(2) because they were grossly negligent.

397. The conduct of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether injury resulted and exhibited a deliberate indifference by intentional acts and/or omissions amounting to gross negligence.

398. Defendants not only breached their duty to Plaintiffs but also acted with gross negligence under the laws of the State of Michigan as to Plaintiffs' safety, protection and health by:

      a. Failing to provide prisoners with a functioning heating, ventilation and air conditioning (HVAC) system, functioning windows and functioning roofing for safety and health, in violation of MDOC's Humane Treatment and Living Conditions for Prisoners Policy Directive 03.03.130;

b.      Failing to ensure that a housekeeping plan is developed and maintained for all areas of their respective facilities that is consistent with requirements set forth in the Preventive and Emergency Maintenance for Correctional Facilities, in violation of MDOC Policy Directive 04.03.100, Policy Directive 04.03.102, and the MDOC Sanitation Manual;

c.      Failing to issue necessary cleaning materials and equipment to housing unit staff to be provided to offenders responsible for the cleanliness and orderliness of their individual living areas, including walls, floors, sinks, toilets, windows, beds, lockers, and property, in violation of MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100, Policy Directive 04.03.102, and the MDOC Sanitation Manual;

d.      Failing to immediately and effectively correct deficiencies that threaten the health or welfare of staff or offenders, in violation of MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100 and the MDOC Sanitation Manual;

e.      Failing to contact the Regional Environmental Sanitarian to determine appropriate temporary corrective measures to be implemented when deficiencies which threatened the health or welfare of staff or offenders could not be immediately and effectively corrected, in violation of MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100;

f.      Failing to implement procedures necessary to effectively enforce requirements set forth in MDOC Policy Directives 04.03.100, 04.03.102, and 03.03.130, as well as the MDOC's Sanitation Manual;

g.      Acting or failing to act in other ways to expose Plaintiffs to a known and extreme risk to their health and safety that may or will become known during discovery.

399.   It was foreseeable that Defendants actions and omissions, as set forth above, would result in injury to Plaintiffs. It was foreseeable that haphazard retrofitting, leaky roofs, inoperable windows, inadequate ventilation, and outdated

HVAC systems would contribute to an environment ripe for mold proliferation and that failure to properly clean or eradicate this proliferation would further exasperate the problem. It was similarly foreseeable that mold would result in dangerous conditions for the incarcerated women at WHV.

400. Defendants were the factual cause of Plaintiffs' injuries.

401. Defendants' actions were the ones most immediate, efficient, and direct cause of Plaintiffs' injuries.

402. As the direct and proximate result of Defendants' gross negligence, Plaintiffs and the proposed Class are entitled to all damages and relief available at law and equity.

## **RELIEF REQUESTED**

403. WHEREFORE, Plaintiffs pray on behalf of themselves and the members of the proposed Classes for entry of judgment finding and awarding as follows:

   a) Certifying the proposed Classes under Rule 23;

   b) For an Order adjudging the practices and conduct of Defendants complained of herein to be in violation of the rights guaranteed to Plaintiffs under the U.S. Constitution and Federal law;

c)      For an Order adjudging that Defendants were deliberately indifferent to the serious medical risk to the Plaintiffs and proposed Classes;

d)      For an Order adjudging that Defendants failed to protect Plaintiffs and the proposed Classes from a state-created danger;

e)      For an award to Plaintiffs against Defendants, jointly and severally, all relief available under 42 U.S.C. § 1983, to be determined at trial, with interest on such amounts;

f)      For an award to the proposed Classes against Defendants, jointly and severally, all relief available under 42 U.S.C. § 1983, to be determined at trial, with interest on such amounts;

g)      For an award of injunctive relief to the proposed Classes against Defendants;

h)      For an award to Plaintiffs and the proposed Classes of actual damages, including those arising from loss of past and future income and benefits, humiliation, mental anguish, loss of reputation, emotional distress and other harm, in an amount in excess of $75,000 against Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Bullard, Vallad, and Moore in their individual capacity;

i)      For an award of punitive damages in an amount to be determined at trial;

j)      For an award to Plaintiffs of their attorneys' fees, disbursements, and costs in this action, pursuant to 42 U.S.C. § 1988, and as otherwise available at law or in equity;

k)      For an award of prejudgment interest;

l)      For such other and further relief as the Court deems just and equitable.


Dated: September 25, 2020                  Respectfully submitted,

                                           /s/Channing Robinson-Holmes
                                           **PITT   MCGEHEE   PALMER   &
                                           RIVERS PC**
                                           Cary S. McGehee (P42318)
                                           Beth M. Rivers (P33614)
                                           Channing Robinson-Holmes (P81698)
                                           117 W. 4th Street, Suite 200
                                           Royal Oak, MI  48067
                                           P: (248) 398-9800
                                           cmcgehee@pittlawpc.com

                                           **NICHOLS KASTER, PLLP**
                                           Matthew H. Morgan (MN 304657)
                                           Rebekah L. Bailey (MN 0389599)
                                           Nicole J. Schladt (MN0400234)
                                           80 South Eighth Street, Ste. 4600
                                           Minneapolis, MN 55402
                                           P: (612) 256-3200
                                           F: (612) 338-4878
                                           morgan@nka.com

bailey@nka.com
nschladt@nka.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48326
P: (313) 777-7LAW
jon@jmarkolaw.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

**ON BEHALF OF THE PLAINTIFFS
AND THE PUTATIVE CLASSES**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2020 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Scott A. Mertens at: mertensS@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Neil Giovanatti at: GiovanattiN@michigan.gov, MarshM3@michigan.gov, parrishs@michigan.gov, ToddW1@michigan.gov

Tracey Van den Bergh at: Vandenberght@michigan.gov, lindemanj2@michigan.gov, toddw1@michigan.gov

Kristie A. Sparks at: sparksdiakowk@michigan.gov, MarshM3@michigan.gov, quintona1@michigan.gov, toddw1@michigan.gov

John L. Thurber at: thurberj@michigan.gov, parrishs@michigan.gov, schuellerT@michigan.gov

Ronald W. Chapman, Sr. at: rchapman@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Wedad Ibrahim at: wibrahim@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Cullen B. McKinney at: Elaine.Moore@tnmglaw.com, Renee.Elwell@tnmglaw.com

Trevor J. Zamborsky at: Trevor.Zamborsky@tnmglaw.com

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil

Procedure and an Affidavit of Service will be filed with the Court upon completion

of service.

Dated: September 25, 2020            /s/Channing Robinson-Holmes
                                     **PITT    MCGEHEE    PALMER    &
                                     RIVERS PC**
                                     Cary S. McGehee (P42318)
                                     Beth M. Rivers (P33614)
                                     Channing Robinson-Holmes (P81698)
                                     117 W. 4th Street, Suite 200
                                     Royal Oak, MI  48067
                                     P: (248) 398-9800
                                     cmcgehee@pittlawpc.com

2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| PAULA BAILEY, KRYSTAL CLARK, and HOPE ZENTZ, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> HEIDI WASHINGTON, in her official and individual capacity, JEREMY HOWARD, in his individual and official capacity, SHAWN BREWER, in his official and individual capacity, KENNETH MCKEE, in his individual and official capacity, JEREMY BUSH, in his individual and official capacity, LIA GULICK, in her individual and official capacity, ED VALLAD, in his individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OSTERHOUT, in her individual and official capacity, JOSEPH TREPPA, in his official and individual capacity, DAN CARTER, in his official and individual capacity, RICHARD BULLARD, in his official and individual capacity, and TONI MOORE, in her official and individual capacity, <br><br> Defendants. | Case No. 2:19-cv-13442 VAR-EAS <br><br> District Judge Victoria A. Roberts <br> Mag. Judge Elizabeth A. Stafford |

| | |
|---|---|
| **MARKO LAW, PLLC** | **MI DEP'T OF ATTORNEY GEN.** |
| Jonathan R. Marko (P72450) | Scott A. Mertens (P60069) |
| 1300 Broadway Street, Suite 500 | Kristen M. Heyse (P64353) |
| Detroit, MI 48326 | Michael Dean (P71333) |

P: (313) 777-7LAW
jon@jmarkolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0387013)
Nicole J. Schladt (MN0400234)
80 South Eight Street, Suite 4600
Minneapolis, MN  55402
P: (612) 256-3200
morgan@nka.com
bailey@nka.com
nschladt@nka.com

**PITT  MCGEHEE  PALMER  &
RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes
(P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656

Kristie A. Sparks (P79177)
John L. Thurber (P44989)
Zachary A. Zurek (P80116)
MDOC Division
P.O. Box 30217
Lansing, MI  48909
P: (517) 335-3055
mertensS@michigan.gov

*Attorneys for Defendants*

sradner@excololaw.com

***Attorneys for Plaintiffs and the
Putative Classes***

## JURY DEMAND

Plaintiffs and the proposed Classes they represent hereby demand a trial by

jury in the above-captioned matter.

Dated: September 25, 2020        Respectfully submitted,

/s/Channing Robinson-Holmes
**PITT MCGEHEE PALMER &
RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Nicole J. Schladt (MN0400234)
80 South Eighth Street, Ste. 4600
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
nschladt@nka.com

3

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
1300 Broadway Street, Suite 500
Detroit, MI 48326
P: (313) 777-7LAW
jon@jmarkolaw.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

**ON BEHALF OF THE PLAINTIFFS
AND THE PUTATIVE CLASSES**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2020 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Scott A. Mertens at: mertensS@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Neil Giovanatti at: GiovanattiN@michigan.gov, MarshM3@michigan.gov, parrishs@michigan.gov, ToddW1@michigan.gov

Tracey Van den Bergh at: Vandenberght@michigan.gov, lindemanj2@michigan.gov, toddw1@michigan.gov

Kristie A. Sparks at: sparksdiakowk@michigan.gov, MarshM3@michigan.gov, quintona1@michigan.gov, toddw1@michigan.gov

John L. Thurber at: thurberj@michigan.gov, parrishs@michigan.gov, schuellerT@michigan.gov

Ronald W. Chapman, Sr. at: rchapman@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Wedad Ibrahim at: wibrahim@chapmanlawgroup.com, esmith@chapmanlawgroup.com, mkairis@chapmanlawgroup.com

Cullen B. McKinney at: Elaine.Moore@tnmglaw.com, Renee.Elwell@tnmglaw.com

Trevor J. Zamborsky at: Trevor.Zamborsky@tnmglaw.com

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants

listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil Procedure and an Affidavit of Service will be filed with the Court upon completion of service.

Dated: September 25, 2020

/s/Channing Robinson-Holmes
**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI 48067
P: (248) 398-9800
cmcgehee@pittlawpc.com