# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| PAULA BAILEY, individually, and KRYSTAL CLARK, and HOPE ZENTZ, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HEIDI WASHINGTON, in her official and individual capacity, JEREMY HOWARD, in his individual and official capacity, SHAWN BREWER, in his official and individual capacity, KENNETH MCKEE, in his individual and official capacity, JEREMY BUSH, in his individual and official capacity, LIA GULICK, in her individual and official capacity, ED VALLAD, in his individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OSTERHOUT, in her individual and official capacity, JOSEPH TREPPA, in his official and individual capacity, DAN CARTER, in his official and individual capacity, JOEL DREFFS, in his official and individual capacity, RICHARD BULLARD, in his official and individual capacity, and TONI MOORE, in her official and individual capacity,<br><br>Defendants. | Case No. 2:19-cv-13442 VAR-EAS<br><br>District Judge Victoria A. Roberts<br>Mag. Judge Elizabeth A. Stafford |

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
220 W. Congress, Fourth Floor
Detroit, MI 48226
P: (313) 777-7LAW
jon@jmarkolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0389599)
Melanie A. Johnson (MN0400814)
80 South Eight Street, Suite 4700
Minneapolis, MN  55402
P: (612) 256-3200
morgan@nka.com
bailey@nka.com
mjohnson@nka.com

**PITT  MCGEHEE  PALMER  &
RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes
(P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**MI DEP'T OF ATTORNEY
GEN.**
Joshua S. Smith (P63349)
Kristen M. Heyse (P64353)
Michael R. Dean (P71333)
Jennifer A. Foster (P75947)
Sara E. Trudgeon (P82155)
John L. Thurber (P44989)
Keith G. Clark (P56050)
MDOC Division
P.O. Box 30217
Lansing, MI  48909
P: (517) 335-3055
smithj191@michigan.gov

*Attorneys for Defendants*

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

***Attorneys for Plaintiffs and the
Putative Class***

## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Paula Bailey, Krystal Clark, and Hope Zentz ("Plaintiffs"), on behalf of themselves and Krystal Clark and Hope Zentz ("Class Representatives") on behalf of the proposed Class below, and by and through counsel Marko Law, PLLC, Nichols Kaster, PLLP, Pitt McGehee Palmer & Rivers, P.C., Law Offices of David S. Steingold, PLLC, and Excolo Law, PLLC, state as follows for their Second Amended Complaint against the above-named Defendants:

### INTRODUCTION

1. Huron Valley Correctional Facility for Women ("WHV") is operating under a state of degradation, filth, and inhumanity, endangering the health and safety of incarcerated women and staff alike daily.

2. WHV is underfunded, understaffed, poorly administered, poorly managed and maintained, and intentionally overcrowded, giving rise to a chaotic and perilous environment inside the prison walls.

3

3.     Incarcerated women are regularly denied hygienic conditions and movement at WHV, in part because the facilities have been allowed to deteriorate beyond their useful lives, and because WHV's facilities were not originally designed to house the number of incarcerated women they currently house. In some cases, WHV's facilities were not originally designed to house incarcerated women at all. Haphazard retrofitting through the years has placed enormous strain on WHV's aging units and has resulted in dangerous living conditions for the incarcerated women.

4.     Many of the facilities at WHV suffer from roof leaks and other forms of water penetration, leading to damp and damaged carpets and ceilings, as well as a generally humid environment.

5.     Failing exhaust and HVAC systems further compound the problem. In 2018, WHV's Annual Physical Plant Report recommended replacing the HVAC system in Housing Units 1, 2, 3, 4, and 5, noting, "The typical life expectancy of an industrial/commercial HVAC system is 20-25 years with proper maintenance. This system is 43 years old. Essentially, the entire HVAC system needs to be replaced." The report also referenced aging HVAC in the Emmett, Filmore, Gladwin, and Lenawee Units. For these four units, the report suggested that "[r]estroom and shower exhaust systems need to be upgraded to accommodate their use." In 2018, air handlers needed to be replaced in 15 different buildings at WHV. By 2022, the

number of buildings requiring urgent air handler replacement had not changed from 15.

6.     These structural infirmities and inadequate maintenance and repairs have led to dangerous breathing conditions, exasperating and making unavoidable exposure to allergens, mold, and chemical fumes within the housing units, as well as other units frequented by inmates.

7.     Defendants could have largely eradicated the cascading harms caused by long-term and unrelenting exposure to allergens, mold, and toxins in the housing units—or at least minimized mold in continuously damp spaces thereby preventing the need for persistent use of toxic cleaning chemicals in unventilated spaces—by, for example, updating the WHV's ventilation system at appropriate times, providing routine and appropriate maintenance, following Defendants' own housekeeping protocols, and making desperately needed repairs.

8.     But, because of Defendants' lack of action to address WHV's unclean, dilapidated conditions and lack of ventilation, the women incarcerated 24/7 within WHV suffered and continue to suffer ongoing exposure to excessive allergens, harsh cleaning chemicals, and harmful varieties of mold, including but not limited to Ochroconis, Cladosporium, Chaetomium, and Stachybotrys ("mold").   These persistent and long-term exposures left unchecked lead to further and serious and long-lasting medical complications.

9.     By way of example, the mold has taken a significant toll on the women incarcerated in WHV, both physically and mentally. The mold has caused respiratory infections, coughing, wheezing, rashes, dizziness, and fatigue—all symptoms which, in turn, impact the inflicted's mental health and which may lead to serious, long-lasting physical effects, such as asthma, life-threatening secondary infections, insomnia, memory loss, trouble concentrating and confusion.

10.     The women have complained about the presence of mold in the facility for years, and continue to do so, but their pleas have been ignored. Defendants have failed to remove the mold, remedy the conditions causing the mold, and otherwise protect Plaintiffs and the proposed Class from exposure to mold and from suffering symptoms and health conditions caused by mold exposure.

11.     As discussed below, conditions at WHV have deteriorated to such a degree as to expose Plaintiffs and the proposed Class to an excessive risk of serious harm to their health and safety, in violation of the rights guaranteed to them under the United States Constitution.

12.     The constitutional violations complained of herein are not isolated incidents impacting a few inmates and caused by a few correctional personnel. Rather, the structural building problems relating to ventilation, its effects, such as the mold infestation, and related lack of medical care has persisted for more than six years and impacted prisoners housed in numerous units.

6

13.     Defendants have long been on notice of the horrific conditions and constitutional deprivations occurring daily at WHV yet have failed to remedy the deplorable state of affairs.

14.     This is a civil rights class action, brought under 42 U.S.C. § 1983, challenging the inhumane, dangerous, and unconstitutional conditions endured by the women locked inside WHV.

15.     Plaintiffs Paula Bailey, Krystal Clark, and Hope Zentz (collectively "Plaintiffs"), on behalf of themselves seek damages, and Krystal Clark and Hope Zentz ("Class Representatives") on behalf of the proposed Class, seek injunctive and declaratory relief.

## JURISDICTION AND VENUE

16.     Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, and jurisdiction is therefore proper pursuant to 28 U.S.C. §§ 1331 and 1343.

17.     Venue is proper in this District under 28 U.S.C. § 1391. The parties reside, or at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiffs' claims also occurred in this judicial district. Defendants are subject to this Court's personal jurisdiction.

## PARTIES

### I.    PLAINTIFFS

18.    Plaintiff Paula Bailey ("Bailey") is a woman formerly incarcerated in WHV. Ms. Bailey was incarcerated at WHV from 2009 to 2021. She was released on May 4, 2021. She brings this Complaint on behalf of herself as described herein.

19.    Plaintiff Krystal Clark ("Clark") is a woman currently incarcerated in WHV. She brings this Complaint on behalf of herself individually, and on behalf of herself and the proposed Class, as described herein.

20.    Plaintiff Hope Zentz ("Zentz") is a woman currently incarcerated in WHV. She brings this Complaint on behalf of herself individually, and on behalf of herself and the proposed Class, as described herein.

### II.    MDOC DEFENDANTS

21.    Defendant Heidi Washington ("Washington"), at all relevant times, was the Director of the Michigan Department of Corrections. As Director, Washington oversees Michigan's correctional system, including WHV. Washington is named as a Defendant in both her official and individual capacity.

22.    Defendant Kenneth McKee ("McKee"), at relevant times, has been the Deputy Director for Correctional Facilities Administration ("CFA") at MDOC. McKee is named as a Defendant in both his official and individual capacity.

23.     Defendant Jeremy Bush ("Bush"), at relevant times, has been the Assistant Deputy Director of the Jackson Region for CFA at MDOC. Bush is named as a Defendant in both his official and individual capacity.

24.     Defendant Lia Gulick ("Gulick"), at relevant times, has been the Acting Deputy Director for Budget and Operations Administration ("BOA"), or the Deputy Director of BOA, at MDOC. Gulick is named as a Defendant in both her official and individual capacity.

25.     Defendant Ed Vallad ("Vallad"), at relevant times, has been the Physical Plant Division Administrator at MDOC. Vallad is named as a Defendant in both his official and individual capacity.

26.     Defendant Toni Moore ("Moore"), at all relevant times, was the State Administrative Manager. Moore is named as a Defendant in both her official and individual capacity.

**III.   WHV DEFENDANTS**

27.     Defendant Jeremy Howard ("Howard"), at relevant times, has been the acting Warden of WHV. Howard is named as a Defendant in both his official and individual capacity.

28.     Defendant Shawn Brewer ("Brewer"), at relevant times, was the Warden of WHV. Brewer is named as a Defendant in both his official and individual capacity.

29.     Defendant David Johnson ("Johnson"), at relevant times, has been the Deputy Warden of WHV. Johnson is named as a Defendant in both his official and individual capacity.

30.     Defendant Karri Osterhout ("Osterhout"), at relevant times, has been the Deputy Warden of WHV. Osterhout is named as a Defendant in both her official and individual capacity.

31.     Defendant Joseph Treppa ("Treppa"), at all relevant times until on or about October of 2017, was a Physical Plant Supervisor. Treppa is named as a Defendant in both his official and individual capacity.

32.     Defendant Dan Carter ("Carter"), at relevant times, was a Physical Plant Supervisor. Carter is named as a Defendant in both his official and individual capacity.

33.     Defendant Joel Dreffs ("Dreffs") was, at relevant times, a Physical Plant Supervisor. Dreffs is named in both his official and individual capacity.

34.     Defendant Richard Bullard ("Bullard"), at all relevant times, was the Physical Plant Superintendent. Bullard is named as a Defendant in both his official and individual capacity.

## FACTUAL ALLEGATIONS

35.     Plaintiffs and the proposed Class by reference incorporate the preceding paragraphs as though fully set forth herein.

10

36.     Plaintiffs are current or former inmates of WHV, and the Class Representatives bring this action on behalf of similarly situated current and future inmates of WHV.

37.     WHV houses pretrial detainees as well as convicted women. The facility houses substantially more than 2,000 women at any given time.

38.     WHV is currently the only women's prison in the State of Michigan.

39.     At all material times, the actions and/or omissions alleged herein occurred under color of state law, and the individual employees of the Defendants were acting within the scope and course of their employment.

40.     At all material times, MDOC employed Defendants Washington, Brewer, Howard, McKee, Bush, Gulick, Vallad, Johnson, Osterhout, Treppa, Carter, Dreffs, Bullard, Vallad, and Moore (collectively "Defendants"), all of whom initiated and carried out the policies, practices, and customs of MDOC, and are also liable for their own actions and/or omissions.

41.     Defendants' policies, practices, customs, actions and/or omissions related to ventilation, maintenance, repairs, hygiene, and mold at WHV stand in stark contrast to their affirmative duty and obligation to quickly address issues inadequate ventilation, and the problems caused from it, in the facility.

42.   For example, Defendants have an affirmative duty and obligation to provide prisoners with "[l]ighting, ventilation, heating, and noise levels that are adequate for comfort."[1]

43.   Importantly, "[p]reventative and emergency maintenance shall be performed at all state-owned correctional facilities to ensure the proper functioning of all electrical, mechanical and plumbing equipment and systems as well as the facility's physical plant."[2] Defendants have an affirmative duty and obligation to provide for emergency maintenance programs that result in the "immediate restoration of equipment and facilities to such a condition that human life or structural soundness of equipment or facilities is not endangered."[3]

44.   Additionally, "[w]ardens shall ensure that a housekeeping plan is developed and maintained for all areas of their respective facilities."[4] In particular, "[n]ecessary cleaning materials and equipment shall be issued by housing unit staff" so that inmates may clean their individual living areas, including walls, floors, sinks, toilets, windows, beds, lockers, and property.[5]

---

[1] MDOC's Humane Treatment and Living Conditions for Prisoners Policy Directive 03.03.130.

[2] MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100.

[3] *Id.*

[4] MDOC's Sanitation and Housekeeping Standards Policy Directive 04.03.102.

[5] *Id.*

45.     "Deficiencies which may threaten the health or welfare of staff or offenders shall be corrected immediately whenever possible. If the deficiency cannot be immediately corrected, the Regional Environmental Sanitarian shall be contacted to determine appropriate temporary corrective measures to be implemented."[6]

46.     Despite Defendants' affirmative duties and obligations, the conditions at WHV continue to deteriorate without meaningful intervention, threatening the health and safety of all incarcerated women at the facility on a daily basis.

## I.     THE FACILITIES

### A)     Conditions at WHV

47.     As is, the prison and its bunkrooms lack proper ventilation, leading to a generally warm, moist environment. The building roofs, windows, and pipes leak, causing dampness in WHV's housing units.

48.     Air handling units were run well past their useful lives.  Air filters were rendered ineffective and blown through due to the fact that they were not changed regularly enough.

49.     At all material times the facility has been overcrowded, and the conditions at WHV have been filthy and dangerous, providing a breeding ground for biological contaminations, including microscopic fungi, spore-producing mold, mites, and other environmental irritants.

---

[6] *Id.*

50.    Collectively, the structure and management of WHV's facilities made inmates at WHV sick.

### 1)    Haphazard Retrofitting

51.    In the mid-2000's, the WHV facility began operating exclusively as an all-women's prison.  At various points in time before, it had operated as a mental institution, as well as a male and female prison.

52.    The facility's infrastructure is outdated and badly in need of repair. To combat over-crowding, the institution has undergone retrofitting that has further exacerbated issues with ventilation and mold throughout WHV facilities.

53.    For example, Defendants have converted many structures that were not designed for sleeping and bathroom facilities into housing units without repairing the roofs, adequately ventilating the spaces, or updating the HVAC systems.

54.    The gymnasium in the Jennings Building/School was converted into housing and renamed the Lenawee Temporary Housing Unit in 2015.

55.    At least four former TV rooms at WHV were converted into cell areas in 2015, as well as 44 former offices.[7] The prison also opened a building once used for storage and food services as a cell area in 2015.[8]

---

[7] Paul Egan, "State's female inmates crowded," *Livingston County Daily Press and Argus* (November 26, 2015).

[8] *Id.*

14

56.     Storage closets without windows or ventilation are now being used as group rooms. Without proper ventilation, these retrofitted facilities contribute to dangerously unhealthy living conditions, prevent moisture and volatile chemical cleaning compounds from dissipating, and foster an ideal breeding ground for mold and other environmental pollutants.

### 2)     Leaky Roofs

57.     Further contributing to the mold problem, many units have leaky roofs and/or widespread water damage from flooding.

58.     Water leaks through the roof of WHV units regularly. Defendant Bullard submitted Annual Physical Plant Reports to Defendant Moore from 2013 to 2018 that detailed extensive problems with leaking roofs and water damage to ceilings and carpets at WHV.

59.     Water-logged and stained ceiling tiles are visible in common spaces. Water damage was visible beneath window frames in 2021.

60.     According to plant reports, roofs needed replacement in the Lenawee units from 2013 through at least 2018.

61.     Roofs needed replacement in the Calhoun and Dickinson units from 2013 to 2022.

62.     The Kent Building's roof needed replacement from 2013 through 2017.

15

63.     The MSI Building's roof needed replacement from 2015 through at least 2018.

64.     According to plant reports, in 2021, WHV was aware that metal ceilings in Dickinson and Filmore were rusted or damaged and needed replacement "to cover up water damage;" and that acoustic ceiling systems in many buildings, including Housing Unit 5, needed replacement "to cover up water damage."

65.     The 2021 Physical Plant Report also warned that "Exterior concrete stairs [in Kent building] were spalling off and creating a dangerous situation" ("potentially life threatening") due to water damage.

66.     Leaks in at least the Lenawee unit have directly dampened occupied beds.

67.     Leaks have also occurred in at least Units 1, 2, 4, 5, 6, Harrison A and Dickinson B, the Field House, MSI Programs Building, and the Chow Hall.

68.     In July of 2020, a water-logged ceiling in Housing Unit 2B collapsed. Samples from the fallen ceiling tiles showed significant levels of Alternaria fungal contamination.

69.     In 2021, WHV's Physical Plant Report recommended replacing the steam to hot water convert system in Kent Hall because it was "Beyond useful life," broken or not functioning, "leaking," with "[m]ore than 50% of tubes [] plugged."

The Physical Plant Supervisor noted that having an old, defective steam-to-hot-water converter "impairs building operation."

70.     By 2022, WHV's Physical Plant Report stated that "facility wide," steam piping and condensate lines were "old[,] rusty and having more and more leaks."

71.     In 2022, WHV's Physical Plant Supervisor further reported that the motor control centers in every housing unit and other buildings "need to be replaced primarily due to obsolescence and damage due to excessive atmospheric moisture over the years due to past steam leaks and poor ventilation."

72.     Women have complained to Defendants, including specifically Defendant Brewer, that the leaks lead to mold growth on surfaces in the units.

73.     A former facility worker reported that "the roof leaks so badly it has shorted out the lights."[9] Others described the leaks by saying, "when it would rain, it looked like coffee coming out of the ceiling."[10]

74.     In 2019, one inmate reported using "10 to 20 buckets" to capture leaking water in one part of the prison alone.[11]

---

[9] Paul Egan, "Ex-officer says Michigan's only prison for women is crowded, dangerous," *Detroit Free Press* (July 25, 2019).
[10] *Id.*
[11] *Id.*

17

75.     This continued well into 2023, with an inmate observing that the Gladwin-B roof leaked every rainy day, so much that buckets had to be placed in the hallways and by the entrance to catch water. "Wet paint" signs were posted to signal roof leakage.

76.     In June of 2020, another inmate observed water leaking from a ceiling tile at the top of the stairs by the Gladwin-B showers, running down the stairs and onto the base level. Two sections of ceiling tiles fell, and water stains grew on the remaining ceiling tiles. Inmates had to mop and empty buckets throughout the night.

77.     This water damage has not been properly cleaned or remediated.  In fact, the 2016 flood in the fieldhouse was cleaned up by inmates without proper protective gear.

### 3)     *Inoperable Windows, Grading, and Gutters*

78.     Many housing units have needed window replacements since 2013, either because the windows do not open, limiting ventilation in the units, or because the windows allow water to come into the facility, increasing humidity, promoting a damp environment for mold to proliferate, promoting an unsanitary environment, and harming inmates' health.

79.     An industrial hygienist who inspected WHV in December of 2021 observed humidity control issues throughout all WHV buildings.

80.     According to Inside Air Quality (IAQ) guidelines, to maintain proper building sanitation and health of inhabitants, humidity levels should be maintained between 40% and 60% during the cooling season (approximately November to March), and 30% to 50% during the heating season (approximately April to October).

81.     The hygienist also observed temperature control issues in Unit 4, Gladwin, Dickinson, and other buildings.

82.     Windows needed replacement in Housing Units 1, 2, and 3 from 2016 through at least 2022.

83.     Windows needed replacement in Housing Units 4 and 5 from 2014 through at least 2022.

84.     Windows needed replacement in Kent and Dickinson buildings through at least 2021.

85.     Additionally, the lawn areas surrounding WHV units are improperly graded, causing drainage to flow toward the buildings and through cracks in the windows and other parts of the building. Drainage issues due to soil grading plagued the facility from 2013 through 2018. This has been a recurrent problem and directly contributes to the damp environment experienced by incarcerated women at WHV.

86.     In 2021, WHV's Annual Physical Plant Report recommended improving drainage to "prevent personal injury" and "[p]revent water from

infiltrating building exterior." The Report identified the water as a "hazard to inmates," and noted that, "Water sometimes has entered bldg. K."

87.    Further, gutter systems above the windows were "leading to more serious problems" by 2016 in the Dickinson, Emmett, Filmore, Gladwin, Harrison, and Lenawee units, as well as the Kent Building. Gutter systems were leading to "water damage" in those structures by 2017. Gutters needed replacement in most buildings throughout the facility from 2013 through at least 2021.

88.    In 2021, WHV's Physical Plant Report recommended replacing gutter systems in Dickinson, Emmett, Filmore, Gladwin, Harrison, Jennings/Lenawee, and Kent buildings, explaining: "Leading to More Serious Problems. To Cover up Water Damage." The Report also recommended replacing metal panels and flashing and resealing windows in many housing units "to cover up water damage."

### 4)    *Inadequate Ventilation*

89.    By approximately 2018, several housing units on the compound were experiencing a failure in the operation of ventilation and air conditioning units wherein the units were "not functioning properly or at all," according to Defendant Bullard's 2018 Annual Physical Plant Report.

90.    Air handlers, which are responsible for regulating and circulating air, have needed replacement in almost every housing unit since 2013, as well as the

20

Administration Building, Programs Building, Field House, Prisoner Services Building, and the Kent Building.

91.    During the December 2021 inspection of WHV, an industrial hygienist observed that air handling units in nearly every building had multiple problems, including filthy coils, damaged fiberglass insulation, debris, and corrosion.

92.    The hygienist observed that the air handling units did not seem well-maintained and that the filter media, used to remove contaminants from the air, should be changed 50% more frequently than MDOC permitted, given the large population and 24/7 nature of the facility. A maintenance worker informed the hygienist that they had suggested the proper timeline, but the recommendation was not adopted.

93.    Mold is a common problem for air handlers, as they frequently build up condensation that encourages growth of mold spores.

94.    Air handlers needed replacement in Housing Units 1, 2, 3, 4, and 5 from 2013 through at least 2022.

95.    Air handlers needed replacement in the Emmett, Filmore, Gladwin, Harrison, and Lenawee units, as well as the Kent Building, from 2014 through at least 2022.

96.    In 2018, the restroom and shower exhaust systems were deemed inadequate for the spaces they serviced in the Dickinson, Emmett, Filmore, Gladwin, Harrison, and Lenawee units.

97.    "In restrooms and shower rooms in eight [out of 14] residential units at Women's Huron Valley Correctional Facility, 'existing exhaust fans are beyond repair, resulting in limited to no ventilation,' [the Michigan Department of Technology, Management, and Budget] said in an unsigned memo received July 9 by the Building Committee of the State Administrative Board."[12]

98.    The shower unit in Gladwin-B has particularly poor ventilation, causing condensation to drip on the women's clothes while they shower.

99.    During his inspection of WHV in December of 2021, an industrial hygienist conducted smoke tests of bathroom and shower area exhaust fans. These smoke tests revealed the exhaust fans had little to no draw, meaning air was not taken out of the rooms by the fans.

100.   The same smoke test revealed poor-to-no draw on the return air grills in day rooms used by inmates.

101.   The poor ventilation further damaged motor controls and provided an environment conducive for mold to develop and grow throughout the facility.

---

[12] *Id.*

102.    Mold grows around a metal access panel inside the Dickinson-D ADA shower, which has no air vent. A small portable fan is supposed to keep the bathroom dry but officers frequently take it and use it in their offices.

103.    One inmate observed that the use of fans had little effect, and that it became so damp in the bathrooms that the toilet seats were wet.

104.    Inadequate ventilation also exacerbates the impact of the harsh cleaning chemicals used within WHV.

105.    The hygienist also observed visibly filthy return air vents during his inspection—and, in several buildings, he observed these return air vents were blocked, which effectively halts the entire ventilation system.

106.    Additionally, Defendants do not adequately clean this antiquated ventilation system further shortening its useful life and exasperating the conditions for inmates and detainees.

107.    WHV's Housekeeping Plan requires ventilation ducts be cleaned four times annually.  Yet, for example, Defendants failed to clean the ducts at all in the west side units for several years.

### 5)    Outdated HVAC Systems

108.    As acknowledged by Defendants Bullard and Brewer, the HVAC system needs to be replaced and is nearly 20 years past its peak life expectancy in most WHV buildings, including Housing Units 1, 2, 3, 4, and 5; the Emmett,

Filmore, Gladwin, Harrison, and Lenawee units; the Administration Building; the Programs Building & Unit 6; the Field House; the Prisoner Services Building; and the Kent Building.[13]

109.   Upon information and belief, the HVAC system in Housing Units 1, 2, 3, 4, and 5; the Administration Building; the Programs Building & Unit 6; the Field House; and the Prisoner Services Building reached its peak life expectancy at some point from approximately 1995 to 2000.

110.   In 2017, Defendant Bullard wrote in his Annual Physical Plant Report: "The typical life expectancy of an industrial/commercial HVAC system is 20-25 years with proper maintenance. This system is 42 years old. The entire HVAC system needs to be replaced." He repeated the same comment multiple times throughout the report for various buildings at WHV, including Housing Units 1, 2, 3, 4, and 5, as well as the Administration Building, Programs Building, and Field House.

111.   Defendant Bullard's Annual Physical Plant Report in 2018 contained the exact same statement for all of the same buildings (updating to note that the system was now *43* years old).

---

[13] Paul Egan, "State agency does about-face on why women's prison is getting $488,000 fix," *Detroit Free Press* (July 15, 2019).

112.   WHV's Annual Physical Plant Report in 2022, now drafted by WHV Physical Plant Supervisor-1 Joel Dreffs, contained the same statements for all the same buildings, but continued to refer to WHV's HVAC system as "43 years old." On information and belief, by 2022, the HVAC systems in these units were in fact forty-*seven* years old—nearly half a century.

113.   For the Emmett, Filmore, Gladwin, and Lenawee units in 2018, Defendant Bullard simply wrote, "The typical life expectancy of an industrial/commercial HVAC system is 20-25 years with proper maintenance." Upon information and belief, the HVAC systems for those buildings exceeded their life expectancy as well.

114.   For the Emmett, Filmore, Gladwin, Harrison, Lenawee, and Kent units in 2022, Physical Plant Supervisor Dreffs wrote, "Air handlers need to be replaced as well as hot and cold decks. The typical life expectancy of an industrial/commercial HVAC system is 20-25 years with proper maintenance." Upon information and belief, the HVAC systems for those buildings continue to exceed their life expectancy.

115.   Defendants were actually aware of the conditions and actually aware that a substantial risk of serious inmate harm would result from the conditions.

116.   Defendants disregarded that risk by failing to take reasonable measures to abate the problem.

**B)**     <u>Effects and Dangers of Poor Ventilation</u>

     ***1)***     ***Dangers of Biological Contaminants: Mold, Mites, and Other Allergens***

117.    Mold comprises a large group of microscopic fungi. Most types of mold produce spores that can be air-, water-, or insect-borne.

118.    Mold and mites thrives in humid, warm, and/or damp spaces that are poorly ventilated.

119.    "A reduction in high relative humidity levels to below 60% should reduce the abundance of allergic mites and fungi . . . in the air."[14] This is because "[t]he majority of fungi require relative humidifies in excess of 75% in order to grow," and high humidity "can have a significant impact on mite abundance." *Id*. at 356. On the other hand, "[i]ncreasing humidity to closer to 40% "should reduce the incidence of respiratory infections, the severity of allergic and asthmatic reactions, and indoor ozone levels." *Id*. at 358.

120.    The ideal temperature of mold growth is between 77 and 86-degrees Fahrenheit.

121.    As mold grows, spores can be released into the air where they become easy to inhale.

---

[14]Anthony V. Arundel et al., *Indirect Health Effects of Relative Humidity in Indoor Environments*, 65 Env. Health Perspectives 351, 358 (1986), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1474709/pdf/envhper00436-0331.pdf.

122.    Increased carbon dioxide in the air can suggest the presence of mold in a facility and indicates insufficient outdoor air is being introduced.

123.    Exposure to mold spores can cause symptoms such as skin rash and itching, respiratory infections, headaches, dizziness, nosebleeds, nasal stuffiness, throat irritation, coughing, watery eyes, or wheezing. Toxins in mold may also lead to muscle cramps, numbness in extremities, weight gain, light sensitivity, and hair loss. Some individuals develop serious infections in their lungs when they are exposed to mold, causing shortness of breath, chest tightness, and diseases like pneumonia or a pulmonary hemorrhage.

124.    Mold spores, when acting as an allergen, can also lead to asthma, or trigger allergies or asthma attacks in those who already suffer from these ailments. People with serious allergies or problems with asthma may have more severe reactions to mold exposure.

125.    Mold exposure may also lead to or contribute to insomnia, anxiety, depression, loss of appetite, confusion, and trouble concentrating.   Long-term exposure to mold toxins can affect the brain and lead to nervous-system challenges and cognitive and emotional impairments.

126.    Prolonged exposure to mold may exacerbate the severity of the reaction and result in perturbation of the immunological system.

127.   Mold-colonized environments often harbor bacteria and dust mites that release toxins and contribute to "toxic mold" and "sick building syndrome."

128.   Mold also emits volatile organic compounds that produce strong fumes directly into the air. When not properly ventilated, these fumes are linked to symptoms such as headaches, dizziness, fatigue, nasal irritation, and nausea.

129.   Assessments for mold exposure include environmental assessments for the presence of mold and allergy testing. Allergy testing can be accomplished through skin or blood tests. Some physicians recommend testing for mold-specific antibodies.

130.   Removing affected individuals from damp places where mold exists is a necessary part of preventing and treating mold exposure.

131.   The best practice in addressing mold growth is to remove the mold and work to prevent future growth. This includes controlling humidity levels with dehumidifiers and/or exhaust fans; ensuring air vents are in working order and unobstructed; controlling temperature fluctuations; ensuring proper air circulation; promptly fixing points of water intrusion and leaky roofs, windows, and pipes; thoroughly cleaning and drying after flooding or water damage; and ventilating shower, laundry, and cooking areas.

132.   Small amounts of mold can be removed with commercial mold removers or with water and bleach, ammonia, Borax, or hydrogen peroxide.  Large

amounts of mold, though, require specialized removal techniques and personal protective equipment.

133.   An industrial hygienist who inspected WHV in December of 2021 observed that even low levels of molds should raise alarm bells for prison leaders because the contamination indicated mold spores were either being deposited with dust and dirt from elsewhere in the facility, or were in the beginning stages of fungal growth (biological amplification).

134.   Defendants were actually aware of the physical dynamics of mold and its growth as set forth above, and the substantial risk of serious inmate harm that would result, including the physical symptoms set forth above.

### 2)   *Dangers of Improper Cleaning and Chemical Fumes*

135.   Poor ventilation and persistent leaks in a building created a breeding ground for mold growth and other environmental irritants.

136.   Lack of proper cleaning in an unventilated, wet space makes inmates sick.

137.   When WHV did allow use of harsher cleaners, such as chlorine-based chemicals—such as just before an inspection—it did not provide inmates with proper protective gear.

138.   Further, the lack of proper ventilation meant that, even in a temporarily clean environment, the WHV facilities continued to make inmates sick.

29

139.   Short-term effects of exposure to chlorine gas in poorly ventilated areas include build-up of fluid in the lungs, shortness of breath, coughing, and burning eyes, skin, nose, and throat. Exposure can also exasperate other chronic conditions, such as asthmas, allergies, or existing lung disease/damage (e.g., from smoking).[15]

140.   Long-term exposure to even low levels of chlorine gas can cause permanent lung disease, such as bronchitis and shortness of breath, or tooth corrosion. *Id.*

**C)**   **Results of Poor Ventilation in WHV**

   ***1)***   ***Mold and Allergens at WHV***

141.   Upon information and belief, testing in the WHV would disclose the presence of various molds or allergens such as:

   a.   Ochroconis is known to grow principally in soil and can cause infections under the skin.

   b.   Cladosporium is known to grow on decaying paint and textiles and is generally regarded to be allergenic. Cladosporium can cause extrinsic asthma, skin lesions, nail infections, sinusitis, and pulmonary infections.

   c.   Chaetomium is known to grow on water-damaged paper and drywall. Several species of Chaetomium are toxigenic and known to cause systemic, cerebral, skin (and under the skin), and pulmonary infections.

---

[15]   Mich. Dep't of Health, Bleach Fact Sheet, *available at* https://www.michigan.gov/-/media/Project/Websites/michiganprepares/docs/pdf/01/Bleach_Fact_Sheet_08-2014.pdf.

d.     Stachybotrys is known to grow on water-damaged drywall. It is generally identified in surface rather than air samples. Several species of Stachybotrys are toxigenic and can specifically produce Stratoxin H, which is poisonous upon inhalation. Individuals with chronic exposure to Stratoxin H experience cold and flu symptoms, sore throats, diarrhea, headaches, fatigue, dermatitis, hair loss, and general malaise. Stratoxin H is also a liver and kidney carcinogen. Areas with relative humidity above 55% and that are subject to temperature fluctuations are ideal for Stratoxin H production.

e.     Acremonium is a known human pathogen, causing mycetomas, onychomycosis, keratitis, endophthalmitis, osteomyelitis, peritonitis, meningitis, and endocarditis. This fungi may be considered a Type I (hay fever and asthma) and Type III (hypersensitivity pneumonitis; Humidifier lung) allergen.

f.     Alternaria is a common cause of extrinsic asthma. Alternaria spores from this fungus are deposited in the nose, mouth, and upper respiratory tract. Alternaria has been associated with hypersensitivity pneumonitis, sinusitis, deratomycosis, onychomycosis, subcutaneous phaeohyphomycosis, and invasive infection.

g.     Curvularia can cause people asthma, allergic fungal sinusitis, onychomycosis, ocular keratitis, sinusitis, mycetoma, pneumonia, endocarditis, cerebral abscess, and disseminated infection.

h.     Fusarium is a pathogen often found in stagnant water (e.g, sinks, humidifiers). The spores, when ingested or inhaled, can produce the mycotoxin trichothecene, which targets the circulatory, alimentary, skin, and nervous systems. Fusarium can cause eye infections, endocarditis, skin infection, onychomycosis, and various systemic infections.

i.     Trichoderma produces the mycotoxin trichothecene and can cause infections.

142.   MDOC personnel, including Defendants Washington, Brewer, McKee,

Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Dreffs, Bullard, Vallad, and

Moore, were actually aware of the extensive mold problem as it was readily visible, and they actually observed it. Likewise, they received numerous complaints about mold by detainees and inmates at WHV.

143.   For example, Defendants Brewer and Osterhout inspected the showers in Filmore-B on or about December 2018.

144.   Many inmates filed grievances about the mold, bringing complaints about water intrusion, dampness, lack of ventilation, respiratory ailments, and biological contamination in the facility, directly to the attention of Defendant Brewer on many occasions during Step Two of the inmates' grievance process.

145.   The mold in shower units, including those in Gladwin-B, Unit 4 and others, has been especially extreme for more than five years, visibly covering the walls, ceilings, and floors.

146.   Mold also grows in storage closets and other closets adjacent to the shower units.

147.   The mold looks green, black, and fuzzy. Many inmates describe the mold as looking "alive." The mold is flakey and slimy to the touch. It can also have a sticky, gum-like feeling.

148.   In some instances, the mold has "eaten" through bricks and door frames. The mold has also caused tiles throughout the units to peel up from the ground.

149.    As early as 2013, detainees and inmates at WHV began complaining to Defendants—including multiple guards, nurses, nurse practitioners, and doctors—about the presence of visible mold in shower units, in sinks, around toilets in cells, near the windows, around door casings, in the hallways, and in the air vents.

150.    An industrial hygienist who inspected WHV in December 2021 observed that nearly every building had filthy air return vents, return air ducts, and supply air diffusers, and that the supply and return air ducts appeared to have never been cleaned. The hygienist observed that fungal surface sampling from these return air ducts showed moderate to heavy fungal concentration, indicating to him that fungal growth (biological amplification) had previously or was actively taking place within WHV.

151.    The hygienist also took air samples, which showed mold concentration exceeding baselines for certain mold/allergen types.

152.    The hygienist observed temperatures from 65.6 to 81.0 degrees Fahrenheit in housing units over four days. Even in the middle of a Michigan winter, indoor temperatures were warm enough to expedite mold growth.

153.    Inmate/detainee members of the Warden's Forum Committee wrote a letter to Defendant Brewer in 2018, complaining that women were "experiencing health problems due to environmental hazards within [unit #2 westside housing]. Due to the improper function of HVAC units, compounded by lack of proper

cleaning agents to kill the mold arising from the poor ventilation/unwarranted condensation on walls/windows in housing/cell areas and unit (base-hallways, etc.) continuously moist areas breed mold leeching levels of toxins into the air."

154. The Warden's Forum Committee exists to assist Defendant Brewer in identifying and resolving problems in the general population of WHV. The Committee consists of WHV's housing unit representatives, and the Committee meets at least monthly to discuss inmate concerns with Defendant Brewer. According to MDOC's Prisoner Housing Unit Representatives/Warden's Forum Policy Directive, 04.01.150, "the Warden shall provide the Warden's Forum with written responses to each agenda item, copies of which shall be posted in each housing unit and forwarded to the appropriate Regional Prisoner Administrator (RPA) and to the Grievance Section in the Office of Legal Affairs." Inmates at WHV complained regularly about mold at Committee meetings.

155. An inmate in Filmore-B observed that black drops would appear on her white shirt when she dried it under the air vent in her cell. An air quality test was conducted in the inmate's cell in November of 2022, but she was never told the results.

156. Plaintiffs and other women have also complained about symptoms, such as skin rash and itching, nasal stuffiness, throat irritation, coughing, watery eyes, wheezing, and respiratory conditions and infections, which are known to be

caused by environmental contaminants allowed to persist through WHV's poor ventilation.

157. Plaintiffs and other women complained about these symptoms, but their requests for treatment were largely ignored by guards, nurses, physician assistants, or physicians.

158. Several women were explicitly told by doctors and/or nurses that their symptoms were caused by mold exposure, and yet the appropriate repairs, maintenance, and cleanup has not yet taken place.

159. In other cases, medical staff refused to record diagnoses and symptoms related to the conditions of the women's confinement within the women's medical records. One nurse even joked to an inmate who had a rash across her arms, neck, and face that her rash looked like a mold rash "but we would never put that."

160. Several MDOC employees complained to women about their own allergies and headaches triggered by working in the facility. They attributed their symptoms to mold in the building and said their symptoms cleared up when they went home at the end of the day. New MDOC guards are placed in buildings with the worst mold problems because seasoned guards refuse to work in them.

161. MDOC personnel, including Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Dreffs, Bullard, Vallad, and Moore have failed to take appropriate measures to eradicate the mold despite actual

knowledge of its existence and prevalence, and Defendants have disregarded the substantial risk of serious inmate harm that resulted from long-term mold exposure.

### 2) *Improper Cleaning Supplies and Chemical Fume Exposure in WHV*

162. Lack of proper cleaning in WHV's unventilated, wet buildings regularly made inmates sick.

163. WHV placed the cleaning responsibilities largely on the inmates, but failed to regularly provide inmates with appropriate cleaning supplies.

164. In 2023, a sewer backed up into one of the housing units, but bleach was not used to clean or sanitize, and no fans were used to dry it after cursory effprts at cleaning.

165. As the health hazards related to wet cells continued to spread and worsen, and biological contaminants like mold proliferated throughout the units, Defendants exacerbated the problem further by prohibiting shower porters from using bleach and other stringent cleaners when cleaning the showers.

166. At one Warden's Forum Committee meeting, inmates alerted Warden Brewer that mold was growing in the unit as a direct result of WHV's decision to remove fungicide and bleach. When inmates requested another fungus remover called Wexide to combat the problem, Defendant Brewer denied the request. Defendant Brewer told the inmates that if they scrubbed harder, the mold would be gone. At other times, Defendant Brewer has denied the mold's existence.

167.   Defendants have required on occasions inmates to clean showers from 11:00 pm until 5:00 am straight "or else."

168.   Generally, inmates were not provided with personal protective equipment to protect against harsh cleaning chemicals, biological contamination, and inhalation of volatile compounds and chemical fumes.

169.   At times, inmates instructed to clean were not given paper towels or mops and had to resort to scrubbing their cells and cell floors with menstrual pads.

170.   On one occasion, a guard instructed inmates to instead scratch the mold off the shower tiles and wall with their fingernails.

171.   In December 2014, the Warden's Forum Committee requested stronger, undiluted disinfectant and cleaning supplies to help ameliorate health issues related to wet cells.  Administration responded that there was "absolutely no need to replace the current cleaning supplies with stronger products."

172.   Lack of proper ventilation for volatile cleaning chemicals also made inmates and staff sick.

173.   An industrial hygienist inspecting WHV in December 2021 observed that the chemicals had caused significant corrosion to painted metal materials (*e.g.*, ceiling panels, return air vents, supply air vents, light frames, hatches).  This demonstrates dangerous levels of chemicals were routinely in the air in these poorly ventilated spaces.

37

174. During the December of 2021 inspection, the hygienist observed that the bathrooms and shower areas smelled heavily of chlorine, to the point where the chlorine was visibly bothering a masked MDOC employee who had been tasked with taking photographs during the inspection.

## II. THE PLAINTIFFS

### A) <u>Plaintiff Paula Bailey</u>

175. Plaintiff Paula Bailey ("Bailey") was an inmate at WHV from 2009 to 2021. She was housed in multiple units, including Dickinson, Filmore, Harrison, and Unit 1.

176. Throughout her time at WHV, Plaintiff Bailey suffered from sneezing, constant coughing, shortness of breath, wheezing, dry, scaly skin, nosebleeds, weight gain, muscle cramping, headaches, hair loss, rashes that would blister and scar, chest pain, fatigue, frequent upper respiratory infections, and difficulty breathing issues.

177. On April 19, 2018, Paula spoke with nurses in healthcare about her symptoms. Paula was told immediately that her symptoms were related to mold exposure.

178. Plaintiff Bailey has noticed mold in at least three units during her time at WHV, including Gladwin-B, Dickinson-B, and Filmore-B.

179.    Plaintiff Bailey first noticed mold at WHV in 2016 when she lived in Gladwin-B. In Gladwin-B, the windows remained closed, causing the windows to sweat and creating a musty odor. Plaintiff Bailey first noticed mold in Gladwin-B in 2016.

180.    Eventually, brown and black mold formed in Gladwin-B, dripping from the ceiling in the shower onto Plaintiff Bailey's face and body. She developed a rash that left visible scars on her face, chest, and legs.

181.    Plaintiff Bailey noticed similar mold in the showers during her time in Dickinson-B. However, after transferring to Filmore-B, Plaintiff Bailey began experiencing even more severe symptoms such as wheezing, chest pain, and coughing.

182.    On August 14, 2019, Plaintiff Bailey filed a grievance because she was denied an allergy test to determine what was causing her symptoms.

183.    Her symptoms became worse. Plaintiff Bailey's rash became so painful to the point that she would itch until she bled, which in turn caused scarring.

184.    Plaintiff Bailey began to experience seizures and felt like she could not get enough air in her lungs. This caused extreme pain to Plaintiff Bailey's body which only intensified her fears.

185. Plaintiff Bailey often woke up at night coughing uncontrollably and had to be treated with inhalers, antihistamines, and nebulizer treatments to help combat her severe mold reaction and the environment created by poor ventilation.

186. Her symptoms subsided only when she had opportunities to leave the Filmore-B building.

187. In addition, Plaintiff Bailey developed a respiratory infection on or around April of 2018 when she was housed in Filmore-B. Plaintiff Bailey suffered from a respiratory infection for several months.

188. Due to her worsening symptoms, she was often afraid that she would die in prison. She also started suffering from memory loss, anxiety, and depression.

189. When in the shower, an area with poor exhaust draw and ventilation, her symptoms got worse. It grew to the point that she was afraid to bathe and asked officers to prop open the back door because she felt like she was suffocating while she showered.

190. She would cry herself to sleep at night because she could not breathe, and she did not know if she would ever get better.

191. Plaintiff Bailey complained to other MDOC personnel, including Prison Counselor Schilling, Resident Unit Manager Jackson, and Officer Norris, on numerous occasions.

192.   Despite repeated complaints, Defendants failed to take reasonable steps to eradicate the mold from the unit or to fix the structural problems leading to persistent and constant mold growth, such as updating the WHV's ventilation system, following Defendants' housekeeping protocols, or by making desperately needed repairs.

193.   After being released in 2021, it was Plaintiff Bailey's wish to start a new life with her husband. However, she is now left to deal with the remnants of her incarceration.

194.   In June 2021, Plaintiff Bailey sought treatment for her scarring, breathing issues and other symptoms. During her visit, several nurses confirmed that Plaintiff Bailey's medical conditions were caused by her environment, particularly the poor ventilation and related mold at the facility.

195.   Plaintiff Bailey also visited a specialist to treat her seizures. The doctor said that her seizures could have been caused by an infection in her brain from mold or environmental issues while at WHV.

196.   Plaintiff Bailey continues to suffer from seizures and seeks preventative treatment to help combat her other symptoms.

197.   Plaintiff Bailey has permanent scarring all over her body and lives with COPD, a chronic disease, since being subjected to the poorly ventilated conditions within WHV.

198.   Plaintiff Bailey has suffered, and continues to suffer from, physical injuries and emotional distress related to the mold caused by WHV's poor ventilation, which in turn caused her health symptoms.

**B)**   **Plaintiff Krystal Clark**

199.   Plaintiff Krystal Clark ("Clark") is an inmate at WHV. She has lived in multiple housing units during her incarceration at WHV, including Gladwin, Unit 3, Unit 4, and the infirmary.

200.   Since entering WHV, Plaintiff Clark has developed severe respiratory issues, uncontrollable asthma, shortness of breath, breakouts on her face, rashes on her arms, legs, and ankles, weight gain, nosebleeds, incessant coughing, headaches, dizziness, bacterial infections, severe eye infections that have resulted in having to wear an eye patch, and most recently, ear infections that caused hearing loss and a white residue to grow and leak from her ears.

201.   Plaintiff Clark developed her first symptoms in 2011 during her first year of incarceration. She had difficulty breathing, and dealt with frequent coughing, headaches, and dizziness.

202.   Around the same time these initial symptoms appeared, Plaintiff Clark observed mold in the shower area on the ceiling, in the cracks on the walls and near the drains. The mold was brown and black, and it would drip down on people as they showered.

42

203.   In 2013, Plaintiff Clark was given a mask to wear while showering and was further told to "limit [her] time in the shower area."

204.   In 2014, Plaintiff Clark continued to experience breathing issues, breakouts, and a rash.

205.   Plaintiff Clark showed an officer the mold she saw in the unit and showed them the rashes and breakouts on her body.

206.   In 2013 and 2021, Plaintiff Clark was so concerned about the mold and the symptoms she was experiencing, she wrote a letter to Defendant Heidi Washington to alert her of the issues she has been dealing with. Defendant Washington never responded.

207.   Plaintiff Clark complained about the presence of mold to MDOC personnel on numerous occasions. She complained directly to Defendant Brewer during Step 2 of the grievance process. She has also submitted multiple kites in an effort for relief from her symptoms.

208.   The conditions at WHV have also exacerbated Plaintiff Clark's shortness of breath, chest tightness, allergies and asthma. Plaintiff Clark's respiratory problems continue to persist without improvement. It is hard for Plaintiff Clark to breathe anywhere at WHV, but she experiences some relief when she is allowed to be outside.

209.   Plaintiff Clark suffers from coughing fits so severe that she has been provided with a facemask to wear when visiting with other people. She also wheezes when she talks.

210.   In 2015, Plaintiff Clark's symptoms worsened to the point that she was hospitalized for her relentless coughing and breathing issues. Plaintiff Clark was diagnosed with bronchitis.

211.   In January of 2020, Plaintiff Clark was sent to Dwayne Waters Hospital for a lung test due to her constant wheezing, chest pain and breathing difficulties. On January 9, 2020, Nurse Potter began to do the test, but stopped because of the severity of Plaintiff Clark's respiratory issues.

212.   On February 26, 2020, Plaintiff Clark was again sent to Dwayne Waters Hospital for a lung test. Since Plaintiff Clark still had not seen a pulmonologist, Nurse Potter refused to perform the test because of Plaintiff Clark's debilitating condition.

213.   When Plaintiff Clark asked WHV to conduct an allergy test, the nurses said WHV did not give allergy tests in the facility.

214.   On January 11, 2022, after students in a clinic at the University of Michigan advocated for Plaintiff Clark to receive proper healthcare, she was seen by Dr. Rosenman, an allergist, who confirmed that she had an extreme allergy to mold and additionally confirmed that her symptoms were due to mold exposure.

215.  Back at WHV, Dr. Tran informed Plaintiff Clark that she likely wouldn't heal until she left WHV.

216.  Without proper treatment, proper ventilation, and a lack of mold remediation, Plaintiff Clark's symptoms have continued to worsen. She continues to have difficulty breathing, suffers from constant wheezing, shortness of breath, chest pains, and headaches.

217.  Plaintiff Clark has been diagnosed with pneumonia twice throughout her time at WHV and is currently on three inhalers and takes six different medications to help her cope with her symptoms. Plaintiff Clark also used to use a daily nebulizer treatment but has since reduced its use due to her heart condition.

218.  Plaintiff Clark also suffers from black spots on her abdomen and chest. These spots make her uncomfortable as it feels like something is growing beneath her skin. She was given cream for the spots, but there has been no improvement.

219.  In addition to her other medications, Plaintiff Clark has repeatedly been prescribed steroids and antibiotics to treat her symptoms, but they have only provided temporary relief and excessive weight gain.

220.  Since being afflicted with these symptoms caused by the conditions within WHV, Plaintiff Clark has been severely depressed. She cries every day because she is worried that she will die in prison. She feels helpless. Her face and body are so swollen that she feels unrecognizable.

221.   Plaintiff Clark's only wish is to be able to get healthy again and to go home to her children.

222.   Plaintiff Clark has suffered, and continues to suffer from, physical injuries and emotional distress caused by the poor ventilation and unclean environment at WHV.

223.   Plaintiff Clark's health has likely been permanently affected by the deplorable living conditions at WHV. Plaintiff Clark has been incarcerated for over a decade and upon her release she will likely be left with permanent health issues that she will have to deal with for the rest of her life.

C)   **Plaintiff Hope Zentz**

224.   Plaintiff Hope Zentz ("Zentz") is an inmate at WHV. She has lived in multiple units, including Dickinson, Gladwin, Emmett, Harrison, and Unit 2. She was housed in Unit 2 from 2011 to 2020.

225.   Plaintiff Zentz first observed mold at WHV during her time housed in Unit 2. She observed mold dripping from the ceiling and from light fixtures in the shower area, and on the windows, heat registers, and vents.

226.   In one instance, patchy black mold dripped from the ceiling in the shower onto Plaintiff Zentz's face and body. Where the mold touched her, Plaintiff Zentz developed a body rash.

46

227. Plaintiff Zentz continues to experience itchy, red, and blotchy skin after showering.

228. After a year-and-a-half in Unit 2, Plaintiff Zentz began experiencing chronic headaches and dizziness. Her symptoms subsided only when she left the facility for fresh air.

229. Plaintiff Zentz developed a rash, a continuous cough, sore and scratchy throat, severe sinus issues (that she's suffered with since entering the unit in 2011), mental fogginess, dizziness, vision problems, hair loss, nosebleeds, lethargy, body cramps, and nausea.

230. Plaintiff Zentz also suffers from trouble breathing, coughing, and wheezing, which worsens at night. Plaintiff Zentz is frequently woken in the middle of the night from pain from her sore and scratchy throat. Plaintiff Zentz regularly had to stop during workout sessions and clear her throat which results in her coughing up a thick, creamy white phlegm.

231. In 2019, Plaintiff Zentz suffered from a nose infection for two months without relief.  Her nose would constantly run and release green mucus. The pain from the infection caused her to wake up at night.

232. Plaintiff Zentz also started to experience eye-twitching, vision problems, and dizziness around this time. Again, these symptoms tend to subside when she's able to go outside for a while. In January 2019, a rash of hard bumps

47

filled with liquid appeared on Plaintiff Zentz's arms, legs, and stomach and in June, the rash moved to her neck and face. Upon developing the rash, Plaintiff Zentz dealt with extreme itching. Plaintiff Zentz sought medical care and was diagnosed with folliculitis on her legs and stomach and a fungal infection on her face.

233.   Plaintiff Zentz complained about her symptoms to the health care unit on many occasions, including Nurse Practitioner Olmstead.

234.   Plaintiff Zentz was told by MDOC health care, including Nurse Porter in 2019, that her respiratory problems were probably caused by exposure to mold at WHV. Nurse Porter told Plaintiff Zentz that her own allergies start to act up every time she comes to work in the facility.

235.   Plaintiff Zentz first observed mold at WHV during her time housed in Unit 2. She observed mold dripping from the ceiling and from light fixtures in the shower area, and on the windows, heat registers, and vents.

236.   In one instance, patchy black mold dripped from the ceiling in the shower onto Plaintiff Zentz's face and body. Where the mold touched her, Plaintiff Zentz developed a body rash.

237.   Plaintiff Zentz complained about the presence of mold to MDOC personnel, including Defendant Brewer, on numerous occasions.

238.   Despite repeated complaints, effective steps were not taken to eradicate the mold from the unit or to keep it from returning by, for example updating the

48

WHV's ventilation system, following Defendants' housekeeping protocols, or by making desperately needed repairs and consistent, regular maintenance.

239.   Once, Plaintiff Zentz had a conversation with a maintenance man who said the ventilation systems at WHV were covered in mold. He told Plaintiff Zentz that administration kept asking him to put a "band-aid" on the problem by painting over mold throughout the facility.

240.   Plaintiff Zentz continues to suffer from symptoms on a daily basis caused by the damp, poorly ventilated conditions within WHV. She is often mentally foggy, nervous, and scared because she does not know the long-term effects of her environment.

241.   Plaintiff Zentz feels helpless and emotional because she is not receiving adequate help and is forced to live in unsanitary living conditions.

242.   Plaintiff Zentz is due to be released in 2026. After serving her time, she was hopeful to be able to start a new life with her fiancé; however, she is now nervous her fresh start may turn out differently or be cut short by more severe health conditions.

243.   Plaintiff Zentz has suffered, and continues to suffer from, physical injuries and emotional distress related to the environmental hazards within WHV and her associated health symptoms.

49

## III. THE DEFENDANTS

### A) The Decisionmakers at WHV

#### 1) Wardens Brewer and Howard

244. Defendant Brewer, at relevant times, has been the Warden of WHV, until approximately January of 2020.

245. Defendant Howard became acting Warden of WHV in approximately January of 2020.

246. The Warden at WHV is responsible for overseeing the operation of WHV, development of WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, including housekeeping staff, and ensuring that Defendants enforced and abided by policies and regulations at the MDOC, the State of Michigan, and the United States.

247. The Warden is further responsible for the care, custody and protection of individuals including Plaintiffs and the proposed Class.

248. The Warden of WHV reports directly to the Jackson Region Assistant Deputy Director, Defendant Bush.

249. The Warden supervises many WHV employees, including Deputy Wardens Johnson and Osterhout.

#### 2) Deputy Wardens Johnson and Osterhout

250. Defendant Johnson and Defendant Osterhout have at relevant times served as Deputy Wardens of WHV.

50

251.   In this capacity, Defendants Johnson and Osterhout have upon information and belief been responsible for the operation of WHV, development of budget recommendations and WHV policies and practices, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, and ensuring that Defendants enforced and abided by policies and regulations at the MDOC, the State of Michigan, and the United States.

252.   The Deputy Wardens are further responsible for the care, custody and protection of inmates including Plaintiffs.

253.   The Deputy Wardens report directly to the WHV Warden.

254.   The Deputy Wardens supervise many WHV employees, and are directly involved in the hiring, training, disciplining, counseling and grievances of WHV employees, including corrections officers who maintain regular contact with the inmates housed at WHV.

### 3)      *Physical Plant Supervisors Treppa, Carter, and Dreffs*

255.   Defendant Treppa, Defendant Carter, and Defendant Dreffs have at relevant times served as Physical Plant Supervisors at WHV.

256.   In this capacity, Defendants Treppa, Carter, and Dreffs have, upon information and belief, been responsible for the overall maintenance of the WHV facility physical plant, including building, electrical, mechanical, power plant, sewage lift station, and grounds maintenance.

257.   As Physical Plant Supervisors, Defendants Treppa, Carter, and Dreffs were responsible for planning and coordinating the work of a variety of trades persons and their supervisors in maintenance activities. Maintenance activities include the installation, maintenance, and repair of electrical, steam, water, and sewer systems, such as ventilation and HVAC systems. Maintenance activities also include installation, maintenance, and repair of drainage, roof, gutter, and window systems to control water and biological contaminant intrusion.

258.   Defendants Treppa, Carter, and Dreffs coordinated the ordering process for materials and tools needed to maintain the WHV facilities.

259.   Defendants Treppa, Carter, and Dreffs also directed custodial services responsible for cleanup, painting, and other projects.

260.   As Physical Plant Supervisors, Defendants Treppa, Carter, and Dreffs reported directly to the Physical Plant Superintendent.

### 4)    *Physical Plant Superintendent Bullard*

261.   Defendant Bullard, at relevant times, has served as Physical Plant Superintendent of WHV.

262.   The Physical Plant Superintendent is responsible for overseeing and maintaining the conditions and logistical operations of WHV and further serves as the direct supervisor to the Physical Plant Supervisors.

263.   As Physical Plant Superintendent, Defendant Bullard is also responsible for preparing the Annual Physical Plant Report each year for WHV, a responsibility which requires inspecting the facilities' roof, HVAC system, and ventilation with an eye toward preventative maintenance and necessary repairs.

264.   Upon information and belief, the Physical Plant Superintendent reports to the MDOC's Physical Plant Division Administrator, Defendant Vallad.

### B)   <u>MDOC Control over WHV</u>

265.   The MDOC is a Michigan governmental agency that operates WHV.

#### 1)   *Director Washington*

266.   Defendant Washington has served as Director of the MDOC since approximately July of 2015, overseeing Michigan's correctional system, including WHV.

267.   Her duties and responsibilities include developing and implementing policies and procedures for the operation and management of the MDOC and its employees, as well as managing the MDOC's budget.

268.   She is responsible for the care, custody and protection of prisoners under the jurisdiction of the MDOC.

269.   Defendant Washington has full power and authority in the supervision and control of the MDOC's affairs.

270.   Defendant Washington ensures MDOC enforces and abides by the laws, policies, and regulations of State of Michigan, and the United States.

271.   Defendant Washington supervises many MDOC employees, including the BOA headed by Deputy Director Gulick and the CFA headed by Deputy Director McKee.

### 2)   *Deputy Director McKee*

272.   The CFA at the MDOC is responsible for the operation of all correctional institutions operated by the MDOC.

273.   As Deputy Director for CFA at MDOC, Defendant McKee is a principal decisionmaker as to the management and operation of MDOC facilities, including WHV.

274.   Defendant McKee is responsible for promulgating and administering MDOC's policies related to preventive and emergency maintenance.

275.   Defendant McKee reports directly to Defendant Washington.

276.   Defendant McKee supervises many MDOC employees including Jackson Region Assistant Deputy Director Bush, who, in turn, supervises the WHV Warden.

### 3)   *Jackson Region Assistant Deputy Director Bush*

277.   Jackson Region Deputy Director Bush oversees the MDOC facilities in the Jackson, Michigan region, including WHV.

278.   As Jackson Region Deputy Director, Defendant Bush is aware of the state and conditions of a Jackson-area facility like WHV and is responsible for ensuring the maintenance and improvement of critical infrastructure.

279.   The Warden of WHV reports to Defendant Bush.

280.   Defendant Bush reports directly to Defendant McKee.

### 4)    *Deputy Director Gulick*

281.   The BOA at MDOC provides oversight of staff support functions and oversees the MDOC's budget.

282.   As Deputy Director for the BOA at MDOC, Defendant Gulick is a principal decisionmaker in determining the MDOC's budget and the allocation of funds as to prisoner healthcare and facility improvements among other matters.

283.   As the MDOC's principal administrator of the Department's budget and allocation of funds, Defendant Gulick exercises significant control over facility maintenance and improvements at MDOC facilities, including WHV.

284.   Defendant Gulick reports directly to Defendant Washington.

285.   Defendant Gulick supervises many MDOC employees, including the Physical Plant Division Administrator, Defendant Vallad.

### 5)    *Physical Plant Division Administrator Vallad*

286.   Upon information and belief, the Physical Plant Division is responsible for administering the MDOC's facilities' physical maintenance and repairs,

promulgating policies and practices related to physical maintenance and repairs of MDOC facilities, training maintenance and repair employees, and contracting with maintenance and repair subcontractors.

287. As Physical Plant Division Administrator, Vallad is aware of the state and conditions of the MDOC's facilities, including WHV, and would be responsible for ensuring the maintenance and improvement of critical infrastructure.

288. Administrator Vallad is a principal decisionmaker as to the physical maintenance and improvement of MDOC facilities, including WHV.

289. Defendant Vallad reports directly to Defendant Gulick.

290. Defendant Vallad supervises many MDOC employees, including, upon information and belief, Physical Plant Superintendent Bullard.

### *6)* *State Administrative Manager Moore*

291. As State Administrative Manager, Defendant Moore oversees the administration of Michigan's correctional system, including WHV, and serves as Bullard's supervisor.

292. Defendant Moore signs off on order requests submitted by the Physical Plant Supervisors at WHV for maintenance materials and supplies, thereby controlling the flow of necessary repairs at WHV. Upon information and belief, Defendant Moore is also responsible for managing relationships with vendors that supply cleaning supplies, for example.

## IV.   DELIBERATE INDIFFERENCE

293.   WHV's poor ventilation system combined with regular water intrusion to create filtration, humidity, and temperature control issues that in turn resulted in dirty, damp, warm buildings that fostered mold growth and caused inmates long-term exposure to other harmful allergens, particulates, and toxins.

294.  Defendants have failed—for nearly thirty years—to replace the inadequate and failing HVAC system, instead allowing vents, often blocked or broken, to fill up with mites, mold spores, and damaged fiberglass insulation, electing instead to use floor fans  (often removed by WHV staff for their own use in officers' quarters), if anything was used at all. These conditions caused and continue to cause environmental hazards and chemical fumes to remain stagnant in the air and build on surfaces, further sickening inmates and staff.

295.  Defendants have failed to replace the inadequate and failing air handlers, directly contributing to poor ventilation and condensation levels that encourage the spread of biological contamination, growth of mold, and unventilated chemical fumes.

296.   Defendants have failed to replace broken steam to hot water converters, steam piping, directly contributing to temperature control issues within the facility that also encourage mold growth within the facility.

297.   Defendants have failed to timely address drainage issues, steam piping and condensate failures, gutter failures, leaking windows, and roof leaks, directly contributing to water intrusion levels that encourage dangerous water damage to the infrastructure and mold growth.

298.   In many cases, Defendants have failed to properly repair roof leaks and grading issues throughout WHV, choosing instead to cover up ceiling and carpet damage caused by regular water infiltration into the units.

299.   At one point in time, the law library had approximately 20 buckets catching water from a leak in the roof. The water soaked the carpet below, and inmates used shower curtains to protect the books. When inspections occurred, Defendant Osterhout told the inmates to remove the buckets and curtains in the law library so that the inspectors would not examine the problem more closely.

300.   Similarly, on or about September 2018, Defendant Brewer was informed of the leaking ceilings in Lenawee. Upon information and belief, the leak was not repaired until late 2019. In Filmore-B, Defendants instructed guards to wear masks and/or gloves to help minimize the impact of mold exposure on those employees.

301.   What's more, the lack of proper humidity control, air filtration, and air circulation enabled the spread and accumulation of biological contaminants— including mites, mold spores, grime—and damaged fiberglass insulation into spaces

58

where inmates are confined. Inmates have no choice but to bear these unsanitary conditions and breath in these pollutants day after day as a result of their incarceration and lack of ability to move freely or get fresh air.

302.   The presence of mold and other biological contamination within inmate spaces in WHV is evidence of the inadequate ventilation and it contributed to the unsanitary conditions within WHV.

303.   Yet, even as inmates complained and became sick from the environmental hazards that resulted from the poor ventilation within WHV, Defendants failed to respond reasonably.

304.   On or about September 2018, a member of the Warden's Forum Committee wrote a letter to Defendant Washington, RUM Lopez, Deputy Johnson, and Deputy Halliwell regarding the failure of the ventilation system.

305.   Defendants also failed to test the mold present at WHV, despite actual knowledge of its existence, women's health complaints, and actual knowledge of the causal link between the two.

306.   For example, Warden's Forum Committee notes from January 2016 indicate that the inmates' complaints of mold were "unfounded," yet the mold continues to proliferate to this day.

307.   Rather than abate the mold, MDOC personnel, at the direction of Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout,

Treppa, Carter, Dreffs, Bullard, Vallad, and Moore, have elected instead to conceal it.

308.   Defendants have painted over the mold, including directly painting ventilation screens in order to conceal its existence from the inmates, increasing the likelihood that the inmates would be unknowingly exposed to it.

309.   Upon information and belief, the Warden and Deputy Wardens, including Defendants Brewer, Johnson, and Osterhout, complete regular building inspection walkthroughs. During these walkthroughs, they state that the mold is not harmful and instruct maintenance crews, including Defendants Treppa, Carter, Dreffs, and Bullard, to paint over it.

310.   For example, Defendant Brewer walked through Filmore-B on or about December 2019, noting areas of the facility that had the most noticeable signs of mold. The next day, a painting crew of inmates painted over the areas identified by Defendant Brewer.

311.   Inmates have even been awoken in the middle of the night by MDOC personnel painting over mold and corrosion/rust damage before a morning inspection in an effort to conceal the problems.

312.   During the initial days of the multi-day December 2021 inspection, the industrial hygienist observed and commented on several filthy air filters that had not been changed for a long period of time, substantially past WHV's own

recommended amount of time. Maintenance then attempted to conceal the extent of the air filter problem for the rest of the inspection days by replacing the filters in the units set to be inspected, moments before the inspector arrived. The hygienist noted that the filters, when checked at approximately 10 A.M., displayed that they had been changed that same day.

313.   Maintenance workers under the supervision of Defendants Treppa, Carter, and Dreffs have covered mold in the showers with grout to conceal the problem.

314.   Notwithstanding, the mold, particularly in the shower units, has penetrated through. The mold bubbled and burst through the paint. It continues to spread and be visible in the units.

315.   As the mold problem continued to spread, worsen, and proliferate throughout the units, Defendants exacerbated the problem further by prohibiting shower porters from using bleach and other stringent cleaners when cleaning the showers.

316.   At one Warden's Forum Committee meeting, inmates alerted the Warden that mold was growing in the unit as a direct result of WHV's decision to remove fungicide and bleach. When inmates requested another fungus remover called Wexide to combat the problem, Defendant Brewer denied the request.

Defendant Brewer told the inmates that if they scrubbed harder, the mold would be gone. At other times, Defendant Brewer has denied the mold's existence.

317.   Im some instances, Inmates were not given paper towels or mops and had to resort to scrubbing their cells and cell floors with menstrual pads.

318.   On one occasion, a guard instructed inmates to instead scratch the mold off the shower tiles and wall with their fingernails.

319.   In December 2014, the Warden's Forum Committee requested stronger, undiluted disinfectant and cleaning supplies to help ameliorate health issues related to wet cells.  Administration responded that there was "absolutely no need to replace the current cleaning supplies with stronger products."

320.   Defendants have required on occasions inmates to clean showers from 11:00 pm until 5:00 am straight "or else."  Of course, without changes to building ventilation and without the appropriate cleaning supplies, the mold will never truly be eradicated and continues to spread in the bathrooms, showers, and cells.

321.   In 2023, a sewer backed up into one of the housing units, but bleach was not used to clean or sanitize, and no fans were used to dry it after cleaning. During limited periods during the pandemic and before inspections, chlorine bleach and stronger chemicals were sometimes, but not consistently, available for cleaning.

322.   Defendants' failures and inactions amount to deliberate indifference towards Plaintiffs' Constitutional rights as well as deliberate indifference to the

human feelings and physical safety of Plaintiffs and the proposed Class they seek to represent.

323.  Defendants have intentionally ignored complaints made by Plaintiffs and the proposed Class regarding the health issues that resulted from the poor ventilation and damp environment within WHV. In some instances, Defendants intentionally sought to cover up or conceal the problem.

324.  As early as 2009, Warden's Forum Committee members began voicing concerns regarding a "vent cleaning" project which had been put on hold.  The Committee voiced the concerns again in 2013 while the project remained on hold, specifically indicating concern for the health effects related to lack of vent maintenance. WHV responded by requiring inmates to clean the vents themselves and paint over rust and filthy vents prior to inspections.

325.  In fact, in December 2019, Defendant Brewer told inmates that they needed to stand on chairs and clean the dirty air vents.

326.  Likewise, an industrial hygienist inspecting WHV in December of 2021 observed most air vents inspected were filthy and covered in a thick coating of dust and other particulates. When the MDOC was due to conduct their own inspection of WHV's conditions in February of 2022, the same industrial hygienist observed that air return vents that were visibly filthy in December had since been cleaned.

327.   Defendants have gone as far as to proactively prohibit inmates from talking about the mold problem, indicating that such discussions could cause a riot. In fact, Defendant Brewer told inmates/detainees during the Warden's Forum Committee that they could not refer to the "mold problem" and instead had to discuss "mildew." [16]

328.   MDOC personnel and contractors also actively prohibited by Defendants from talking about the result of their poor ventilation system—i.e., the mold problem.

329.   Upon information and belief, Defendants would not allow medical staff to conduct allergy tests to identify mold allergies for inmates who requested the tests.

330.   Despite continuous complaints—including many kites and many filed grievances—over the past several years, Defendants maintained a policy, custom, pattern, and practice of utterly failing to remedy their gross failures and ignoring, denying, and then deflecting responsibility onto the inmates for the conditions at WHV causing deprivation of Plaintiffs' constitutional rights.

331.   For example, when inmates complain about the conditions at WHV, including mold and inadequate ventilation, Defendant Brewer tells inmates he is

---

[16] "Mildew refers to certain kinds of mold or fungus.  The term mildew is often used generically to refer to mold growth, usually with a flat growth habit." *What is the difference between Mold and Mildew?*, U.S. Environmental Protection Agency,   https://www.epa.gov/mold/what-difference-between-mold-and-mildew (last accessed Sept. 15, 2023).

"waiting on the call from Heidi," indicating that Defendant Washington is responsible for fixing such problems.

332.   Poor ventilation, and the environmental hazards that result from it, remain a continuing condition and threat to the health of women incarcerated at WHV thereby necessitating this Court's intervention to enjoin Defendants from continuing to violate Plaintiffs' and the Class Members' constitutional rights and to hold Defendants accountable to current, former, and future incarcerated women who were forced or who will be forced to suffer unbearable pain and horrendous, inhumane, and deplorable conditions within the walls of WHV.

### A)   The Decisionmakers at WHV

#### 1)   Deputy Warden Johnson

333.   As Deputy Warden of WHV, Johnson was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including water damage to infrastructure, lack of ventilation, and biological contamination.

334.   As Deputy Warden of WHV, Johnson was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

335.   Upon information and belief, Deputy Warden Johnson read Defendants Bullard and Dreffs's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

336.   As Deputy Warden of WHV, Johnson was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

337.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Warden Johnson failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risks of associated with these infrastructural conditions, and the associated and foreseeable risk that inmates housed in WHV would suffer harms related to these conditions.

338.   As Deputy Warden of WHV, Johnson was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV.

339.   Upon information and belief, Deputy Warden Johnson was aware of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at all relevant times.

340.   Upon information and belief, Deputy Warden Johnson was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

341.   Upon learning of the infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Deputy Warden Johnson was required to take speedy and effective measures to ensure the health and safety of WHV inmates, by, among other things, coordinating and effectuating a plan to address the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to his superiors.

342.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Deputy Warden Johnson was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

67

c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d.  Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e.  Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f.  Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g.  Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### 2)   *Deputy Warden Osterhout*

343.  As Deputy Warden of WHV, Osterhout was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including water damage to infrastructure, lack of ventilation, and biological contamination.

344.  As Deputy Warden of WHV, Osterhout was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

68

345.   Upon information and belief, Deputy Warden Osterhout read Defendants Bullard and Dreffs's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

346.   As Deputy Warden of WHV, Osterhout was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

347.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Warden Osterhout failed to advocate for necessary budgetary expenditures to improve the facility and eliminate environmental hazards and biological contamination, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards from these conditions.

348.   As Deputy Warden of WHV, Osterhout was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV.

349.   Upon information and belief, Deputy Warden Osterhout was aware of the presence of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at WHV at all relevant times.

350.   Upon information and belief, Deputy Warden Osterhout was, at all relevant times, aware that associated risks of environmental hazards and biological contamination at WHV posed a potential significant health risk to WHV inmates.

351.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Deputy Warden Osterhout was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to his superiors.

352.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Deputy Warden Osterhout

353.   was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

> a.  Failing to coordinate and administer effective testing of the biological contamination present at the facility;

70

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### *3)* *Warden Brewer*

354. As Warden of WHV, Brewer was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including water damage to infrastructure, lack of ventilation, and biological contamination.

355.   As Warden of WHV, Brewer was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

356.   As Warden of WHV, Brewer was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

357.   Upon information and belief, Warden Brewer read Defendants Bullard and Dreffs's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

358.   The grievances women filed, complaining of water intrusion, dampness, lack of ventilation, respiratory ailments, and biological contamination in the facility, brought the issue directly to the attention of Warden Brewer during Step Two of the inmates' grievance process.

359.   Warden Brewer has also presided over Warden's Forum Committee Meetings, during which, on several occasions, inmates have voiced complaints about water intrusion, dampness, lack of ventilation, and biological contamination like mold in the facility, and of medical symptoms related to biological contamination,

and requests for improved ventilation and cleaning agents to eradicate the biological contamination.

360.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Warden Brewer failed to advocate for necessary budgetary expenditures to improve the facility and eliminate environmental hazards and biological contamination, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards from these conditions.

361.   As Warden of WHV, Brewer was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV.

362.   Upon information and belief, Warden Brewer was aware of the presence of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at WHV at all relevant times.

363.   Upon information and belief, Warden Brewer was, at all relevant times, aware that associated risks of environmental hazards and biological contamination at WHV posed a potential significant health risk to WHV inmates.

364.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Warden Brewer was required to take speedy and effective measures to ensure the

health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to his superiors.

365.    Despite the duty owed to WHV inmates and knowledge of the ventilation, humidity, temperature, and water intrusion problems, and subsequent health risks associated with these infrastructure deficiencies, at WHV, Warden Brewer was deliberately indifferent to the health and safety of the WHV inmates and worked to instead cover up the existence of water damage, water intrusion, and biological contamination at the facility by directing employees to paint over rust and visible mold in the facility's bathroom and directing inmates, during at least one Warden's Forum Committee Meeting, to refrain referring to a "mold problem" and instead to refer to the visible mold as mildew.

366.    Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Warden Brewer was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

> a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

74

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### 4)   *Warden Howard*

367.   As Warden of WHV, Howard was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, including water damage to infrastructure, lack of ventilation, and biological contamination.

368.   As Warden of WHV, Howard was responsible for overseeing the living conditions of WHV, ensuring that his superiors were aware of any necessary improvements, and advocating for budget expenditures for the facility.

369.   As Warden of WHV, Howard was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

370.   Upon information and belief, Warden Howard read Defendant Bullard's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

371.   The grievances women filed, complaining of water intrusion, dampness, lack of ventilation, respiratory ailments, and biological contamination in the facility, brought the issue directly to the attention of Warden Howard during Step Two of the inmates' grievance process.

372.   Warden Howard has also presided over Warden's Forum Committee Meetings, during which, on several occasions, inmates have voiced complaints about water intrusion, dampness, lack of ventilation, and biological contamination like mold in the facility, and of medical symptoms related to biological contamination,

and requests for improved ventilation and cleaning agents to eradicate the biological contamination.

373.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Warden Howard failed to advocate for necessary budgetary expenditures to improve the facility and eliminate environmental hazards and biological contamination, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards from these conditions.

374.   As Warden of WHV, Howard was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV.

375.   Upon information and belief, Warden Howard was aware of the presence of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at WHV at all relevant times.

376.   Upon information and belief, Warden Brewer was, at all relevant times, aware that associated risks of environmental hazards and biological contamination at WHV posed a potential significant health risk to WHV inmates.

377.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Warden Howard was required to take speedy and effective measures to ensure the

health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to his superiors.

378.    Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Warden Howard was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### 5) *Physical Plant Supervisor Treppa*

379. As Physical Plant Supervisor of WHV, Treppa was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

380. In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Treppa was responsible for ensuring that preventable health hazards, such as problems with ventilation, water intrusion, humidity, temperature regulation, and biological contamination, were identified, reported to his superiors, and eradicated from the facility or otherwise remediated.

381. As Physical Plant Supervisor of WHV, Treppa was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

382. Upon information and belief, Defendant Treppa read Defendants Bullard and Dreffs's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

383.   As Physical Plant Supervisor of WHV, Treppa was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that critical ventilation, moisture, humidity, and temperature control systems were damaged, broken, non-functioning, or long-overdue for replacement, and risked injury, health hazard, or danger to inmates.

384.   Upon information and belief, Physical Plant Supervisor of WHV Treppa was aware of the presence of ventilation failures, poor drainage, water damage, concrete spalling, rust, and biological contamination at WHV at all relevant times.

385.   Upon information and belief, Physical Plant Supervisor of WHV Treppa was, at all relevant times, aware that these infrastructural conditions at WHV posed a significant health risk to WHV inmates.

386.   Upon learning of the presence of ventilation, moisture, humidity, temperature control, and biological contamination problems at WHV and the resulting significant health risks posed to the WHV inmate population, Physical Plant Supervisor of WHV Treppa was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

387. Despite the duty owed to WHV inmates and knowledge of the ventilation, humidity, temperature, and water intrusion problems, and subsequent health risks associated with these infrastructure deficiencies, Physical Plant Supervisor of WHV Treppa was deliberately indifferent to the health and safety of the WHV inmates and directed maintenance employees to paint over rust and visible mold present on the facility's bathroom wall and to grout over biological contamination in the facility's shower.

388. Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Physical Plant Supervisor of WHV Treppa was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

    a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

    b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

    c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

    d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### *6)   Physical Plant Supervisor Carter*

389.   As Physical Plant Supervisor of WHV, Carter was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

390.   In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Carter was responsible for ensuring that preventable health hazards, such as problems with ventilation, water intrusion, humidity, temperature regulation, and biological contamination, were identified, reported to his superiors, and eradicated from the facility or otherwise remediated.

391.   As Physical Plant Supervisor of WHV, Carter was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature

control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

392.   Upon information and belief, Defendant Carter read Defendants Bullard and Dreffs's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

393.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Supervisor of WHV Carter failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of injury, health hazards, or danger to inmates caused by damaged, broken, or non-functioning ventilation, moisture, humidity, and temperature control infrastructure within WHV.

394.   As Physical Plant Supervisor of WHV, Carter was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that critical ventilation, moisture, humidity, and temperature control systems were damaged, broken, non-functioning, or long-overdue for replacement, and risked injury, health hazard, or danger to inmates.

395.   Upon information and belief, Physical Plant Supervisor of WHV Carter was aware of the presence of ventilation failures, poor drainage, water damage, concrete spalling, rust, and biological contamination at WHV at all relevant times.

396.   Upon information and belief, Physical Plant Supervisor of WHV Carter was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

397.   Upon learning of the presence of ventilation, moisture, humidity, temperature control, and biological contamination problems at WHV and the resulting significant health risks posed to the WHV inmate population, Physical Plant Supervisor of WHV Carter was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

398.   Despite the duty owed to WHV inmates and knowledge of the ventilation, humidity, temperature, and water intrusion problems, and subsequent health risks associated with these infrastructure deficiencies, Physical Plant Supervisor of WHV Carter was deliberately indifferent to the health and safety of the WHV inmates and directed maintenance employees to paint over rust and visible mold present on the facility's bathroom wall and to grout over biological contamination in the facility's shower.

399.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Physical Plant Supervisor of WHV

Carter was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV, among other things:

a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### 7)     *Physical Plant Supervisor Dreffs*

400.   As Physical Plant Superintendent of WHV, Dreffs was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

401.   In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Dreffs was responsible for ensuring that preventable health hazards, such as problems with ventilation, water intrusion, humidity, temperature regulation, and biological contamination, were identified, reported to his superiors, and eradicated from the facility or otherwise remediated.

402.   As Physical Plant Supervisor of WHV, Dreffs was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

403.   Defendant Dreffs own Annual Physical Plant Report of WHV detailed the significant infrastructural deficiencies at WHV.

404.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Supervisor of WHV Dreffs failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of injury, health hazards, or danger to inmates caused by damaged, broken,

or non-functioning ventilation, moisture, humidity, and temperature control infrastructure within WHV.

405.   As Physical Plant Supervisor of WHV, Dreffs was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that critical ventilation, moisture, humidity, and temperature control systems were damaged, broken, non-functioning, or long-overdue for replacement, and risked injury, health hazard, or danger to inmates.

406.   Upon information and belief, Physical Plant Supervisor of WHV Dreffs was aware of the presence of ventilation failures, poor drainage, water damage, concrete spalling, rust, and biological contamination at WHV at all relevant times.

407.   Upon information and belief, Physical Plant Supervisor of WHV Dreffs was, at relevant times, aware that the above-listed issues at WHV posed a potential significant health risk to WHV inmates.

408.   Upon learning of the presence of ventilation, moisture, humidity, temperature control, and biological contamination problems at WHV and the resulting significant health risks posed to the WHV inmate population, Physical Plant Supervisor of WHV Dreffs was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements

so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

409. Despite the duty owed to WHV inmates and knowledge of the ventilation, humidity, temperature, and water intrusion problems, and subsequent health risks associated with these infrastructure deficiencies, Physical Plant Supervisor of WHV Dreffs was deliberately indifferent to the health and safety of the WHV inmates and directed maintenance employees to paint over rust and visible mold present on the facility's bathroom wall and to grout over biological contamination in the facility's shower.

410. Despite the duty owed to WHV inmates and knowledge of infrastructure-related health risks at WHV, Physical Plant Supervisor of WHV Dreffs was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV, among other things:

    a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

    b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

    c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### 8)   *Physical Plant Superintendent Bullard*

411.   As Physical Plant Superintendent of WHV, Bullard was responsible for the overall physical condition of WHV and overseeing the maintenance, repair, and improvement of the facility.

412.   In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Bullard was responsible for ensuring that preventable health hazards, such as problems with ventilation, water intrusion, humidity, temperature regulation, and biological contamination, were identified, reported to his superiors, and eradicated from the facility or otherwise remediated.

413.   As Physical Plant Superintendent of WHV, Bullard was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

414.   Bullard's own Annual Physical Plant Reports of WHV detail the significant infrastructural deficiencies at WHV.

415.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Superintendent of WHV Bullard failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of injury, health hazards, or danger to inmates caused by damaged, broken, or non-functioning ventilation, moisture, humidity, and temperature control infrastructure within WHV.

416.   As Physical Plant Superintendent of WHV, Bullard was in a position to learn via observation of the facility, inmate grievances, or from his subordinates, that critical ventilation, moisture, humidity, and temperature control systems were damaged, broken, non-functioning, or long-overdue for replacement, and risked injury, health hazard, or danger to inmates.

417.   Upon information and belief, Physical Plant Superintendent of WHV Bullard was aware of the presence of ventilation failures, poor drainage, water

damage, concrete spalling, rust, and biological contamination at WHV at all relevant times.

418.   Upon information and belief, Physical Plant Superintendent of WHV Bullard was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

419.   Upon learning of the presence of ventilation, moisture, humidity, temperature control, and biological contamination problems at WHV and the resulting significant health risks posed to the WHV inmate population, Physical Plant Superintendent of WHV Bullard was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

420.   Despite the duty owed to WHV inmates and knowledge of the ventilation, humidity, temperature, and water intrusion problems, and subsequent health risks associated with these infrastructure deficiencies, Physical Plant Superintendent of WHV Bullard was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV, among other things:

a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

**B)** **The Decisionmakers at MDOC**

*1)* ***Director Washington***

421. As MDOC Director, Washington was responsible for overseeing the

health and safety of WHV inmates, including Plaintiffs, from, among other things,

preventable environmental health hazards like water damage to infrastructure, lack of ventilation, and biological contamination and ensuring that the WHV facility was a well-maintained, healthy environment.

422. Washington knew that the MDOC had not utilized its budget to invest in infrastructural improvement and, consequently, that the conditions at the facility were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination, which could pose a serious risk of the health and safety of inmates.

423. Upon information and belief, Defendant Washington read Defendants Bullard and Dreffs's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

424. With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Director Washington failed to administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of water intrusion, poor ventilation, biological contamination and other hazards, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards as a result.

425. As MDOC Director, Washington was in a position to learn via inmate grievances or from her subordinates that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for

inmates at WHV, including the presence of mold in WHV as early as January of 2015

426. The grievances women filed, complaining of water intrusion, dampness, lack of ventilation, respiratory issues and mold-related ailments, and biological contamination in the facility, brought the issue directly to the attention of Defendant Washington during Step Three of the inmates' grievance process, as early as January of 2015.

427. As MDOC Director, Washington was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

428. Upon information and belief, Director Washington was aware of these infrastructural conditions and the associated risks of environmental hazards and biological contamination as early as January of 2015.

429. Upon information and belief, Director Washington was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

430. Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population,

Director Washington was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

431.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related risks at WHV, Director Washington was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

    a.  Failing to coordinate and administer effective testing of the biological contamination present at the facility;

    b.  Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

    c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

    d.  Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

    e.  Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.  Budgeting money in such a way that necessary structural and mechanical repairs went unfunded, resulting in damp conditions and an environment ripe for mold proliferation;

### 2)    *Deputy Director McKee*

432.    As CFA Deputy Director, McKee was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards like water damage to infrastructure, lack of ventilation, and biological contamination, and ensuring that the WHV facility was a well-maintained, healthy environment.

433.    Upon information and belief, Defendant McKee read Defendant Bullard's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

434.    McKee was in a position to know that the MDOC had not utilized its budget to invest in infrastructural improvement and, consequently, that the conditions at the facility were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

96

435.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Director McKee failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of water intrusion, poor ventilation, biological contamination and other hazards, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards as a result.

436.   As Deputy Director, McKee was in a position to learn from his subordinates that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV at all relevant time.

437.   As Deputy Director, McKee was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

438.   Upon information and belief, Deputy Director McKee was aware of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at all relevant times.

439.   Upon information and belief, Deputy Director McKee was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

440.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Deputy Director McKee was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

441.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Deputy Director McKee was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

    a.  Failing to coordinate and administer effective testing of the biological contamination present at the facility;

    b.  Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

    c.  Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the

growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination. Failing to promulgate and administer MDOC policies related to preventive and emergency maintenance.

### 3) *Jackson Region Assistant Deputy Director Bush*

442. As Jackson Region Assistant Deputy Director, Bush was responsible for overseeing the health and safety of WHV inmates, including Plaintiffs, from, among other things, preventable environmental health hazards, like water damage to infrastructure, lack of ventilation, and biological contamination, and ensuring that the WHV facility was a well-maintained, healthy environment.

443. Upon information and belief, Defendant Bush read Defendants Bullard and Dreffs's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

444.   Bush was in a position to know that the MDOC had not utilized its budget to invest in infrastructural improvement and, consequently, that the conditions at the facility were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

445.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Jackson Region Assistant Deputy Director Bush failed to advocate for or administer any budgetary expenditures to improve the facility and eliminate or lessen the risk of water intrusion, poor ventilation, biological contamination and other hazards, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards as a result..

446.   As Jackson Region Assistant Deputy Director, Bush was in a position to learn from his subordinates that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV at all relevant times.

447.   As Jackson Region Assistant Deputy Director, Bush was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature

control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

448.   Upon information and belief, Jackson Region Assistant Deputy Director Bush was aware of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at all relevant times.

449.   Upon information and belief, Jackson Region Assistant Deputy Director Bush was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

450.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Jackson Region Assistant Deputy Director Bush was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

451.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Jackson Region Assistant Deputy Director Bush was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### 4) *Deputy Director Gulick*

452. As BOA Deputy Director, Gulick was the principal decisionmaker in determining the MDOC's budget and the allocation of funds as to prisoner healthcare and facility improvements, among other things.

453. Upon information and belief, Defendant Gulick read Defendants Bullard and Dreffs's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

102

454.   Gulick knew that the MDOC had not utilized its budget to invest in infrastructural improvement at WHV and, consequently, that the conditions at the facility were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

455.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Deputy Director Gulick failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate or lessen the risk of water intrusion, poor ventilation, biological contamination and other hazards, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards as a result..

456.   As Deputy Director, Gulick was in a position to learn from his subordinates that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV at all relevant times.

457.   As Deputy Director, Gulick was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

458.   Upon information and belief, Deputy Director Gulick was aware of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at all relevant times.

459.   Upon information and belief, Deputy Director Gulick was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

460.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Deputy Director Gulick was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

461.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related health risks at WHV, Deputy Director Gulick was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

a.  Failing to coordinate and administer effective testing of the biological contamination present at the facility;

104

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination. Budgeting money in such a way that necessary structural and mechanical repairs went unfunded, resulting in damp conditions and an environment ripe for mold proliferation;

### 5) *Physical Plant Division Administrator Vallad*

462. As Physical Plant Division Administrator, Vallad was responsible for the overall physical condition of MDOC facilities, and overseeing the maintenance, repair, and improvement of the facilities, including WHV.

463. In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Vallad was responsible for ensuring that a preventable health hazards, such as problems with ventilation, water intrusion,

105

humidity, temperature regulation, and biological contamination, were identified, reported to his superiors, and eradicated from the facility.

464. Upon information and belief, Defendant Vallad read Defendants Bullard and Dreffs's Annual Physical Plant Reports of WHV, which detailed the significant infrastructural deficiencies at WHV.

465. As Physical Plant Division Administrator, Vallad was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

466. With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, Physical Plant Division Administrator Vallad failed to advocate for necessary budgetary expenditures to improve the facility and eliminate the risk of injury, health hazards, or danger to inmates caused by damaged, broken, or non-functioning ventilation, moisture, humidity, and temperature control infrastructure within WHV.

467. As Physical Plant Division Administrator, Vallad was in a position to learn via observation of the facility, or from his subordinates, that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV.

468.   Upon information and belief, Physical Plant Division Administrator Vallad was aware these infrastructural conditions and the associated risks of environmental hazards and biological contamination at all relevant times.

469.   Upon information and belief, Physical Plant Division Administrator Vallad was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

470.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, Physical Plant Division Administrator Vallad was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

471.   Despite the duty owed to WHV inmates and knowledge of the infrastructure-related risks at WHV, Physical Plant Division Administrator Vallad was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

   a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

107

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Allowing WHV to fall into such disrepair that the ventilation and HVAC systems stopped functioning adequately, among other infrastructural failings, so as to foster dangerous living conditions;

f. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

g. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

### *6)*   *State Administrative Manager Moore*

472. As State Administrative Manager, Moore was responsible for overseeing the administration of Michigan's correctional system, including WHV In overseeing the physical condition of WHV, as well its maintenance, repair, and improvement, Defendant Moore was responsible for ensuring that preventable health

hazards, such water intrusion, lack of ventilation, and biological contamination, were identified, reported to their superiors, and eradicated from the facility.

473.   Upon information and belief, Defendant Moore read Defendants Bullard and Dreffs's Annual Physical Plant Report of WHV, which detailed the significant infrastructural deficiencies at WHV.

474.   As State Administrative Manager, Moore was aware of the conditions of the WHV facility and knew that such conditions were likely to, and did in fact, result in ventilation problems, humidity control problems, temperature control problems, water intrusion, and biological contamination that posed the significant risk of the health and safety of inmates.

475.   With deliberate indifference to the known risk to WHV inmates posed by the conditions in the facility, State Administrative Manager Moore failed to advocate for or administer necessary budgetary expenditures to improve the facility and eliminate the risk of water intrusion, poor ventilation, biological contamination and other hazards, and the associated and foreseeable risk that inmates housed in WHV would suffer health hazards as a result..

476.   As State Administrative Manager, Moore was in a position to learn from their subordinates, that problems with ventilation, humidity, temperature control, and water intrusion were resulting in environmental hazards for inmates at WHV.

477.   Upon information and belief, State Administrative Manager Moore was aware of these infrastructural conditions and the associated risks of environmental hazards and biological contamination at all relevant times.

478.   Upon information and belief, State Administrative Manager Moore was, at all relevant times, aware that these infrastructural conditions at WHV posed a potential significant health risk to WHV inmates.

479.   Upon learning of the presence of infrastructural deficiencies at WHV and the resulting significant health risk posed to the WHV inmate population, State Administrative Manager Moore was required to take speedy and effective measures to ensure the health and safety of WHV inmates from the health hazards caused by these ongoing infrastructural failures within WHV, to secure facility improvements so as to prevent further health hazards in the facility, and to report these health hazards to their superiors.

480.   Despite the duty owed to WHV inmates and knowledge of the mold and related health risks at WHV, State Administrative Manager Moore was deliberately indifferent to the health and safety of the WHV inmates and failed to take effective action to address the health hazards caused by these ongoing infrastructural failures within WHV by, among other things:

> a. Failing to coordinate and administer effective testing of the biological contamination present at the facility;

b. Failing to coordinate and administer effective methods to eradicate biological contamination at the facility;

c. Failing to advocate for, coordinate, and administer effective facility improvements so as to prevent the growth and spread of biological contamination in the facility;

d. Attempting to cover up the presence of water intrusion, water damage, and resulting biological contamination at the facility;

e. Knowing about the substantial risk of health hazards and other environmental conditions posed to Plaintiffs by the infrastructural deficiencies in WHV and disregarding that risk; and

f. Implicitly authorizing, approving, or knowingly acquiescing in the systemwide failure to test, treat, repair, and disinfect WHV facilities to prevent and control further environmental health hazards such as concrete failure, ceiling failure, and biological contamination.

## **CLASS ACTION ALLEGATIONS**

481. The Class Representatives bring this action as a class action against currently employed or appointed MDOC and WHV Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure 23.

482. The Class Representatives assert their claims on behalf of a Class defined as follows:

> All detainees and inmates of WHV who were incarcerated at WHV since November 20, 2016.

(collectively referred to as "the proposed Class").

483.    The proposed Class excludes Defendants' officers, directors, and employees, as well as any judicial officer who presides over this action and members of the judicial officer's immediate family.

484.    **Fed. R. Civ. P. 23(a)(1)—Numerosity / Impracticality of Joinder:** The proposed Class is so numerous that joinder of all proposed Class Members is impracticable. On information and belief, there are over a thousand Class Members in the proposed Class, all of whom are or will be subject to the conditions set forth herein and therefore face a significant risk of serious illness and injury.

485.    Class members are identifiable using records maintained in the ordinary course of business by WHV.

486.    **Fed. R. Civ. P. 23(a)(2)—Commonality**: Common questions of law and fact exist as to all proposed Class Members. Among the common questions are, including but not limited to:

a.      Whether the unhygienic and dangerous conditions at WHV subject the proposed Class to an ongoing, substantial, and imminent risk of physical and psychological harm, illness, and death;

b.      Whether the conditions at WHV violate the Eighth Amendment's prohibition of cruel and unusual punishment;

c.      Whether the unhygienic and dangerous conditions at WHV, and Defendants' refusal to effectively remedy the conditions, result in constitutionally cognizable harm or present a constitutionally excessive risk of harm;

d.      Whether Defendants knowingly instituted or condoned the dangerous and unhygienic conditions at WHV;

112

e.      Whether Defendants have been deliberately indifferent to the actual and serious risk of mental and physical suffering of proposed Class;

f.      Whether Defendants maintain a policy, custom, and/or widespread practice of violating proposed Class's constitutional rights through exposure to the dangerous conditions at WHV;

g.      The nature, scope, and operation of Defendants' practices, policies and customs as applied to prisoners incarcerated at WHV; and

h.      Whether Defendants failure to hire, train, and/or supervise competent WHV staff and agents resulted in violations of proposed Class's constitutional rights.

487.  **Fed. R. Civ. P. 23(a)(3)—Typicality:** The claims of the Class Representatives are typical of other members of the proposed Class, as their claims from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the class claims.

488.  Further, Defendants are expected to raise common defenses to these claims, so that final relief is appropriate for both Class.

489.  **Fed. R. Civ. P. 23(a)(4)—Adequacy of Representation**: The Class Representatives will fairly and adequately represent the interests of the proposed Class and will serve diligently as class representatives. Their interests are aligned with those of the purported Class and they have retained counsel experienced in civil rights litigation, litigation involving rights of prisoners, and class action litigation.

490.  This action is maintainable as a class action because Defendants have acted or refused to act on grounds that generally apply to the proposed Class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting

the proposed Class as a whole.

491.   **Fed. R. Civ. P. 23(b)**—

492.   The proposed Class should also be certified under Federal Rule of Civil

Procedure 23(b)(1) and/or (b)(2) because:

a.   The prosecution of separate actions by individual Class
Members would create a risk of inconsistent or  varying  adjudication
with  respect  to  individual  Class  Members  that  would  establish
incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual Class
Members would create a risk of adjudications with respect to them
which would, as a practical matter, be dispositive of the interests of
other Class Members not parties to the adjudications, or substantially
impair or impede their ability to protect their interests; and/or

c.   Defendant has acted or refused to act on grounds generally
applicable to the proposed Class, thereby making appropriate final and
injunctive relief with respect to the Class Members as a whole.

493.   Alternatively, this case can be maintained as a class action with respect

to particular issues under Federal Rule of Civil Procedure 23(c)(4).

## CAUSES OF ACTION

### COUNT I: VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
*(Against All Defendants on behalf of Plaintiffs and the Proposed Class)*

494.   Plaintiffs  and  the  proposed  Class,  by  reference,  incorporate  the

preceding paragraphs as though fully set forth herein.

495.   Inadequate ventilation and poor air flow violate the Eighth Amendment when it undermines inmate health and facility sanitation.

496.   Defendants had actual knowledge through personal observation that there was a substantial risk of serious harm to the proposed Class due to inadequate ventilation, resulting from use of old, ill-maintained, and broken equipment, that caused inmates to endure persistent and long-term exposure to environmental contaminants, including microscopic fungi, spore-producing mold, mites, fiberglass insulation, harmful chemicals and other contaminants.

497.   Defendants had actual knowledge through personal observation that there was a substantial risk of serious harm to the proposed Class due to water intrusion and persistent leaks throughout WHV, which exacerbated the ventilation problems and caused inmates to endure a damp, dangerous, water-damaged environment.

498.   Defendants' personal observations are demonstrated most obviously by the physical plant reports, which identified the serious need for repairs and replacements in the HVAC system and with vents and air-handling units year after year. Defendants chose to ignore these reports and watch WHV slip into a state of filth and disrepair. Defendants' disregard is demonstrated by its lack of action each in the face of these reports.

499.   In addition to actual knowledge by personal observation, numerous complaints were filed by Plaintiffs and members of the proposed Class and submitted to Defendants and other prison officials about the building conditions and the harm they are causing, all of which were inadequately addressed by Defendants and many of which were intentionally ignored.

500.   In other words, Defendants knew there was a substantial risk of serious harm to the proposed Class but failed to take reasonable measures to abate the problems and protect Plaintiffs and the proposed Class from serious risk of injury and instead actively worked to conceal the problem.

501.   In particular, Defendants had actual knowledge of the mold that the damp and poorly ventilated conditions fostered at WHV.

502.   Defendants had actual knowledge of Plaintiffs' and the proposed Class's asserted serious needs but disregarded them by failing to take reasonable measures to abate them.

503.   Defendants created a policy or custom under which the unconstitutional practice of intentionally failing to take reasonable steps to remedy ventilation issues, instead ignoring the problems, and the issues resulting from, and concealing the problems altogether in the face of actual knowledge that the inmates faced a substantial risk of serious harm as a result and/or Defendants allowed the continuance of such a policy or custom.

504.   The conduct of Defendants, as alleged in this complaint, violates the rights guaranteed to Plaintiffs and the proposed Class they represent under the Eighth Amendment to the United States Constitution and laws in violation of 42 U.S.C. § 1983, subjecting them to a substantial risk of serious harm, and causing the injuries alleged in this Complaint.

505.   Such actions and decisions on the part of Defendants, individually, separately, and/or jointly, were done in a knowing, willful, or in a reckless manner and in bad faith.

506.   By virtue of the special relationship of the state-imposed custodial setting, Defendants were under an affirmative obligation to spend their resources to protect Plaintiffs and proposed Class from harm.

507.   Defendants' policies, practices, and customs violate Plaintiffs' basic human rights and dignity, and their right to be free from unconstitutional unhygienic and dangerous conditions and cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

508.   These policies, practices, and customs have been and continue to be implemented by the Defendants and their agents and employees, under color of law, in their official and individual capacities, and are the proximate cause of the ongoing violations of the constitutional rights of Plaintiffs and the proposed Class.

509.   Defendants have been and are aware of the unconstitutional and dangerous conditions of the WHV and have unreasonably instituted and/or condoned such conditions and/or been deliberately indifferent to the inhumane conditions and rampant violations of law and the substantial risk of serious harm and actual harm to Plaintiffs and the proposed Class.

510.   Defendants have failed to prevent, caused, and continue to cause Plaintiffs and the proposed Class tremendous mental anguish, suffering, and pain, as well as the serious and lasting injury they are currently experiencing or are at risk of experiencing. Defendants' conduct is the direct and proximate cause of the constitutional violations and injuries to Plaintiffs and the proposed Class as set forth above.

511.   Defendants' failure and refusal to remedy the ventilation issues at WHV directly exposed Plaintiffs and the proposed Class to an excessive risk of serious illness and injury.

512.   As a result of the Defendants' actions and/or omissions, Plaintiffs and the proposed Class were deprived of their fundamental rights guaranteed by the U.S. Constitution,.

513.   As a result of Defendants' unlawful conduct, Plaintiffs are entitled to all damages and relief available at law and equity.

514.   As a result of Defendants' unlawful conduct, the Class Representatives and the proposed Class are entitled to injunctive relief and other equitable relief permitted by law.

### COUNT II: NEGLIGENCE

*(Against  Defendants Howard, Brewer, McKee, Bush, Gulick, Vallad, Johnson, Osterhout, Treppa, Carter, Dreffs, Bullard, and Moore on behalf of Plaintiffs and the Proposed Class)*

515.   Plaintiffs and the proposed Class hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

516.   As a result of Defendants' unlawful conduct, Plaintiffs are entitled to all damages and relief available at law and equity.

517.   The Class Representatives seek on behalf of the proposed Class injunctive relief and other relief to the extent available in equity.

518.   Under Michigan law, a negligence claim requires (1) "that the defendant owed a legal duty to the plaintiff," (2) "that the defendant breached or violated the legal duty," (3) "that the plaintiff suffered damages," and (4) "that the breach was a proximate cause of the damages suffered." *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449 (1993).

519.   The acts and conduct of Defendants alleged in the above stated cause of action when considered under the laws of the State of Michigan, constitute both negligence and gross negligence and the Defendants are not entitled to the immunity of MCL § 691.1407(2) because they were grossly negligent.

520.   The conduct of the Defendants was so reckless as to demonstrate a substantial lack of concern for whether injury resulted in and exhibited a deliberate indifference by intentional acts and/or omissions amounting to gross negligence.

521.   Defendants owed Plaintiffs and the proposed Class a duty of care.

522.   Defendants not only breached their duty to Plaintiffs and the proposed Class but also acted with gross negligence under the laws of the State of Michigan as to their safety, protection and health by:

a.   Failing to provide prisoners with a functioning heating, ventilation and air conditioning (HVAC) system, functioning windows and functioning roofing for safety and health, in violation of MDOC's Humane Treatment and Living Conditions for Prisoners Policy Directive 03.03.130, as well as ordinary standards of care;

b.   Failing to ensure that a housekeeping plan is developed and maintained for all areas of their respective facilities that is consistent with requirements set forth in the Preventive and Emergency Maintenance for Correctional Facilities, in violation of MDOC Policy Directive 04.03.100, Policy Directive 04.03.102, and the MDOC Sanitation Manual, as well as ordinary standards of care;

c.   Failing to issue necessary cleaning materials and equipment to housing unit staff to be provided to offenders responsible for the cleanliness and orderliness of their individual living areas, including walls, floors, sinks, toilets, windows, beds, lockers, and property, in violation of MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100, Policy Directive 04.03.102, and the MDOC Sanitation Manual, and other appropriate standards of care;

d.   Failing to immediately and effectively correct deficiencies that threaten the health or welfare of staff or offenders, in violation of MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100 and the MDOC Sanitation Manual, and other appropriate standards of care;

120

       e.     Failing to contact the Regional Environmental Sanitarian to determine appropriate temporary corrective measures to be implemented when deficiencies which threatened the health or welfare of staff or offenders could not be immediately and effectively corrected, in violation of MDOC's Preventive and Emergency Maintenance for Correctional Facilities Policy Directive 04.03.100, and other appropriate standards of care;

       f.     Failing to implement procedures necessary to effectively enforce requirements set forth in MDOC Policy Directives 04.03.100, 04.03.102, and 03.03.130, as well as the MDOC's Sanitation Manual;

       g.     Acting or failing to act in other ways to expose Plaintiffs to a known and extreme risk to their health and safety that may or will become known during discovery.

523.   It was foreseeable that Defendants actions and omissions, as set forth above, would result in injury to Plaintiffs and the proposed Class. It was foreseeable that haphazard retrofitting, leaky roofs, inoperable windows, inadequate ventilation, and outdated HVAC systems left derelict and in disrepair would contribute to an environment ripe for proliferation of environmental contaminants, including microscopic fungi, spore-producing mold, fiberglass insulation, mites, harmful chemicals and other particulates. It was further foreseeable that failure to properly clean or eradicate this proliferation would result in dangerous conditions and cause further cause harm to the incarcerated women at WHV.

524.   Defendants were the factual cause of Plaintiffs' and the proposed Class's injuries.

525.   Defendants' actions were the ones most immediate, efficient, and direct cause of Plaintiffs' and the proposed Class's injuries.

526.   As the direct and proximate result of Defendants' negligence, Plaintiffs are entitled to all damages and relief available at law and equity.

527.   As the direct and proximate result of Defendants' negligence, the Class Representatives and the proposed Class are entitled to injunctive relief and other all other relief available in equity.

## **RELIEF REQUESTED**

528.   WHEREFORE, Plaintiffs pray on behalf of themselves and the Class Representatives pray on behalf of members of the proposed Class for entry of judgment finding and awarding as follows:

a)      Certifying the proposed Class under Rule 23;

b)      Granting the Class Representatives leave to amend to add additional defendants as they replace named Defendants in their respective positions so to permit the Class Representatives to continue to seek to address ongoing harm;

c)      Adjudging the practices and conduct of Defendants complained of herein to be in violation of the rights guaranteed under the U.S. Constitution and Federal law;

d)      Adjudging that Defendants were deliberately indifferent to the serious risk of harm to the Plaintiffs and proposed Class;

e)      Adjudging that Defendants failed to protect Plaintiffs and the proposed Class from a state-created danger;

f)      Adjudging Defendants Howard, Brewer, McKee, Bush, Gulick, Vallad, Johnson, Osterhout, Treppa, Carter, Dreffs, Bullard, and Moore acted negligently;

g)      Awarding injunctive relief to the Class Representatives and the proposed Class against Defendants currently employed or appointed to positions within and for the MDOC and the WHV, and any other equitable relief available;

h)      Awarding Plaintiffs Bailey, Clark, and Zentz all other relief available under 42 U.S.C. § 1983, to be determined at trial, with interest on such amounts against Defendants, jointly and severally;

i)      Awarding Plaintiffs Bailey, Clark, and Zentz of actual damages, including those arising from loss of past and future income and benefits, humiliation, mental anguish, loss of reputation, emotional distress and other harm, in an amount in excess of $75,000 against Defendants Washington, Brewer, McKee, Bush, Gulick, Johnson, Osterhout, Treppa, Carter, Dreffs, Bullard, Vallad, and Moore in their individual capacity;

j)      For an award of punitive damages for Plaintiffs Bailey,

Clark, and Zentz in an amount to be determined at trial;

k)      For an award to Plaintiffs and the proposed Class of their

attorneys' fees, disbursements, and costs in this action, pursuant to 42

U.S.C. § 1988, and as otherwise available at law or in equity;

l)      For an award of prejudgment interest;

m)      For such other and further relief as the Court deems just

and equitable.

Dated: September 15, 2023            Respectfully submitted,

/s/Melanie A. Johnson
**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Melanie A. Johnson (MN0400814)
80 South Eighth Street, Ste. 4700
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
mjohnson@nka.com

**PITT   MCGEHEE   PALMER   &
RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)

124

117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
220 W. Congress, Fourth Floor
Detroit, MI 48326
P: (313) 777-7LAW
jon@jmarkolaw.com

**LAW OFFICES OF DAVID S.
STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

**ON BEHALF OF THE PLAINTIFFS
AND THE PUTATIVE CLASS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2023 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Jennifer A. Foster    fosterj15@michigan.gov, bryank1@michigan.gov, marcumj1@michigan.gov, thomasl21@michigan.gov

John L. Thurber    thurberj@michigan.gov, heysek@michigan.gov, thomasl21@michigan.gov, toddw1@michigan.gov

Joshua S. Smith    smithj191@michigan.gov, heysek@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Keith Clark    clarkk33@michigan.gov, heysek@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Kristin M. Heyse    heysek@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Michael R. Dean    deanm2@michigan.gov, heysek@michigan.gov, marcumj1@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Sara Elizabeth Trudgeon    trudgeons@michigan.gov, bryank1@michigan.gov, heysek@michigan.gov, toddw1@michigan.gov

Zachary Austin Zurek    zurekz1@michigan.gov, bryank1@michigan.gov, heysek@michigan.gov, toddw1@michigan.gov

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules of Civil

Procedure and an Affidavit of Service will be filed with the Court upon completion

of service.

Dated: September 15, 2023        /s/Melanie A. Johnson

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN 304657)
Rebekah L. Bailey (MN 0389599)
Melanie A. Johnson (MN0400814)
80 South Eighth Street, Ste. 4700
Minneapolis, MN 55402
P: (612) 256-3200
F: (612) 338-4878
morgan@nka.com
bailey@nka.com
mjohnson@nka.com

2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| PAULA BAILEY, individually, and KRYSTAL CLARK, and HOPE ZENTZ, on behalf of themselves and others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>HEIDI WASHINGTON, in her official and individual capacity, JEREMY HOWARD, in his individual and official capacity, SHAWN BREWER, in his official and individual capacity, KENNETH MCKEE, in his individual and official capacity, JEREMY BUSH, in his individual and official capacity, LIA GULICK, in her individual and official capacity, ED VALLAD, in his individual and official capacity, DAVID JOHNSON, in his individual and official capacity, KARRI OSTERHOUT, in her individual and official capacity, JOSEPH TREPPA, in his official and individual capacity, DAN CARTER, in his official and individual capacity, JOEL DREFFS, in his official and individual capacity, RICHARD BULLARD, in his official and individual capacity, and TONI MOORE, in her official and individual capacity,<br><br>        Defendants. | Case No. 2:19-cv-13442 VAR-EAS<br><br>District Judge Victoria A. Roberts<br>Mag. Judge Elizabeth A. Stafford |

<div style="display:flex">
<div>

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
220 W. Congress, Fourth Floor
Detroit, MI 48326
P: (313) 777-7LAW
jon@jmarkolaw.com

**NICHOLS KASTER, PLLP**
Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0389599)
Melanie A. Johnson (MN0400814)
80 South Eight Street, Suite 4700
Minneapolis, MN  55402
P: (612) 256-3200
morgan@nka.com
bailey@nka.com
mjohnson@nka.com

**PITT MCGEHEE PALMER & RIVERS PC**
Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Channing Robinson-Holmes (P81698)
117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com
brivers@pittlawpc.com
crobinson@pittlawpc.com

**LAW OFFICES OF DAVID S. STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

</div>
<div>

**MI DEP'T OF ATTORNEY GEN.**
Joshua S. Smith (P63349)
Kristen M. Heyse (P64353)
Michael R. Dean (P71333)
Jennifer A. Foster (P75947)
Sara E. Trudgeon (P82155)
John L. Thurber (P44989)
Keith G. Clark (P56050)
MDOC Division
P.O. Box 30217
Lansing, MI  48909
P: (517) 335-3055
smithj191@michigan.gov

***Attorneys for Defendants***

</div>
</div>

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

*Attorneys for Plaintiffs and the Putative Class*

## JURY DEMAND

Plaintiffs and the proposed Class they represent hereby demand a trial by jury in the above-captioned matter.

Dated: September 15, 2023                    Respectfully submitted,

                                             /s/Melanie A. Johnson
                                             **NICHOLS KASTER, PLLP**
                                             Matthew H. Morgan (MN 304657)
                                             Rebekah L. Bailey (MN 0389599)
                                             Melanie A. Johnson (MN0400814)
                                             80 South Eighth Street, Ste. 4700
                                             Minneapolis, MN 55402
                                             P: (612) 256-3200
                                             F: (612) 338-4878
                                             morgan@nka.com
                                             bailey@nka.com
                                             mjohnson@nka.com

                                             **PITT MCGEHEE PALMER & RIVERS PC**
                                             Cary S. McGehee (P42318)
                                             Beth M. Rivers (P33614)
                                             Channing Robinson-Holmes (P81698)

3

117 W. 4th Street, Suite 200
Royal Oak, MI  48067
P: (248) 398-9800
cmcgehee@pittlawpc.com

**MARKO LAW, PLLC**
Jonathan R. Marko (P72450)
220 W. Congress, Fourth Floor
Detroit, MI 48326
P: (313) 777-7LAW
jon@jmarkolaw.com

**LAW OFFICES OF DAVID S. STEINGOLD, PLLC**
David S. Steingold (P29752)
Samantha Baker (P83674)
500 Griswold Street, Suite 2320
Detroit, MI 48226
P: (313) 962-0000
detroitdefender@yahoo.com

**EXCOLO LAW, PLLC**
Solomon M. Radner (P73653)
26700 Lahser Road, Suite 401
Southfield, MI 48033
P: (866) 939-2656
sradner@excololaw.com

**ON BEHALF OF THE PLAINTIFFS AND THE PUTATIVE CLASS**

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2023 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Jennifer A. Foster     fosterj15@michigan.gov, bryank1@michigan.gov, marcumj1@michigan.gov, thomasl21@michigan.gov

John L. Thurber     thurberj@michigan.gov, heysek@michigan.gov, thomasl21@michigan.gov, toddw1@michigan.gov

Joshua S. Smith     smithj191@michigan.gov, heysek@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Keith Clark     clarkk33@michigan.gov, heysek@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Kristin M. Heyse     heysek@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Michael R. Dean     deanm2@michigan.gov, heysek@michigan.gov, marcumj1@michigan.gov, marshm3@michigan.gov, toddw1@michigan.gov

Sara Elizabeth Trudgeon     trudgeons@michigan.gov, bryank1@michigan.gov, heysek@michigan.gov, toddw1@michigan.gov

Zachary Austin Zurek     zurekz1@michigan.gov, bryank1@michigan.gov, heysek@michigan.gov, toddw1@michigan.gov

I hereby also certify that the foregoing document will be served to the Registered Agent of newly added Defendants or newly added Defendants

listed in the above-captioned matter pursuant to Rule 4 of the Federal Rules

of Civil Procedure and an Affidavit of Service will be filed with the Court

upon completion of service.


Dated: September 15, 2023         /s/Melanie A. Johnson
                                  **NICHOLS KASTER, PLLP**
                                  Matthew H. Morgan (MN 304657)
                                  Rebekah L. Bailey (MN 0389599)
                                  Melanie A. Johnson (MN0400814)
                                  80 South Eighth Street, Ste. 4700
                                  Minneapolis, MN 55402
                                  P: (612) 256-3200
                                  F: (612) 338-4878
                                  morgan@nka.com
                                  bailey@nka.com
                                  mjohnson@nka.com