UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA BAILEY, *et al*.,

Plaintiffs,

v.

HEIDI WASHINGTON, *et al*.,

Defendants.

Case No. 19-13442
Honorable Stephen J. Murphy
Magistrate Judge Elizabeth A. Stafford

---

**REPORT AND RECOMMENDATION FOLLOWING
EVIDENTIARY HEARING ON EXHAUSTION ISSUES
(ECF NO. 192)**

---

## I.     Introduction

In their second amended complaint (SAC), Plaintiffs Paula Bailey,

Krystal Clark, and Hope Zentz, on behalf of themselves and similarly

situated women who have been inmates at the Huron Valley Correctional

Facility for Women (WHV), sue several officials of the Michigan Department

of Corrections (MDOC), alleging that WHV's poor ventilation and humid

conditions have made them sick.  ECF No. 161.  In August 2020, the

Honorable Victoria A. Roberts denied defendants' motion for summary

judgment, finding that factual issues remained about whether plaintiffs

exhausted their administrative remedies.  ECF No. 69.  After Judge

Roberts' retirement, the case was transferred to the Honorable Stephen J.

Murphy, and he denied defendants' second motion for summary judgment

on exhaustion grounds that was filed after plaintiffs' SAC.  ECF No. 191.

Defendants then moved for an evidentiary hearing to resolve the

disputed issues of fact related to the exhaustion issues, which Judge

Murphy granted and referred to the undersigned.  ECF No. 192; ECF No.

198 (citing *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015) (finding "that the

disputed issues of fact regarding exhaustion under the PLRA presented a

matter of judicial administration that can be decided in a bench trial").  The

referral of this matter for an evidentiary hearing is permitted under 28

U.S.C. § 636(b)(1)(B).

After the October 2024 evidentiary hearing and a review of the

parties' proposed findings of fact and conclusions of law, (ECF No. 215 and

ECF No. 216), the Court finds that defendants have failed to sustain their

burden of proof on whether plaintiffs sufficiently exhausted their

administrative remedies.

## II.    Claims in the Second Amended Complaint

In the SAC, plaintiffs allege that WHV facilities "suffer from roof leaks

and other forms of water penetration, leading to damp and damaged

carpets and ceilings, as well as a general humid environment."  ECF No.

2

161, PageID.3372.  They asserted that the humid conditions were caused
or exacerbated by failing exhaust and HVAC systems; haphazard
retrofitting; inoperable windows, grading, and gutters; and inadequate
ventilation.  *Id.*, PageID.3372, 3382-3393.

Plaintiffs' SAC says that the poor ventilation created a breeding
ground for allergens, including mold and mites, and that WHV supplied
inadequate cleaning supplies to the inmates who were tasked with cleaning
the facilities.  *Id.*, PageID.3394-3404.  The combination of poor ventilation
and strong-smelling cleaning chemicals made the inmates sick.  *Id.*,
PageID.3405-3406.

Plaintiffs claim that the mold exposure caused Bailey "sneezing,
constant coughing, shortness of breath, wheezing, dry [and] scaly skin,
nosebleeds, weight gain, muscle cramping, headaches, hair loss, rashes
that would blister and scar, chest pain, fatigue, frequent upper respiratory
infections, and difficulty breathing issues."  *Id.*, PageID.3406. Though she
was released from prison in 2021, she allegedly continues to suffer from
permanent scarring, COPD, and "seizures [that] could have been caused
by an infection in her brain from mold or environmental issues while at
WHV."  *Id.*, PageID.3409.

Clark claims to have suffered many ailments, including

3

severe respiratory issues, uncontrollable asthma, shortness of breath, breakouts on her face, rashes on her arms, legs, and ankles, weight gain, nosebleeds, incessant coughing, headaches, dizziness, bacterial infections, severe eye infections that have resulted in having to wear an eye patch, and most recently, ear infections that caused hearing loss and a white residue to grow and leak from her ears.

*Id.*, PageID.3410.  Shortly after her release from prison, an allergist "confirmed that she had an extreme allergy to mold and additionally confirmed that her symptoms were due to mold exposure."  *Id.*, PageID.3412.

Plaintiffs' SAC states that "Zentz developed a rash, a continuous cough, sore and scratchy throat, severe sinus issues…mental fogginess, dizziness, vision problems, hair loss, nosebleeds, lethargy, body cramps, and nausea."  *Id.*, PageID.3415.  Still imprisoned, she allegedly continues to suffer from those ailments.  *Id.*, PageID.3417.

## III.   Exhausting Administrative Remedies

### A.

The Prison Litigation Reform Act (PLRA) requires prisoners to "properly" exhaust all "available" administrative remedies before filing a lawsuit challenging prison conditions.  42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 88-90, 93 (2006).  The PLRA requires exhaustion of internal remedies for "all inmate suits about prison life, whether they involve

4

general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  To meet this requirement, an inmate must strictly comply with the grievance process provided by the prison. *Woodford*, 548 U.S. at 93-94.

"Failure to exhaust administrative remedies is an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence." *Lee*, 789 F.3d at 677.  "But a prisoner countering a motion alleging failure to exhaust must offer competent and specific evidence showing that he indeed exhausted his remedies, or was otherwise excused from doing so." *Parks v. Mich. Dep't of Corr.*, No. 2:20-cv-11673, 2021 WL 3533422, at *3 (E.D. Mich. May 17, 2021), *adopted*, 2021 WL 2820984 (E.D. Mich. July 7, 2021) (cleaned up). The Sixth Circuit "requires an inmate to make affirmative efforts to comply with the administrative procedures, and analyzes whether those efforts to exhaust were sufficient under the circumstances." *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (cleaned up).

The PLRA is meant to serve the interests of both the prisons and prisoners.  "It gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors." *Woodford*, 548 U.S. at 93 (cleaned

up).  But if a prisoner cannot make use of the prison grievance process—if administrative remedies are unavailable—she is excused from the exhaustion requirement.  *Ross v. Blake*, 578 U.S. 632, 643-44 (2016).

The Supreme Court has explained that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Ross*, 578 U.S. at 643.  And "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id*. at 643-44.

An administrative remedy is also unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id*. at 644.  Officials may not "devise procedural systems" that are "blind alleys and quagmire" designed to "trip up all but the most skillful prisoners."  *Id*. (cleaned up)*; see also Does 8-10 v. Snyder*, 945 F.3d 951, 965 (6th Cir. 2019) ("[T]he MDOC [Prison Rape Elimination Act] grievance process is, in practice, filled with contradictions and machinations, and these

6

contradictions and machinations render the process 'incapable of use.'")
(quoting *Ross*, 578 U.S. at 643).

## B.

MDOC Policy Directive (PD) 03.02.130 (effective 3/18/2019) has a
three-step procedure that prisoners must follow to complete the
administrative review process and properly exhaust grievances.  ECF No.
56-2.  The policy requires a prisoner to try to informally resolve the problem
with the allegedly offending staff within two business days of learning about
the grievable issue.  *Id.*, PageID.605, ¶ Q.  Then, within five business days
of those informal efforts, the prisoner may "file" a Step I grievance about
any unresolved issues by "send[ing]" it to the grievance coordinator.  *Id.*,
PageID.606, ¶ W.  The grievance coordinator then determines whether the
grievance should be "rejected pursuant to this policy."  *Id.*, PageID.606,
¶ Y.  "If the grievance is rejected, the grievance response shall state the
reason for the rejection without addressing the merits of the grievance."  *Id*.
If the grievance is accepted, the coordinator must assign it to the
appropriate respondent.  *Id.*  The respondent "shall" respond to the
grievance within 15 business days absent an extension.  *Id.*, ¶ Z.

To appeal the outcome at Step I, the prisoner may request a Step II
grievance form and then "file" it by "send[ing]" the completed appeal form

7

within ten business days of receiving the Step I response or, if no response was received, within ten business days after the date the response was due. *Id.*, PageID.607, ¶ DD. The same process applies for a prisoner to "file" a Step III appeal—the grievant must "send" the completed form within ten business days of receiving the Step II response or, if no response was received, within ten business days after the date the response was due. *Id.*, PageID.608, ¶ HH. Prisoners must appeal their grievances through Step III before suing. *Id.*, PageID.602, ¶ C.

The PD lists 14 reasons that a grievance coordinator may reject a grievance. *Id.*, PageID.603-604, ¶ J. Common reasons for rejections are that a grievance is "vague, illegible, or contains multiple unrelated issues"; "raises issues that are duplicative of those raised in another grievance filed by the grievant"; "filed in an untimely manner"; and "[t]wo or more prisoners and/or parolees have jointly filed a single grievance regarding an issue of mutual impact or submit identical individual grievances regarding a given issue as an organized protest." *Id*.

## IV.   Factual Issues

After reviewing defendants' motions for summary judgment on exhaustion grounds, Judge Roberts and Judge Murphy held that factual issues remained and denied summary judgment. ECF No. 69; ECF No.

191.  The Court summarizes those rulings and the remaining factual issues below.

In defendants' first motion for summary judgment, they argued that (1) plaintiffs failed to exhaust grievances that were completed after the filing of the complaint; (2) plaintiffs failed to name some defendants; and (3) the content of the grievances did not address the plaintiffs' claims.  ECF No. 56, PageID.582, 589, 594.  Rejecting those arguments, Judge Roberts found as follows:

**1. Bailey's Grievances**

    a. WHV-18-04-1116-03D—filed April 19, 2018 (ECF No. 62-5, PageID.922-927)

        i. Though there were two different grievances with the same number, and defendants denied having record of the one referencing mold, Bailey "submit[ted] a memorandum from MDOC indicating that it received her Step I grievance regarding the mold issue on April 20, 2018 and a date for a responses."  ECF No. 69, PageID.1017-1018 (citing ECF No. 62-5, PageID.923).

        ii. Bailey's Step II appeal was dated July 8, 2018, but the MDOC's receipt stamp was dated July 26, 2018.  *Id.*

9

"Bailey's Step II grievance was rejected as untimely," a

rejection that was upheld at Step III.  *Id.*, PageID.1018.  "It

is unclear why it took MDOC nearly three weeks to

receive the grievance."  *Id.*

iii. Defendants argued that Bailey's grievance 1116 was

rejected as a joint grievance, but she filed the grievance

on her own, the MDOC did not show that others filed

identical grievances or any evidence of an organized

protest, and Bailey highlighted her own adverse effects

from the mold.  Thus, factual issues remained.  *Id.*

b. WHV-2019-10-4358-28E—filed November 22, 2019 (ECF No.

56-3, PageID.627-631)

i. Judge Roberts rejected defendants' argument that

plaintiffs had to exhaust the grievance process before

filing suit.  *Id.*, PageID.1019.  The Step III grievance

appeal was filed after the initial complaint was filed.

"However, the Sixth Circuit has refused to dismiss an

action on exhaustion grounds where the administrative

grievance process was only completed while an appeal

was pending."  *Id.* (citing *Thaddeus–X v. Wozniak*, 215

F.3d 1327 (6th Cir. 2000) (although the claims were not
exhausted previously, court addressed merits of the
appeal because the action could simply be refiled upon
remand); *Curry v. Scott*, 249 F.3d 493, 502 (6th Cir.
2001)).

ii.  Although Bailey did not name all the defendants in this
grievance, a prisoner need not name unknown officials,
and "Bailey's grievance placed Defendants on notice of
the underlying mold issues and a question of fact existed
as to whether there was adequate exhaustion."  ECF No.
69, PageID.1020-1021 (citing *Thomas v. Woolum*, 337
F.3d 720, 734 (6th Cir. 2003)).

iii. An improper rejection of a grievance can constitute
exhaustion.  *Id.*, PageID.1021-1022.  And though this
grievance was rejected as vague, "Bailey's grievance did
provide the date, time, place, and names of those
involved, as required by" the PD, so the Court could not
discern what more Bailey could have done to comply.
Thus, questions about whether MDOC improperly

11

rejected grievance 4358 remained. *Id.*, PageID.1022-1023.

c. WHV-2019-08-3773-12Z—filed August 17, 2019 (ECF No. 56-3, PageID.632-636)

    i. Judge Roberts "believe[d] sufficient questions of fact exist surrounding exhaustion for Grievance 3773. Defendants make the same arguments—untimely filing and failure to include all relevant names in grievance—that the Court rejected for Grievance 4358." *Id.*, PageID.1023.

2. Clark and Zentz's Grievances

a. Judge Roberts addressed Clark's and Zentz's grievances together. Clark's relevant grievances are WHV-19-04-1981-28E (filed April 12, 2019 (ECF No. 56-5, PageID.727-730)), WHV-19-04- 2004-28K (filed April 14, 2019, *id.*, PageID.731-734)), and WHV-16-04-2219-28E (filed April 10, 2016, *id.*, PageID.735-739)). Zentz filed one grievance: WHV-19-05-2141-28K (filed April 25, 2019, ECF No. 56-6, PageID.786-789).

b. Judge Roberts rejected defendants' arguments that Clark and Zentz failed to exhaust their administrative remedies: "The

12

Court has already made a finding that Plaintiffs need not name every MDOC Defendant in administrative grievances so long as the agency is given fair notice of the basis for a claim.  Clark and Zentz gave sufficient notice.  They identified the specific individuals that they believed were involved in the establishment of the policy and procedures addressing mold and resulting health issues.  This is enough to put staff on notice of an underlying mold issue in the prison, although Clark and Zentz did not name every individual involved in this suit." ECF No. 69, PageID.1023-1024.

c. Rejecting defendants' argument that the grievances were unrelated to plaintiffs' claims, Judge Roberts found that "the grievances note the adverse symptoms resulting from alleged mold exposure at WHV." *Id*., PageID.1024.

Defendants filed another motion for summary judgment on exhaustion grounds after the SAC was filed.  ECF No. 177.  The motion addressed the same grievances that were at issue in the first motion for summary judgment as well as Bailey's grievance WHV-20-03-0929-03E, filed in February 2020.  ECF No. 177-4, PageID.3872-3877.  As Judge Murphy noted, defendants' second motion was "largely duplicative of its

13

first motion" and "relie[d] on the assumption that the grievances—which the Court already found sufficient to support Plaintiffs' claims—were insufficient to support Plaintiffs' claims now that they have identified improper ventilation as the cause of the mold."  ECF No. 191, PageID.4281.

Judge Murphy denied the motion, first finding that, "to the extent Defendants' arguments are duplicative of the arguments made in its first motion, ECF 56, the Court will incorporate in full the reasoning in its previous Order, ECF 69."  ECF No. 191, PageID.4281-4282.  And Judge Murphy agreed that "the grievances here provided WHV with a fair opportunity to investigate the health conditions and the mold exposure— which naturally should involve an investigation into the cause of the mold and the cause of the health conditions at issue."  *Id*., PageID.4282.  He noted that "the PLRA does not require Plaintiffs to differentiate between the consequence of the condition and its cause.  According to MDOC policy, Plaintiffs' grievances need only address the "'unsatisfactory conditions of confinement' or 'the facts involving the issue.'"  *Id*. (citing ECF No. 177, PageID.3560, 3655).  Plaintiffs showed that they made sufficient efforts to comply with the PD, as "the mold, ventilation, and underlying health conditions are all the same 'condition' or 'issue.'"  *Id*.

Defendants then moved for reconsideration or for an evidentiary hearing.  They identified these factual issues as remaining:

1. Whether Bailey's grievance 1116 that plaintiffs rely on is a true grievance (ECF No. 192, PageID.4300, 4303-4304);

2. Whether plaintiffs' grievances were properly rejected as joint grievances (*id.*, PageID.4301, 4303-4304);

3. Whether plaintiffs' grievances put MDOC on notice of the claims of inadequate ventilation in their grievances (*id.*, PageID.4301);

4. Whether plaintiffs' grievances were insufficient because they did not name defendants (*id.*, PageID.4302).

Judge Murphy granted the motion and referred the evidentiary hearing to the undersigned.  ECF No. 198.

## V.   Findings of Fact and Conclusions of Law

### A.

The Court first notes that defendants presented *no factual evidence at all* to sustain their burden of proof on the issues they outlined.

First, although defendants had denied that Bailey filed the grievance numbered 1116 that plaintiffs rely on, grievance coordinator Latasha Boa verified that MDOC received the Step II appeal form for that grievance. ECF No. 213, PageID.4666 (addressing ECF No. 62-5, PageID.926).  Boa

knew that MDOC received the appeal form because it was date-stamped
and because Warden Shawn Brewer signed the response.  *Id.*  In their
proposed findings of fact and conclusions of law, defendants no longer
challenge the authenticity of the grievance at ECF No. 62-5, PageID.926,
but instead argue that the grievance was properly rejected because it did
not name defendants.  ECF No. 216, PageID.4791.

Defendants also offered no evidence that plaintiffs' grievances failed
to put defendants on notice of the claims in the complaint or that plaintiffs'
failure to name the specific defendants here is dispositive.  As described in
greater detail below, they offered two witnesses who merely testified to the
language of the PD, reviewed the information on the grievance forms, and
described how grievances are processed.  ECF No. 213.  Neither witness
enlightened the Court about the specific reasons grievance screeners
rejected the grievances at issue.  Rather, the witnesses testified that the
screeners had discretion to reject the grievances even for reasons that
were plainly improper under the language of the PD.  And in their proposed
findings and conclusions, defendants simply regurgitated boilerplate legal
arguments that Judge Roberts and Judge Murphy already rejected.  *See*
ECF No. 216, PageID.4799-4806.

16

Four of the grievances that plaintiffs rely on were filed after their initial complaint but before the SAC.  ECF No. 1; ECF No. 161, ECF No. 177-2, PageID.3729-3732, 3684-3732, 3814-3817, 3769-3772.  Defendants argued in their proposed findings and conclusions that plaintiffs introduced those grievances at the evidentiary hearing, but those grievances were first submitted as exhibits to defendants' second motion for summary judgment. ECF No. 177-2.  Defendants assert, "It is well understood that a prisoner must completely exhaust administrative remedies before initiating legal action."  ECF No. 216, PageID.4807 (citing *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (stating that a prisoner "may not exhaust administrative remedies during the pendency of the federal suit")).

But in *Mattox v. Edelman*, the court held that a party may amend her complaint under Federal Rule of Civil Procedures 15 to add claims exhausted after the original complaint:

> Our sister circuits have unanimously concluded that Rule 15 permits a prisoner to amend his complaint to add new claims that have only been exhausted after the commencement of the lawsuit…. We find the reasoning of these cases compelling.  As we have noted, the PLRA's exhaustion requirement is designed to give prison officials a fair opportunity to address a prisoner's claims on the merits before federal litigation is commenced.  If a prisoner exhausts some of his claims after a proper federal lawsuit has been filed as to other claims, and then moves to amend his complaint to add the newly exhausted claims, the policy behind the PLRA's exhaustion requirement is still met

17

because prison officials will have had a fair opportunity to
address the new claims on the merits.

851 F.3d 583, 592 (6th Cir. 2017).  Thus, plaintiffs had a right to rely on

newly exhausted claims to support their SAC, and defendants' argument

lacks merit.  Besides, because defendants failed to sustain their evidentiary

burden of showing that plaintiffs' earlier grievances were insufficient for

them to exhaust their administrative remedies, plaintiffs' claims should

survive even if those four latest grievances were excluded.

What is more, plaintiffs elicited testimony during the evidentiary

hearing to support their claim that the PD is "so opaque, confusing, and

contradictory that no ordinary incarcerated person can discern or navigate

it, and thus it does not provide an available remedy."  ECF No. 215,

PageID.4765.

## B.

As noted, ¶ J of the PD allows grievance coordinators to reject a

grievance if, among other reasons, "[i]t is vague, illegible, or contains

multiple unrelated issues" (¶ J1); [i]t raises issues that are duplicative of

those raised in another grievance filed by the grievant" (¶ J2); "[t]he

grievance is filed in an untimely manner" (¶ J5); and "[t]wo or more

prisoners and/or parolees have jointly filed a single grievance regarding an

issue of mutual impact or submit identical individual grievances regarding a

18

given issue as an organized protest" (¶ J7).  ECF No. 56-2, PageID.603-604.  Virtually all of plaintiffs' grievances were rejected for one or more of these reasons.

Defendants assert that the Court must defer to MDOC's interpretation of the PD when assessing whether a plaintiff has exhausted her administrative remedies.  ECF No. 216, PageID.4798-4799.  They suggest that a plaintiff whose grievance was rejected has failed to exhaust her remedies as a matter of law.  *Id.*  Not true.  "If this were the case, a prisoner would be barred from filing suit even if the grievance screener incorrectly rejects his grievance."  *Johannes v. Washington*, No. 14-11691, 2016 WL 1253266, at *6 (E.D. Mich. Mar. 31, 2016).  Defendants bear the burden of showing that the grievance screener's reasoning for the rejection was proper under the facts.  *Id.*; *see also Bailey v. Michigan Dep't of Corr.*, No. 19-13442, 2020 WL 4934314, at *5 (E.D. Mich. Aug. 24, 2020) (questionable rejection of a grievance "raises a question of fact because an improper rejection would constitute exhaustion"); *Savoie v. Oliver*, 731 F. Supp. 3d 862, 872 (E.D. Mich. 2024) (same).  The Court finds that MDOC's reasons for rejecting plaintiffs' grievances were improper under the facts.

Richard Russell, the MDOC's hearings and grievance section administrator, testified that he was "the responsible party to lead a team

19

and be a subject matter expert in revising the policy." ECF No. 213, PageID.4565, 4577. He explained that, to submit grievance appeals, prisoners must place their documents in intra-department or U.S. mail. *Id*., PageID.4573-4574. The prisoners may not hand their documents to the grievance coordinator. *Id*., PageID.4585. But a grievance is not "filed" when it is placed in the mail. Though the PD repeatedly states that prisoners file their grievances by *sending* them to them to the appropriate recipient, "[g]rievances and grievance appeals at all steps shall be considered filed *on the date received by the Department*." ECF No. 56-2, PageID.605 (emphasis added).

Yet before plaintiffs' counsel could finish her question to Russell about how the prison mail operated, he blurted, "Not my area." ECF No. 213, PageID.4584. He continued to be quick to deny familiarity with the prison mail processes throughout his testimony. Russell did not know whether those sorting the mail in the WHV's mail collection slot included both intra-department and U.S. mail. *Id*., PageID.4587-4588. He could not answer how many employees were assigned to sort the mail or whether those employees had to read some of the mail. *Id*., PageID.4588. But Russell admitted that "mail, in the processing of a grievance, is an integral issue as it relates to the grievance process." *Id*., PageID.4585. And

20

despite being the "subject matter expert in revising the [grievance] policy,"
he never inquired about the mail distribution system.  ECF No. 213,
PageID.4577, 4585.

Russell's failure to consider the time for mail processing is concerning
because, as plaintiffs note, that time eats into the prisoners' narrow time-
periods for submitting grievances and appeals.

> The required five business days for incarcerated women to
> submit at Step I and the ten business days for Steps II and III
> necessarily include the time it takes for the grievance to be sent
> through the prison mail system and sorted from other prison
> mail (like kites) and U.S. mail and sent to the grievance office.

ECF No. 215, PageID.4741.  And grievance coordinator Boa testified that it
generally takes "between three to five days at best, five being rare,"[1] for a
Step I grievance placed in a mailbox to be received and stamped as filed.
ECF No. 213, PageID.4711.  Thus, a prisoner attempting to file a Step I
grievance within five days of trying to informally resolve the issue with the
relevant official must rush her grievance to the mail slot.  But despite her
best efforts, the grievance may be late because of the mail processing
time—a process with which the prisoner has no control.

---

[1] The Court doubts the accuracy of this testimony for the reasons stated
below.

21

Plaintiffs also argue that the prisoners' reliance on the mail for filing their grievances "is particularly problematic at Step II."  ECF No. 215, PageID.4741.  They explain that "[t]he ten-business day deadline includes the time for the response to be sent to an inmate (by mail), the time for the inmate to request (by mail) and receive (by mail) the Step II form, and the time for the inmate to fill out and send back the Step II form to the department (again, by prison mail)."  *Id.* (citing ECF No. 215, PageID.4596-4597).

Prisoners file Step III grievances by sending them through intra-department mail or U.S. Mail to an office in Lansing, Michigan.  ECF No. 215, PageID.4598-4599.  All Russell knew about the Lansing mailroom was that mail was delivered to departments twice a day.  *Id.*, PageID.4599.  He neither testified to knowing how long it takes for mail sent from WHV to arrive at the Lansing mailroom nor how long mail sits in that mailroom before being delivered to the grievance office.  *Id.*  But Russell agreed that the prisoners have no control over how long it takes for his office to receive the grievances after they are sent.  *Id.*   And the grievances are not stamped as received until they arrive in the grievance office.  *Id.*

The possibility that grievances may be untimely despite the prisoner's prompt efforts is not just hypothetical.  Recall that Bailey's Step II form for

22

grievance 1116 was dated July 8, 2018, but it was not date-stamped as received until July 23, 2018,[2] so her grievance was rejected as untimely. ECF No. 62-5, PageID.923.  And Boa had no reason to doubt the dates on which Bailey represented that she executed and sent her grievances.  ECF No. 213, PageID.4700.

In her Step III appeal, Bailey wrote that her Step II appeal was not untimely, expressing frustration with the persistent difficulties she experienced in trying to get her grievances addressed:

> My Step Two Grievances are being rejected, the reason given… I am not filing the Step Two Grievance, within Ten Business Days of receiving my Step One response.  That is not True!  The day after I receive each and every one of my Step One grievances response, I kite the Grievance Coordinator's, several times, Ms. Boa requesting my Step Two Grievances… I do not receive A response for A (Month, or even Two Months). I would catch Ms. Boa, Grievance Coordinator, on the Walkway of the Facility, or out of her office, and inquire about why she has not sent me my Step Two Grievances? And it has been well over A month and I have (Kited several times)?  Ms. Boa has always responded… (Don't worry about it, I will get it to you…

---

[2] The Court assumes that the date as stamped on the form is "the date received by the Department" for determining whether a grievance is timely. ECF No. 56-2, PageID.605.  But the grievance form also includes a "Date Received by Step II Respondent," which here was July 26, 2018.  ECF No. 62-5, PageID.926.  Judge Roberts interpreted the form as meaning that the MDOC received the grievance on July 26, 2018.  ECF No. 69, PageID.1018.  So the Court is unclear on which received date the MDOC relies.

ECF No. 62-5, PageID.926.  Despite these pleas, Russell upheld the rejection at Step III.  *Id.*, PageID.927.  And Boa admitted that the grievance response failed to clarify for Bailey that the grievance was untimely based on the date that it was received and not the date that it was sent.  ECF No. 213, PageID.4704.

The evidence shows that MDOC repeatedly rejected grievances as untimely despite gaps of more than five days between the date the prisoner wrote that they sent the grievances and when they were received by the Step II respondent.  *See, e.g.*, ECF No. 56-3, PageID.630 (sent on September 22, 2019 and received on September 30, 2019); *id.*, PageID.628 (sent on November 2, 2019 and received on November 18, 2019); ECF No. 56-5, PageID.734 (sent on April 14, 2019 and received on April 22, 2019); *id.*, PageID.665 (sent on July 8, 2018 and received on July 23, 2018).  Thus, Russell had reason to question whether grievances were untimely because of delays in the mail processing time or other factors outside the prisoners' control.  He had to know that using the receipt date to determine whether grievances were timely filed resulted in prisoners being denied access to the grievance system despite their best efforts.

Decades ago, when creating the prison mailbox rule, the Supreme Court held that courts cannot "rigidly" dismiss appeals as untimely when

the "petitioner did all he could under the circumstances" and had no control over the filing arriving at its destination. *Fallen v. United States*, 378 U.S. 139, 144 (1964). In *Fallen*, the government did not "dispute the record facts that petitioner had done all that could reasonably be expected to get the letter to its destination within the required 10 days." *Id*. In a passage that could have been written for this case, the Court later explained the injustice of imposing deadlines on prisoners that are measured by when the mailing is received rather than when it was sent.

> The situation of prisoners seeking to appeal without the aid of counsel is unique. Such prisoners cannot take the steps other litigants can take to monitor the processing of their notices of appeal and to ensure that the court clerk receives and stamps their notices of appeal before the 30-day deadline. Unlike other litigants, pro se prisoners cannot personally travel to the courthouse to see that the notice is stamped "filed" or to establish the date on which the court received the notice. Other litigants may choose to entrust their appeals to the vagaries of the mail and the clerk's process for stamping incoming papers, but only the pro se prisoner is forced to do so by his situation. And if other litigants do choose to use the mail, they can at least place the notice directly into the hands of the United States Postal Service (or a private express carrier); and they can follow its progress by calling the court to determine whether the notice has been received and stamped, knowing that if the mail goes awry they can personally deliver notice at the last moment or that their monitoring will provide them with evidence to demonstrate either excusable neglect or that the notice was not stamped on the date the court received it. Pro se prisoners cannot take any of these precautions; nor, by definition, do they have lawyers who can take these precautions for them. Worse, the pro se prisoner has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot

control or supervise and who may have every incentive to
delay.  No matter how far in advance the pro se prisoner
delivers his notice to the prison authorities, he can never be
sure that it will ultimately get stamped "filed" on time.  And if
there is a delay the prisoner suspects is attributable to the
prison authorities, he is unlikely to have any means of proving
it, for his confinement prevents him from monitoring the process
sufficiently to distinguish delay on the part of prison authorities
from slow mail service or the court clerk's failure to stamp the
notice on the date received.  Unskilled in law, unaided by
counsel, and unable to leave the prison, his control over the
processing of his notice necessarily ceases as soon as he
hands it over to the only public officials to whom he has access-
the prison authorities-and the only information he will likely
have is the date he delivered the notice to those prison
authorities and the date ultimately stamped on his notice.

*Houston v. Lack*, 487 U.S. 266, 270–72 (1988).

Thus, under the prison mailbox rule, "a pro se prisoner's complaint is

deemed filed when it is handed over to prison officials for mailing to the

court.  Cases expand the understanding of this handing-over rule with an

assumption that, absent contrary evidence, a prisoner does so on the date

he or she signed the complaint."  *Brand v. Motley*, 526 F.3d 921, 925 (6th

Cir. 2008) (cleaned up).

To implement the prison mailbox rule, facilities within the MDOC must

have systems to date-stamp mail when prisoners hand over the documents

to prison authorities for mailing.  MDOC could use that same system for

grievances, date-stamping the documents when prisoners hand them over

for filing.  After all, just like circumstances described in *Houston*, prisoners

26

have no choice but "to entrust their appeals to the vagaries of the mail."

*Houston*, 487 U.S. at 271.  "Worse, the *pro se* prisoner has no choice but to

entrust the forwarding of his [grievance documents] to prison authorities

whom he cannot control or supervise and who may have every incentive to

delay."  *Id*.  So "[n]o matter how far in advance the pro se prisoner delivers

his notice to the prison authorities, he can never be sure that it will

ultimately get stamped 'filed' on time."  *Id*.  And if prison official caused the

delay, "he is unlikely to have any means of proving it, for his confinement

prevents him from monitoring the process sufficiently to distinguish delay

on the part of prison authorities from slow mail service."  *Id.*

Even when prisoners "have done all that could reasonably be

expected to get" their grievances timely filed, their grievances will be

considered untimely if circumstances well beyond the prisoners' control

cause the grievances to be delivered outside the PD's tight deadline.

*Fallen*, 378 U.S. at 144.  For those prisoners, the grievance process is

unavailable.  *Ross*, 578 U.S. at 643-44.

Thus, the Court should find that, "absent contrary evidence," a

prisoner has filed her grievance documents on the date she signed them.

*Brand*, 526 F.3d at 925.

**D.**

Plaintiffs also assert, "Incarcerated women face rejection for untimeliness, [but] WHV personnel are not beholden to the same strict timelines."   ECF No. 215, PageID.4742.   The PD does have a deadline for prison personnel to respond to grievances: "A Step I grievance *shall* be responded to within 15 business days after receipt of the grievance unless an extension is granted."   ECF No. 56-2, PageID.606 (emphasis added). But Russell testified that an official's failure to respond to a grievance within 15 business days does not violate policy.   ECF No. 213, PageID.4595-4596, ¶ Z.

The Court knows of no authority requiring a prison to timely respond to grievances; prisoners have no constitutional right to effective grievance procedures.   *Meadows v. Gibson*, 855 F. Supp. 223, 225 (W.D. Tenn. 1994).   Even so, by requiring a prisoner to write an appeal without knowing that her grievance was denied or the reason for that decision, the PD allows a respondent to deny a prisoner a meaningful appeal.   For example, a prisoner who does not know that her Step II grievance was found untimely will not know to address that issue in her appeal.   Such a mechanism in an administrative scheme is "so opaque that it becomes, practically speaking, incapable of use," meaning that the prisoner is

28

excused from the exhaustion requirement. *Ross*, 578 U.S. at 643. Thus, when a prisoner's only option is to blindly appeal the denial of a grievance without knowing the reason for the denial, the appeal process should be found unavailable to that prisoner.

**E.**

Under ¶ J7, a grievance can be rejected if "two or more prisoners and/or parolees have jointly filed a single grievance regarding an issue of mutual impact or submit identical individual grievances regarding a given issue as an organized protest." ECF No. 56-2, PageID.603. Thus, ¶ J7 applies only to (1) a single grievance *jointly filed* by more than one prisoner or (2) *identical* individual grievances filed by more than one prisoner.

In her order denying defendants' motion for summary judgment, Judge Roberts examined the rejection of grievance 1116 as a joint grievance. ECF No. 69, PageID.1018-1019. In that grievance, Bailey complained only about how mold in the facility affected her own health. *Id*. Judge Roberts declined to find that the rejection of grievance 1116 was proper as a matter of law.

> Pursuant to PD 03.02.130J.7, a grievance can be rejected if "two or more prisoners and/or parolees have jointly filed a single grievance regarding an issue of mutual impact or submit identical individual grievances regarding a given issue as an organized protest." Bailey filed this grievance on her own, and MDOC does not demonstrate that others filed identical

29

grievances.  In fact, the grievances highlight the alleged adverse effects of the mold in the facility on Bailey, not others. Additionally, MDOC does not provide any evidence of an "organized protest."  A reasonable jury could conclude that this was not a joint grievance.

*Id*.

As is evident from the quoted language, Judge Roberts expected that the grievance issues would be resolved by a jury.  *Id*.  Instead, at defendants' request, the adjudication of whether the rejection of plaintiffs' grievances under ¶ J7 was proper occurred before this Court during an evidentiary hearing.  ECF No. 192; ECF No. 213, PageID.4618-4624, 4644-4651.  But despite requesting the evidentiary hearing, defendants offered *no evidence* that grievance 1116 was identical to other prisoners' grievances or that Bailey filed it as part of an organized protest.

Neither of defendants' witnesses testified to knowing the factual basis for the rejections of the grievances under ¶ J7.  The Court asked Russell to address questions as "the person who oversees the creation of the grievance policy" to understand "the limits…or lack of limits" in interpreting ¶ J7.  ECF No. 213, PageID.4645-4646.  Russell's answers suggest that grievance screeners have carte blanche to reject grievances according to unexplained and unsupported interpretations of the policy.  *Id*., PageID.4644-4650.

30

The Court addressed Clark's grievance 2004, noting:

Ms. Clark is talking about her having asthma, COPD.  She's talking about the fact that she has a heart condition, that her chest hurts, that she's short of breath, it's difficult to breathe, her heart races.  Because other prisoners also say that they are experiencing symptoms that they relate to the air, those are considered to be a joint grievance?

*Id.*, PageID.4646, (citing ECF No. 56-5, PageID.734).  Clark was the only prisoner who filed grievance 2004, but the response said, "Reject!  Joint grievance by 2 or more prisoners."  ECF No. 56-5, PageID.734.  The Court asked Russell about that reasoning because he "is charged with overseeing the development of the policy directive and any changes to it."  ECF No. 213, PageID.4647.  Russell's nonresponsive answers included, "I do not respond to these directly" and "I can't tell without looking at the whole context."  *Id.*  And Russell said that screeners may consider the "number of grievances on the same issue."  *Id.*, PageID.4648-4649.  But as noted, ¶ J7 does not define joint grievances as addressing the "same issue"; it describes "*identical* individual grievances."  ECF No. 56-2, PageID.603.  Even so, Russell testified that the decision of whether

31

grievances are joint is the grievance coordinator's "judgment call."  ECF

No. 213, PageID.4639.[3]

And with no explanation from Warden Brewer at Step II or Russell at

Step III, the grievance screener's rejection of grievance 2004 as a joint

grievance was upheld.  ECF No. 56-5, PageID.731-733.  Russell upheld

the rejection of the grievance at Step III even though he did not "know what

the grievance coordinator considered when they made that decision."  *Id.*,

PageID.731.  He simply rubber-stamped the decision of the screener.

And Russell's testimony evidences an unwritten policy of MDOC to

steer common issues affecting multiple prisoners to the warden's forum.

He testified, "The 'joint' means they've filed on the issue with the same

language, and those are issues that we prefer to go to the warden forum,

that's why we do it that way."  ECF No. 213, PageID.4645.  Conspicuously

---

[3] Echoing Russell's testimony, Boa said that a grievance coordinator had
the discretion to "Reject!" a grievance Clark filed because it allegedly
addressed "multiple issues."  ECF No. 213, PageID.4678-4679 (addressing
ECF No. 177-2, PageID.3817).  The grievance alleged only unsanitary
conditions in the restrooms and showers, including feces and urine on the
floor and black mold in the shower stalls, and described how those
unsanitary conditions affected Clark's health.  ECF No. 213, PageID.4678-
4679 (addressing ECF No. 177-2, PageID.3817).  Boa agreed that another
grievance coordinator could have found the grievance to be "a single
grievance that the living conditions are exacerbating her health issues."  *Id.*

32

absent from defendants' proofs was evidence that plaintiffs' grievances used the same language.

Russell's response to a hypothetical that the Court presented illustrates how MDOC blocks prisoners who suffer from a common condition of confinement from exhausting their administrative remedies through the grievance system. The hypothetical was, "Somebody is poisoning the food. Multiple prisoners say, 'I'm poisoned. I'm eating this food; it's poisoning me….' And the grievance coordinator can say, 'they're all complaining about food poisoning, so reject it?'" ECF No. 213, PageID.4650. Russell answered, "So the administrative remedy for that is taking to the warden's forum, that's correct." *Id*. He agreed that "the grievance coordinator could say, you all need to take this to the warden's forum; I'm going to reject this as a grievance." *Id*. And Russell claimed that a prisoner who has been poisoned as described in the hypothetical could exhaust their administrative remedies by "taking it to the warden's forum." *Id*. With the caveat that he is not a lawyer, Russell testified that "[a]ny administrative remedy that's been fully realized"—including the warden's forum—"once that's done, they have the ability to appeal to court." *Id.*, PageID.4650-4651. But Russell is plainly wrong.

The PD does not direct prisoners to grieve conditions of confinement through the warden's forum.  Rather, the PD states that a prisoner with "a concern with the content of a policy or procedure" may direct her concerns to the warden's forum.  ECF No. 56-2, PageID.603, ¶ J9.  The Sixth Circuit thus held that two prisoners failed to exhaust their claims alleging unconstitutional conditions of confinement by raising them through the warden's forum instead of the grievance process.  *Berryman v. Haas*, No. 19-1484, 2020 WL 6325553, at *2 (6th Cir. May 11, 2020).  The court noted that "the Warden's Forum is for challenging a prison policy or procedure, which was not the focus of Berryman and Lee's suit."  *Id.*  Courts in this district have also held that when a prisoner's action is "for monetary damages and injunctive relief under Section 1983, alleging violations of his constitutional rights," she may not exhaust her claims through the warden's forum.  *Palmer v. Elrod*, No. CV 16-13665, 2017 WL 9472756, at *2 (E.D. Mich. Aug. 9, 2017), *adopted,* No. 16-13665, 2017 WL 4230655 (E.D. Mich. Sept. 25, 2017).

Plaintiffs brings this action "under 42 U.S.C. § 1983, challenging the inhumane, dangerous, and unconstitutional conditions endured by the women locked inside WHV."  ECF No. 161, PageID.3375, ¶ 14.  They sue for injunctive relief and damages.  *Id.*, PageID.3490-3491, ¶ 528.  So

34

plaintiffs could not exhaust their administrative remedies through the warden's forum.  *Berryman*, 2020 WL 6325553, at *2; *Palmer*, 2017 WL 9472756, at *2.[4]

In sum, Russell, *the MDOC official charged with overseeing the development of the PD*, wrongly testified that plaintiffs' grievances about the allegedly poor ventilation and humid conditions here could have exhausted their administrative remedies through the warden's forum.  His interpretation is supported neither by the plain language of the PD nor by the courts interpreting the policy.  It is a misrepresentation.

So for prison conditions that harm more than one prisoner, MDOC imposes an unwritten policy that deviates from the plain language of ¶ J7 and "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Ross*, 578 U.S. at 643.  And as Russell agreed, when grievances are rejected, "there is no interview with the prisoner" and "no investigation."  ECF No. 213,

---

[4] Even if plaintiffs' complaints about the ventilation and humid conditions could be characterized as a policy or procedure, the PD permits a prisoner to grieve the "content of the policy or procedure [ ] as it was specifically applied to the grievant."  ECF No. 56-2, PageID.603, ¶ J8; *see also Washington v. Washington*, No. 2:21-CV-12202, 2023 WL 6546663, at *6 (E.D. Mich. Apr. 6, 2023), *adopted*, 2023 WL 6367682 (E.D. Mich. Sept. 29, 2023).  Each plaintiff here grieved the ventilation and humidity specifically as it applied to herself, so ¶ J8 did not direct the plaintiffs to address their individual complaints to the warden's forum.

PageID.4601.  The result is perverse: the more prisoners harmed by a condition of confinement, the more likely that MDOC will steer them to the warden's forum.  But when those harmed prisoners file an action in court, MDOC defendants will argue that the plaintiffs failed to exhaust their administrative remedies.  Thus, MDOC officials stymy the prisoners' efforts to get relief either through the grievance system or in court, and they do so without needing to interview the plaintiffs or investigate their claims.

It is hard to imagine a machination that so fully subverts the intention of the PLRA for prisoners to have "an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors."  *Woodford*, 548 U.S. at 94.  And by rejecting the grievances without interviews or investigations, MDOC undermines the aim of the PLRA to "improve[ ] the quality of those prisoner suits" with "the creation of an administrative record that is helpful to the court."  *Id*. at 95.  As *Woodford* explained, "When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved."  *Id*.  Because MDOC rejected virtually all of plaintiffs' grievances, no evidence of mold or harm to plaintiffs was gathered through the grievance process.  This Court should not sanction

MDOC's machinations and should find that defendants' improper rejection of their grievances satisfied exhaustion.

## VI.   Conclusion

Defendants failed to sustain their burden of showing by a preponderance of the evidence that plaintiffs failed to exhaust their administrative remedies.  *Lee*, 789 F.3d 677.  Thus, defendants' request to dismiss this action on exhaustion grounds should be denied.


s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: March 12, 2025


## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections lack merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System to their email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 12, 2025.

s/Davon Allen
DAVON ALLEN
Case Manager
