UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA BAILEY, individually, and KRYSTAL CLARK, and HOPE ZENTZ, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

HEIDI WASHINGTON, *et al.*,

Defendants.

No. 2:19-cv-13442

HON. STEPHEN J. MURPHY, III

MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

**DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

Jonathan R. Marko (P72450)
Marko Law, PLLC
220 W. Congress, Fourth Floor
Detroit, MI 48226
(313) 777-7LAW
jon@jmarkolaw.com

Matthew H. Morgan (MN304657)
Rebekah L. Bailey (MN0389599)
Nichols Kaster, PLLP
80 S. Eight St., Ste., 4700
Minneapolis, MN 55402
(612) 256-3200
morgan@nka.com
bailey@nka.com

Cary S. McGehee (P42318)
Beth M. Rivers (P33614)
Pitt McGehee Palmer Bonanni & Rivers PC
117 W. 4th St., Ste. 200
Royal Oak, MI 48067
(248) 398-9800

Joshua S. Smith (P63349)
Kristin M. Southerland (P64353)
Adam P. Sadowski (P73864)
Sara E. Trudgeon (P82155)
Michael R. Dean (P71333)
Jeffrey D. Alber (P76530)
William J. Predhomme II (P81527)
Assistant Attorneys General
Attorneys for Defendants
Michigan. Dept. of Attorney General
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Smithj191@michigan.gov
SoutherlandK@michigan.gov
SadowskiA1@michigan.gov
TrudgeonS@michigan.gov
DeanM2@michigan.gov
AlberJ@michigan.gov
PredhommeW1@michigan.gov

Shiraz K. Khan (P78359)

cmcgehee@pittlawpc.com
brivers@pittlawpc.com
***Attorneys for Plaintiffs Bailey Zentz & the Putative Classes***

David S. Steingold (P29752)
Samantha Baker (P83674)
Law Offices of David S. Steingold
30300 Northwestern Hwy., Ste.111
Farmington Hills, MI 48334
(313) 962-0000
detroitdefender@yahoo.com
***Attorneys for Paula Bailey, Hope Zentz & the Putative Class ONLY***

Shiraz Law Firm PLLC
30400 Telegraph Rd., Ste. 380
Bingham Farms, MI 48025
(248) 419-0678
info@shirazlawfirm.com
***Attorney for Plaintiff Clark***

Ari Kresch (P29593)
Attorney for Plaintiffs
Excolo Law, PLLC
26700 Lahser Rd., Ste. 310
Southfield, MI 48033
(800) 529-3476
akresch@1800lawfirm.com
***Attorney for Plaintiffs Bailey Zentz & the Putative Classes***

/

## DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW

Joshua S. Smith (P63349)
Assistant Attorney General
Michigan Dept. of Attorney General
Attorney for Defendants
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
smithj191@michigan.gov

Dated: October 16, 2026

# TABLE OF CONTENTS

Page


Index of Authorities ........................................................................................ iii

introduction and relevant procedural history .........................................................1

Findings of Fact ...........................................................................................................2

I. WHV is an appropriate placement for Clark. ...............................................2

A. Background ..........................................................................................2

B. The evidence relied upon by this Court. .............................................4

C. WHV does not present unsafe conditions of confinement....................8

D. Clark's medical claims are not supported by the evidence. ...............15

1. The health conditions Clark complains of in her motion are not supported by the evidence and do not require removal from WHV. ...........................................................17

E. Moving Clark from WHV is unnecessary would be burdensome. .........................................................................................43

Conclusions of Law ...................................................................................................49

II. Clark fails to establish a basis for this Court to grant the extraordinary remedy she seeks of a temporary restraining order or preliminary injunction. ...................................................................................................49

A. In deciding a motion for a preliminary injunction, this Court may consider evidence that would be inadmissible at trial................50

B. Clark's request for injunctive relief in the prison context faces a high bar.........................................................................................51

C. Clark fails to show a substantial likelihood of success on the merits. ..............................................................................................54

1. Clark cannot establish the objective element of an Eighth Amendment claim. ..........................................................57

2. Clark is not exposed to high levels of mold at WHV. ............61

3. The medical evidence does not support Clark's claims............64

4. Clark consistently refuses treatment. ........................................68

5. Clark's claimed medical conditions are inconsistent with her conduct and appear to be exaggerated or even fabricated. ........................................................................69

6. Clark cannot establish the subjective element of an Eighth Amendment claim. ......................................................72

7. Clark relies on inapposite case law. .........................................74

D. Clark cannot show irreparable harm. ................................................75

E. The balance of equities and the public interest weigh against an injunction. ...........................................................................................78

III. The PLRA bars Clark's requested injunctive relief. ....................................80

Conclusion and Relief Requested ..........................................................................85

Certificate of Service ..............................................................................................85

# INDEX OF AUTHORITIES

Page

## Cases

*Air Int'l US (Inc.) v. Engineered Plastic Components, Inc.*,
No. 2:23-CV-11041, 2023 WL 6527761 (E.D. Mich. May 4, 2023) ..................51

*Alspaugh v. McConnell*,
643 F.3d 162 (6th Cir. 2011) ............................................................ 64, 73

*Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*,
796 F.3d 636 (6th Cir. 2015) ..................................................................52

*Bazzetta v. McGinnis*,
124 F.3d 774 (6th Cir. 1997) ..................................................................80

*Bell v. Wolfish*,
441 U.S. 520 (1979) ..............................................................................53

*Blackmore v. Kalamazoo Cnty.*,
390 F.3d 890 (6th Cir. 2004) ..................................................................74

*Burton v. Mich. Dep't of Corr.*,
No. 20-CV-12501, 2023 WL 8441763, at *8 (E.D. Mich. Nov. 13, 2023).........69

*Cameron v. Bouchard*,
815 Fed. App'x 978 (6th Cir. 2020)...................................................... 57, 61, 64

*Carter v. Mich. Dep't of Corr.*,
No. 12–cv–12621, 2013 WL 5291567, at *6 (E.D. Mich. Sep. 19, 2013) ..........79

*Christian v. Mich. Dep't of Corrections--Health Services*,
No. 12-12936, 2013 WL 607783, at *6 (E.D. Mich. Jan. 28, 2013)....................60

*City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*,
484 F.3d 380 (6th Cir. 2007) ..................................................................50

*Colvin v. Caruso*,
605 F.3d 282 (6th Cir. 2010) ..................................................................56

*Contech Casting, LLC v. ZF Steering Sys., LLC*,
931 F. Supp. 2d 809 (E.D. Mich. 2013) ....................................................76

*Coots v. Twilla*,
2023 WL 3450413, at *4 (S.D. Ohio May 15, 2023) .......... 79

*Damon's Rests., Inc. v. Eileen K Inc.*,
461 F. Supp. 2d 607 (S.D. Ohio 2006) .......... 4, 51

*Dana Corp. v. Celotex Asbestos Settlement Trust*,
251 F.3d 1107 (6th Cir. 2001) .......... 53

*Dodson v. Wilkinson*,
304 F. App'x 434 (6th Cir. 2008) .......... 73

*Essroc Cement Corp. v. CPRIN, Inc.*,
593 F. Supp. 2d 962 (W.D. Mich. 2008) .......... 75

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 54, 55

*Farnsworth v. Nationstar Mortgage, LLC*,
569 F. App'x 421 (6th Cir. 2014) .......... 52

*Glover v. Johnson*,
855 F.2d 277 (6th Cir. 1988) .......... 78

*Hanna v. Toner*,
630 F.2d 442 (6th Cir. 1980) .......... 78

*Hardin-Bey v. Rutter*,
524 F.3d 789 (6th Cir. 2008) .......... 55

*Hardy v. Whitaker*,
351 F.R.D. 84 (E.D. Mich. 2026) .......... 61

*Harris v. Wilter*,
596 F.2d 678 (5th Cir. 1979) .......... 79

*Helling v. McKinney*,
509 U.S. 25 (1993) .......... 74, 75

*Higuchi Int'l Corp. v. Autoliv ASP, Inc.*,
103 F.4th 400 (6th Cir. 2024) .......... 54

*Hudson v. McMillian*,
503 U.S. 1 (1992) .......... 55

*Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*,
148 F.4th 365 (6th Cir. 2025)....................................................................76

*J.P. Morgan Sec., LLC v. Duncan*,
No. 2:22-CV-11732, 2022 WL 3325514 (E.D. Mich. Aug. 11, 2022)................51

*Johnson v. Allen*,
No. 1:15-cv-1329, 2016 WL 860428, at *4 (W.D. Mich. Mar. 7, 2016)............69

*Jones v. North Carolina Prisoners' Labor Union*,
433 U.S. 119 (1977) ..........................................................................................78

*Kendrick v. Bland*,
740 F.2d 432 (6th Cir. 1984)............................................................. 53, 79

*Leary v. Daeschner*,
228 F.3d 729 (6th Cir. 2000)..............................................................................54

*Libertarian Party of Ohio v. Husted*,
751 F.3d 403 (6th Cir. 2014)..................................................... 57, 61, 64

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................................78

*McIntosh v. Marina*,
No. 2:23-CV-11196, 2023 WL 3854097 (E.D. Mich. June 6, 2023) ..................51

*McNeilly v. Land*,
684 F.3d 611 (6th Cir. 2012)..............................................................................52

*NAACP v. City of Mansfield*,
866 F.2d 162 (6th Cir. 1989)..............................................................................54

*Nelson v. Campbell*,
541 U.S. 637 (2004) ..........................................................................................80

*Niles v. Owensboro Med. Health Sys., Inc.*,
No. 4:09-CV-00061, 2011 WL 3163247 (W.D. Ky. July 26, 2011) .....................7

*Nken v. Holder*,
556 U.S. 418 (2009) ..........................................................................................78

*Northeast Ohio Coal. For Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*,
467 F.3d 999 (6th Cir. 2006) .......... 52

*Overstreet v. Lexington–Fayette Urban County Gov't*,
305 F.3d 566 (6th Cir. 2002) .......... 52

*Palmer v. Wagner*,
3 Fed. App'x 329 (6th Cir. 2001) .......... 69

*Patio Enclosures, Inc. v. Herbst,*
39 Fed. Appx. 964 (6th Cir. 2002) .......... 76

*PCC Airfoils, LLC v. Daugherty*,
176 F.4th 509 (6th Cir. 2026) .......... 54

*Pearson v. Mich. Dep't of Corrections*,
170 F.4th 1027 (6th Cir. 2026) .......... 73, 75

*Reedy v. West*,
988 F.3d 907 (6th Cir. 2021) .......... 55

*Rhinehart v. Scutt*,
894 F.3d 721(6th Cir. 2018) .......... 56, 64, 73

*Rhodes v. Chapman*,
452 U.S. 337 (1981) .......... 55

*Roghan v. Block*,
590 F. Supp. 150 (W.D. Mich. 1984) .......... 52

*Ruiz v. Estelle*,
650 F.2d 555 (5th Cir. 1981) .......... 79

*Santiago v. Ringle*,
734 F.3d 585 (6th Cir. 2013) .......... 56

*TE Connectivity Corp. v. Sumitomo Elec. Wiring Sys., Inc.*,
644 F. Supp. 3d 393 (E.D. Mich. 2022) .......... 81

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) .......... 79

*Wells Fargo Bank, NA v. Mich Troy Tech. LLC*,
No. 2:24-CV-10241, 2024 WL 5480363 (E.D. Mich. Feb. 2, 2024)....................51

*Westlake v. Lucas*,
537 F.2d 857 (6th Cir. 1976).............................................................. 61, 64, 73

*Wilson v. Williams*,
961 F.3d 829 (6th Cir. 2020)......................................................................54

*Winn v. Waugaman*,
2015 WL 1606151, at *5 (E.D. Ky. Apr. 8, 2015)..............................................79

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008). .........................................................................................76

**Statutes**

18 U.S.C. § 3626(a)(1).......................................................................... 81, 83

18 U.S.C. § 3626(a)(2)...................................................................... 53, 83, 84

18 U.S.C. § 3626(a)(3)(A)(i), (ii) ......................................................................84

18 U.S.C. § 3626(a)(3)(B) ...............................................................................84

18 U.S.C. § 3626(g)(4).....................................................................................83

28 U.S.C. § 2284 ..............................................................................................84

Mich. Comp. Laws § 791.204............................................................................83

**Other Authorities**

11A *Wright & Miller Federal Practice & Procedure* § 2949 (3d ed. 2026) ......4, 51

**Rules**

Fed. R. Civ. P. 61.1(a).......................................................................................50

Fed. R. Civ. P. 61.1(a)(2)..................................................................................50

Fed. R. Civ. P. 61.1(a)(3)..................................................................................50

Fed. R. Civ. P. 62.1 ..........................................................................................50

## INTRODUCTION AND RELEVANT PROCEDURAL HISTORY

Plaintiff Krystal Clark, through counsel, filed an emergency motion for a temporary restraining order and preliminary injunction on July 8, 2026, requesting to be removed from the Women's Huron Valley Correctional Facility (WHV) due to alleged health conditions she claims are caused by mold exposure at WHV. (ECF No. 242.) The Court denied Plaintiff's request for temporary restraining order as moot. (ECF No. 272, PageID.7018.)

Following briefing by the parties, this Court held an in-person evidentiary hearing on September 24, 2026. (ECF No. 266; ECF No. 274.) During the hearing, Clark presented her case in support of her motion, but, due to time constraints, Defendants were only able to present one witness. Following the hearing, the Court allowed the parties to submit supplemental testimony October 2, 2026, and ordered them to file proposed findings of fact and conclusions of law by October 16, 2026. (ECF No. 272, PageID.7018.) Defendants submitted supplemental testimony. (ECF No. 273.)

Defendants' proposed findings of fact and conclusions of law are set forth below.

## FINDINGS OF FACT

### I. WHV is an appropriate placement for Clark.

#### A. Background

1. Clark, one of three named Plaintiffs in the present case, is incarcerated within the Michigan Department of Corrections (MDOC) at Women's Huron Valley Correctional Facility (WHV) in Ypsilanti, Michigan. (ECF No. 160, PageID.3410.)

2. Although this case is stayed pending Defendants' appeal to the Sixth Circuit and administratively closed, (ECF No. 240), Clark filed an emergency motion for a temporary restraining order and preliminary injunction on July 6, 2026. (ECF No. 242.)

3. Clark seeks transfer out of WHV to another facility due to alleged health concerns she claims are caused by mold exposure at WHV. (*Id.*, PageID.5176–5177.)

4. On July 8, 2026, this Court ordered Defendants to respond to Clark's motion no later than July 10, 2026, for Clark to file a reply no later than July 13, 2026, at 9:00 a.m., and for a hearing to be held on July 15, 2026. (ECF No. 245, PageID.5368–5369.)

5. On July 9, 2026, MDOC temporarily transferred Clark to the Duane L. Waters Health Center (DWH), an inpatient hospital operated by MDOC, pending the outcome of her motion, (ECF No. 248, PageID.5374–5375), for the

purpose of obtaining more time to respond to that motion, (ECF No. 250, PageID.5386).

6. Defendants indicated that Clark's transfer to DWH was not a concession of the substance or validity of any of Clark's claims. (ECF No. 250, PageID.5386–5387.)

7. Following Clark's transfer, this Court modified the scheduling order on two occasions, ultimately scheduling the evidentiary hearing for September 24, 2026, from 1:00 to 5:00 p.m. (ECF No. 249, PageID.5376–5378; ECF No. 261, PageID.6703–6704; ECF No. 266, PageID.6781.) Proceedings commenced at 1:15 p.m. and concluded at 5:21 p.m., with a brief recess from approximately 3:48 p.m. to 4:07 p.m. (ECF No. 274, PageID.7099, 7197–7198, 7254.)

8. Although the hearing lasted four hours, and Clark was able to present all of the witnesses she called, only one of Defendants' witnesses, Dr. Anuj Malik, MD, was able to testify at the hearing. (*Id.*, PageID.7254.)

9. Clark is incarcerated on felony convictions for a 2010 armed robbery, a 2010 assault with intent to commit great bodily harm less than murder, and a 2008 second-degree home invasion, with an earliest release date is May 9, 2027. (OTIS Sheet, Hrg. Ex. B, p. 000243–246.)

**B. The evidence relied upon by this Court.**

10. In deciding motions for a preliminary injunction, district courts employ a lower evidentiary standard that would apply at trial, including evidence that would otherwise be inadmissible. (ECF No. 267, PageID.6793) (citing *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 620 (S.D. Ohio 2006) and 11A *Wright & Miller Federal Practice & Procedure* § 2949 (3d ed. 2026).)

11. In the present case, the Court relies on the testimony of the following witnesses who testified at the September 24, 2026, hearing:

- Krystal Clark, Plaintiff and movant;
- Dr. Brandon Bet, DO;
- Erica Herman, RN;
- Dr. Radhika Sheth, MD;
- Dr. Anuj Malik, MD.

12. This Court also allowed the parties to submit written testimony, (ECF No. 272, PageID.7017–7018), and relies on the declarations of the following witnesses:

- Dr. Carmen McIntyre-Leon, MD;
- Dr. Deborah S. Heaney, MD;
- Gina Legato, WHV prison counselor;
- Wil Alexander, MDOC's body worn camera manager;

- Sheena Brandenburg.

13. This Court also relies on the following exhibits that were admitted at the September 24, 2026, hearing:

- Plaintiff's Hearing Exhibit A, Plaintiff's emergency motion and attachments, Hrg. Ex. A, 000002–000188, which is also contained in the record at ECF No. 242, PageID.5175–6841.

- Plaintiff's Hearing Exhibit B, Defendants' response to Plaintiff Clark's emergency motion and included exhibits, which contains Defendants' Hearing Exhibits 1 through 12, Hrg. Ex. B, 000190–000926, which is also in the record at ECF No. 253, PageID.5871–6567, and ECF No. 255, PageID.6579–6617.

- Plaintiff's Hearing Exhibit C, Clark's reply in support of motion for injunctive relief and exhibits, Hrg. Ex. C, pp. 000928–000979, which is also contained in the record at ECF No. 256, PageID.6618-6825.

- Plaintiff's Hearing Exhibit E1, Clark's medical records from July 9, 2026, through September 18, 2026, Hrg. Ex. E1, pp. 001023–001859.

- Plaintiff's Hearing Exhibit E2, Clark's updated medical records from August 5, 2026 through September 18, 2026, Hrg. Ex. E2, pp. 000001–001012.

- Plaintiff's Hearing Exhibit F, Clark's medical records from January 1, 2025, through July 8, 2026, Hrg. Ex. F, pp. 00001–001728.

- Plaintiff's Exhibit G, portions of Henry Ford Infectious Disease records (Defendants agreed to admission of photos only as records are duplicative), Hrg. Ex. G, pp. 000063, 000072.

- Defendants' Hearing Exhibit 1, Clark's Offender Tracking Information (OTIS) sheet, Hrg. Ex. B, pp. 000243–000246, which is also contained in the record at ECF No. 253-2, PageID.5924–5927.

- Defendants' Hearing Exhibit 2; Matt Koche declaration, curriculum vitae, and summary report, Hrg. Ex. B, pp. 000248–000261, which is also contained in the record at ECF No. 253-3, PageID.5929–5942.

- Defendants' Hearing Exhibit 3, Clark's Meal History 2026, Hrg. Ex. B, pp.000264–000265, which is also contained in the record at ECF No. 253-4, PageID.5945–5946.

- Defendants' Hearing Exhibit 4, Clark's Callouts 2026, Hrg. Ex. B, pp. 000267–000298, which is also contained in the record at ECF No. 253-5, PageID.5948–5979.

- Defendants' Hearing Exhibit 5; Doug Kline Declaration, Hrg. Ex. B, pp. 000300–000302, which is also contained in the record at ECF No. 253-6, PageID.5981–5983.

- Defendants' Exhibit 6, Dr. McIntyre-Leon Declaration with curriculum vitae, Hrg. Ex. B, pp. 000304–000328, which is also contained in the record at ECF No. 253-7, PageID.5985–6009.

- Defendants' Hearing Exhibit 7, Dr. Heaney Declaration with curriculum vitae, and 2025 and 2026 summary reports, Hrg. Ex. B, pp. 000330–000368, which is also contained in the record at ECF No. 253-8, PageID.6011–6049.

- Defendants' Hearing Exhibit 8, Medical records referenced in Dr. Heaney's 2025 and 2026 summary reports, Hrg. Ex. B, pp. 000370–000875, 000888–000926, which is also contained in the record at ECF No. 253-9, PageID.6050–6556 and ECF No. 255, PageID.6579–6617.

- Defendants' Hearing Exhibit 9, Telephone calls, Hrg. Ex. B, p. 000876, which was submitted to the Court as a recording as per ECF No. 271.

- Defendants' Hearing Exhibit 10, July 4, 2026, telephone call, Hrg. Ex. B, p.000877, which was submitted to the Court as a recording as per ECF No. 271

- Defendants' Hearing Exhibit 11, Other prisoner JPays, Hrg. Ex. B, p .000879–000882, which is also contained in the record at ECF No. 253-12, PageID.6560–6563.

- Defendants' Hearing Exhibit 12; Lock history for Prisoners Rebecca Fackler, Ashley Hoath and Khaira Howard, Hrg. Ex. B, pp. 000884–

000886, which is also contained in the record at ECF No. 253-13, PageID.6565–6567.

- Defendants' Hearing Exhibit 17, July 4, 2026, video of health care callout.
- Defendants' Hearing Exhibit 19, August 31, 2026, video of Clark.

(ECF No. 274, Hrg. Trans., PageID.7130, 7140, 7143, 7150.)

14. Plaintiff's Hearing Exhibits A, B, and C contain motions, briefs, and supporting exhibits. This Court recognizes that motions and briefs contain the parties' arguments and thus do not constitute evidence. This Court therefore disregards the motions and briefs for evidentiary purposes.

15. Following the hearing, Defendants moved for the admission of the following exhibits:

- Defendants' Hearing Exhibits 13 and 14, autopsies for Howard and Hoath are admissible as public records. *Niles v. Owensboro Med. Health Sys., Inc.*, No. 4:09-CV-00061, 2011 WL 3163247, at *1 (W.D. Ky. July 26, 2011).
- Defendants' Hearing Exhibit 15, photographs of Clark's cell, have been authenticated, and a foundation laid by, Legato. (Legato Decl., ECF No. 273-4, PageID.7068, ¶ 10.)
- Defendants' Hearing Exhibit 16, a video of the pack-up of Clark's cell, has been authenticated, and a foundation laid by, Legato. (*Id.*, PageID.7069, ¶¶11–12.)
- Defendants' Hearing Exhibit 17 and Hearing Exhibit 19, videos of Clark, have been authenticated by Clark's testimony, and Alexander, who also laid a foundation. (Alexander Decl., ECF No. 273-5, PageID.7074, ¶¶ 3–4.)

- Defendants' Hearing Exhibit 18, Clark's medical records from July 9 through September 18, 2026, have been authenticated, and a foundation laid by, Dr. McIntyre-Leon. (Dr. McIntyre-Leon Decl., ECF No. 273-2, PageID.7033-34, ¶¶ 7–9.)

16. This Court admits those exhibits, finding that they meet the evidentiary requirements for a preliminary injunction, and that Defendants sufficiently authenticated them and laid appropriate foundations for their admission.

17. Accordingly, this Court relies on those exhibits as well.

**C. WHV does not present unsafe conditions of confinement.**

18. Clark alleges that she was exposed to dangerously high levels of mold at WHV, relying on her subjective observations as a layperson and this Court's order denying Defendants' motion for judgment on the pleadings that " 'Huron Valley is infested with mold.' " (ECF No. 242, PageID.5187, 5209.)

19. Clark misinterprets this Court's order, which acknowledged that it was required to accept Plaintiffs' allegations as true. (ECF No. 230, PageID.4958, n.1.)

20. That leaves only Clark's lay testimony that she has "observed" things that look to her like mold. (ECF No. 242, PageID.5209, ECF No. 274, PageID.7095–7096.)

21. But that testimony is, at best, vague. Clark claims that mold is everywhere at WHV, but other than overly broad statements—behind sinks, in showers, on walls, and so forth—Clark never testifies exactly where the mold is located in the prison facility, nor does she state when she observed the mold.

22. For instance, Clark did not testify that mold was in *her* shower or cell, or even her housing unit. Nor did Clark testify *when* she observed the mold.

23. Moreover, Clark's observations that WHV is infested with mold, and that the mold is present in dangerously high levels, are refuted by expert testing at WHV and the testimony of several witnesses.

24. Prior to this case being filed, Materials Testing Consultants Inc. (MTC) conducted air sampling for indoor air quality testing at WHV at the request of MDOC in April 2018. (ECF No. 152-2, PageID.2866.)

25. MTC tested WHV for the presence of a variety of different fungal spores and other particles, including Stachybotrys, commonly known as "black mold." (*Id.*, PageID.2867.) It found no significant concentrations of mold, and no Stachybotrys. (*Id.*, PageID.2867, 2871–2872, 2878.)

26. Matt Koche, an expert with 24 years of experience "evaluating indoor environments for the presence of contaminants," conducted two rounds of mold testing at WHV, the first in February 2022, and the second in February and March

2026. (Koche Decl., Hrg. Ex. B, p. 000250, ¶¶ 3–6; Koche curriculum vitae, *id.*, pp. 000256–259; Indoor air quality assessment, *id.*, pp. 000261–261.)

27. According to Koche, mold is present in nearly every indoor and outdoor environment in the world, but the presence of mold background levels, like those present at WHV, poses little to no risk. (*Id.*, p. 000251, ¶¶ 7–8.)

28. In 2022 and 2026, Koche conducted testing in Clark's housing unit and cell. (*Id.*, pp. 000251, 000253, ¶¶ 13, 21.)

29. At the time of the 2022 testing, Clark resided in cell 19 of the Gladwin A housing unit. (*Id.*, p. 000253, ¶ 21.) At the time of the 2026 testing, Clark resided in cell 4 on the south wing of the Harrison A housing unit. (*Id.*, pp. 000251 ¶ 13.)

30. In Koche's professional opinion, "[a]ir testing is the better measure of potential human exposure to mold," but he also conducted surface testing "to replicate the testing conducted by Plaintiffs' expert in 2021." (*Id.*, p. 000250, ¶ 6.)

31. Based on his testing, Koche concluded that

> The levels of airborne mold I found in Clark's cell and housing units in 2022 and 2026, were minimal, within the normal range for a building, and were similar to or less than the typical outdoor exposure level. The air samples represent an IICRC[1]-defined condition 1 (normal fungal ecology) status. These levels represent no increased human health risk relative to typical outdoor exposure.

[1] This Court takes judicial notice that the acronym "IICRC" stands for Institute of Inspection, Cleaning and Restoration Certification (IICRC). See https://iicrc.org/.

(*Id.*, p. 000253–254, ¶ 27.)

32. More specifically, Koche's 2022 "air testing revealed fungal spore counts to be below the minimum detection limit, which is less than 27 spores per square meter" in Clark's cell, and the surface testing in Clark's cell and housing unit similarly showed minimal mold and probably no active growth. (*Id.*, p. 000253, ¶¶ 22–27.)

33. The levels detected in both Clark's housing unit and cell in 2022 were lower than typical outdoor air levels and " consistent with background levels within a typical healthy building and/or those found in the outdoor environment." (*Id.*, pp. 000251, 000253–254, ¶¶ 8, 24, 26–27.)

34. The 2026 testing in Clark's cell showed a total of 54 mold spores per cubic meter of air, which were at the minimum detection limit for the sample. (*Id.*, p. 000252, ¶ 14.)

35. Air testing in Clark's housing unit showed extremely low spore counts, ranging from 53 to 188 mold spores per cubic meter of air, which were "near the lower detection limits of the sample." (*Id.* ¶ 18.)

36. A surface test of a shower vent in Clark's housing unit indicated "that mold was present on less than 5% of the sample area, with probably no active mold growth." (*Id.*, pp.00252–253, ¶ 19.)

37. According to Koche, "the fungal results collected from Harrison A and Clark's cell are very low and pose no increased risk to occupants relative to a typical outdoor exposure." (*Id.*, p. 00252, ¶ 20.)

38. When Koche collected his testing samples from Clark's cell, he did not observe any visible signs of mold growth on accessible surfaces or the contents of the cell. (*Id.*, p. 000252, ¶ 17.)

39. Koche's testing found nothing to support Clark's claims of widespread mold contamination at WHV. (*Id.*, p. 000251, ¶ 10.)

40. In addition to Koche's testing, several witnesses testify that they have not observed mold in Clark's cell, her housing unit, or WHV in general.

41. Gina Legato, a Prison Counselor (PC) at WHV who was assigned to Clark's housing unit from December 22, 2025, until the time Clark was transferred to DWH, testified to the following:

- Legato has been employed as a PC at WHV since April 17, 2022. (Legato Decl., ECF No. 273-4, PageID.7065–7066, ¶ 2.)
- Since December 22, 2025, Legato has worked in the Harrison housing unit where Clark was housed until her transfer to DWH. (*Id.*, ¶ 3.)
- During Legato's weekly inspections, she did not observe mold or mildew in Clark's cell, nor did she notice any smells that gave her any concerns about mold being present in her cell. (*Id.*, ¶ 6.)

- Clark never approached Legato with specific concerns or complaints about mold in her cell or in any common area in her housing unit, although Clark did approach prisoner porters who were cleaning to try to persuade them that there was mold in the showers, but the porters would tell Legato to that it was "definitely not mold." (*Id.*, ¶ 7.)
- Legato's position as PC meant that she was present in the unit every working day and she inspected the showers and common areas on a daily basis. Legato never saw mold present in those areas. (*Id.*, ¶ 8.)

42. Sheena Brandenburg, a former inmate at WHV who was in Clark's housing unit from June 15, 2023, to August 30, 2024, testified to the following:

- Clark did not keep her cell clean, and it often smelled musty due to her hanging wet clothes to dry in her cell. (Brandenburg Decl., ECF No. 273-6, PageID.7082, ¶ 25.)
- She does not believe there to be harmful mold at WHV, and the conditions at WHV were no different than other communal living settings. (*Id.*, ¶¶ 26–27.)
- There would be black mildew buildup in the shower areas, which was remedied by utilizing industrial fans, updating lighting, changing shower curtains monthly, and having a power washer available for cleaning. (*Id.*, PageID.7083, ¶¶ 28–29.)

- The bathrooms were cleaned twice daily, and Clark would complain when others would clean the bathroom that the cleaning products triggered her asthma. (*Id.*, ¶ 30.)

43. Dr. Carmen McIntyre-Leon, Chief Medical Office for MDOC, also noted that WHV has been tested for the presence of mold and the results were consistent with what is found in most public buildings. (ECF No. 273-2, PageID.7044, ¶ 27.)

44. Dr. Anuj Malik, MD, whom this Court accepted as expert in infectious diseases, (ECF No. 273, PageID.7235), testified that if WHV exposed inmates to dangerously high levels of mold, other prisoners would be affected, but that the records indicate that no other individuals had the same ear condition as Clark, (*id.*, PageID.7243).

45. In addition, the evidence shows that, despite her claims to have observed mold throughout WHV, Clark spends little time outside her housing unit and cell.

46. Clark ate her meals in WHV's chow hall less than 10% of the time in 2026. (Hrg. Ex. B, pp. 000264–265.)

47. Clark has also chosen not to participate in any programming or education services. (Hrg. Ex. B, pp. 00267–298.)

48. Other than her occasional trip to the WHV chow hall, the only time Clark left her housing unit for 15 minutes or more at a time with any regularity is for weekly church services, law library callouts, and daily (or more) healthcare callouts. (*Id.*)

49. Accordingly, the evidence shows that Clark largely remains in her housing unit, Harrison A, and her cell both of which contained low levels of mold that were in the normal range for a building and similar to or less than that present in the outdoor environment.

**D. Clark's medical claims are not supported by the evidence.**

50. Clark's motion for a temporary restraining order and preliminary injunction requested removal from WHV based on several asserted health conditions that she claims were caused by exposure to dangerously high levels of mold at WHV. (ECF No. 250, PageID.5176.)

51. Clark specifically alleges that she suffers from a number of conditions, including presumed cutaneous aspergillosis on her ears, a mold allergy, respiratory issues, and coughing blood (hemoptysis). (ECF No. 242, PageID.5184, 5194, 5209.)

52. In her supporting declaration, Clark claims that her "chronic fungal ear infection," breathing issues, "allergic reactions," "nasal bleeding," "eye

irritation," and "hearing issues" require removal from WHV. (*Id.*, PageID.5208–5209.)

53. At the evidentiary hearing, Clark testified that she was "[t]hrowing up blood," had bloody stools, and "[s]welling, bowel issues, rashes . . . . nosebleeds . . . headaches, dizziness affecting my heart, swelling all over my body." (ECF 274, PageID.7094.)

54. Since she was moved to DWH, Clark has claimed to suffer from additional medical conditions, including gastrointestinal problems, chronic constipation, chronic cough, an inability to eat or drink without vomiting, bloody sputum, and vomiting blood. (ECF No. 274, PageID.7101–7104; ECF No. 273-2, PageID.7042–7044.)

55. Because Clark's motion seeks removal from WHV based on her claims of mold exposure while living there, her health conditions that emerged, or became more severe, at DWH have no bearing on resolution of her motion, are not relevant to her request for relief, and will not be considered by this Court.

56. Accordingly, only those conditions Clark complained of in her motion will be considered in deciding that motion.

57. This Court will, however, briefly address the health concerns that Clark claims began, or became more severe, at DWH.

58. As discussed below, although Clark complains of numerous severe health conditions, the evidence does not support her claims.

**1. The health conditions Clark complains of in her motion are not supported by the evidence and do not require removal from WHV.**

59. Although Clark claims that she has serious medical conditions requiring removal from WHV and placement into a hospital or similar setting, those claims are largely limited to her subjective beliefs, without objective testing or clinical evidence to support them.

60. Clark's subjective claims must be interpreted in light of Dr. McIntyre-Leon's diagnosis of somatic symptom disorder (SSD) for Clark, which "causes patients to have excessive thoughts, feelings, and behaviors related to physical symptoms" that "are excessive and/or out of proportion." (ECF No. 273-2, PageID.7036, ¶ 13.)

61. According to Dr. McIntyre-Leon, "[p]atients with SSD may often feel as though their conditions and symptoms are going to kill them, even when it is not a plausible outcome." (*Id.*, PageID.7036–7037.)

62. In the present case, "Clark's SSD complicates her medical treatment" because "her recollections and perceptions are often skewed because of her inability to provide accurate assessments of her physical conditions." (*Id.*, PageID.7036.)

63. This Court finds that Clark's exaggerated and inaccurate claims regarding her medical conditions and symptoms is consistent with her diagnosis of SSD.

64. To begin with, the evidence Clark attached to her motion does not support her claims.

65. Clark's first exhibit is a May 2, 2022, letter to Marti Kay Sherry, MDOC's Administrator of Bureau of Health Care Services and MDOC Director Heidi Washington, (Hrg. Ex. A, p. 000165), but neither Sherry, Director Washington, nor anyone else at MDOC, received this letter, (Hrg. Ex. B, p. 000302, ¶¶ 4–8), and Clark does not claim that she actually mailed the letter.

66. The letter does not provide support for any of her alleged medical conditions; rather, it claims that Dr. Matthew Ellison, a contract doctor at WHV, does not follow Clark's treatment plan and violates doctor-patient privilege by allowing a nurse in the room during consultations. (Hrg. Ex. A, p. 000165.)

67. But, as Dr. Carmen McIntyre-Leon testified, having a female nurse present when a male doctor examines a patient is both routine and reasonable, particularly in a correctional setting. (Hrg. Ex. B, at p. 000310, ¶ 16; ECF No. 273-2, PageID.7038–73039, ¶ 18.)

68. Contrary to Clark's claims, Dr. Ellison has followed Clark's treatment plan other than when making minor modifications based on his medical judgment. (*Id.*, p. 000309, ¶ 14; ECF No. 273-2, PageID.7037–7038, ¶ 16.)

69. Specifically, her two treating physicians at the Henry Ford Medical Center in Jackson, Michigan, Dr. Bet and Dr. Sheth, recommended that Clark take Benadryl/diphenhydramine for allergy symptoms, but increased dry eyes and memory disturbance were thought to be possibly related to the medication, and there was a concern for a potential exacerbation of the cardiac conditions. (Hrg. Ex. B, at p. 000309; ¶ 14, p. 000335, ¶ 27; ECF No. 273-2, PageID.7037–7038, ¶ 16; ECF No. 274, PageID.7150–7151, 7208–7209, 7218.) As a result, Clark has been prescribed alternative allergy medications, including Claritin, (Hrg. Ex. B, at p. 000309; ¶ 14; ECF No. 273-2, PageID.7037–7038, ¶ 16), which both Dr. Bet and Dr. Sheth agreed was equivalent to Bendryl. (ECF No. 274, PageID.7150–7151, 7218–7219.)

70. Clark's second exhibit is a Henry Ford Infectious Disease Clinic follow-up note from an April 21, 2026, visit with Dr. Sheth, which lists Clark's self-reported symptoms and claimed medical conditions, but the note includes no testing or objective evidence to support Clark's claims. (Hrg. Ex. A, pp. 000167–171.)

71. In addition, Dr. Sheth notes that Clark was offered, but refused, a referral to a dermatologist for a biopsy of her ears. (*Id.*, 170.)

72. Clark's third exhibit is a University of Michigan Cardiology Clinic note from April 8, 2026, in which Clark reports various symptoms and conditions, none of which are backed by testing or objective evidence. (Hrg. Ex. A, pp. 00173–178.)

73. For example, Clark reports coughing up blood, but this was never verified. (Hrg. Ex. B, at p. 000338, ¶ 40; ECF No. 273-2, PageID.7039, 7043, ¶¶ 19(b), 24.)

74. Clark's fourth exhibit is grievance WHV-0738, which describes an alleged March 11, 2026, incident in which Clark claims that Dr. Ellison is not following her Henry Ford Infectious Disease plan and not giving her "necessary medications," including Benadryl, eye drops, and lotion, recommending that Clark purchase the items from the commissary. (Hrg. Ex. A, at p. 000180.)

75. As discussed above, however, Dr. Ellison has followed Clark's treatment plan, with medically appropriate modifications.

76. Clark's fifth exhibit contains three separate grievances, only one of which bears an identifying number to indicate that it was filed, and in which Clark complains about the treatment she has received, claiming that she was interrupted

by a nurse, and that the presence of other staff in her exam room violates her medical privacy. (Hrg. Ex. A, at pp. 000184–188.)

77. None of these claims, however, relate to any medical condition, emergent or otherwise, and this exhibit instead shows that Clark receives ongoing medical treatment.

78. Clark's sixth exhibit is this Court's order denying Defendants' motion to dismiss. (ECF No. 230.) As stated above, because this Court's order recognized that it must accept Plaintiffs' allegations as true, (*id.*, PageID.4958, n.1), it thus offers no support for Clark's allegations.

79. Clark's seventh exhibit is a media report about inmate deaths at WHV, which also fails to support her claims because those deaths are not linked to either her claims of dangerously high levels of mold at WHV or her claimed health conditions. (Hrg. Ex. A, at p. 000101–103.)

80. Clark's motion also relied on her declaration, in which she stated that she is "experiencing serious and worsening health issues that [she believes] are aggravated by mold exposure and the conditions at WHV" and that she has "seen and experienced what [she believes] to be mold in [her] living area and shower rooms," and "in the common areas inside and outside of the facility." (Hrg. Ex. A, at pp. 000035–36.)

81. Her claims, however, are rebutted by Koche's testing, as well as the testimony of Legato and Brandenburg. (Hrg. Ex. B, pp.000260–261; ECF No. 273-4, PageID.7066–7098, ¶¶ 5–9; ECF No. 273-6, PageID.7082–7083, ¶¶ 26–30.)

82. Clark's declaration alleges that she suffers from a number of symptoms, including a "chronic fungal ear infection," breathing issues, "allergic reactions," "nasal bleeding," "eye irritation," and "hearing issues," and believes that her treatment of these symptoms has been "recommended in connection with these mold-related/allergy symptoms." (ECF No. 242, PageID.5184, 5194, 5209.)

83. The evidence does not support these claims.

84. Clark claims that other women prisoners have recently died at WHV and, despite acknowledging that she does "not know the specific medical cause of those deaths," asserts that it makes her "fear that [she] may suffer catastrophic injury or death if [she] remain[s] housed there." (*Id*., p. 000037.)

85. Clark, however, provided no evidence linking these deaths to either her own claimed medical issues or the conditions that she claims caused them, and they have no relevance to this motion. (ECF No. 274, PageID.7107.)

**a. Clark has no medical condition requiring removal from WHV.**

86. Clark claims to suffer from several health conditions, including an ear infection, difficulty breathing, nosebleeds, a severe mold allergy, and coughing blood. (ECF No. 242, PageID.5187, 5208–5210, 5214; ECF 274, PageID.7094.)

87. At various times, she has also complained of a facial droop, vomiting blood, and difficulty walking, but these claims are based on Clark's self-reported symptoms and lack corroboration in her medical record. (Hrg. Ex. B, at pp. 000349–351, 000353–975, 000898.)

88. Dr. Deborah S. Heaney, M.D., who also has a master's degree in public health, reviewed Clark's medical history and found that Clark's claims have little support.

89. Dr. Heaney specifically found no medical reason to move Clark to DWH and "that Clark has no emergent medical condition and no condition warranting removal from WHV for medical reasons." (Hrg. Ex. B, pp. 00890, ¶¶ 4–5.)

90. For example, although Clark complains of a severe mold allergy, (ECF No. 250-9, Page.ID.5838, 5843), the record shows that her only mold allergy is to Alternaria alternata, a single type of very common mold, but nothing in her medical record indicates that it is severe. (Hrg. Ex. B, at p. 000890, ¶ 8.)

91. Clark relies on references in her medical record to statements by Dr. Rosenman at Michigan State University purporting to show a mold allergy, and elicited testimony about that by Dr. Sheth, but on cross-exam, Dr. Sheth admitted that she never actually saw Dr. Rosenman's notes or the results of any allergy testing he may he may have performed. (ECF No. 273, PageID.7217–7218.)

92. In 2021, Clark was diagnosed with otomycosis, a superficial noninvasive fungal infection in the auditory/ear canal. (*Id.*, pp. 000891–891, ¶¶ 9–10.)

93. Despite this diagnosis, and the importance of ear hygiene, Clark did not comply with the recommended cleaning instructions or keep her ear canals dry and did not attend most of her appointments for ear irrigation and cleaning. (*Id.*, p. 000891, ¶ 12.)

94. Ultimately, her otomycosis was caused by topical antibiotic use, poor ear hygiene, and ear wax, not mold exposure at WHV. (*Id.*, ¶ 13.)

95. Clark has repeatedly complained about her ears over the past few years but has continually refused to do ear washes and asked for them to be discontinued. (*Id.*, pp. 000893, ¶¶ 25-26.)

96. Clark has also refused recommended biopsies of her ears, even though medical professionals, including her treating physicians, testified that a biopsy is the only way to diagnose the skin condition on her ears.

97. Dr. Sheth testified that she has recommended to Clark that she get a biopsy of her ears, but Clark has refused to allow a biopsy. (ECF No. 274, PageID.7228.)

98. Dr. Bet agreed that to get a definitive diagnosis of aspergillosis, "a tissue biopsy showing direct invasion of the mold into tissue" is needed. (Bet Testimony, ECF No. 274, PageID.7164-7165.)

99. Similarly, Dr. Malik testified that that "without a biopsy, a diagnosis of aspergillosis cannot be established. That is very clear in the literature." (ECF No. 274, PageID.7237.)

100. Although Clark claimed that she did not decline the biopsy and merely wanted "to see if the medicine[[2]] [would] work, (ECF No. 274, PageID.7122), Dr. Sheth testified that not only did she recommend the biopsy of Clark's ears, which Clark in fact declined (*id*., PageID.7228), but that Clark could have both continued to take the posaconazole *and* had a biopsy, (*id*., PageID.7214–7215).

101. Clark's ear condition has been treated by Dr. Bet since June 1, 2025. (Hrg. Ex. B, p. 000661).

102. Although Dr. Bet diagnosed Clark with "Aspergillosis," Dr. Heaney and Dr. Malik disagree with this diagnosis. (Hrg. Ex. B, p. 000894, ¶¶ 30; ECF No. 274, PageID.7328.)

103. Dr. Malik testified that his review of the records shows that "there was never a biopsy done to prove that the—that this fungus or organism or mold

[2] That medicine was posaconazole. (ECF No. 273, PageID.7215.)

was penetrating into the tissue or causing any tissue destruction." (*Id.* PageID.7236–7237.)

104. According to Dr. Malik, there are three reasons why a medical diagnosis of aspergillosis on Clark's ears cannot be established:

- First, the Infectious Diseases Society of America has stated that when Aspergillus niger is isolated from a sample, colonization and contamination must be ruled out because the mold is "present in the environment everywhere, indoor and outdoor, and can frequently contaminate a sample that otherwise does not contain that mold." (*Id.*, PageID.7237–7238.)
- Second, "without a biopsy, a diagnosis of aspergillosis cannot be established. That is very clear in the literature. And in Ms. Clark's case, a biopsy is not available." (*Id.*)
- Third, Clark's "case involves only the pinna[3] of the ear without involving the external ear canal, and there has never been description of a case where I did a considerable amount of searching on PubMed, and there's never been a case described in which there was only pinna

[3] The pinna of the ear is the external part that is visible to the eye.

involvement symmetrically bilateral and lack of involvement of the ear canal." (*Id.*)

105. Moreover, an exam by an otolaryngologist (commonly referred to as an ENT) found that "[t]he only abnormality on exam for her ears is symmetric pigmented crusting of auricle," which is the skin and cartilage surrounding the ear, and the ENT made no diagnosis of fungal infection and did not recommend antifungal treatment. (Hrg. Ex. B, p. 000894, ¶ 31.)

106. Despite Clark's testimony that she had never refused to have a biopsy of her ears, Exhibit 19, a video from August 31, 2026, shows Clark refusing a biopsy of her ears in a loud and agitated manner, yelling at the medical staff present in her room. (ECF No. 274, PageID.7140.)

107. Further undercutting Clark's claims, her internal ear canals are clear of debris or infection, and she has no evidence of current infection and no urgent condition with her ears. (Hrg. Ex. B, p. 000894, ¶ 32.)

108. Clark's claimed difficulty hearing has no clinical support; medical providers repeatedly stated that there are no communication problems noted, even though Clark does not wear her hearing aids, and Clark shows that she understands conversations. (*Id.*, pp. 000894–895, ¶ 33.)

109. Clark's prior hearing testing was found to be unreliable and suggestive of poor effort or malingering, and there is nothing escalating or urgent about Clark's hearing. (*Id.*, ¶¶ 32–33.)

110. Clark also claims to have a severe mold allergy, but testing showed only a positive IgE for a single type of mold, Alternaria alternata. (*Id.*, p. 000895, ¶ 35.)

111. Clark's IgE positivity means sensitization, and the medical evidence does not show that Clark has a clinical illness related to this allergy, that it is linked to prison exposure, or that it is an urgent or escalating condition that would require her removal from WHV. (*Id.*, ¶ 36.)

112. Clark claims to have considerable difficulty breathing, but the record does not support this claim.

113. Although Clark has a long history of asthma, predating her incarceration, she receives treatment and it has remained stable. (*Id.*, p. 000896, ¶ 42.)

114. Clark claims to have had a mold infection but, although a single sputum culture in 2023 was positive for Aspergillus niger, it was taken in the bathroom behind a closed door, unobserved, and was highly suspicious of being tampered with, and a repeat culture only four days later was negative. (*Id.*, p.

000891, ¶¶ 14–15.) Similarly, an external ear swab in 2023 was positive for the same mold. (*Id.*, pp. 00891–892, ¶ 16.)

115. Notably, Clark has a negative lgE to Aspergillus. (*Id.*, p. 000895, ¶ 35.)

116. Although Dr. Bet recommended that Clark "should avoid any mold exposure that may further worsen her symptoms," he agreed that there was nothing to indicate that conditions at WHV would worsen her symptoms. (ECF No. 274, PageID.7152, 7171.)

117. Clark complains of several minor ailments that are not urgent and for which she has declined treatment.

118. For example, although Clark has dry-eye syndrome, she reports her vision as being good, and she has refused eye drops to treat this condition. (*Id.*, p. 000896, ¶ 43.)

119. Clark experiences occasional mild nosebleeds, likely due to dry air and her antihistamine use; nothing suggests that this common condition is due to any underlying pathology, and Clark declined treatment with saline spray, which is a simple and effective treatment with no side effects. (*Id.*, p. 000895, ¶¶ 37–38.)

120. This (nosebleeds) is not an urgent issue and has shown no escalation. (*Id.* ¶ 39.)

121. Clark complains of several other ailments that lack clinical support.

122. For instance, Clark claims to cough blood, but this again is based only on her subjective reports and has never been verified by a medical provider. (*Id.*, p. 000896, ¶¶ 40–41.)

123. Clark has repeatedly visited WHV's clinic complaining of pain in various areas, but extensive imaging has shown nothing abnormal and no indication of an underlying health condition that would cause her reported pain. (*Id.*, pp. 000897–898, ¶ 49.)

124. Although Clark claims to have difficulty walking, her presentation has been inconsistent, and no objective evidence indicates an inability to ambulate. (*Id.*, p. 000898, ¶ 50.)

125. Clark's claimed observation of mold at WHV is contradicted by repeated mold testing and, according to Dr. Heaney, Clark's medical records show that she has no health condition, emergent, escalating, or otherwise, requiring her removal from WHV. (*Id.*, pp. 000890, 000895–898; ECF No. 273-3, PageID.7049, 7051, ¶¶ 4–5, 12.)

126. Dr. McIntyre-Leon agreed, finding no condition that requires Clark to be removed from WHV and that her condition is stable. (Hrg. Ex. B, pp. 000308, 000312, ¶¶ 10, 19; ECF No. 273-2, PageID.7036–7037, 7045, ¶¶ 12–14, 28.)

127. Similarly, Clark's treating doctors, Dr. Bet and Dr. Sheth, found no reason to remove her from WHV or to place her in a hospital. (ECF No. 274, PageID.7169–7171, 7224–7225.)

**b. Clark has refused treatment, delaying both the treatment of her claimed medical conditions and the improvement of her health complaints, and has exaggerated or fabricated symptoms and medical issues.**

128. Clark has consistently refused medical treatment, and those who have provided medical care to her or resided with her at WHV have suspected her of exaggerating or fabricating her symptoms and tampering with her medical tests.

129. Both Dr. McIntyre-Leon and Dr. Heaney found that Clark has refused much of her recommended medical treatment for years. (Hrg. Ex. B, pp. 000310–312, ¶¶ 17–20; Hrg. Ex. B, pp. 000893, 000895–896, ¶¶ 25–26, 38–39, 43; ECF No. 273-2, PageID.7039–7042, ¶¶ 19–20.)

130. For example, despite claims about an ear infection, on several occasions Clark has refused to allow medical professionals to wipe debris from, or even clean, her ears. (Hrg. Ex. B, pp 000312, ¶18(a)–(c); ECF No. 273-2, PageID.7041, ¶ 20(a).)

131. Between May 17, 2025, and February 18, 2026, Clark either refused or failed to show up more than 150 times for her scheduled ear washing by WHV

nursing staff as recommended by her Infectious Disease Specialist. (Hrg. Ex. B, p. 000311, ¶ 18(d); ECF No. 273-2, PageID.7042, ¶ 20(d).)

132. Similarly, although Clark's treating physicians and Dr. Malik all agree that she needs to get a biopsy of her ears to definitively diagnose her condition, Clark has refused to allow any medical professionals to take biopsies. (ECF No. 274, PageID.7164–7165, 7227–7228, 7237.)

133. According to Dr. McIntyre-Leon, without a biopsy of her ears, "it is difficult to come up with an appropriate treatment plan with the limited information [Clark] is permitting to be obtained." (ECF No. 273-2, PageID.7043, ¶ 236.) And "Clark's refusal to follow medical guidance and to allow requisite testing has resulted in significant delays to both her treatment and improvement of many of her complaints. (*Id.*, PageID.7045, ¶ 29.)

134. Dr. McIntyre-Leon also found that, without a definitive diagnosis, there is the possibility that the current treatment plan, is completely unnecessary and the Posaconazole's side effects could be what is causing many of Clark's alleged problems with her gastrointestinal system, as well as her headaches, nausea, and constipation. (*Id.*, PageID.7043, ¶ 23.)

135. Clark's recalcitrance to agree to the recommended treatment of her conditions has continued at DWH:

- She has refused to save sputum, stool, and urine samples.

- Although Clark claims to be constipated, she refused 6 of 10 scheduled doses of lactulose in July.
- Pulmonary function testing could not be completed due to poor effort and not following instructions.
- Clark refused to allow a breathing test on a peak flow meter and inhaler, claiming to be too tired.
- Clark refused 5:00 a.m. vital signs, saying they'd already been completed at 3:00 a.m. They had been completed earlier, but that was following her complaint of chest pain and that her blood pressure had been low at that time.
- Ear cleaning and culture could not be completed because she reported excessive pain.
- She refused ear cleaning, culture, and pictures on July 16, 2026, and refused to sign the refusal of treatment form. She continued to refuse July 17 through 19, 2026.
- On July 20, 2026, she refused an enema and stool collection ordered by her provider, stating she would not allow the nurses to assist with the procedure, but instead, would only do so independently.
- On August 8, 2026, Clark refused wound care stating that she did it herself. Clark was very hostile and began arguing and shouting at staff, which resulted in the physical exam being deferred.
- On August 12, 2026, Clark refused the evening cleanse of her ears.
- On August 19, 2026, Clark began refusing to permit daily pictures of her ears and was only going to permit weekly pictures to be taken.
- On August 30, 2026, Clark refused an enema.
- On August 31, 2026, Clark refused to go for a skin biopsy on her ears.

(Hrg. Ex. B, pp. 000310–311, ¶ 17; ECF No. 273-2, PageID.7039–7042, ¶¶ 19–20.)

136. Clark's consistent refusal to allow recommended treatment and testing by her medical providers casts significant doubt on her claims and contradicts her testimony at the hearing that she went to all of her appointments and did not refuse recommended medical treatment and testing. (ECF No. 274, PageID.7126–7127, 7140.)

137. Medical providers have also suspected Clark of tampering with medical tests and fabricating symptoms. (*Id.*, ¶¶ 14, 48.)

138. Brandenburg testified that Clark fabricates, exaggerates, or intentionally exacerbates her symptoms and medical conditions, and regularly files grievances in an effort to "get paid":

- Clark admitted that she filed a large number of grievances and medical requests in order to make a paper trail so she could sue later because "this is how we get paid."
- Clark bragged about her lawsuits and the money she made from them.
- Clark had Brandenburg read her "letters from people involved with her lawsuit and her family telling her what to say, how to say it, and step-by-step instruction on how to further her litigation."
- Clark wrote medical requests "in a way that would intentionally counteract policy so that she could argue later that staff were not following policy."
- Clark refused to walk the 25 feet to get her medication from healthcare, claiming she needed a wheelchair.
- Clark tried to get as many medical details and accommodations as she could, even though she did not need them.

- Clark had some medications that she was allowed to keep on her person, and Brandenburg witnessed Clark throwing her pills away in the unit bathroom; when Brandenburg told Clark that she would not get better without taking the medication, Clark said "that's their problem[.]"
- Clark also intentionally made her medical problems worse. Even though Clark had heart and water-retention issues, she ate food that would intentionally exacerbate her medical issues, such as junk food or other high-sodium foods like potato chips and ramen noodles. Clark traded food with other inmates so that this food could not be tracked back to her.
- Clark would purposely not wash her ears and would cover them with a damp tissue to make whatever was growing on her ears grow more, explaining that this was "their" problem and she needed to get out of prison.
- When Brandenburg told Clark that what she was doing was making her conditions worse and she wouldn't get better, Clark responded that getting better is "not how we get paid."
- As early as December 2023, Clark would brag about "getting paid" and how she was going to be moved out of WHV.

- When Clark attended visits, she would put large sunglasses on, a face mask, her compression socks, and take her walker, but as soon as she was back in the housing unit, she would be perfectly fine.
- Clark complained about people cleaning the bathrooms, claiming that it triggered her asthma.
- Although Clark has a crooked smile, it was not as drastic as the facial droop in Clark's OTIS photograph.

(ECF No.273-6, PageID.7079–7082, ¶¶ 8–21, 23–24.)

139. Other prisoners at WHV agreed that Clark fabricated her symptoms. (Hrg. Ex. B, pp 000879–881.) JPAYs[4] from other inmates at WHV stated that Clark would purposely make herself sick, put mold on her ears and told others that she did it for money, would put ink and toilet paper on her ears, and claimed mold was growing out of her ears. (*Id.*)

140. Another prisoner noted that Clark would get angry at people who would clean and paint at WHV. (Hrg. Ex. B, pp 000882.)

**c. Clark's actions and behavior contradict her claims to suffer from severe health conditions.**

141. Clark's claimed health conditions also conflict with her own behavior, and during phone calls, Clark often tells friends or relatives in a strained voice that

[4] JPAY is an e-mail system available to prison inmates.

she cannot breathe, but moments later will talk or even yell, without any signs of difficulty breathing.

142. For instance, during a March 8, 2026, telephone call with her family, Clark starts crying while having ger family record her, but then cuts the recording while yelling and swearing, then commences recording again. (Hrg. Ex. 9, at 3:00-8:05.)

143. On July 4, 2026, only two days before she filed her motion for emergency injunctive relief, in a telephone call with advocates during a rally, she claimed that she could not breathe and that WHV staff would not provide her with breathing treatments. (Hrg. Ex. 10, at 02:30-02:59, 04:00-04:15.)

144. As shown by a video that begins as that telephone call is ending, when a correctional officer arrived to escort her to healthcare, she told her advocates that she was being sent to segregation, which was clearly false because the correctional officer informed Clark that she needed to go to healthcare. (Hrg. Ex. 17.)

145. Although Clark claimed to have difficulty breathing a few minutes before this, and said that WHV would not provide treatment for her, Clark told the correctional officer that that she did not need to go to healthcare. (*Id.*)

146. Likewise, even though she claimed to have difficulty breathing moments before this, she yelled loudly at the correctional officer. (*Id.*)

147. And, despite Clark's repeated claims to have difficulty walking, the video shows her walking at a brisk pace with no signs of difficulty walking or breathing. (*Id.*)

148. Brandenburg also heard Clark's telephone conversations with her family and witnessed her conduct afterwards. (ECF No. 273-6, PageID.7082, ¶ 22.)

149. Clark would ask family members to call the prison and complain on her behalf, falsely telling them that she was not getting medical care or that she was suffering from medical issues; when Clark got off the phone, however, she would be perfectly fine. (*Id.*)

150. Similarly, Clark has claimed to have a facial droop, which is covered by the mask she wears most of the time, but there is no medical reason for the droop or for Clark to wear a mask, which also prevents consistent observation of the facial droop. (Hrg. Ex. B, pp. 000896–897, ¶¶ 44–45.)

151. Medical professionals have found that Clark's facial droop switches sides—it began on the right side of her face, then moved to the left, and back and forth, (*Id.,* ¶¶ 19, 44), including Dr. Bet, who noted that Clark's facial droop is sometimes on the left and sometimes on the right. (*Id.*, pp.000650, 000665.)

152. Exhibit 19, a video from August 31, 2026, shows Clark refusing a biopsy of her ears in a loud and agitated manner, yelling at the medical staff

present in her room 2026, and her facial droop is not present at all. (*Id.*, PageID.7140).

**d. The health conditions that Clark claims emerged, or became more significant at, DWH are irrelevant to the present motion, and are neither supported by the evidence nor require hospitalization.**

153. As mentioned above, Clark also complains of several health conditions that have either emerged at, or became more significant since her temporary transfer to, DWH.

154. Clark has claimed that, while at DWH, she has had constipation, no bowel movement for approximately 50 days, headaches, vomiting, and has blood in her sputum and vomit. (ECF No. 274, PageID.7097-7099, 7102.)

155. Clark's motion, however, is premised on the claim that conditions at WHV, namely exposure to dangerously high levels of mold, have caused serious health conditions that require removal from WHV, inpatient care, or hospitalization. (ECF No. 242, PageID.5176-5177.)

156. The conditions that Clark claims emerged, or became more significant, at DWH, cannot have been related to conditions at WHV because she left WHV on July 9, 2026, and thus cannot support her motion for removal from WHV. (ECF No. 274, PageID.7189.)

157. Regardless, this Court finds that the conditions Clark claims have emerged, or become more significant at, DWH are not supported by the evidence and do not warrant the level of medical care that Clark claims is necessary.

158. For instance, despite her claims of having gone approximately 50 days without a bowel movement, Dr. McIntyre-Leon testified that "records and testing show that Clark still had active bowels and that there was no obstruction." (ECF No, 273-2, PageID.7042, ¶ 21.)

159. Dr. Heaney, agreed, finding that "[i]t would be impossible to go weeks without a bowel movement," and noting that imaging and several abdominal X-rays "disproved Clark's claim" by showing "stool in the colon and no obstruction." (ECF No. 273-3, PageID.7050, ¶ 10.)

160. Clark's witness, RN Herman, also testified that Clark had movement in her GI tract and that it was not possible to go without a bowel movement for 30 or more days. (ECF No. 274, PageID.7193–7194.)

161. Clark's claims of vomiting also have little support in the record.

162. For starters, Clark's vomiting is mainly based on her own self reporting; DWH staff has observed little actual vomit, at most finding "very small amounts in her basin." (ECF No. 273-3, PageID.7050, ¶ 9.)

163. DWH staff has primarily observed clear or white mucous, which "is not consistent with what [vomit] from the stomach or bowel looks like," and an

"abdominal CT showed no abnormality of the stomach or other upper gastroenterology tract." (*Id.*)

164. Contrary to Clark's claims that she vomits blood and has blood in her sputum, no medical staff at DWH has witnessed this, and she has generally refused to save samples for testing. (ECF No. 273-2, PageID.7039, 7043, ¶¶ 19(b), 24.)

165. As for Clark's claim to have blood in her sputum, although Dr. Sheth's treatment notes indicate that Clark reported blood in her sputum, Dr. Sheth never personally observed this. (ECF No. 274, PageID.7217).

166. Further undermining Clark's claims regarding constipation and vomiting, her weight has remained relatively stable at DWH. (ECF No. 273-2, PageID.7042, ¶ 21; ECF 273-3, PageID.7058; ECF 274, PageID.7194.)

167. As to Clark's complaints about headaches, Dr. McIntyre-Leon found that, although Clark has complained about headaches for years, "radiological studies including the head and neck [have] failed to show any masses or findings to provide objective reasons for the causes of the headaches." (ECF No, 273-2, PageID.7042, ¶ 22.)

168. Dr. Sheth also noted that a CT scan of Clark's head was negative. (ECF 274, PageID.7207.)

169. Dr. Heaney also found no objective support for Clark's claim of having severe headaches, noting that Clark's blood pressure and pulse remained

normal, and testing has not disclosed any concerning findings. (ECF No. 273-3, PageID.7051, ¶ 11.)

170. In addition, Dr. Heaney found that Clark exaggerated her symptoms, "often rating her pains at 10 to 20 out of 10. (*Id.*)

171. Dr. Heaney's conclusion is consistent with Clark's SSD, which skews her perceptions of her symptoms and medical conditions due to an inability to provide accurate assessments of her physical condition. (ECF No. 273-2, PageID.7036–7037, ¶ 13.)

172. Clark alleges that none of her medical issues have been resolved since her transfer to DWH, including her ears, her GI issues, and heart issues. (ECF No. 274, PageID.7104–7105.)

173. The evidence, however, does not support Clark's claims.

174. Dr. Bet testified that Clark's ears have improved. Her ears showed improvement both in the spring, while Clark was still at WHV, and as of August 24, 2026, after her transfer to DWH. (ECF No. 274, PageID.7159, 7163, 7172.)

175. And, during a July 24, 2026, visit, Clark informed Dr. Sheth that "she felt like her ears were improving[.]" (*Id.*, PageID.7210.)

176. Clark's testimony contradicts that of her medical providers, including what she told them, and lacks credibility.

**E. Moving Clark from WHV is unnecessary would be burdensome.**

177. The evidence shows that permanently removing Clark from WHV, which is the only women's prison in Michigan, would be burdensome and harmful for Defendants, and would not alleviate her claims.

178. Clark requests removal from WHV, arguing that her request is "narrow," but this claim is belied by the conditions she places on a transfer:

- Requiring Defendants to, within 24 hours, transfer her to a "medically appropriate correctional, medical, or other lawful secure placement outside WHV where she will not be exposed to the complained-of mold and related environmental triggers." (ECF No. 242, PageID.5204.)
- Requiring Defendants to "maintain Ms. Clark in that medically appropriate placement pending further order providing that no cell, unit, wing, or other area within WHV will constitute compliance with that order." (*Id.*)
- Requiring Defendants to "ensure that Ms. Clark's infectious disease treatment plan, mold-avoidance instruction, antifungal monitoring, prescribed medications, and ordered imaging or follow-up care are not interrupted." (*Id.* at PageID.5205.)

- Requiring Defendants "to file a compliance notice identifying the selected outside-WHV placement, the medical and environmental basis for the placement, and the steps taken to maintain continuity of care." (*Id.*)

  - Any placement must not expose her "to the complained-of mold and related environmental triggers." (*Id.*, PageID.5177.)

179. These requests are not supported by the evidence.

180. Testing going back to 2018 indicates that WHV does not contain high levels of mold, and that the levels of mold to which Clark is exposed at WHV are lower than outside air, consistent with a healthy building, and are, for all intents and purposes, minimal, (Hrg. Ex. B, pp. 000251–254, ¶¶ 8, 14–16, 18–27; ECF No. 152-2, PageID.2866–2867, 2871–2872, 2878), but the same cannot be said of an outside facility.

181. Allowing Clark to remain at DWH indefinitely is not a viable option because there is no medical reason for Clark to remain at DWH. (Hrg. Ex. B, p. 000312, ¶ 19; *id.*, p. 000890, ¶ 4; ECF No. 273-2, PageID.7035–7037, ¶¶ 11–14; ECF No. 273-3, PageID.7049, ¶ 4.)

182. Additionally, because DWH serves as MDOC's main medical facility, treating patients from all MDOC facilities, (Hrg. Ex. B, pp. 000307–308, ¶¶ 9, 11(, it has limited bedspace, (*id.*, p. 000307308, ¶¶ 9, 11; ECF No. 273-2, PageID.7035,

¶ 11), and allowing Clark to remain there would take a potential bed away from other patients who require the level of care provided at DWH, (*id.*).

183. Clark's medical needs were being met at WHV, and she gains no health benefits by being housed outside WHV or by remaining at DWH. (*Id.,* pp. 000306-308, 000312, ¶¶ 8, 10, 18; ECF 273-2, PageID.7036–7037, 7045, ¶¶ 12, 14, 28; ECF No. 273-3, PageID.7049, 7051, ¶¶ 4–5, 12.)

184. None of the numerous medical professionals and consultants who have evaluated Clark recommend removing her from WHV or suggest that her claimed medical conditions require hospitalization. (*Id.,* p. 000309, ¶ 12; *id.*, p. 000890, 000895, ¶¶ 5, 36; ECF 273-2, PageID.7037, ¶ 14.)

185. And all of the medical experts and providers who have testified in this matter have concluded that Clark neither requires removal from WHV or hospitalization:

- Dr. Malik testified that Clark's claimed medical conditions do not require removal from WHV and do not require hospitalization. (ECF No. 274, PageID.7244–7245.)
- Dr. McIntyre-Leon testified that Clark's clinical assessments show that she is stable, and "Clark will not suffer any irreparable harm by being housed at WHV with her current medical conditions and needs." (ECF No.273-2, PageID.7035, ¶ 12.) Clark does not need

inpatient level of care and none of her medical providers have recommended that Clark be removed from WHV. (*Id.*, PageID.7037, ¶ 14.) Additionally, Clark can be safely housed at WHV, the medical treatment provided/offered at WHV is sufficient, and there is no health benefit to house Clark outside of WHV. (Hrg. Ex. B, pp. 000308–309, 000312, ¶¶ 10, 12, 19; ECF No. 273-2, PageID.7045, ¶ 28.)

- Dr. Heaney testified, after reviewing Clark's health care records, that there is "no medical reason to remove Clark from WHV" and "no medical reason to move Clark to DWH." (Hrg. Ex. B, p. 000890, ¶ 4; ECF No. 273-3, PageID.7049, ¶ 4.) Dr. Heaney further concluded that "Clark has no emergent medical condition, no condition warranting removal from WHV for medical reasons, and no condition that requires hospitalization. Her medical needs can be met at WHV." (Hrg. Ex. B, p. 000890, ¶ 5; ECF No. 273-3, PageID.7049, ¶ 5.)
- Dr. Bet testified that, if he believed that Clark's health conditions required removal from WHV, he "would not hesitate to recommend her removal," but his treatment notes made no such recommendation, and he admitted that he has found nothing

indicating that her "symptoms were being exacerbated by staying at" WHV. (ECF No. 274, PageID.7169–7171.)

- Dr. Sheth also testified that, if she believed that Clark needed to be removed from WHV or that her medical condition required hospitalization, she would recommend that, but she agreed that she has not made either of those recommendations. (*Id.*, PageID.7224–7225.)

186. In sum, the evidence supports the following findings of fact by this Court:

- Clark is not exposed to dangerously high levels of mold at WHV and the presence of mold at WHV is consistent with a typical healthy building and the outdoor environment.
- None of Clark's claimed health conditions is caused by exposure to dangerously high levels of mold at WHV.
- Although Clark has many claimed health conditions, most of them are based on her own subjective self-reporting of symptoms, with little objective clinical evidence to support her claims. And exaggeration of symptoms is consistent with her SSD diagnosis.
- Although Clark complains of a wide variety of symptoms and medical conditions that she claims are caused by mold exposure at WHV,

including her ear condition, headaches, difficulty breathing, constipation, heart problems, and GI issues, the only medical evidence she provided was from her two infectious disease doctors who are only treating her ear condition, and neither Dr. Bet nor Dr. Sheth testified that her ear condition was related to mold exposure at WHV.

- And Clark provided no evidence at all on her other symptoms and medical issues, and nothing showing that those symptoms and medical issues are related to mold exposure at WHV.
- Clark has refused medical treatment on numerous occasions, including repeatedly refusing to get a biopsy, which is the only way to accurately diagnose the condition on her ears.
- None of the medical providers and experts who testified, including Clark's own treating physicians Dr. Bet and Dr. Sheth, stated that Clark's medical conditions require removal from WHV.
- None of the medical providers and experts who testified, including Clark's own treating physicians Dr. Bet and Dr. Sheth, stated that Clark's medical conditions require hospitalization.
- The evidence does not show that Clark's symptoms and medical conditions are linked to mold exposure at WHV or a serious risk of substantial harm to Clark if she returns to WHV.

- Clark's medical needs can be met at, and she has no conditions requiring removal from, WHV.
- Clark has no medical conditions requiring in-patient treatment at DWH or a hospital.
- It would be inappropriate for Clark to continue to be placed at DHW because she has no medical conditions requiring the level of care provided there and her continued placement at DWH takes up a bed for an inmate that does require such care.
- It would be burdensome and unnecessary for MDOC to move Clark from WHV.

## CONCLUSIONS OF LAW

### II. Clark fails to establish a basis for this Court to grant the extraordinary remedy she seeks of a temporary restraining order or preliminary injunction.

1. On July 6, 2026, Clark filed an emergency motion seeking a temporary restraining order and preliminary injunction, or an indicative ruling under Fed. R. Civ. P. 61.1. (ECF No. 242.)

2. This Court denied Clark's motion for a temporary restraining order as moot because Defendants moved Clark to DWH pending the outcome of her motion. (ECF No. 272, PageID.7018.)

3. Because this case is currently on appeal in the Sixth Circuit Court of Appeals, this Court lacks jurisdiction and cannot grant her request for a preliminary injunction.[5] *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007).

4. The Federal Rules, however, allow a party to seek an indicative ruling while a case is on appeal. Fed. R. Civ. P. 62.1. On the present motion for a preliminary injunction, this Court may do the following:

> (1) defer considering the motion;
> (2) deny the motion; or
> (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Civ. P. 61.1(a).

5. Clark requests relief under Fed. R. Civ. P. 61.1(a)(3).

6. Because Clark has not sustained her heavy burden for obtaining injunctive relief and cannot show that Defendants have violated the Eighth Amendment, her motion is denied pursuant to Fed. R. Civ. P. 61.1(a)(2).

**A. In deciding a motion for a preliminary injunction, this Court may consider evidence that would be inadmissible at trial.**

7. As previously noted by this Court, preliminary injunction hearings employ a lower evidentiary standard, allowing district courts to "give some weight

[5] This Court is aware that the Sixth Circuit released its decision on October 15, 2026, (ECF No. 281), but it has not yet released its mandate.

to otherwise inadmissible evidence." (ECF No. 267, PageID.6793) (citing *Damon's Rests., Inc.*, 461 F. Supp. 2d at 620 and 11A *Wright & Miller* § 2949.)

8. On numerous occasions, this Court has acknowledged that it may rely on affidavits and hearsay evidence at a preliminary injunction hearing. See *Wells Fargo Bank, NA v. Mich Troy Tech. LLC*, No. 2:24-CV-10241, 2024 WL 5480363, at *1 (E.D. Mich. Feb. 2, 2024); *McIntosh v. Marina*, No. 2:23-CV-11196, 2023 WL 3854097, at *1 (E.D. Mich. June 6, 2023); *Air Int'l US (Inc.) v. Engineered Plastic Components, Inc.*, No. 2:23-CV-11041, 2023 WL 6527761, at *2 (E.D. Mich. May 4, 2023); *J.P. Morgan Sec., LLC v. Duncan*, No. 2:22-CV-11732, 2022 WL 3325514, at *2 (E.D. Mich. Aug. 11, 2022).

9. Accordingly, this Court has considered and relied upon the testimony and exhibits presented at the September 24, 2026, hearing, the supplemental written testimony offered by Defendants, the exhibits that Defendants introduced in their written testimony, and the exhibits attached to Clark's motion for preliminary injunction, Defendants' response, and Plaintiff's reply brief, and has weighed the evidence accordingly.

### B. Clark's request for injunctive relief in the prison context faces a high bar.

10. Clark must show that she meets the high bar for injunctive relief and that Defendants' conduct violates the Eighth Amendment. She fails to do either.

11. Preliminary injunctions "are extraordinary and drastic remedies . . . never awarded as of right." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (citation modified).

12. As the moving party, Clark "bears the burden of justifying such relief," *McNeilly v. Land*, 684 F.3d 611, 614–15 (6th Cir. 2012), which requires a far more stringent showing of proof than that required to survive summary judgment, *Farnsworth v. Nationstar Mortgage, LLC*, 569 F. App'x 421, 425 (6th Cir. 2014).

13. This Court may grant injunctive relief "only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Roghan v. Block*, 590 F. Supp. 150, 153 (W.D. Mich. 1984), aff'd 790 F.2d 540 (6th Cir. 1986).

14. A party seeking a preliminary injunction must establish four factors: (1) a strong likelihood of success on the merits; (2) irreparable injury would result absent an injunction; (3) granting the injunction would not cause substantial harm to others; and (4) the public interest would be served by granting the injunction. *Northeast Ohio Coal. For Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

15. Clark must also show that she has no adequate legal remedy. *Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1118 (6th Cir. 2001).

16. Moreover, where a prison inmate seeks an order enjoining state prison officials, this Court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *Kendrick v. Bland*, 740 F.2d 432 at 438, n.3 (6th Cir. 1984).

17. In addition, the Prison Litigation Reform Act (PLRA) limits the injunctive relief available to incarcerated persons, providing that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

18. Consistent with the principle that courts should defer to the decisions of prison administrators, the Supreme Court has cautioned that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of Government, not the Judicial." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979).

19. As further explained below, Clark does not meet the standard for injunctive relief.

### C. Clark fails to show a substantial likelihood of success on the merits.

20. Clark has the "initial burden" of showing a strong or substantial likelihood of success on the merits. *NAACP v. City of Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).

21. "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000), and merely showing a genuine issue of material fact is insufficient, *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 514 (6th Cir. 2026).

22. Absent a likelihood of success on the merits, injunctive relief should not be granted. *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024).

23. The stringent standards for injunctive relief apply to Clark's Eighth Amendment claim, requiring her to establish both the objective and subjective elements.

24. An Eighth Amendment claim has an objective component and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

25. For the objective prong, Clark must show that the conditions of her confinement pose a substantial risk of serious harm. *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020).

26. Only the most extreme and egregious conditions of confinement violate the Eighth Amendment, *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), because routine discomfort, including "restrictive and even harsh [conditions] . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). See also *Hardin-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

27. The Eighth Amendment only prohibits conduct involving the "unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346 (citation modified).

28. The operative complaint in this case asserts a conditions-of-confinement claim, not a medical indifference claim, (ECF No. 161, PageID.3482–3487), as shown by the fact that no Defendant is a medical provider, (*id.*, PageID.3376–3378).

29. The subjective prong requires Clark to show that that Defendants were (1) aware of facts from which an inference of a substantial risk of serious harm could be drawn, (2) that they actually drew that inference, and (3) consciously disregarded it. *Farmer*, 511 U.S. at 837–38.

30. Negligence is insufficient to meet this test, *Reedy v. West*, 988 F.3d 907, 914 (6th Cir. 2021), because plaintiffs must show that defendants had states of mind that rise above gross negligence, *Rhinehart,* 894 F.3d at 737, and were

"equivalent to criminal recklessness," *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013).

31. Clark cannot establish either the objective or the subjective element.

32. Because Clark did not bring a medical deliberate-indifference claim in her complaint, she cannot now ask for such relief. *Colvin v. Caruso*, 605 F.3d 282, 299 (6th Cir. 2010) ("Colvin's request . . . was improper because he did not bring his wrongful-removal claim in his original complaint.").

33. Even if Clark could now raise such a claim, medical deliberate-indifference claims invoke the same test as a conditions-of-confinement case but require a showing that prison officials did not adequately respond to a serious medical need of a prisoner that was "objectively harmful enough to establish a constitutional violation." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). This is typically shown by a "failure to provide treatment" for a serious medical need, or "treatment so cursory as to amount to no treatment at all." *Id.*, 737 (citation omitted).

34. This Court previously distilled Plaintiffs' allegations in this case down to the assertion that a "lack of adequate ventilation at Huron Valley" caused Plaintiffs to "suffer[] from long-term exposure to mold, toxins, and allergens" and that the subsequent mold caused various health problems. (Order, ECF No. 230, PageID.4957.)

35. Clark's motion is based on her claim that she has serious health conditions caused by exposure to dangerously high levels of mold at WHV, which requires her removal from WHV and placement in "a medically appropriate correctional, medical, or other lawful secure placement outside WHV where she will not be exposed to the complained-of mold and related environmental triggers[.]" (ECF No. 242, PageID.5204.)

36. To prove that she is entitled to the extraordinary step of an injunction, Clark needs to provide more than her subjective beliefs that the conditions at WHV are currently causing her problems; she needs to provide evidence. *Cameron v. Bouchard*, 815 Fed. App'x 978, 986 (6th Cir. 2020); *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 420–21 (6th Cir. 2014).

37. Clark fails to sustain her burden because she offers no evidence of dangerously high levels of mold at WHV, no evidence of any serious health condition requiring her removal from WHV or the type of intensive medical treatment she requests, which is inpatient treatment or hospitalization.

**1. Clark cannot establish the objective element of an Eighth Amendment claim.**

38. Clark cannot show a likelihood of success on the merits because, although the evidence she provides shows several subjective complaints, for the

most part, these subjective complaints are unsupported by objective clinical evidence.

39. Further, none of the medical experts and providers who provided testimony, including Clark's own treating physicians and witnesses, have concluded that Clark's medical conditions require removal from WHV, hospitalization, or the inpatient clinical environment provided at DWH:

- Dr. Malik testified that testified that Clark's claimed medical conditions do not require removal from WHV and do not require hospitalization. (ECF No. 274, PageID.7244–7245.)
- Dr. McIntyre-Leon testified that Clark's medical condition is stable, her medical needs can be met at WHV, Clark does not require an inpatient level of care, and will gain no health benefit from being housed outside of WHV or at DWH. (Hrg. Ex. B, pp. 000308–309, 000312, ¶¶ 10–12, 19; ECF No.273-2, PageID.7035, 7037, 7045, ¶¶ 12, 14, 28.)
- Dr. Heaney found "no medical reason to remove Clark from WHV" or place her at DWH or another hospital." (Hrg. Ex. B, p. 000890, ¶¶ 4–5; ECF No. 273-3, PageID.7049, ¶ 4–5.)

- Dr. Bet stated that he has found nothing indicating that Clark's medical condition requires removal from WHV. (ECF No. 274, PageID.7169–7171.)
- Dr. Sheth also testified that she has not recommended that Clark be removed from WHV or placed in a hospital. (*Id.*, PageID.7224–7225.)

40. For that matter, as testified to by Dr. McIntyre-Leon, none of Clark's numerous specialty consultants or health care professionals who have evaluated her have found that she has any health condition that requires her removal from WHV or that requires an inpatient level of care. (Hrg. Ex. B, p. 000309, ¶ 12; ECF No. 273-2, PageID.7037, ¶ 14.)

41. Nor do Clark's medical records support her claims of a medical emergency. Instead, they show a long history of claims and symptoms that medical professionals cannot corroborate with clinical findings or testing; a consistent refusal of medical treatment, including exams and testing that would determine whether her claimed conditions and symptoms even exist; and evidence that Clark is exaggerating or feigning her medical conditions.

42. Clark's medical complaints, both in terms of symptoms and claimed conditions, are inaccurate and exaggerated. This is consistent with Clark's SSD, which causes her to "to have excessive thoughts, feelings, and behaviors related to

physical symptoms" that "are excessive and/or out of proportion." (ECF No. 273-2, PageID.7036, ¶ 13.)

43. Clark's SSD leads Clark to "feel as though their conditions and symptoms are going to kill them, even when it is not a plausible outcome." (*Id.*, PageID.7036–7037.)

44. Clark's SSD also complicates her medical treatment because "her recollections and perceptions are often skewed because of her inability to provide accurate assessments of her physical conditions." (*Id.*, PageID.7036.)

45. In short, the evidence shows that Clark has no emergent medical condition, no condition requiring her removal from WHV for medical reasons, and no condition requiring placement at DWH or hospitalization.

46. Moreover, the case law does not support her request to be removed from WHV. This Court has recognized that it "is ill-equipped to micro-manage prisoner medical treatment." *Christian v. Mich. Dep't of Corrections--Health Services*, No. 12-12936, 2013 WL 607783, at *6 (E.D. Mich. Jan. 28, 2013), *report and recommendation adopted*, No. 12-CV-12936, 2013 WL 607779 (E.D. Mich. Feb. 19, 2013).

47. Similarly, the Sixth Circuit has long held that, so long as "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments

and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976).

**2. Clark is not exposed to high levels of mold at WHV.**

48. Clark claims that she was exposed to dangerously high levels of mold at WHV, but she offers only two items of evidence to support her assertions: (1) this Court's order denying Defendants' motion to dismiss, and (2) her own testimony. (ECF No. 242, PageID.5187, 5191, 5194, 5197–5198, 5208–5210; ECF No. 274, PageID.7095–7096.)

49. But, as stated above, Clark cannot rely on this Court's order denying Defendants' Rule 12(c) motion to dismiss because this Court had to accept Plaintiffs' allegations as true, *Hardy v. Whitaker*, 351 F.R.D. 84, 102 (E.D. Mich. 2026), precluding any fact finding in deciding that motion.

50. For injunctive relief, Clark must support her claim with evidence. *Cameron*, 815 Fed. Appx. at 986; *Libertarian Party of Ohio*, 751 F.3d at 420–21. But she provides no objective evidence that any of these alleged conditions affect where she spends most of her time–her cell and housing unit.

51. When Koche tested Clark's cell earlier this year, he "observed no visible signs of mold growth on accessible surfaces/contents." (Hrg. Ex. B, p. 000252, ¶ 17.) Repeated testing at WHV shows that the level of mold exposure in

her housing unit and cell are less than outside air and consistent within a typical healthy building. (*Id*., p. 000253–254, ¶ 27.)

52. Similarly, Koche's 2022 testing showed low levels of mold consistent with outdoor exposure. (*Id*., 000253–254, ¶¶ 8, 21–27.)

53. Testing going back to 2018 has found no significant concentrations of mold and no Stachybotrys. (ECF No. 152-2, PageID.2866–2867; 2871–2872, 2878.)

54. Likewise, testimony from witnesses who have observed WHV in general, and Clark's cell and housing unit specifically, does not support Clark's claims of mold at WHV.

55. Legato testified that she had been in and viewed Clark's cell, as well as conducted daily inspections of common areas in the unit, including the showers, and did not find mold**.** (ECF No. 273-4, PageID.7066–7068, ¶¶ 2, 5–8, 8.)

56. Nor has Legato seen mold anywhere at WHV during her 11 years of employment at MDOC. (*Id*., ¶ 9.)

57. Despite Clark's claims that there is mold at WHV, she never approached Legato with any specific concerns or complaints about mold in her cell or common areas of the housing unit. (*Id*., ¶ 7.) Instead, Clark claimed that WHV or unit showers contained mold, without providing any specifics, i.e., when, where, what it looked like, and so forth. (*Id*.)

58. A video offered by Defendants through Legato showing the pack up of Clark's cell at WHV following her transfer to DWH on July 9, 2026, supports Legato's testimony that Clark's cell contained no mold. (Hrg. Ex. 16.)

59. Similarly, photographs of Clark's cell from March 2026, also support Legato's testimony that Clark's cell contained no mold. (Hrg. Ex. 15.)

60. Legato also testified that when other prisoners would clean the showers, Clark would try to convince them that the showers contained mold. (ECF No. 273-4, PageID.7067–7068, ¶ 7.) When the other prisoners disagreed with Clark, she would cause disruptions in the housing unit by yelling and arguing with other prisoners and staff. (*Id.*)

61. Brandenburg was incarcerated at WHV in the same housing unit at Clark from June 15, 2023 to August 30, 2024. (ECF No. 273-6, PageID.7087, ¶ 3.)

62. Brandenburg testified that she did not believe that there was harmful mold at WHV and that conditions were similar to "other communal living settings." (*Id.*, PageID.7082, ¶¶ 26–27.)

63. According to Brandenburg, there was mildew in the showers "like you would see in any bathroom," but the bathrooms were cleaned twice per day, and had industrial fans to help with ventilation. (*Id.*, PageID.7083, ¶¶ 28–30.) Clark, however, complained about efforts to clean the bathrooms, claiming that the chemicals triggered her asthma. (*Id.*, ¶ 30.)

64. Based on this evidence, Clark has failed to establish that she is exposed to high levels of mold at WHV, let alone dangerously high levels.

**3. The medical evidence does not support Clark's claims.**

65. As with her claims about mold, Clark cannot rely on this Court's order on Defendants' motion to dismiss, unsupported allegations from the complaint, or her own subjective beliefs, and instead must make her case through evidence. *Cameron*, 815 Fed. Appx. at 986; *Libertarian Party of Ohio*, 751 F.3d at 420–21.

66. Because Clark did not present sufficient objective evidence to support her claim that she has serious medical issues requiring her removal from WHV, she has failed to meet her burden.

67. As discussed above, although Clark has several subjective medical complaints and a few verified medical conditions, the evidence does not support her claims that she has a serious medical condition requiring removal from WHV or placement in a hospital or similar setting.

68. While Clark takes exception to the medical care she has received, the Eighth Amendment guarantees her adequate medical care, not the care of her choice, *Rhinehart*, 894 F.3d at 750; *Westlake*, 537 F.2d at 860, n.5, particularly where, as here, medical providers have examined and treated Clark for her purported conditions, *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).

69. Clark alleges that she suffers from a number of symptoms, including a "chronic fungal ear infection," breathing issues, "allergic reactions," "nasal bleeding," "eye irritation," and "hearing issues." (ECF No. 242, PageID.5208–5209.)

70. The medical record does not support her assertions. Dr. Heaney testified that she found no support for these claims, or for the medical issues Clark asserts arose, or became more acute, at DWH. (Hrg. Ex. B, pp. 00890–898, ¶¶ 4, 8–23, 25–50; ECF No. 273-3, PageID.7049–7051, ¶¶ 7, 9–11.)

71. Dr. McIntyre-Leon agreed, finding that Clark's condition remains stable and, although Clark "has been evaluated by numerous specialty consultants and is regularly evaluated by health care professionals," that none of them found that she requires an "inpatient level of care." (Hrg. Ex. B, pp. 000308, 000312, ¶¶ 10, 19; ECF No. 273-2, PageID.7036–7037, ¶¶ 12, 14.)

72. Dr. Malik, Dr. McIntyre-Leon, and Dr. Heaney all testified that Clark's claimed medical conditions do not require removal from WHV. (Hrg. Ex. B, p. 000312*,* at ¶ 5; Hrg. Ex. B, p. 000890, ¶ 19; ECF No, 273-2, PageID.7036–7037, ¶¶ 12, 14, 28; ECF No. 273-3, PageID.7049, 7051, ¶¶ 4–5, 12; ECF No. 274, PageID.7244–7245.)

73. The two physicians treating Clark's ears both agreed that her ears have improved beginning in the spring of 2026, before Clark left WHV, and that

improvement has continued at DWH. (ECF No. 274, PageID.7159, 7163, 7172, 7210.)

74. Dr. Bet and Dr. Sheth also agreed that Clark does not need to be removed from WHV and that her medical conditions do not require hospitalization. (ECF No. 274, PageID.7169–7170, 7224–7225.)

75. Moreover, the thousands of pages of medical records submitted by the parties show that Clark has received extensive care for all of her claimed medical conditions, including ample testing, medications, and visits to medical providers outside of MDOC. (See, e.g., Hrg. Ex. B; Hrg. Ex. E1; Hrg. Ex. E2; Hrg. Ex. F; Hrg. Ex. 18.)

76. Not only does the medical record fail to support Clark's claims, it also shows that her claimed serious medical conditions are largely based on unsubstantiated, self-reported symptoms, and that most of her claims lack supporting objective clinical evidence. (Hrg. Ex. B, pp. 000891–898, ¶¶ 14, 17–23, 28–29, 32–33, 38, 40–41, 43–50; ECF No. 273-2, PageID.7042–7044, ¶¶ 21–25; ECF No. 273-3, PageID.7049–7051, ¶¶ 7, 9–11.)

77. The objective medical record finds no support for an emergent medical condition or a condition requiring Clark's removal from WHV. (Hrg. Ex. B, at pp. 000890, 000895–898, ¶¶ 5, 34, 39, 41–43, 49–50; ECF No. 273-2,

PageID.7036–7037, 7045, ¶¶ 12, 14, 28–29; ECF No. 273-3, PageID.7049, 7051, ¶¶ 4–5, 12; ECF No. 274, PageID.7169–7170, 7224–7225, 7244–7245.)

78. Clark's claims about Dr. Ellison not following her treatment plan and her exception to how he provides treatment also cannot support an Eighth Amendment claim because the evidence shows that Dr. Ellison followed Clark's treatment plan, making minor adjustments based on his sound medical judgment. (Hrg. Ex. B, at p. 000309, ¶ 14; ECF 273-2, PageID.7037–7038, ¶ 16.)

79. Notably, many of Clark's claims hinge on her baseless objection to the presence of a nurse or other medical staff during her exams, which is unrelated to her claimed medical issues, and it is wholly appropriate to have a female chaperone present when being treated by a male medical provider, particularly in a correctional setting. (Hrg. Ex. B, at p. 000310, ¶ 16; ECF 273-2, PageID.7038–7039, ¶ 18.)

80. Clark has received and continues to receive medical treatment, despite her own recalcitrance, for her many existing and claimed medical conditions, including medications, and referrals to and treatments by outside consultants and specialists. (Hrg. Ex. B, at p. 000306, 000308–309, ¶¶ 8, 11–14; *id.*, pp. 000890–898, ¶¶ 8–23, 25–50; ECF 273-2, PageID.7034, 7037–7038, ¶¶ 10, 14–17; ECF No. 273-3, PageID.7050–7051, ¶¶ 9–11.) The medical care provided by Defendants to Clark satisfies the Eighth Amendment.

81. On this record, this Court concludes that Clark received appropriate medical care while at WHV, and does not require removal from WHV, hospitalization, or continued care at DWH.

**4. Clark consistently refuses treatment.**

82. The evidence also shows that Clark has consistently refused medical treatment for the conditions that underlie her claims, including a refusal to get a biopsy of her ears, which is the only way to diagnose her ear condition. (Hrg. Ex. A, p 000170, Hrg. Ex. B, at pp. 000310–312, ¶¶ 17–18; *id.*, 000893, 000895–896, ¶¶ 25–26, 38–39, 43; ECF No. 273-2, PageID.7039–7042, ¶¶ 19–20; ECF No. 274, PageID.7164–7165, 7228, 7237.)

83. Despite this evidence, Clark testified at the September 24, 2026 hearing that she has never refused treatment for any of her medical conditions. (ECF No. 274, PageID.7126.) But, a few moments later, Clark admitted that she had refused ear irrigation treatments. (*Id.*, PageID.7126–7127.) And shortly after that, Clark claimed that she "went to every appointment." (*Id.*, PageID.7127)

84. Similarly, on recross-examination, Clark denied that she refused a recommended ear biopsy on August 31, 2026. (*Id.*, PageID.7140). But Exhibit 19, a video from August 31, 2026, shows Clark refusing a biopsy of her ears in a loud and agitated manner, yelling at the medical staff present in her room.

85. Notably, in Exhibit 19, Clark's claimed facial droop is not present at all.

86. Clark's testimony lacks credibility and flies in the face of her medical record and the testimony of other witnesses.

87. Clark's consistent refusal of medical care strongly supports this Court's denial of her request for injunctive relief and precludes relief under the Eighth Amendment. *Palmer v. Wagner*, 3 Fed. App'x 329, 331 (6th Cir. 2001) ("Palmer's voluntary refusal to complete the physical therapy treatment as ordered precludes an Eighth Amendment claim against Wagner.") See also *Burton v. Mich. Dep't of Corr.,* No. 20-CV-12501, 2023 WL 8441763, at *8 (E.D. Mich. Nov. 13, 2023), report and recommendation adopted in part, rejected in part on other grounds, No. 20-CV-12501, 2023 WL 8437612 (E.D. Mich. Dec. 5, 2023); *Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428, at *4 (W.D. Mich. Mar. 7, 2016).

**5. Clark's claimed medical conditions are inconsistent with her conduct and appear to be exaggerated or even fabricated.**

88. Clark's actions and behavior are often inconsistent with her claimed health conditions, and she has been suspected of tampering with medical tests and faking symptoms, (Hrg. Ex. B, pp. 000891, 000897, ¶¶ 14, 48), and has refused

medical treatment and objective testing, *Id.*, pp. 000310–312, ¶¶ 17–18; *id.*, 000893, 000895–896, ¶¶ 25–26, 38–39, 43).

89. On phone calls, Clark has said that she was experiencing difficulty breathing, but moments later would talk or even yell without any signs of difficulty. (Hrg. Ex. 9.)

90. And on July 4, 2026— two days before she filed her motion for emergency injunctive relief—she told advocates that she could not breathe and that WHV staff would not provide her with breathing treatments. (Hrg. Ex. 10, at 02:30-02:59, 04:00-04:15.)

91. But, as shown by a video that begins as that telephone call is ending, when a correctional officer arrived to escort her to healthcare, she falsely told her advocates that she was being sent to segregation. (Hrg. Ex. 17.)

92. Clark then told the correctional officer that that she did not need to go to healthcare, yelled loudly at him, and walked at a brisk pace, showing no signs of difficulty breathing or walking. (*Id.*)

93. Another example is Clark's claimed facial droop, which medical providers, including Dr. Bet, have noted switches sides; it began on the right side of her face, then moved to the left, then back to the right, and again to the left. (Hrg. Ex. B, pp. 000650, 000655, 000892, 000897, ¶¶ 19, 44.)

94. When Clark's mask is removed, the facial droop often disappears altogether; if she had a true facial droop, she would be unable to speak clearly or drink from a cup without difficulty, yet she's able to do both. (*Id.*, pp 000896–897, ¶ 45–47.)

95. Extensive testing, going back to 2021, has found no medical reason for her facial droop, and it appears to be entirely volitional. (*Id.*, ¶ 44.)

96. In addition to medical providers and WHV staff, other prisoners at WHV have observed that that Clark has exaggerated and even fabricated her own symptoms. (*Id.*, pp. 000878–882.)

97. For instance, Brandenburg testified that Clark filed needless grievances and sought unnecessary medical details to "get paid" from lawsuits. (ECF No. 273-6, PageID.7079,¶¶ 9-12.)

98. Clark also fabricated symptoms and medical conditions for the same reason, as well as deliberately presenting herself as medically vulnerable for visitors and falsely telling family members that she was not receiving medical care or was suffering from medical issues. (*Id.*, PageID.7080, 7082, ¶¶ 13–15, 22–24.)

99. Brandenburg also saw Clark make her symptoms and conditions worse, refusing to take medication or even throwing it away, and eating food that exacerbated her medical issues. (*Id.*, PageID.7080–8071, ¶¶ 14, 17–21.)

### 6. Clark cannot establish the subjective element of an Eighth Amendment claim.

100. To establish the subjective element of an Eighth Amendment claim, Clark must show that that Defendants were (1) aware of facts from which an inference of a substantial risk of serious harm could be drawn, (2) that they actually drew that inference, and (3) consciously disregarded it. *Farmer*, 511 U.S. at 837–38.

101. Clark relies on a May 2, 2026, letter to MDOC healthcare and Director Washington and a grievance, (Hrg. Ex. A, p. 000165), but neither Sherry nor Director Washington received Clark's letter, and MDOC has no record that it was received, (Hrg. Ex. B, p. 000302, ¶¶ 4–8).

102. Similarly, grievance WHV-0738 was against non-party Dr. Ellison, not Sherry or Director Washington, claiming that he did not follow Clark's treatment plan, (Hrg. Ex. A, p. 000165), which the evidence shows to be untrue, (Hrg. Ex. B, at p. 000310, ¶ 16; ECF No. 273-2, PageID.7038–73039, ¶ 18).

103. Both the letter and the grievance are insufficient as a matter of law because neither of them contains "facts from which an inference of a substantial risk of serious harm could be drawn." *Farmer*, 511 U.S. at 837–38.

104. For that matter, Clark offers no evidence that any Defendant has actually drawn an inference that Clark faced such a risk, or that they consciously disregarded it. *Id*.

105. Moreover, the evidence strongly shows that Clark receives extensive ongoing care, often from outside specialists. (ECF No. 273-2, PageID.7034, 7037, ¶ 10, 14–15; Hrg. Ex. B; Hrg. Ex. E1; Hrg. Ex. E2; Hrg. Ex. F; Hrg. Ex. 18.)

106. This satisfies the Eighth Amendment. *Rhinehart*, 894 F.3d at 740, 750; *Westlake*, 537 F.2d at 860, n.5; *Alspaugh*, 643 F.3d at 169.

107. Further, Clark's dissatisfaction with her medical care does not equate to an Eighth Amendment violation because "[a]n inmate's 'disagreement with the testing and treatment he has received . . . does not rise to the level of an Eighth Amendment violation.' " *Rhinehart*, 894 F.3d at 740 (quoting *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008)).

108. Defendants, none of whom are medical providers, are entitled to rely on Dr. Ellison's medical judgment as to appropriate treatment. *Pearson v. Mich. Dep't of Corrections*, 170 F.4th 1027, 1038 (6th Cir. 2026) ("[P]rison officials do not act with deliberate indifference to a prisoner's medical needs when they rely on medical judgments made by medical professionals responsible for prisoner care.") (citation modified). Defendants are likewise entitled to rely on the medical judgment of Dr. McIntyre-Leon.

109. Dr. Ellison "has followed Clark's treatment plan with slight modifications based on his medical judgment," including substituting other antihistamines for Benadryl because of potential negative effects, including

increased dry eyes, memory disturbances, and "potential exacerbation of cardiac conditions." (Hrg. Ex. B, at p. 000309, ¶ 14; ECF No. 273-2, PageID.7037, ¶ 16.)

110. Clark has offered no medical evidence that Dr. Ellison has failed to provide her with appropriate treatment and her own witnesses, Dr. Bet and Dr. Sheth, agreed other antihistamines were equally effective for treating allergies. (ECF No. 274, PageID.7150–7151, 7218–7219.)

**7. Clark relies on inapposite case law.**

111. Clark's motion cites only two cases to support her substantive arguments, *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890 (6th Cir. 2004) and *Helling v. McKinney*, 509 U.S. 25 (1993), neither of which applies here. (ECF No. 242, PageID.5195–5196.)

112. In *Blackmore*, jail officers observed symptoms of severe abdominal pain that were obvious to a layperson, including vomiting. 390 F.3d at 894.

113. Despite these direct observations, the jail officers did not provide any treatment other than antacids, which Blackmore vomited up, until he was taken to a hospital two days later for an appendectomy. *Id.*

114. Here, Clark never alleges that any Defendant has personally observed her medical condition, and the evidence shows that Defendants have provided extensive medical treatment, including by outside specialists. (Hrg. Ex. B, pp. 000306, 000309–310, ¶¶ 8, 12–15; *id.*, pp. 000890–898, ¶¶ 8–23, 25–50; Hrg. Ex.

E1; Hrg. Ex. E2; Hrg. Ex. F; Hrg. Ex. 18; ECF No. 273-2, PageID.7034, 7037, ¶ 10, 14–15.)

115. In addition, Defendants reasonably relied on the medical judgments of Dr. Ellison and other providers, *Pearson*, 170 F.4th at 1038, none of whom recommend removal from WHV, let alone care in a hospital or other inpatient setting.

116. Nor does *Helling* apply here. In *Helling*, the evidence at trial showed that the plaintiff's cellmate smoked heavily, directly exposing him to a constant barrage of second-hand smoke in his own cell. 509 U.S. at 28.

117. Clark, however, provides no evidence of dangerous levels of mold in her cell or housing unit, or evidence that visible mold is present at WHV and testing in both 2022 and 2026 indicates that Clark's cell and housing unit had lower levels of mold exposure than what is present in typical outside air and is consistent with a healthy building. (¶¶ 8, 14–29, Ex. B.)

**D. Clark cannot show irreparable harm.**

118. "The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors," *Essroc Cement Corp. v. CPRIN, Inc.,* 593 F. Supp. 2d 962, 970 (W.D. Mich. 2008), because showing an irreparable injury is an essential element for the

issuance of an injunction, *Patio Enclosures, Inc. v. Herbst,* 39 Fed. Appx. 964, 967 (6th Cir. 2002).

119. Clark must demonstrate that “irreparable injury is likely in the absence of an injunction”; the possibility of irreparable harm is insufficient. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).

120. The harm must also “be both certain and immediate, not speculative or theoretical.” *Int’l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 371 (6th Cir. 2025) (citation modified).

121. Clark cannot make this showing for several reasons.

122. Clark’s claims are, at best, speculative rather than “certain and immediate.” *Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) (citation modified).

123. The evidence fails to show any Eighth Amendment violation, let alone irreparable harm.

124. The medical records and testimony show a history of subjective complaints without clinical verification, refusal of treatment, and refusal of testing to confirm Clark’s claims.

125. Clark’s unsubstantiated claims, without any supporting evidence, do not constitute an irreparable injury sufficient to support injunctive relief.

126. Clark claims that the recent deaths of four prisoners at WHV has "worried her," (ECF No. 242, PageID.5208), but those tragic deaths have no bearing on Clark's conditions of confinement or medical conditions, as stated by this Court in ruling upon Defendants' objection to this evidence, (ECF No. 274, PageID.7107).

127. Clark provides no evidence linking those deaths to her claimed medical conditions or mold exposure, and each of them were in different cells and housing units than Clark. (Hrg. Ex. 12.)

128. The two prisoners for whom autopsies have been completed show that their deaths were attributable to a pulmonary embolism (Howard) and suicide (Hoath). (Howard, Howard-Khaira-727808-Autopsy-Report.pdf, Hrg. Ex. 13; Hoath Hoath-Ashley-0435875-Autopsy-Report-Corrected.pdf; Hrg. Ex. 14.) These unfortunate deaths were unrelated to any allegation of mold exposure. (*Id.*)

129. Moreover, Clark's condition is stable, her medical needs can be met at WHV, and she will suffer no harm if she remains at WHV, as shown by the fact that no medical provider, including her own treating doctors, has recommended removing Clark from WHV. (Hrg. Ex. B, , pp. 000308, 000312, ¶¶ 10, 19, pp. 000890, ¶¶ 4–5; ECF No. 273-2, PageID.7034, 7036–7037, 7045, ¶¶ 10, 12–14, 28; ECF No. 273-3, PageID.7049, 7051, ¶¶ 4–5, 12; ECF No. 274, PageID.7169–7171, 7224–7225.)

### E. The balance of equities and the public interest weigh against an injunction.

130. The final two preliminary injunction factors—whether the injunction would harm others and whether it serves the public interest—"merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

131. Both factors weigh against the grant of a preliminary injunction.

132. Because the public has a strong interest in a well-ordered correctional system, corrections officials must be afforded considerable latitude in their administration of state prisons. *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 126 (1977) ("Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators."); *see also Hanna v. Toner*, 630 F.2d 442, 444 (6th Cir. 1980) (noting that "courts . . . should be reluctant to become involved in the internal administration of state prisons.") (citation modified).

133. Defendants' strong interest in being able to manage WHV weighs heavily against injunctive relief.

134. Further, court intervention into state activities is inherently harmful. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Glover v. Johnson*, 855 F.2d 277, 286–87 (6th Cir. 1988) (recognizing that any interference by the federal court in the administration of state prisons is necessarily

disruptive); *Ruiz v. Estelle*, 650 F.2d 555, 573 (5th Cir. 1981) (injunctive relief would cause "irreparable injury" to Texas Department of Corrections). And the public has a strong interest in " 'leaving the administration of [] prisons to [] prison administrators.' " *Coots v. Twilla*, 2023 WL 3450413, at *4 (S.D. Ohio May 15, 2023) (citing *Winn v. Waugaman*, 2015 WL 1606151, at *5 (E.D. Ky. Apr. 8, 2015)).

135. Generally, the public interest is not served by "issuing an injunction that affects the operation of the prison system." *Carter v. Mich. Dep't of Corr.*, No. 12–cv–12621, 2013 WL 5291567, at *6 (E.D. Mich. Sep. 19, 2013).

136. "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (citation modified).

137. Where a prison inmate seeks to enjoin state prison officials, the court must proceed with caution and recognize the unique nature of the prison setting. *Kendrick*, 740 F.2d at 438 n.3; *Harris v. Wilter*, 596 F.2d 678, 680 (5th Cir. 1979).

138. In sum, the "problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference

by the courts." *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (citation modified).

139. Clark fails to overcome Defendants' and the public's strong interest in allowing Defendants to administer WHV without court intervention.

140. Nor is keeping Clark at DWH a viable option because there is no medical reason for Clark to remain at DWH, or any other hospital. (Hrg. Ex. B, p. 000312, ¶ 19; *id.*, p. 000890, ¶ 4; ECF No. 273-2, PageID.7035–7037, ¶¶ 11–14; ECF No. 273-3, PageID.7049, ¶ 4.)

141. Moreover, DWH has limited bedspace, (*id.*, p. 000307–308, ¶¶ 9, 11; ECF No. 273-2, PageID.7035, ¶ 11), and Clark remaining at DWH would take a potential bed away from a prisoner who, unlike Clark, requires the level of care provided at DWH, (*id.*).

142. It strongly violates the public interest to give Clark a bed at DWH and deny it to another prisoner who may need it.

## III. The PLRA bars Clark's requested injunctive relief.

143. Congress enacted the PLRA in part to limit the discretion of federal courts to exercise injunctive power over state correctional system. *Nelson v. Campbell*, 541 U.S. 637, 650 (2004).

144. As such, courts must " 'give substantial weight to any adverse impact on . . . the operation of a criminal justice system caused by the relief.' " *Id.* (citing 18 U.S.C. § 3626(a)(1)).

145. Clark fails to satisfy the PLRA's requirements for injunctive relief.

146. To begin with, although Clark recites three of the elements of the PLRA's standard for injunctive relief, she does not show how she satisfies this standard, and this Court will not scour the record and law to make an argument for her. *TE Connectivity Corp. v. Sumitomo Elec. Wiring Sys., Inc.*, 644 F. Supp. 3d 393, 399 (E.D. Mich. 2022).

147. The PLRA requires that injunctive relief "be narrowly drawn, extend no further than necessary to correct harm . . . and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(1), (2).

148. Because WHV is the only women's prison in Michigan, there is no other prison in Michigan that Defendants can move her to, and moving Clark from WHV would be burdensome for Defendants and thus not comport with the PLRA.

149. Clark's request does not satisfy the PLRA because it is not "narrowly drawn," would extend further than necessary to correct her claimed harm, and is not the "the least intrusive means necessary to correct that harm," as shown by the numerous conditions she places on her transfer request. (See, supra, Findings of Fact, ¶ 173.)

150. Clark claims to offer Defendants "choices" to "place [Clark] in a medically appropriate correctional, medical, or other lawful secure placement outside of WHV" or "[p]ermit Defendants to select" where she is placed rings hollow in light of these onerous conditions. (*Id.,* PageID.5184–5185.)

151. Neither the testing nor the medical evidence shows any need for removal from WHV. (Hrg. Ex. B, pp. 000251–254, ¶¶ 8–27; pp. 000890, 000895–898, ¶ 5, 34, 39, 41–43, 49–50; ECF No. 273-2, PageID.7036–7037, 7045, ¶¶ 12, 14, 28–29; ECF No. 273-3, PageID.7049, 7051, ¶¶ 4–5, 12; ECF No. 274, PageID.7169–7170, 7224–7225, 7244–7245.)

152. As discussed above, Clark's claims about widespread mold at WHV are unsupported and contradicted by the evidence. Moreover, mold is ubiquitous; it is present in nearly all climates and in nearly all buildings throughout the world. (Hrg. Ex. B, p. 000251, ¶ 7; ECF No. 274, PageID.7170, 7237.)

153. Clark's request contravenes the reality that the levels of mold in her cell, housing unit, and at WHV are minimal, consistent with a healthy building, and present no increased health risk relative to typical outdoors exposure. (Hrg. Ex. B, pp. 000252–254, ¶¶ 14–27.)

154. Ultimately, Clark fails to prove that the conditions at WHV are unsafe, and her overly burdensome request contravenes the PLRA.

155. In addition, Clark only addresses part of the PLRA, the three factors for a preliminary injunction under 18 U.S.C. § 3626(a)(2), and ignores the other limits on injunctive relief placed by the PLRA. (ECF No. 242, PageID.5199–5200.)

156. Under the PLRA, Courts cannot order corrections officials to act outside the scope of their authority. 18 U.S.C. § 3626(a)(1)(B).

157. Defendants do not have the authority to move Clark to a non-MDOC facility because they only have control over state prisons. Mich. Comp. Laws § 791.204. Nor can Defendants ensure that such a non-MDOC facility would have lower levels of mold than the negligible levels in Clark's housing unit and cell.

158. Accordingly, the relief Clark requests is barred by 18 U.S.C. § 3626(a)(1)(B).

159. The relief requested also amounts to a prisoner release order under 18 U.S.C. § 3626(g)(4), which is "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison[.]"

160. Moving Clark to an outside local or federal facility would "reduce or limit" WHV's and thus MDOC's prisoner population, which the PLRA bars this unless the court has previously entered an order for less intrusive relief that did not

remedy the issue, and the defendant has had a reasonable amount of time to comply with that previous order. 18 U.S.C. § 3626(a)(3)(A)(i), (ii).

161. No such prior order has entered in the present case, and such an order can only be entered by a three-judge court convened under 28 U.S.C. § 2284. 18 U.S.C. § 3626(a)(3)(B).

162. Clark's claim that the move will be "temporary" is disingenuous because she also claims that "no cell, unit, wing, or other area within WHV will constitute compliance with the order." (ECF No. 242, PageID.5204.)

163. Although the PLRA limits preliminary injunctions to 90 days, 18 U.S.C. § 3626(a)(2), Clark's argument signals that she will ask the Court to extend any relief provided.

164. Given that she is eligible for parole on May 9, 2027, she effectively asks this Court to order her placement outside of WHV for the remainder of her incarceration, which exceeds the scope of this Court's authority under the PLRA.

165. This Court holds that Clark's motion for a preliminary injunction fails to satisfy the four-part test for injunctive relief, fails to satisfy the Eighth Amendment's deliberate indifference test, and is barred by the PLRA.

166. This Court therefore denies Clark's motion.

## CONCLUSION AND RELIEF REQUESTED

Based on the above findings of fact and conclusions of law, this Court denies Plaintiff Krystal Clark's motion for preliminary injunction.

Respectfully submitted,

*/s/ Joshua S. Smith*
Joshua S. Smith (P63349)
Assistant Attorney General
Michigan Dept. of Attorney General
Attorney for Defendants
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
smithj191@michigan.gov

Dated: October 16, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2026, I electronically filed the above document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel.

*/s/ Joshua S. Smith*
Joshua S. Smith (P63349)
Assistant Attorney General
Attorney for Defendants