**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**PAULA BAILEY**, individually,
**KRYSTAL CLARK** and **HOPE ZENTZ**,
on behalf of themselves and others
similarly situated,
Plaintiffs,

Case No. 2:19-cv-13442
Hon. Stephen J. Murphy, III
Mag. Judge Elizabeth A. Stafford

v.

**HEIDI WASHINGTON**, *et al.*,
Defendants.

---

# PLAINTIFF KRYSTAL CLARK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** .......... iv

**PLAINTIFF CLARK'S RESPONSE TO DEFENDANTS' MOTION TO ADMIT EXHIBITS (ECF NO. 273)** .......... 1

**PROPOSED FINDINGS OF FACT** .......... 12

I. Procedural Background and Scope of the Remaining Preliminary-Injunction Request .......... 12

II. The Relief Clark Requested Was Prospective Medical-Placement Relief, Not Acute Hospitalization .......... 17

III. Clark's July 6 Declaration Identified a Constellation of Ongoing Medical Issues .......... 19

IV. The Contemporaneous Medical Record Immediately Before July 6, 2026 .......... 21

A. April 21, 2026 : Dr. Sheth .......... 21

B. June 26, 2026 : WHV / Dr. Ellison .......... 23

C. June 30, 2026 : Dr. Bet .......... 24

D. June 30, 2026 : MDOC Follow-Up and Henry Ford Nursing Note .......... 27

E. July 2, 2026 : Audiology and WHV Respiratory Complaints .. 28

F. July 4, 2026: Intermittent Respiratory Symptoms and Context of a Single Healthcare Encounter .......... 30

V. The Pre-Filing Record Objectively Corroborated Material Components of Clark's Declaration .......... 31

VI. Clark's Transfer to DWH Was Temporary and Did Not Resolve the Preliminary-Injunction Dispute .......... 33

VII. The Post-Transfer DWH Record Shows Ongoing Multisystem Care and Continuing Ear/Wound Treatment .......... 35

A. August 4, 2026 : Herman Nursing and Wound Care .......... 35

B. August 13, 2026 : Nausea/Vomiting, Poor Intake, Headache, and Ear Findings ........ 36
B.1. August 14, 2026 : Abnormal EKG and Outside Emergency-Department Transfer ........ 36
C. August 17, 2026 : Respiratory, IV, and Wound Care ........ 37
D. August 21, 2026 : Vomiting, Abdominal Symptoms, Cough, and Ear Findings ........ 38
E. September 2026 : Continuing Wound Care ........ 38
VIII. Dr. Bet's August 24 Follow-Up Continued Systemic Treatment and Monitoring ........ 41
IX. Defendants' Environmental Report Does Not Establish That WHV Is Medically Appropriate for Clark ........ 43
X. Defendants' Competing Medical Positions ........ 46
XI. Hearing Testimony and the Completed Evidentiary Record ........ 48
XII. Proposed Findings Concerning Weight, Credibility, and the Nature of the Risk ........ 64
XIII. Current Prospective Risk and Narrow Relief ........ 67

**PROPOSED CONCLUSIONS OF LAW** ........ 70
I. Evidentiary Rulings on Defendants' Motion to Admit (ECF No. 273) ........ 70
II. Governing Preliminary-Injunction and Rule 52 Standards ........ 73
III. Eighth Amendment Standards for Medical Needs and Prospective Environmental Risk ........ 76
IV. Clark Has Shown a Likelihood of Success on the Merits ........ 82
A. Objective component ........ 82
B. Subjective component / current official response ........ 85
C. Defendants' principal "no emergency / no hospitalization" theory does not resolve the merits ........ 88
V. Clark Has Shown a Likelihood of Irreparable Harm Absent Prospective Relief ........ 89

VI. The Balance of Equities and Public Interest Favor Narrow Relief ........ 91
VII. The Requested Relief Can Be Tailored to the PLRA ........ 93
VIII. The TRO's Mootness Does Not Resolve the Preliminary-Injunction Request ........ 95
IX. Defendants' Oral Motion for the Equivalent of a Directed Verdict Should Be Denied ........ 96
X. Proposed Preliminary Injunction ........ 97
**CERTIFICATE OF SERVICE** ........ 99

# TABLE OF AUTHORITIES

## CASES

*Bailey v. Michigan Department of Corrections*,
No. 25-1608, slip op. (6th Cir. Oct. 15, 2026)................14, 78, 80, 84, 87

*D.T. v. Sumner County Schools*, 942 F.3d 324 (6th Cir. 2019).......74, 89

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........... 76-77, 81-82, 86-89, 92

*Hadix v. Johnson*, 367 F.3d 513 (6th Cir. 2004)................................ 80

*Helling v. McKinney*, 509 U.S. 25 (1993) ......67, 74, 77-78, 80, 82-89, 91

*Miles-El v. Michigan*, No. 25-1140, slip op. (6th Cir. Oct. 9, 2026)
............................................................................. 79-81, 88-89

*Pearson v. Michigan Department of Corrections*,
170 F.4th 1027 (6th Cir. 2026)...................................................76, 81

*Phillips v. Tangilag*, 14 F.4th 524 (6th Cir. 2021) ............................ 76

*SEC v. G. Weeks Securities, Inc.*, 678 F.2d 649 (6th Cir. 1982) .......... 10

*Sisters for Life, Inc. v. Louisville-Jefferson County Metropolitan Government*,
56 F.4th 400 (6th Cir. 2022).............................................................. 73

*Talal v. White*, 403 F.3d 423 (6th Cir. 2005) ....................... 77-78, 84-85

*Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020)................................ 81

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)
......................................................................................... 73-74

## STATUTES

18 U.S.C. § 3626(a)(1)-(2) ......................................................... 92-95, 98

## FEDERAL RULES OF CIVIL PROCEDURE


Fed. R. Civ. P. 43(c) .......... 11

Fed. R. Civ. P. 50 .......... 75, 96

Fed. R. Civ. P. 52 .......... 70, 73, 75, 96

Fed. R. Civ. P. 65 .......... 5, 70, 74-75, 96-98


## FEDERAL RULES OF EVIDENCE


Fed. R. Evid. 106 .......... 3-4, 8, 56, 71

Fed. R. Evid. 401 .......... 1-3, 7-8, 10, 71

Fed. R. Evid. 403 .......... 1-3, 7-8, 10, 71

Fed. R. Evid. 602 .......... 2, 7-8, 10

Fed. R. Evid. 701 .......... 2-3, 7-8, 72

Fed. R. Evid. 702 .......... 2-3, 7-8, 72

Fed. R. Evid. 801-805 .......... 7-8

Fed. R. Evid. 901 .......... 10

# PLAINTIFF CLARK'S RESPONSE TO DEFENDANTS' MOTION TO ADMIT EXHIBITS (ECF NO. 273)

Pursuant to the Court's October 7, 2026 Order, ECF No. 275, Clark incorporates her response to Defendants' motion to admit additional exhibits into these proposed findings and conclusions. The Court expressly authorized Clark to respond to ECF No. 273 either here or by a separate filing. (ECF No. 275, PageID.7256.)

Clark recognizes that preliminary-injunction proceedings permit the Court to consider evidence with greater flexibility than at trial. But the relaxed procedure does not eliminate relevance, personal-knowledge, expert-scope, completeness, or weight concerns. The Court should distinguish (1) authenticity, (2) admissibility for a limited purpose, and (3) the substantive inference Defendants ask the Court to draw.

**Defendants' Exhibits 13 and 14**: Autopsy Reports. Clark objects under Rules 401 and 403 to using the Howard and Hoath autopsies as evidence about her own serious medical needs or the environmental risks she faced at WHV. Clark never claimed personal knowledge of those women's causes of death. If admitted, the reports may establish the specific autopsy findings they contain, not whether returning Clark

to WHV would expose her to a serious health risk. (Pl. Ex. A, Bates 000037-000038.)

**Defendants' Exhibit 15** : Photographs of Clark's Cell. Clark does not contest that Gina Legato may authenticate photographs she recognizes as fairly depicting visible portions of Clark's cell. Clark objects, however, to any inference that ordinary photographs prove the absence of airborne fungal material, hidden moisture, HVAC contamination, conditions in showers or common areas, or an individualized medical risk. Legato may testify to what she personally saw; she is not qualified to convert photographs into an environmental-health or microbial assessment. Fed. R. Evid. 401-403, 602, 701-702. Legato's declaration does not identify when the photographs were taken; accordingly, the photographs should not be treated as a comprehensive assessment of Clark's July 2026 housing conditions. (ECF No. 273-4, ¶ 10, PageID.7068.)

**Defendants' Exhibit 16**: July 9 Cell-Pack-Up Video. Even assuming the video is authenticated, a recording of visible portions of Clark's cell on one date cannot establish the absence of airborne fungal material, concealed moisture, conditions in other parts of the Harrison

housing unit, or the medical safety of a future WHV placement. Clark disputes the broader environmental and medical conclusions Defendants seek to draw from the recording. Fed. R. Evid. 401-403, 701-702.

**Defendants' Exhibit 17**: July 4 Healthcare-Call-Out Video. Defendants characterize this recording as a refusal to attend a healthcare call-out. (ECF No. 273, PageID.7022.) The contemporaneous medical record documents that Clark was evaluated in healthcare and stated she did not need a breathing treatment at that moment. (Pl. Ex. F, Bates 000387-000388.) A single encounter cannot disprove the intermittent breathing difficulties documented by WHV providers or Dr. Bet's standing direction that Clark have access to rescue albuterol for flare-ups. (Pl. Ex. F, Bates 000389, 000402, 000751-000752.) Clark objects to treating the video as a medical evaluation of her broader condition and requests that any relevant, necessary context be considered under Rules 106 and 401-403.

**Defendants' Exhibit 18** : July 9 through September 18 Medical Records. No objection. Those records are substantively the same stipulated medical records already admitted as Plaintiff's Exhibits E-1

and E-2. At the hearing, Defendants stipulated to admission of Plaintiff's medical-record exhibits, and the Court admitted E-1, E-2, and F. (Hrg. Tr. 58:7-25, 59:5-22, ECF No. 274, PageID.7142-43.) Admission of Defendants' duplicate compilation should not imply adoption of Defendants' characterization of the records.

**Defendants' Exhibit 19**: August 31 Biopsy Video. The recording concerns a particular biopsy encounter, not whether Clark's documented conditions resolved or whether WHV would be a medically appropriate placement. The recommended biopsy was not performed on that occasion, nevertheless Clark remained under active medical care, including continued systemic antifungal treatment and Dr. Bet's unretracted mold-avoidance instruction. (Pl. Ex. E-2, Bates 000928-000929; Hrg. Tr. 72:22-73:7.) Clark disputes any inference that the encounter negates the need for medical-placement protection, and preserves any Rule 106 objection to presentation of an incomplete or misleading excerpt.

**Defendants' Exhibits 20 and 21** : Catchall Exhibits. To the extent Defendants seek admission of an unidentified "foundation or rebuttal" exhibit or all exhibits listed by Plaintiff as abstract categories,

there is no discrete item for the Court to admit. Any particular document should be evaluated on its own foundation, relevance, completeness, and permissible use.

**Supplemental Declaration of Dr. Carmen McIntyre Leon.** The Court may consider the declaration under ECF No. 272, but Clark objects to treating the statement that she "will not suffer any irreparable harm" at WHV as expert testimony on the legal Rule 65 standard. (ECF No. 273-2, PageID.7036.) Dr. McIntyre Leon is MDOC's Chief Medical Officer and is board certified in psychiatry; the declaration does not identify a personal examination of Clark or personal environmental assessment of WHV. Her medical and correctional-administration opinions may be weighed, but her assertion concerning "irreparable harm" is a legal conclusion, and any individualized environmental-causation opinion must be evaluated for a sufficient medical and factual foundation.

Dr. McIntyre Leon's declaration does not answer the placement relief Clark actually seeks. She describes DWH as a secure MDOC facility offering outpatient and infirmary services, not an acute inpatient hospital. (ECF No. 273-2, PageID.7035-7036.) Clark's motion

seeks a medically appropriate, secure placement outside WHV with continuity of necessary care; she has never made acute hospitalization the condition for that relief. (ECF No. 242, PageID.5176-5177; Pl. Ex. C, ECF No. 256, PageID.6621.)

**Supplemental Declaration of Dr. Deborah Heaney**. Clark does not seek exclusion merely because Heaney reviewed records rather than personally treating Clark. Her specialized opinions may be considered within the limits of her record review and expertise. The Court should, however, distinguish her assessment that acute hospitalization was unnecessary from the placement relief actually requested. Her denial of mold-related medical injury is also disputed by the clinical record, which documents a treating infectious-disease recommendation to avoid exposure that could aggravate respiratory and allergic symptoms. (Pl. Ex. F, Bates 000751-000752; Hrg. Tr. 68:20-69:14, ECF No. 274, PageID.7152-53.) That recommendation is relevant to prospective risk. Heaney's supplemental affidavit is at ECF No. 273-3; her earlier record review is in Defendants' admitted Exhibit 7.

**Supplemental Declaration of Gina Legato.** Clark does not object to Legato's testimony about what she personally observed in the

cell or common areas. Clark objects to collateral character evidence, third-party statements attributed to shower porters, and lay conclusions that photographs or visual inspections establish the absence of harmful or airborne mold. Fed. R. Evid. 401-403, 602, 701-702, 801-805. The Court should give Legato's firsthand observations appropriate weight, but should not treat her observations or secondhand reports as microbial sampling or individualized clinical evidence. Legato herself acknowledges Clark made complaints about mold at WHV and in the unit showers. (ECF No. 273-4, ¶ 7, PageID.7068.)

**Supplemental Declaration of Wil Alexander**. Alexander appears in ECF No. 273-5 as MDOC's body-camera manager, offered principally to authenticate the July 4 and August 31 recordings. But he was not individually identified on Defendants' witness list in ECF No. 268, PageID.6796-97. The September 25 Order authorized supplemental testimony from witnesses on the filed witness lists who could not testify at the hearing. (ECF No. 272, PageID.7017-18.) The July 17 scheduling order separately required good cause before admission of an omitted witness or exhibit. (ECF No. 249, PageID.5377.) Clark therefore objects to reliance on Alexander as a

supplemental witness absent a particularized good-cause showing. If the Court nonetheless considers his declaration for the limited authentication purpose, Clark does not contest the identity of the two recordings, subject to her Rule 106 objection and to the limits on medical conclusions that may be inferred from them. Alexander offers no medical diagnosis and no environmental examination of WHV. Alexander's declaration identifies the August 31 recording as Exhibit 18 in paragraph 4, although Defendants offer that recording as Exhibit 19; the discrepancy should be clarified when assessing the foundation. (ECF No. 273-5, ¶ 4, PageID.7074; ECF No. 273, PageID.7023.)

**Supplemental Declaration of Sheena Brandenburg**. Clark objects to collateral accusations and lay environmental-health opinions under Rules 401-403, 602, 701-702, and, where applicable, 801-805. Brandenburg states that she occupied the A wing of the Harrison housing unit at WHV until August 30, 2024, and left WHV on February 10, 2026. She consequently was not in a position to observe Clark's actual July 2026 housing conditions or contemporaneous medical status. (ECF No. 273-6, ¶¶ 2-4, PageID.7078.) Her assertion that WHV lacked "harmful mold" rests on no identified environmental testing or

specialized medical assessment. Her allegations about Clark's motives, lawyers, and advocacy are collateral to the medical-placement issues.

If the Court considers Brandenburg's declaration, two portions are relevant to environmental conditions: she acknowledges "black build-up" in Harrison showers and identifies a "ventilation issue" for which WHV installed industrial fans, changed lighting and shower curtains, made a power washer available, and cleaned the bathrooms twice daily. (ECF No. 273-6, PageID.7083.) Brandenburg calls the buildup "mildew," but she supplies no expert foundation for differentiating mildew from fungal growth or for determining whether the condition posed a risk to Clark.

**Errata to Brandenburg Declaration (ECF No. 280). The** October 13 filing supplies a Facebook Messenger screenshot referenced by Brandenburg. The displayed account is identified only as "Facebook user"; the image does not authenticate its sender or establish any connection to Clark or her counsel. (ECF No. 280, PageID.7284-7285.) Whatever the nature of the message, there is no demonstrated evidentiary basis for attributing it to Clark or treating it as evidence of WHV conditions, her medical needs, or the prospective risk from return

to WHV. Clark objects under Rules 401, 403, 602, and 901 to such collateral and prejudicial inferences.

Defendants' reliance on Alexander also differs procedurally from their five listed medical, correctional, or former-prisoner witnesses. A witness's status as a records custodian does not alone satisfy the September 25 requirement that the affiant appear on the filed witness list. If the Court finds good cause to receive Alexander's narrow authentication statement, Clark requests the same opportunity to identify the completing portions of any video relied upon and to argue its evidentiary limits. (ECF No. 268, PageID.6796-97; ECF No. 249, PageID.5377; ECF No. 272, PageID.7017-18.)

Defendants object that the September 25 Case Management Order limited live testimony, Dr. Malik's redirect examination, and admission of their remaining exhibits. (ECF No. 273, PageID.7024-25.) The cases they invoke protect a meaningful opportunity to present evidence when material facts are disputed. See *SEC v. G. Weeks Securities, Inc.*, 678 F.2d 649, 651 (6th Cir. 1982). But G. Weeks involved an injunction entered on disputed factual findings before the defendants could present live rebuttal testimony. Here, the Court has not entered a

preliminary injunction; it held a four-plus-hour hearing, heard Defendants' Dr. Malik, and expressly permitted supplemental written testimony by witnesses unable to testify and record-cited rebuttal by both parties. (ECF No. 272, PageID.7017-18.) Rule 43(c) permits evidence on a motion to be received by affidavit, oral testimony, or both. Fed. R. Civ. P. 43(c).

The Court also has not categorically excluded Defendants' remaining exhibits: its October 7 Order afforded Clark an opportunity to respond before deciding Defendants' motion to admit them. (ECF No. 275, PageID.7256.) Defendants' objection does not justify automatic admission of every proposed exhibit or setting aside the existing schedule. As such, Clark requests that the Court decide the individual exhibit objections and the preliminary-injunction motion on the supplemented record.

## PROPOSED FINDINGS OF FACT

### I. Procedural Background and Scope of the Remaining Preliminary-Injunction Request

1. Clark is a named Plaintiff in this action and remains in the custody of the Michigan Department of Corrections ("MDOC"). (ECF No. 264, PageID.6727.)
2. Before July 2026, Clark was housed at the Women's Huron Valley Correctional Facility ("WHV"). (ECF No. 264, PageID.6727.)
3. On July 6, 2026, Clark filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction, or alternatively for an indicative ruling. (ECF No. 242, PageID.5175-78.)
4. Clark's July 6 motion sought plaintiff-specific medical-placement protection from continued exposure to the complained-of mold and related environmental triggers at WHV while her infectious-disease treatment and other medical issues remained ongoing. (ECF No. 242, PageID.5176-77.)
5. MDOC thereafter temporarily transferred Clark from WHV to the Duane L. Waters Health Center ("DWH") pending disposition of the motion. Defendants expressly stated that the transfer was

temporary and was not a concession of the substance or validity of Clark's claims. (ECF No. 253, PageID.5882.)

6. The parties later stipulated that Clark was transferred to DWH on or about July 9, 2026 and that she remains in MDOC custody. (ECF No. 264, PageID.6727.)
7. Defendants agreed that Clark would remain at DWH pending this Court's decision on Clark's emergency motion, but Defendants continued to maintain that WHV is an appropriate placement for Clark and can meet her medical needs. (ECF No. 264, PageID.6726.)
8. The parties did not reach an agreement resolving Clark's request for preliminary injunctive relief. (ECF No. 264, PageID.6726.)
9. In 2020, Plaintiff Paula Bailey filed a sworn declaration reporting visible dark material, inadequate shower ventilation, and grievances concerning environmental conditions at WHV. (ECF No. 68, PageID.998-1002.)
10. In earlier filings, Defendants described water damage from leaking pipes, along with ventilation-debris cleaning and inspections. (ECF No. 122, PageID.1865-1869.)

11. In its June 24, 2025 Rule 12(c) order, the Court denied Defendants' motion for judgment on the pleadings as to Clark's claim for injunctive relief and held that Clark had adequately alleged a real and immediate ongoing injury for standing purposes. (ECF No. 230, PageID.4978-80.)

12. On October 15, 2026, the Sixth Circuit issued a published opinion in this case, affirming the denial of qualified immunity to nine Defendants and reversing as to five on a motion for judgment on the pleadings. *Bailey v. Michigan Department of Corrections*, No. 25-1608, slip op. at 15 (6th Cir. Oct. 15, 2026).

13. On July 9, 2026, the Court noted Clark's blood-streaked sputum and other potentially serious medical concerns, directed expedited proceedings, and recorded MDOC's offer of temporary placement at DWH. (ECF No. 246, PageID.5370-5372.)

14. The parties' Joint Witness and Exhibit List identified Clark's MDOC medical records from January 1, 2025 through July 8, 2026 as Plaintiff's Exhibit F. Defendants stated that they did not object to the MDOC medical records, while noting duplication and

preserving objections to outside records not contained in the MDOC chart. (ECF No. 268, PageID.6802.)

15. The Joint Witness and Exhibit List also identified the updated July 9 through September 18, 2026 medical records as a stipulated/joint exhibit, subject to preserved objections concerning completeness, hearsay within hearsay, medical interpretation, weight, and cumulative use. (ECF No. 268, PageID.6810-11.)

16. On September 24, 2026, the Court held a four-plus-hour evidentiary hearing on Clark's emergency motion. (ECF No. 272, PageID.7017.)

17. Clark, Dr. Brandon Bet, Dr. Radhika Sheth, and Erica Herman, RN testified for Clark at the September 24 hearing. (Hrg. Tr. 8-144, ECF No. 274; see also Hrg. Tr. 60-73, 93-106, 119-144.)

18. At the beginning of the hearing, the Court identified the question as whether conditions alleged at WHV posed a serious medical peril if Clark remained or returned there. That identified issue is broader than whether her ear condition alone required acute hospitalization. (Hrg. Tr. 6:1-9, ECF No. 274, PageID.7090.)

19. Defendants called Dr. Anuj Malik, who testified on direct examination beginning at transcript page 146 and was cross-examined through page 169. (Hrg. Tr. 146:1-169:25, ECF No. 274, PageID.7230-7253.)

20. During the hearing, Defendants made an oral motion docketed as a motion for the "Equivalent to Directed Verdict." (Hrg. Tr. 145:1-15, ECF No. 274; Sept. 24, 2026 docket entry.)

21. The Court did not grant the oral motion during the September 24 hearing; it stated that it was not prepared to deny the preliminary injunction without hearing further evidence and proceeded to receive Defendants' testimony. (Hrg. Tr. 145:16-23, ECF No. 274.)

22. On September 25, 2026, the Court vacated the prior scheduling order and directed the parties to file proposed findings of fact and conclusions of law by October 16, 2026. (ECF No. 272, PageID.7017-18.)

23. The Court also permitted, but did not require, supplemental written testimony by October 2 from witnesses on the witness lists who were unable to testify at the hearing. (Id.)

24. The Court denied only the temporary-restraining-order component of Clark's motion as moot because Defendants had moved Clark to DWH for the pendency of the motion. The Court expressly stated that its forthcoming ruling would resolve Clark's request for a preliminary injunction. (ECF No. 272, PageID.7018.)

## II. The Relief Clark Requested Was Prospective Medical-Placement Relief, Not Acute Hospitalization

25. Clark's motion did not ask the Court to order an acute-care hospital admission for her ears. It requested removal from WHV and transfer to a medically appropriate correctional, medical, or other lawful secure placement outside WHV. (ECF No. 242, PageID.5176-77.)

26. Clark left the selection of the particular lawful outside-WHV placement to Defendants. (Id.)

27. Clark asked that no internal WHV relocation be treated as compliance because the claimed risk concerned continued exposure at WHV. (Id.)

28. Clark also requested continuity of her infectious-disease treatment, antifungal monitoring, prescribed medications, ordered imaging, and follow-up care. (ECF No. 242, PageID.5177.)

29. The relief requested was therefore exposure-avoidance and treatment-continuity relief, not a request for a judicial determination that Clark required acute inpatient hospitalization. (ECF No. 242, PageID.5176-77.)

30. Defendants' own Chief Medical Officer, Dr. Carmen McIntyre Leon, described DWH as an ambulatory or outpatient facility. She stated that DWH's infirmary level is more intensive than routine ambulatory care but less intensive than inpatient hospital care, with round-the-clock skilled nursing and 24/7 provider availability. (Def. Ex. 6; ECF No. 253-7, PageID.5988.)

31. Thus, Clark's current DWH placement itself is not equivalent to acute inpatient hospitalization. (Id.)

32. The disputed placement question is whether Clark may safely be returned to WHV while her relevant treatment, monitoring, and exposure-avoidance issues remain active, not

whether her ears alone required hospital admission on July 6. (ECF No. 242, PageID.5176-77; ECF No. 264, PageID.6726-27.)

## III. Clark's July 6 Declaration Identified a Constellation of Ongoing Medical Issues

33. Clark submitted a sworn declaration in support of the July 6 motion. (Pl. Ex. A, Bates 000035-000038.)

34. Clark identified a chronic fungal ear condition/cutaneous aspergillosis with black, dry, crusted material on and around her ears. (Pl. Ex. A, Bates 000036.)

35. She identified a diagnosis or visit diagnosis of hemoptysis. (Id.)

36. She identified breathing problems and blood-streaked sputum for which chest imaging had been ordered. (Id.)

37. She identified allergic reactions and symptoms that she understood to be associated with suspected mold exposure. (Id.)

38. She identified ongoing Henry Ford infectious-disease care involving antifungal treatment and monitoring. (Id.)

39. She identified nasal bleeding/epistaxis. (Id.)

40. She identified eye irritation, dry eye, itching, allergic conjunctivitis, and related symptoms. (Id.)

41. She identified hearing problems while her ear condition persisted. (Id.)

42. Clark stated that medication and allergy-related measures had been ordered or recommended in connection with the symptoms she described. (Id.)

43. Clark stated that she understood from medical providers and/or medical records that she had a documented mold allergy and mold-related symptoms and that she should avoid mold exposure. (Pl. Ex. A, Bates 000036.)

44. Clark requested removal from WHV because she believed remaining in the complained-of environment while these conditions were ongoing posed an immediate risk to her health. (Pl. Ex. A, Bates 000036-000037.)

45. Clark's declaration did not claim that she personally knew the medical causes of recent deaths at WHV. To the contrary, she stated that she did not know the women personally and did not

know their specific medical causes of death. (Pl. Ex. A, Bates 000037-000038.)

46. The relevance of that awareness, as stated in Clark's declaration, was to her fear and reason for seeking emergency relief; the declaration did not offer the deaths as medical proof that mold caused those deaths. (Id.)

## IV. The Contemporaneous Medical Record Immediately Before July 6, 2026

### A. April 21, 2026 : Dr. Sheth

47. On April 21, 2026, Henry Ford infectious-disease physician Dr. Radhika Sheth evaluated Clark. The encounter's primary diagnosis was hemoptysis. (Pl. Ex. F, Bates 000776-000780.)

48. Dr. Sheth documented that Clark had been referred to infectious disease after a fungal culture from the ear grew Aspergillus and that the available record also referenced a respiratory culture that grew Aspergillus niger. (Pl. Ex. F, Bates 000776-000779.)

49. Dr. Sheth assessed presumed cutaneous aspergillosis and continued posaconazole, with a treatment plan contemplating

approximately six to twelve months of therapy. (Pl. Ex. F, Bates 000779.)

50. Dr. Sheth documented ongoing headaches, runny nose, hives, and occasional hemoptysis. (Pl. Ex. F, Bates 000776-000779.)

51. Dr. Sheth assessed a possible hypersensitivity disorder and noted that some respiratory symptoms and headaches could be explained by allergic rhinitis or sinusitis. (Pl. Ex. F, Bates 000779.)

52. Dr. Sheth documented Clark's report of prior positive testing for Alternaria and a mold-avoidance recommendation from MSU Occupational Health. (Pl. Ex. F, Bates 000779.)

53. Because of intermittent hemoptysis/blood in the sputum, Dr. Sheth ordered chest imaging. (Pl. Ex. F, Bates 000779-000780.)

54. Dr. Sheth's after-visit instructions also directed Clark to continue inhaler treatment and antihistamine treatment for hives and breathing issues. (Pl. Ex. F, Bates 000780.)

**B. June 26, 2026 : WHV / Dr. Ellison**

55. On June 26, 2026, ten days before the motion was filed, WHV physician Dr. Matthew Ellison documented that Clark was following infectious disease and was taking posaconazole for an extended course for possible fungal otitis externa. (Pl. Ex. F, Bates 000402-000403.)

56. Clark reported heat-related worsening of chest tightness and shortness of breath despite prescribed Alvesco and albuterol. (Pl. Ex. F, Bates 000402.)

57. The June 26 note states that Clark had been to healthcare multiple times during the preceding month and was interested in a breathing treatment. (Id.)

58. Clark also reported frequent or near-constant itching that worsened in the heat. (Pl. Ex. F, Bates 000402-000403.)

59. The medication/treatment history in the June 26 encounter included Zyrtec, Claritin, eye drops, artificial tears, nasal saline, and Singulair for allergy-related symptoms. (Id.)

60. On examination, Dr. Ellison documented external-ear rash/lesions. (Pl. Ex. F, Bates 000404.)

61. Dr. Ellison's assessment identified bilateral otitis externa, chronic sinusitis, and headaches as current conditions that were "Not Improved/Same." (Pl. Ex. F, Bates 000404-000405.)

62. The June 26 examination documented ongoing respiratory complaints and treatment along with unresolved ear, sinus, headache, and allergy-related symptoms. (Pl. Ex. F, Bates 000402-000405.)

**C. June 30, 2026 : Dr. Bet**

63. On June 30, 2026, six days before the motion was filed, Henry Ford infectious-disease physician Dr. Brandon Bet evaluated Clark. (Pl. Ex. F, Bates 000744-000752.)

64. Dr. Bet's assessment included aspergillosis and bilateral ear pain. He documented chronic changes of both auricles and continuing debris, although the debris had decreased compared with prior visits. (Pl. Ex. F, Bates 000744, 000748.)

65. Clark remained on posaconazole 300 mg daily. (Pl. Ex. F, Bates 000744, 000751-000752.)

66. Dr. Bet documented continued respiratory symptoms that he described as possibly in response to mold exposure. (Pl. Ex. F, Bates 000751.)

67. Dr. Bet documented that Clark previously had positive IgE testing for Alternaria and that MSU occupational health had recommended avoiding mold exposure. (Id.)

68. Dr. Bet recommended continuing posaconazole through approximately August, with reassessment of whether treatment should be extended depending on clinical progress. (Pl. Ex. F, Bates 000751-000752.)

69. Dr. Bet recommended antihistamine treatment for allergy symptoms. (Id.)

70. Dr. Bet instructed Clark to continue carrying a rescue albuterol inhaler for respiratory flare-ups. (Id.)

71. Dr. Bet agreed with ongoing ophthalmologic treatment consisting of preservative-free artificial tears and antihistamine eye drops. (Id.)

72. Dr. Bet recommended monthly CBC with differential and liver-function testing while treatment continued. (Id.)

73. Dr. Bet also recommended refraining from activities that could lead to flare-ups given the number of symptoms then present. (Pl. Ex. F, Bates 000751.)

74. Most directly, Dr. Bet's written June 30 instructions stated: "Should avoid mold exposure which may further exacerbate her symptoms." (Pl. Ex. F, Bates 000752.)

75. The June 30 instruction did not state that mold avoidance was required only if Clark first met criteria for acute inpatient hospitalization. (Pl. Ex. F, Bates 000752.)

76. Dr. Bet's treatment plan therefore combined ongoing systemic antifungal therapy, respiratory rescue treatment, allergy and eye treatment, laboratory monitoring, infectious-disease follow-up, and express mold avoidance. (Pl. Ex. F, Bates 000751-000752.)

77. The Court admitted color photographs from the Henry Ford medical record as Plaintiff's Exhibit G after Defendants confirmed that they had no objection. Dr. Bet identified the June 30 photographs as accurately reflecting the appearance he observed during treatment, and Dr. Sheth described the April 21 images as

showing black, scaling plaques on the external ears. (Hrg. Tr. 65:1-66:13, 120:10-20; ECF No. 274.) Those photographs supply visual evidence, independent of Clark's own verbal descriptions, of the ear condition evaluated by the treating specialists.

**D. June 30, 2026 : MDOC Follow-Up and Henry Ford Nursing Note**

78. Later on June 30, Dr. Ellison entered an MDOC chart note stating that a chest CT with contrast had been agreed upon in grand rounds after a recommendation from infectious disease in the setting of Clark's complaint of occasional hemoptysis. (Pl. Ex. F, Bates 000398-000399.)

79. The same MDOC record documented the need for pretreatment because of Clark's contrast allergy. (Pl. Ex. F, Bates 000399.)

80. Accordingly, before the July 6 filing, Clark's hemoptysis/blood-streaked-sputum complaint had prompted an infectious-disease imaging recommendation and MDOC grand-rounds approval of a chest CT. (Pl. Ex. F, Bates 000398-000399; 000779-000780.)

81. A Henry Ford nursing note from the June 30 encounter recorded weakness, ear pain/ringing, chest pain, fatigue, shortness of breath, wheezing, feeling unwell, and swelling. (Pl. Ex. F, Bates 000754.)

82. The nursing note recorded Clark's description that her symptoms were "better but not gone." (Id.)

83. The same note recorded 7/10 midsternal chest and leg pain and documented that Clark reported taking posaconazole daily without missed doses. (Id.)

## E. July 2, 2026 : Audiology and WHV Respiratory Complaints

84. On July 2, 2026, four days before the filing, Henry Ford audiology personally observed excessive crusting of both auricles and documented bilateral pain and sensitivity. (Pl. Ex. F, Bates 000741-000742.)

85. The audiologist also observed crusting debris at the openings of both ear canals. (Id.)

86. The scheduled auditory brainstem response ("ABR") test was not performed because the test required insertion of earphones

and the physical condition of Clark's ears did not permit the testing. (Id.)

87. Clark was instructed to return after the skin healed, the crusting stopped, and the otalgia subsided. (Id.)

88. The July 2 audiology record is objective contemporaneous evidence that Clark's bilateral ear condition remained physically unresolved four days before the emergency motion was filed. (Id.)

89. The inability to complete the July 2 hearing examination is significant for its narrow, documented reason: physical crusting and pain prevented placement of the equipment required for the scheduled test. The Court need not infer that Clark had a particular degree of hearing loss or invasive disease from that aborted test; the directly observed physical findings and interruption of the planned examination are themselves evidence. (Pl. Ex. F, Bates 000741-000742.)

90. Separate July 2 WHV nursing documentation records a complaint of difficulty breathing due to heat and directs that Clark be sent to healthcare for assessment. (Pl. Ex. F, Bates 000389.)

91. Another July 2 record documents Clark's report that heat was worsening her symptoms. (Pl. Ex. F, Bates 000395-000396.)

92. The July 2 records, considered with Dr. Bet's June 30 rescue-inhaler instruction for respiratory flare-ups, are consistent with intermittent or flare-type respiratory complaints rather than continuous respiratory distress. (Pl. Ex. F, Bates 000389, 000395-000396, 000751-000752.)

**F. July 4, 2026: Intermittent Respiratory Symptoms and Context of a Single Healthcare Encounter**

93. The July 4 medical record describes an evaluation at WHV following a breathing-related complaint. Clark's statement that she did not need a breathing treatment at that particular encounter did not eliminate her separately documented respiratory complaints or prescribed rescue treatment. (Pl. Ex. F, Bates 000387-000389, 000751-000752.)

94. Dr. Bet had instructed Clark to carry rescue albuterol for episodes of respiratory difficulty. The relevant medical question is whether her reported intermittent symptoms, treatment, and exposure-avoidance precautions created a prospective placement

risk-not whether she was in respiratory distress at every examination. (Pl. Ex. F, Bates 000751-000752.)

## V. The Pre-Filing Record Objectively Corroborated Material Components of Clark's Declaration

95. Clark's July 6 declaration did not stand alone. Multiple medical records in the ten days immediately before filing documented active treatment, objective findings, or diagnostic workup corresponding to several of the conditions described in her declaration. (Pl. Ex. A, Bates 000035-000038; Pl. Ex. F, Bates 000398-000405, 000741-000754.)

96. The fungal/ear component was corroborated by the June 26 WHV external-ear findings, Dr. Bet's June 30 infectious-disease examination and treatment plan, and the July 2 audiologist's direct observations. (Pl. Ex. F, Bates 000404-000405, 000744-000752, 000741-000742.)

97. The hemoptysis/blood-streaked-sputum component was corroborated by Dr. Sheth's April 21 assessment and imaging order and by MDOC's June 30 grand-rounds approval of the chest CT. (Pl. Ex. F, Bates 000779-000780, 000398-000399.)

98. The respiratory component was corroborated by the June 26 WHV complaints and treatment, Dr. Bet's June 30 rescue-inhaler instruction and description of continuing respiratory symptoms, and the July 2 heat-related breathing complaint. (Pl. Ex. F, Bates 000402, 000751-000752, 000389.)

99. The allergy/sinus/headache/eye component appeared repeatedly in the April 21, June 26, and June 30 records. (Pl. Ex. F, Bates 000776-000780, 000402-000405, 000751-000752.)

100. The hearing component was corroborated by the scheduled July 2 ABR evaluation that could not be completed because of the physical condition of Clark's ears. (Pl. Ex. F, Bates 000741-000742.)

101. At the time of filing, Clark remained on prolonged systemic antifungal therapy with laboratory monitoring and infectious-disease follow-up. (Pl. Ex. F, Bates 000779-000780, 000751-000752.)

102. At the time of filing, Clark remained under evaluation for hemoptysis with chest imaging ordered. (Pl. Ex. F, Bates 000398-000399, 000779-000780.)

103. At the time of filing, Clark continued to receive respiratory and allergy treatment. (Pl. Ex. F, Bates 000402-000405, 000751-000752.)

104. Six days before filing, Clark's treating infectious-disease physician expressly instructed her to avoid mold exposure because it could further exacerbate her symptoms. (Pl. Ex. F, Bates 000752.)

105. Contemporaneous clinical records corroborated Clark's reports through objective findings, prescribed treatments, and diagnostic evaluation before she sought emergency relief. (Pl. Ex. F, Bates 000398-000405, 000741-000754, 000776-000780.)

## VI. Clark's Transfer to DWH Was Temporary and Did Not Resolve the Preliminary-Injunction Dispute

106. MDOC described Clark's transfer to DWH as temporary and undertaken pending disposition of her motion. (ECF No. 253, PageID.5882.)

107. Defendants expressly stated that the DWH transfer was not a concession of the merits. (Id.)

108. Defendants later agreed that Clark would remain at DWH only pending this Court's decision while continuing to maintain that WHV is an appropriate placement. (ECF No. 264, PageID.6726.)

109. Thus, absent prospective relief, Defendants have not committed to keep Clark outside WHV after the Court resolves the motion. (Id.)

110. The parties identified the risk of return to WHV and the appropriate scope of preliminary relief as disputed issues for the evidentiary hearing. (ECF No. 264, PageID.6727.)

111. The Court's September 25 order confirms that only the TRO component is moot; the preliminary-injunction request remains for decision. (ECF No. 272, PageID.7018.)

112. DWH is not an acute inpatient hospital. Defendants' own medical declaration describes it as an ambulatory/outpatient facility whose infirmary provides a higher level of care than routine ambulatory care but less than inpatient hospital care. (Def. Ex. 6; ECF No. 253-7, PageID.5988.)

113. Clark's transfer to DWH therefore does not support the proposition that the only legally cognizable medical-placement need is one requiring acute hospitalization. (Id.; ECF No. 242, PageID.5176-77.)

## VII. The Post-Transfer DWH Record Shows Ongoing Multisystem Care and Continuing Ear/Wound Treatment

### A. August 4, 2026 : Herman Nursing and Wound Care

114. On August 4, 2026, DWH nurse Erica Herman documented ongoing nursing care for Clark. (Pl. Ex. E-2, Bates 000687-000692.)

115. The August 4 records include ongoing antifungal/ear care together with complaints including significant abdominal pain. (Pl. Ex. E-2, Bates 000687-000689.)

116. A separate August 4 wound-care note documented bilateral ear wounds and thickened black crusting described in the chart in relation to the documented fungal condition and treated with ketoconazole wound care. (Pl. Ex. E-2, Bates 000691-000692.) The admitted E-1 records provide further corroboration: on July 22, a nurse documented thick black crust covering much of both external ears (Pl. Ex. E-1, Bates 001264); an August 5 note

reported that material collected from the ear on July 28 contained numerous bacterial and fungal elements, while identifying no epidermal or dermal tissue and requiring further microbiologic testing for speciation. (Pl. Ex. E-1, Bates 001029, 001031.)

### B. August 13, 2026 : Nausea/Vomiting, Poor Intake, Headache, and Ear Findings

117. On August 13, 2026, Herman documented nausea/vomiting, headache, poor intake, hypoactive bowel sounds, bilateral leg swelling, and continuing ear findings. (Pl. Ex. E-2, Bates 000509-000511.)

118. The August 13 record includes an objective nursing observation of emesis. (Id.)

119. The August 13 record demonstrates that DWH nursing care was addressing more than Clark's ears alone. (Id.)

### B.1. August 14, 2026 : Abnormal EKG and Outside Emergency-Department Transfer

120. On August 14, 2026, DWH nurse practitioner Melva Wolcott evaluated Clark after an EKG demonstrated bigeminy and trigeminy that Wolcott described as new findings compared with an earlier EKG. Clark reported approximately two days of chest

pain. (Pl. Ex. E-2, Bates 000490-000491; full exhibit book pp. 2368-2369.)

121. Wolcott documented an irregular cardiac rhythm, consulted a Henry Ford emergency physician, and arranged transfer to Henry Ford Jackson's emergency department for evaluation. (Pl. Ex. E-2, Bates 000490-000491.)

**C. August 17, 2026 : Respiratory, IV, and Wound Care**

122. On August 17, 2026, Herman documented a dry cough and coordination of chest imaging, as well as continuing bilateral ear findings. (Pl. Ex. E-2, Bates 000452-000453.)

123. Additional August 17 records document IV fluid treatment for nausea/vomiting and continuing cough/allergy treatment. (Pl. Ex. E-2, Bates 000454-000455.)

124. The August 17 wound-care records document continuing bilateral ear wounds/black crusting and ketoconazole treatment. (Pl. Ex. E-2, Bates 000456-000457.)

125. The August 17 records again show multisystem care at DWH rather than care limited to an isolated ear complaint. (Pl. Ex. E-2, Bates 000452-000457.)

**D. August 21, 2026 : Vomiting, Abdominal Symptoms, Cough, and Ear Findings**

126. On August 21, 2026, Herman documented nausea/vomiting, abdominal pain/colic, poor intake, cough, and continuing bilateral ear findings. (Pl. Ex. E-2, Bates 000406-000407.)

127. Herman personally observed Clark vomit twice during the August 21 encounter. (Id.)

128. The August 21 record also noted that the cough was still present, although less than before, and that the bilateral ear condition was improving. (Id.)

129. The August 21 record therefore documents improvement in some respects without documenting complete resolution of the broader medical issues. (Id.)

**E. September 2026 : Continuing Wound Care**

130. On September 8, 2026, DWH wound-care documentation continued to identify abnormal external-ear findings, including dry, cracked, scabbed, peeling dark skin, wounds, and necrotic tissue. (Pl. Ex. E-2, Bates 000178-000179.)

131. The September 8 wound-care procedure described the ear appearance as brown or black dry eschar and documented cleansing with ketoconazole shampoo and water. (Pl. Ex. E-2, Bates 000178.)

132. On September 16, 2026, DWH again documented bilateral ear rash/lesions, dry/cracked/scabbed/shiny/peeling black skin, wounds with necrotic tissue, and an improving course, with ketoconazole wound care. (Pl. Ex. E-2, Bates 000078-000079.)

133. The DWH record contained continuing wound-care orders extending through and beyond September 18, including nursing-observed ketoconazole shampoo application and evening cleansing of the bilateral external ears. (Pl. Ex. E-2; Sept. 2026 wound-care orders.)

134. The September records establish that Clark continued receiving wound care for visible bilateral ear abnormalities more than two months after filing her emergency motion. (Pl. Ex. E-2, Bates 000178-000179, 000078-000079.)

135. On September 8, 2026, DWH physician Shi-Yu Tan documented chronic headaches, associated nausea and vomiting,

photophobia, and reported right-sided weakness; the differential and workup included a neurology consultation, with the physician expressly noting diagnostic uncertainty. (Pl. Ex. E-2, Bates 000169-000171; full exhibit book pp. 2047-2049.)

136. The same September 8 physician note discussed ongoing abdominal complaints and constipation, noted that medication-related effects were among the possible explanations, and identified gastrointestinal consultation and endoscopic evaluation as planned workup. It also documented a separately evaluated right-leg/knee/ankle complaint after a fall. (Pl. Ex. E-2, Bates 000169-000171.)

137. The MDOC summary generated September 18 listed current or recent medication orders addressing multiple conditions, including systemic antifungal and topical wound treatment, respiratory rescue medication, allergy medication, and gastrointestinal medication. Some orders were as-needed or one-time entries, so the number of listed orders should not be described as the number of drugs necessarily administered every

day. (Pl. Ex. E-2, Bates 000004-000005; full exhibit book pp. 1882-1883.)

138. The September 18 MDOC summary listed “Mold Extract” among Clark’s recorded allergies and included asthma, chronic sinusitis, allergic conjunctivitis, bilateral otitis externa, hearing loss, nausea/vomiting, and an aspergillosis diagnosis code among her health-problem entries. MDOC’s own treatment records thus documented conditions requiring ongoing evaluation and management beyond an isolated ear complaint. (Pl. Ex. E-2, Bates 000005.)

## VIII. Dr. Bet’s August 24 Follow-Up Continued Systemic Treatment and Monitoring

139. Dr. Bet reevaluated Clark on August 24, 2026. (Pl. Ex. E-2, Bates 000919-000929.)

140. Dr. Bet noted clinical improvement in the appearance of Clark’s auricles. (Pl. Ex. E-2, Bates 000928.)

141. Improvement did not end systemic treatment. Dr. Bet recommended continuing posaconazole 300 mg daily, with total treatment to be determined by clinical response and an effort to

continue until the cutaneous lesions were gone. (Pl. Ex. E-2, Bates 000928-000929.)

142. Dr. Bet documented abdominal pain associated with nausea/vomiting and constipation that was being evaluated by facility physicians. (Pl. Ex. E-2, Bates 000928.)

143. Dr. Bet again discussed rescue albuterol for respiratory flare-ups and continued monthly CBC/LFT monitoring. (Pl. Ex. E-2, Bates 000929.)

144. Dr. Bet recommended workup for possible medication-related iatrogenic Cushing's syndrome in connection with posaconazole and inhaled corticosteroid use. (Pl. Ex. E-2, Bates 000929.)

145. Dr. Bet directed follow-up in approximately two months, around October 19, 2026. (Pl. Ex. E-2, Bates 000928-000929.)

146. A subsequent DWH provider note recorded the infectious-disease recommendation to extend posaconazole for approximately two months and entered a 60-day posaconazole order with a stop date of October 24, 2026. (Pl. Ex. E-2, Aug. 25, 2026 provider record, Bates 000345.)

147. Dr. Bet's August 24 record continued to address Clark's visible ear lesions and ongoing antifungal treatment, including further diagnostic considerations and follow-up. (Pl. Ex. E-2, Bates 000919-000929.)

148. As of the September 24 evidentiary hearing, Clark's systemic antifungal course and DWH wound-care regimen had therefore not been documented as completed. (Pl. Ex. E-2, Bates 000928-000929; Sept. 2026 wound-care records.)

## IX. Defendants' Environmental Report Does Not Establish That WHV Is Medically Appropriate for Clark

149. Defendants rely on an environmental assessment commissioned for WHV and summarized in the declaration of consultant Matthew Koche. Clark disputes Defendants' attempt to use that report to establish the medical safety of her return to WHV. Koche did not testify at the evidentiary hearing, and Plaintiff had no opportunity there to examine him about sampling locations, methodology, assumptions, or the significance of the reported findings. (Def. Ex. 2; ECF No. 253-3, PageID.5929-5942; ECF No. 268, PageID.6805.)

150. Even on its own terms, the defense report records fungal material and surfaces assessed as possible or probable fungal growth, followed by reported cleaning. It cannot establish that Clark would face no medically significant exposure in a future WHV placement, particularly in light of her physician's individualized instruction to avoid mold. (ECF No. 253-3, PageID.5941-5942; Pl. Ex. F, Bates 000752.)

151. Koche was not called as a hearing witness. The Joint Witness and Exhibit List preserved Clark's objections to any unsupported individualized medical-causation or health-risk conclusions by a non-treating environmental consultant. His report is not a medical evaluation of Clark and was not tested by live examination at the hearing. (ECF No. 268, PageID.6805; Hrg. Tr. 146-170.)

152. Clark's filed reply previously identified why Defendants' records-review narrative was incomplete: the post-transfer medical records document ongoing treatment, diagnostic uncertainty, and medical issues that were not addressed in Defendants' earlier reviewer submission. (Pl. Ex. C, ECF No. 256,

PageID.6620-6623.) Those clinical records and Dr. Bet's avoidance recommendation provide individualized evidence that the environmental consultant's generalized assessment does not displace. (Pl. Ex. F, Bates 000752.)

153. Clark's treating infectious-disease physician continued systemic antifungal treatment and advised her to avoid exposure that could aggravate her symptoms. The hearing record contains no tested opinion from Koche that resolves whether his particular sampling results satisfy that patient-specific precaution. (Pl. Ex. F, Bates 000751-000752; Hrg. Tr. 68:20-69:14; Def. Ex. 2.)

154. Clark respectfully submits that the disputed consultant report should not be treated as dispositive of the medical-placement question. The relevant relief turns on her documented treatment needs, the existing exposure-avoidance recommendation, the conditions of any proposed return placement, and the protection necessary to prevent an avoidable serious risk. (Pl. Ex. F, Bates 000752; ECF No. 264, PageID.6726.)

## X. Defendants' Competing Medical Positions

155. Defendants characterized Clark's medical evidence as subjective and insufficient. But their argument does not account for the later DWH medical records, the objective condition of her ears, continued systemic antifungal treatment, and the treating physician's instruction to avoid mold. Clark's filed reply identified that gap before the September hearing. (ECF No. 253, PageID.5902-5903; Pl. Ex. C, ECF No. 256, PageID.6620-6622; Pl. Ex. F, Bates 000752.)

156. Defendants relied on a medical-record review by Dr. Heaney that ended in July 2026, before numerous later DWH evaluations, laboratory findings, and continued treatment records. That earlier review did not address the more current evidence central to Clark's requested prospective relief. (ECF No. 255, PageID.6580-6581; Pl. Ex. C, ECF No. 256, PageID.6619-6622; Pl. Ex. E-2.)

157. At the same time, Dr. McIntyre Leon's own declaration identified ongoing diagnoses and treatments including asthma treated with albuterol/Alvesco/montelukast; pruritus/allergies treated with multiple medications; intermittent cough; otitis

externa/presumed cutaneous aspergillosis treated with posaconazole, ketoconazole shampoo, emollient lotion, and infectious-disease follow-up; hearing loss; and dry-eye treatment. (Def. Ex. 6; ECF No. 253-7, PageID.5987-88.)

158. Dr. McIntyre Leon also described DWH’s infirmary as providing a higher level of care than routine ambulatory care, including round-the-clock skilled nursing and 24/7 provider availability. (Def. Ex. 6; ECF No. 253-7, PageID.5988.)

159. The existence of conflicting medical interpretations does not erase the objective observations in the admitted treatment records or the undisputed fact that Dr. Bet continued systemic therapy and expressly gave a mold-avoidance instruction on June 30. (Pl. Ex. F, Bates 000741-000754.)

160. The defense opinions concerning whether Clark required “emergent” hospitalization address a different question from whether continued exposure at WHV presented a sufficiently serious prospective risk while the treating infectious-disease plan remained active. (ECF No. 242, PageID.5176-77; Pl. Ex. F, Bates 000751-000752.)

## XI. Hearing Testimony and the Completed Evidentiary Record

### A. Admission of Plaintiff's Medical Records and Color Photographs

161. At the hearing, Clark moved to admit Plaintiff's Exhibits E-1, E-2, and F, the MDOC medical records spanning January 1, 2025, through September 18, 2026, pursuant to the parties' stipulation. Defense counsel confirmed the stipulation, and the Court admitted Exhibits A, B, C, E-1, E-2, and F. (Hrg. Tr. 58:7-25, 59:5-22, ECF No. 274, PageID.7142-43.)

162. Following admission of Exhibits A, B, C, E-1, E-2, and F for this hearing, the Court admitted the color photographs from Henry Ford as the portion of Exhibit G offered at the hearing. Defendants limited their lack of objection to the photographs rather than the remaining, potentially duplicative material in Exhibit G. (Hrg. Tr. 59:5-22, 65:1-66:13, ECF No. 274, PageID.7143, 7149-50.)

163. Exhibit G was admitted only insofar as it comprised the color photographs duplicated in black and white in Exhibit F. Defense counsel expressly limited his lack of objection to the photographs, and the Court accepted that limitation. Dr. Bet

confirmed that the June 30 images accurately reflected what he observed. (Hrg. Tr. 65:1-66:13, ECF No. 274, PageID.7149-50.) The Court should use these admitted photographs as objective depictions of the ears, not as proof of the precise organism or origin of the lesions.

**B. Dr. Brandon Bet : Treating Infectious-Disease Physician**

164. Dr. Brandon Bet testified as Clark's treating infectious-disease physician. His testimony concerned medical judgments formed during treatment, including the systemic antifungal course, laboratory monitoring, respiratory treatment, the appearance of Clark's ears, and his June 30 exposure-avoidance instruction. (Hrg. Tr. 60-73.)

165. On June 30, Dr. Bet continued posaconazole 300 mg daily. He explained that patients on systemic antifungals require monitoring because the drugs can suppress blood counts and elevate liver enzymes; he therefore recommended monthly blood counts and liver-function tests. (Hrg. Tr. 67:14-22; Pl. Ex. F, Bates 000751-000752.)

166. Dr. Bet testified that Clark needed access to rescue albuterol when respiratory symptoms became severe and that he recommended access to antihistamines because Clark had reported difficulty accessing those medications when symptomatic. (Hrg. Tr. 67:1-13.)

167. The Court permitted Dr. Bet to explain his mold-avoidance instruction for treatment purposes over Defendants' objection, while stating that it would not necessarily treat him as offering an ultimate causation opinion. (Hrg. Tr. 68:1-18.)

168. Dr. Bet then testified that he specifically recommended that Clark "avoid any mold exposure that may further worsen her symptoms." He explained that he was concerned about a respiratory/allergic component and that further exposure could worsen her ability to breathe comfortably. (Hrg. Tr. 68:20-69:6.)

169. Dr. Bet further explained that the medical risks he was trying to reduce included an asthma-type attack and allergic or cutaneous eruptions. (Hrg. Tr. 69:7-14.)

170. Dr. Bet testified that prematurely stopping systemic antifungal treatment before eradication of the infection creates an

expectation that the infection will recur or worsen. (Hrg. Tr. 69:15-19.)

171. By August 24, Clark's ears were improving, but Dr. Bet continued posaconazole because her symptoms had not fully resolved. (Hrg. Tr. 70:8-71:14.)

172. Dr. Bet testified that his advice to avoid mold had not changed as of August 24 and that the instruction still stood. He continued posaconazole and infectious-disease follow-up. (Hrg. Tr. 72:22-73:7.)

173. On redirect, Dr. Bet was asked whether mold avoidance played a part in Clark's improvement and responded, "I think so, yes." (Hrg. Tr. 89:1-5, ECF No. 274, PageID.7173.)

174. Dr. Bet testified from his treatment of Clark and maintained his instruction to avoid mold exposure, although he had not personally assessed environmental conditions at WHV. (Hrg. Tr. 68:20-69:14, 72:22-73:7, 86:1-87:6.)

175. Dr. Bet testified that he would recommend removal from an environment if he knew conditions there were aggravating Clark's ear condition and warranted removal. (Hrg. Tr. 85:1-87:6.)

176. Dr. Bet's firsthand testimony supports the continuing medical basis for systemic antifungal treatment, respiratory/allergy management, and his express mold-avoidance instruction. (Hrg. Tr. 67:1-69:19, 72:22-73:7.)

### C. Dr. Radhika Sheth : Treating Infectious-Disease Physician

177. Dr. Sheth testified concerning her April 21 treatment encounter and subsequent care. Clark reported headaches, runny nose, hives, and blood in her sputum while she remained on posaconazole. (Hrg. Tr. 119:8-120:2.)

178. Dr. Sheth testified that Clark's chart reflected prior occupational-health advice to avoid mold and a documented allergy to certain fungi; based on Clark's symptom pattern, Sheth considered a hypersensitivity or allergic disorder. (Hrg. Tr. 123:10-124:2.)

179. Dr. Sheth documented intermittent hemoptysis (blood in sputum) and ordered a chest CT because prior imaging had been limited to chest X-rays. (Hrg. Tr. 124:3-12.)

180. Dr. Sheth instructed Clark to use her as-needed inhaler for breathing issues and antihistamine treatment for allergy/hive symptoms, and she planned follow-up. (Hrg. Tr. 124:22-125:13.)

181. Dr. Sheth continued treatment for Clark's working diagnosis, recommended further diagnostic evaluation including a biopsy, and ordered chest imaging for intermittent hemoptysis. Clark elected to defer biopsy while continuing antifungal treatment. (Hrg. Tr. 124:3-12, 129:1-130:25, 143:1-4.)

182. Dr. Sheth explained that she did not have to identify the precise location of a mold source to provide treatment. Asked whether mold had some effect on Clark's ears, she answered affirmatively. (Hrg. Tr. 142:1-22, ECF No. 274, PageID.7226.)

**D. Erica Herman, RN : First-Hand DWH Nursing Care**

183. Erica Herman testified that she personally provided nursing care to Clark on DWH's 4 West unit during multiple August shifts, including ketoconazole wound care, daily assessments, and vital-sign checks. (Hrg. Tr. 93:8-18, 94:8-17.)

184. Herman testified that, on August 3, she observed a "thick black crust" on Clark's ears related in the chart to the fungal infection. (Hrg. Tr. 99:2-7.)

185. Herman testified that the August 4 amendment added that Clark's bilateral ears continued to have a thick black crust related to fungal infection but were improving; Herman also testified that Clark remained compliant with the prescribed antifungal medication. (Hrg. Tr. 100:4-16, 101:12-16.)

186. Herman testified that her August 4 wound-care documentation again reflected thick black crusting related in the chart to the fungal infection and an improving course. (Hrg. Tr. 101:21-102:1.)

187. On August 13, Herman personally examined Clark and documented a small amount of clear-colored emesis and hypoactive bowel sounds. (Hrg. Tr. 102:8-24.)

188. On August 17, Herman testified that she reattached IV fluids being used to address nausea. (Hrg. Tr. 104:3-22.)

**E. Krystal Clark**

189. Clark testified that before transfer she experienced ear and hearing problems, breathing difficulties, cough, headaches, rashes, and nosebleeds. Her testimony is supported in significant respects by contemporaneous medical examinations, recorded lesions, ongoing medication, and the treating specialists' findings. (Hrg. Tr. 8:14-11:25; Pl. Ex. F, Bates 000402-000405, 000741-000752.)

190. Clark's account is corroborated in significant respects by independent WHV and Henry Ford findings, including documented ear lesions, continued antifungal treatment, and prescribed respiratory and allergy care. (Pl. Ex. F, Bates 000402-000405, 000741-000752; Hrg. Tr. 8:14-12:5.)

191. Clark testified to observing material she identified as mold in showers, at a sink and in a day room, including areas near vents. That is competent testimony about what she believed she saw at WHV, not expert identification of the substance, its species, concentration, or capacity to cause her medical condition. (Hrg. Tr. 11:18-12:5, ECF No. 274, PageID.7095-96.)

192. Clark testified that, before the July filing, she wrote to MDOC Director Washington concerning mold-related conditions and her medical-care concerns. This testimony is relevant to her efforts to notify senior MDOC officials of the asserted risks. (Hrg. Tr. 39:5-40:16, ECF No. 274, PageID.7123-7124.)

193. On cross-examination, when defense counsel attempted to isolate whether her ear condition alone placed her life in danger, Clark responded that her ears were not the only condition from which she suffered and that she was receiving treatment for the ears. (Hrg. Tr. 38:22-39:4.)

194. With respect to the August 31 biopsy encounter, Clark disputed characterizing her conduct as an outright refusal, and Plaintiff preserved a Rule 106 completeness objection to the video. (Hrg. Tr. 56:2-24.) The Court may nevertheless find from the video and record that the biopsy was not performed; that fact should be weighed together with the continuing treatment plan and treating-physician testimony.

**F. Dr. Anuj Malik : Defense Record-Review Expert**

195. Dr. Malik testified for Defendants as a medical expert but had never treated Clark. (Hrg. Tr. 163:21-164:4.)

196. Dr. Malik had never interviewed, spoken with, met, physically observed, examined, or personally taken a history from Clark. His opinions were based on record review. (Hrg. Tr. 164:1-19.)

197. Dr. Malik did not create the treating records and was not present when Clark's treating clinicians made the observations documented in them. (Hrg. Tr. 165:1-18.)

198. Dr. Malik reviewed the environmental consultant's report but had not personally inspected WHV or collected environmental samples there. (Hrg. Tr. 165:9-12, 167:19-23.)

199. Dr. Malik acknowledged on cross-examination that a clinically stable patient may still need medication, wound care, and specialist follow-up. (Hrg. Tr. 167:24-168:3, ECF No. 274, PageID.7251-52.) That concession is consistent with the fact that improvement or a stable examination does not, without more, show that ordered treatment has been completed.

200. Dr. Malik did not personally examine Clark or inspect or sample WHV. His records-based opinions must be evaluated alongside the firsthand observations and continuing treatment recommendations of the physicians who actually examined her. (Hrg. Tr. 163:21-164:19, 165:9-12, 167:19-23; Pl. Ex. F, Bates 000751-000752.)

201. Dr. Malik's medical opinions were based on a review of records, not a treating examination of Clark or personal environmental investigation at WHV. The Court should evaluate his conclusions in light of the admitted clinical observations and the firsthand testimony of Clark's treating providers. (Hrg. Tr. 150:13-25, 163:21-169:25, ECF No. 274.)

**G. Defendants' October 2 Supplemental Written Testimony**

202. Defendants' October 2 witness declarations are written testimony tendered under the procedure authorized by ECF No. 272, and Defendants separately sought admission of additional exhibits by ECF No. 273. The Court should distinguish the filing of that material from the ultimate admissibility, permissible purpose, and weight assigned to each statement or exhibit. The

following findings describe what those witnesses assert, subject to Clark's pending evidentiary response.

203. Dr. McIntyre Leon's October 2 declaration acknowledges that Clark's chart identifies multiple chronic or ongoing conditions and lists treatment addressing asthma/cough, allergies, hearing impairment, nausea/vomiting, otitis externa, pain, and other conditions. (ECF No. 273-2, PageID.7034-35.) That chart-based acknowledgment is distinct from McIntyre Leon's disputed ultimate opinion concerning the need for DWH placement.

204. Dr. McIntyre Leon describes DWH as an ambulatory/outpatient medical facility whose infirmary level is more intensive than routine ambulatory care but less intensive than inpatient hospitalization. (ECF No. 273-2, PageID.7035-36.)

205. Dr. McIntyre Leon opined that Clark does not require acute hospitalization and that WHV can meet her needs. Those opinions do not resolve Clark's narrower request for an individualized, medically appropriate placement that respects her treating physician's mold-avoidance instruction. (ECF No. 273-2, PageID.7036, 7045; Pl. Ex. F, Bates 000752.)

206. Although Dr. McIntyre Leon identifies a tissue biopsy as important to definitive diagnosis, the admitted records independently document Clark's physical ear findings, prolonged antifungal treatment, and continued medical follow-up. (ECF No. 273-2, PageID.7043; Pl. Exs. E-1, E-2, F.)

207. Dr. Heaney, a non-treating occupational/environmental-medicine reviewer, opines that Clark has no emergent condition, no condition requiring hospitalization, and no medical condition caused by mold exposure. (ECF No. 273-3, PageID.7049-51, 7062.) Her current review focused principally on the period after Clark had been removed from WHV. (ECF No. 273-3, PageID.7049.)

208. Heaney's declaration is relevant defense expert evidence, but its categorical conclusions should be weighed against the treating record rather than used to rewrite it. Bet actually prescribed systemic antifungal treatment, monitoring, rescue respiratory therapy, and mold avoidance; Sheth actually ordered CT workup for hemoptysis and treated allergy/hypersensitivity symptoms.

209. Gina Legato states in her declaration that, during her weekly visual cell inspections and during the July 9 pack-up, she

personally did not see visible mold or smell an unusual odor in Clark's cell. (ECF No. 273-4, PageID.7067-69.) That testimony is relevant to visible conditions in those settings and times but does not, without sampling or specialized expertise, establish the absence of airborne or concealed fungal material or the environmental condition of every area Clark used at WHV.

210. Wil Alexander's declaration authenticates database copies of the July 4 and August 31 body-camera recordings but does not address Clark's medical condition, the medical significance of either encounter, or environmental conditions at WHV. (ECF No. 273-5, PageID.7074-75.)

211. Sheena Brandenburg's testimony is temporally remote from the July 2026 motion: she left WHV in February 2026 and had left Harrison A in August 2024. (ECF No. 273-6, PageID.7078.) Accordingly, she had no first-hand knowledge of Clark's July 2026 medical condition or the contemporaneous condition of Clark's July 2026 cell.

212. Brandenburg nevertheless acknowledged that Harrison shower areas had black buildup and a ventilation issue and that

WHV used industrial fans, changed lighting and shower curtains, made a power washer available, and cleaned bathrooms twice daily. (ECF No. 273-6, PageID.7083.) Her characterization of the buildup as ordinary mildew is a lay characterization, not environmental testing.

213. Brandenburg's allegations about Clark's litigation motives, grievances, conduct toward other prisoners, attorneys, advocates, and social-media disputes are collateral to the medical and environmental questions presented by the preliminary-injunction motion. The Court should not permit those allegations to outweigh objective medical observations made by treating providers. The October 13 errata adds a screenshot of a message from an account displayed only as "Facebook user"; the screenshot does not identify the sender or connect the message to Clark. (ECF No. 280, PageID.7285.)

214. Clark's proof includes objectively documented ear abnormalities, an extended antifungal treatment course with monitoring, and an unretracted instruction from her treating infectious-disease physician to avoid mold exposure. Those

individualized medical facts are central to assessing the safety of a return to WHV. (Pl. Exs. F, E-1, E-2, G; Hrg. Tr. 68:20-69:14, 72:22-73:7.)

**H. Defendants' Oral Motion**

215. After Plaintiff rested, Defendants orally moved for the "equivalent of a directed verdict," arguing that Clark had failed to establish the four preliminary-injunction factors. (Hrg. Tr. 145:1-15.)

216. The Court characterized the request as asking the Court to deny the preliminary injunction without further evidence and stated: "I'm not prepared to do that right now." The Court then directed Defendants to call Dr. Malik and stated that next steps could be discussed afterward. (Hrg. Tr. 145:16-23.)

217. The September 25 Case Management Order thereafter permitted supplemental written testimony from listed witnesses who had been unable to testify and expressly allowed the parties to rebut those witnesses with record citations in the October 16 proposed findings and conclusions. (ECF No. 272, PageID.7017-18.)

218. The oral motion should therefore be evaluated, if at all, on the completed evidentiary record rather than on the truncated record that existed when Defendants first made it.

## XII. Proposed Findings Concerning Weight, Credibility, and the Nature of the Risk

219. Clark's account is supported by independent clinical observations, including documented external-ear lesions, severe crusting, continuing prescribed antifungal treatment, and a treating-physician instruction to avoid mold exposure. (Pl. Ex. F, Bates 000404-000405, 000741-000754; Pl. Ex. E-2; Hrg. Tr. 68:20-69:14.)

220. The most persuasive evidence concerning the treatment plan is the contemporaneous documentation and testimony of Clark's treating infectious-disease physicians, Drs. Bet and Sheth, because those opinions were formed in the course of treatment rather than for litigation. (Hrg. Tr. 60-73, 119-125, ECF No. 274; Pl. Ex. F.)

221. The June 30 mold-avoidance instruction was part of Dr. Bet's actual treatment plan, not a litigation opinion created for the preliminary-injunction hearing. (Pl. Ex. F, Bates 000752.)

222. The Court need not find that mold caused every symptom, or even resolve the precise diagnostic label for Clark's ear condition, to find that the medical record documented unresolved conditions and an express treating-physician instruction to avoid an exposure that could exacerbate symptoms. (Pl. Ex. F, Bates 000751-000752.)

223. The intermittent nature of Clark's respiratory symptoms is consistent with Dr. Bet's written instructions for rescue albuterol during flare-ups, while her contemporaneous medical records continued to document active treatment. (Pl. Ex. F, Bates 000402-000405, 000751-000752.)

224. Clinical improvement is also relevant, but improvement did not equal completion of treatment. Dr. Bet continued posaconazole on August 24 and tied treatment duration to clinical response and disappearance of the lesions. (Pl. Ex. E-2, Bates 000928-000929.)

225. The July 2 audiology record is particularly probative because it contains direct objective observations by a non-litigation treating professional only four days before the filing and documents that the scheduled ABR could not be performed because of the condition of the ears. (Pl. Ex. F, Bates 000741-000742.)

226. The June 30 MDOC chest-CT order is probative because it shows that the hemoptysis complaint was sufficiently medically significant to prompt an infectious-disease imaging recommendation and approval through MDOC grand rounds before the motion was filed. (Pl. Ex. F, Bates 000398-000399.)

227. The post-transfer DWH record is not used to retroactively manufacture an emergency on July 6. It is relevant because it corroborates persistence of issues described at filing and bears directly on the present prospective-risk inquiry and the level of care Clark continued to receive after transfer. (Pl. Ex. E-2.)

228. The evidence does not require a finding that Clark needed acute hospital admission on July 6. It supports the narrower finding that multiple medical conditions and treatment needs

remained active when she filed, including an exposure-avoidance instruction from her treating infectious-disease physician. (Pl. Ex. F, Bates 000398-000405, 000741-000754, 000776-000780.)

229. Clark's request is for prospective medical protection. Her medical records document ongoing treatment and a specific mold-avoidance recommendation; the evidence also establishes that Defendants have not committed to keeping her outside WHV when the temporary DWH placement ends. Those facts support plaintiff-specific relief against an avoidable future exposure risk without requiring a final trial finding about every disputed medical cause. (Pl. Ex. F, Bates 000752; ECF No. 264, PageID.6726; Helling, 509 U.S. at 33-35.)

## XIII. Current Prospective Risk and Narrow Relief

230. As of the September 24 hearing, Defendants had agreed to keep Clark at DWH only pending this Court's decision and continued to maintain that WHV is medically appropriate. (ECF No. 264, PageID.6726.)

231. Accordingly, the possibility of return to WHV after disposition of the motion is not eliminated by a permanent placement commitment. (Id.)

232. As of the hearing, Clark remained under infectious-disease treatment and had a recent treatment plan extending posaconazole and follow-up beyond the hearing date. (Pl. Ex. E-2, Bates 000928-000929; Aug. 25 posaconazole order.)

233. As of September 16, Clark was still receiving bilateral ear wound care at DWH. (Pl. Ex. E-2, Bates 000078-000079.)

234. Although DWH has provided care for Clark's ears, the admitted records also document ongoing respiratory and gastrointestinal concerns and evaluation of an abnormal cardiac rhythm. (Pl. Ex. E-2, Bates 000452-000455, 000490-000491.) Accordingly, any medically appropriate secure placement must account for her medically indicated evaluation, specialist follow-up, and continuity of prescribed care, rather than treating improvement in her ears alone as resolution of her broader medical needs.

235. MDOC has already housed Clark securely outside WHV during the pendency of the motion. That existing placement demonstrates the practical availability of protective placement within MDOC custody while the Court considers the narrow, individualized relief requested. (ECF No. 264, PageID.6726-6727.)

236. A preliminary injunction that preserves medically appropriate placement outside WHV while leaving MDOC discretion to select the secure facility would maintain the current protective status quo without ordering release or dictating a particular institution. (ECF No. 242, PageID.5176-77.)

237. Such relief can also require continuity of the treatment and monitoring already ordered by treating providers without directing the Court to select particular drugs, dosages, or diagnostic methods. (Id.; Pl. Ex. F, Bates 000751-000752; Pl. Ex. E-2, Bates 000928-000929.)

238. The narrowest practical endpoint for placement relief should be tied to an individualized medical determination addressing the relevant exposure-avoidance instruction and current treatment status, rather than to a categorical requirement of hospitalization.

(Hrg. Tr. 68:20-69:14, 72:22-73:7, ECF No. 274; Pl. Ex. F, Bates 000752.)

## PROPOSED CONCLUSIONS OF LAW

The findings below are proposed determinations for the preliminary-injunction issue only. Statements concerning disputed causation, witness credibility, and future risk are proposed inferences from the admitted hearing record, not requests that the Court judicially notice the truth of prior allegations. The Court's assessment of contested matters remains governed by Rule 65, Rule 52(a)(2), and the applicable constitutional standard.

### I. Evidentiary Rulings on Defendants' Motion to Admit (ECF No. 273)

1. ECF No. 275 expressly permits Clark to oppose ECF No. 273 within these proposed findings and conclusions. The Court may consider hearsay and affidavit evidence more flexibly at a preliminary-injunction stage, but it retains discretion to exclude or discount irrelevant, cumulative, unreliable, or improperly inferential material.

2. Defendants' Exhibits 13 and 14 concern the causes and manners of death of other prisoners. Clark requests exclusion of those reports insofar as Defendants use them to draw conclusions about her distinct medical condition or the safety of returning her to WHV. Alternatively, any admission should be limited to matters the reports actually establish. Fed. R.-Evid. 401, 403.
3. Defendants' Exhibits 15 and 16 may be authenticated through Legato for what they visually depict, but neither should be treated as expert proof of the absence of airborne fungal material, hidden moisture, HVAC contamination, or conditions outside the photographed/recorded portions of Clark's cell.
4. Defendants' Exhibits 17 and 19 may be authenticated as recordings of the identified encounters, but Clark's Rule 106 objections should be preserved and the Court should decline unsupported medical inferences from brief video snapshots.
5. Defendants' Exhibit 18 is admissible without objection but is duplicative of the stipulated medical records already admitted as Plaintiff's Exhibits E-1 and E-2. Its admission does not make Defendants' interpretation of those records evidence.

6. No abstract admission should be entered for Defendants' catchall Exhibits 20 and 21 absent identification of a specific item and a specific permissible evidentiary use.

7. Clark contests the conclusory prediction in Dr. McIntyre Leon's affidavit that returning her to WHV will cause no "irreparable harm." The affidavit does not identify a personal examination of Clark or a facility-specific assessment of how Dr. Bet's ongoing mold-avoidance instruction would be honored upon return. (ECF No. 273-2, PageID.7036; Pl. Ex. F, Bates 000752.)

8. Brandenburg's opinions concerning "harmful mold" and medical causation fall outside ordinary lay perception under Rules 701 and 702. Her pre-February-2026 personal observations may be considered for what she actually saw, but they do not establish July 2026 environmental conditions or Clark's July 2026 medical status.

9. Plaintiff's Exhibits A, B, C, E-1, E-2, and F were admitted for the preliminary-injunction hearing, as were the color medical photographs offered from Exhibit G. The admitted medical records and firsthand provider testimony establish substantial ongoing

treatment, visible lesions, and the treating physician's mold-avoidance instruction. (Hrg. Tr. 58:7-59:22, 65:1-66:13, 68:20-69:14; Pl. Ex. F, Bates 000752.)

10. Clark maintains her objections to using Defendants' recordings, cell photographs, autopsy reports, and non-treating declarations as substitutes for medical testimony or competent evidence about individualized environmental risk. The pending exhibit motion may be decided within the purposes and limitations established by the supporting foundation and the Court's orders. (ECF Nos. 273, 275.)

## II. Governing Preliminary-Injunction and Rule 52 Standards

11. Federal Rule of Civil Procedure 65 authorizes preliminary injunctive relief. A party seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities favors relief; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson*

*County Metropolitan Government*, 56 F.4th 400, 403 (6th Cir. 2022).

12. The Court should distinguish the pre-filing record, which bears on why protection was initially sought, from the September 24 and current record, which governs whether prospective relief remains warranted. The same evidence can bear on both questions but may not establish identical risks at different points in time. *Helling*, 509 U.S. at 35-37; Fed. R. Civ. P. 65(a).

13. Irreparable harm is indispensable to preliminary relief and must be sufficiently immediate rather than merely theoretical. *D.T. v. Sumner County Schools*, 942 F.3d 324, 326-27 (6th Cir. 2019).

14. The sworn testimony, objectively documented medical findings, and continuing exposure-avoidance instruction support preliminary relief under Rule 65 pending adjudication of Clark's underlying Eighth Amendment claims. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Helling*, 509 U.S. at 33-35.

15. Under Rule 52(a)(2), a court granting or denying an interlocutory injunction must state the supporting factual findings and conclusions of law. The September 24 hearing and authorized supplementation provide a developed evidentiary record for the Court's Rule 65 determination. The standards governing a Rule 50 motion in a jury trial do not govern that discretionary determination. Fed. R. Civ. P. 50(a), 52(a)(2), 65.

16. Rule 52(c) expressly concerns judgment on partial findings during a nonjury trial, after a party has been fully heard on an issue. Although it provides an analogy to Defendants' request to end the hearing after Plaintiff's evidence, it should not be characterized as the exclusive or automatically applicable procedure for resolving this preliminary-injunction motion. The Court's actual obligation is to consider the Rule 65 request on the record it permitted the parties to complete. Fed. R. Civ. P. 52(a)(2), (c), 65; ECF No. 272, PageID.7017-18.

17. The Court's September 25 order permits completion of the evidentiary record through written testimony from listed witnesses who did not testify and directs proposed findings and

conclusions after that supplementation. (ECF No. 272, PageID.7017-18.)

## III. Eighth Amendment Standards for Medical Needs and Prospective Environmental Risk

18. The Eighth Amendment prohibits deliberate indifference to a substantial risk of serious harm to prisoners. *Farmer v. Brennan*, 511 U.S. 825, 828, 834 (1994).

19. The current Sixth Circuit formulation likewise requires objective and subjective components: objectively, the medical need or risk must be sufficiently serious; subjectively, the responsible officials must know facts showing the serious need or risk and draw the relevant inference. *Pearson v. Michigan Department of Corrections*, 170 F.4th 1027, 1037-38 (6th Cir. 2026); *Phillips v. Tangilag*, 14 F.4th 524, 534-35 (6th Cir. 2021).

20. Under Farmer, officials' knowledge of a substantial risk may be shown by direct notice and circumstantial evidence; a reasonable response must actually address the risk presented. Here, Clark's continuing treatment and specific mold-avoidance recommendation were brought directly to MDOC's attention

before the prospective return decision. *Farmer*, 511 U.S. at 842, 844; *Pl.* Ex. F, Bates 000752; ECF No. 264, PageID.6726.

21. The Eighth Amendment is not limited to treatment of harm that has already culminated in an acute crisis. *Helling v. McKinney* holds that prison officials may not ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering in the future, and that a remedy for unsafe conditions need not await a tragic event. 509 U.S. 25, 33-36 (1993).

22. *Helling* expressly rejected the proposition that a prisoner must already suffer serious current symptoms before prospective environmental-risk relief may be cognizable. Id. at 33-35.

23. The Sixth Circuit applies *Helling*'s objective/subjective framework to individualized environmental-exposure claims. *Talal v. White* held that an inmate with documented environmental sensitivity and medical recommendations for non-exposure housing sufficiently alleged the objective component, while emphasizing that the subjective component requires

knowledge and disregard of the individualized risk. 403 F.3d 423, 426-27 (6th Cir. 2005).

24. *Talal* involved a pleading-stage tobacco-smoke claim, not a factual finding about mold in this institution. Its relevance is the need to consider a prisoner's documented vulnerability and a treating provider's exposure recommendation; it does not eliminate proof of an objectively serious exposure risk or the requisite knowledge and unreasonable response. *Talal*, 403 F.3d at 426-27; *Helling*, 509 U.S. at 35-36. The Sixth Circuit has now applied *Helling* to the mold allegations in this very action. In a published opinion, it held that the alleged prolonged, pervasive mold exposure and resulting serious symptoms plausibly satisfied the objective Eighth Amendment component. *Bailey v. Michigan Department of Corrections*, No. 25-1608, slip op. at 7-8 (6th Cir. Oct. 15, 2026). The court also held that the sufficiently individualized allegations of notice and disregard supported the subjective component against nine officials, and that *Helling* clearly established the prohibition against deliberately ignoring the serious exposure alleged. Id. at 8-13. Those holdings are

directly applicable to the governing legal standard, but the appellate court was reviewing a Rule 12(c) immunity ruling.

25. In a recently issued published decision, *Miles-El v. Michigan*, No. 25-1140, slip op. at 5-7 (6th Cir. Oct. 9, 2026), the Sixth Circuit rejected an individual damages claim under qualified immunity based on an asserted asthma/dog-dander exposure and refusal to transfer. The medical report there listed animals among several possible aggravating factors but did not confirm a dog allergy, quantify the pertinent risk, or advise total separation as medically required; correctional officials consulted providers and supplied treatment. *Miles-El* underscores that a generalized asthma diagnosis and an undocumented particular allergen do not automatically compel a prison transfer. The case differs from Clark's request for prospective, plaintiff-specific relief and her treatment record containing an express individual mold-avoidance recommendation. Even so, Clark bears the burden to show a serious WHV-specific prospective exposure risk and an unreasonable contemplated response, not merely the existence of that medical instruction. Unlike *Miles-El*, which involved a

different environmental hazard and medical record, *Bailey* directly addresses mold exposure at WHV. The Sixth Circuit held that the allegations of serious mold-related harm and officials' deliberate indifference were sufficient to overcome qualified immunity at the pleading stage. *Bailey*, No. 25-1608, slip op. at 7-13; *Miles-El*, No. 25-1140, slip op. at 5-7.

26. Prospective conditions-of-confinement relief requires examination of current conditions and current official responses. *Helling*, 509 U.S. at 35-37. In *Hadix v. Johnson*, 367 F.3d 513, 526, 528 (6th Cir. 2004), the Sixth Circuit cautioned against converting deficiencies or regulatory violations into Eighth Amendment violations without explaining why the present risk crosses the constitutional threshold and why officials' responses constitute deliberate indifference, rather than a disagreement about appropriate measures.

27. *Miles-El* is especially pertinent to the proposed individualized-review alternative. Its qualified-immunity holding does not decide the merits of a prospective injunction on this separate record, but it requires candid attention to the specificity

of medical documentation, the nature and severity of expected exposure, available treatment, and prison officials' actual response. Here Dr. Bet gave explicit mold-avoidance advice but did not identify WHV-specific exposure levels; both facts should be given their proper weight. *Miles-El*, No. 25-1140, slip op. at 5-7; Hrg. Tr. 68:20-69:14, 86:1-87:6.

28. The objective showing must concern a sufficiently substantial and likely risk, not the bare existence of a diagnosis or a universal right to a risk-free environment. In addition, under *Farmer* and *Pearson*, continued medical treatment, monitoring, testing, and an attempted response to environmental complaints bear directly on whether officials responded reasonably. The dispute is not whether MDOC furnished no care; it is whether its proposed response to a specific known exposure-avoidance concern is reasonable. *Farmer*, 511 U.S. at 844; *Pearson*, 170 F.4th at 1037-40; see *Wilson v. Williams*, 961 F.3d 829, 840-41 (6th Cir. 2020).

29. The earlier filed pleadings and sworn declarations demonstrate that concerns about moisture, ventilation, and fungal

conditions at WHV were raised before Clark's July 2026 motion. Together with the admitted clinical records and current treatment evidence, that notice history supports an inquiry into what responsible officials knew and how they responded to Clark's specific risk. (ECF Nos. 68, 122, 161; Pl. Ex. F, Bates 000752; Farmer, 511 U.S. at 842.)

## IV. Clark Has Shown a Likelihood of Success on the Merits

### A. Objective component

30. Clark has shown a substantial likelihood of satisfying the objective component because the record at filing documented more than a minor or isolated complaint: prolonged systemic antifungal therapy, monitoring, unresolved objective bilateral ear pathology, respiratory treatment, hemoptysis workup, allergy/hypersensitivity symptoms, and an express treating-physician instruction to avoid mold exposure because it could exacerbate symptoms. (See Proposed Findings §§ III-V, VII-VIII, XI-XIII.)

31. The objective inquiry is not defeated merely because Clark was not continuously in acute distress. *Helling* recognizes that the

Eighth Amendment protects against sufficiently serious future health risks, and the admitted records themselves describe intermittent respiratory flare-ups rather than continuous respiratory failure. *Helling*, 509 U.S. at 33-36; Pl. Ex. F, Bates 000751-000752.

32. The objective record includes clinical observations independent of Clark's litigation statements: June 26 external-ear lesions; June 30 infectious-disease findings and treatment; MDOC approval of chest imaging for hemoptysis; and July 2 audiology observations that prevented the scheduled ABR test. These records materially distinguish this case from one supported only by subjective fears. (See Proposed Findings §§ III-V, VII-VIII, XI-XIII.)

33. Whether the correct diagnostic label is "cutaneous aspergillosis," "otomycosis," dermatitis, or some combination is disputed. The preliminary-injunction analysis does not require the Court to resolve every diagnostic dispute where the treating plan indisputably included systemic therapy, monitoring, and exposure

avoidance and the admitted record contains objective pathology. (See Proposed Findings §§ IV-V, VII-VIII, XI-XIII.)

34. The absence of acute hospitalization does not negate the seriousness of a prospective exposure risk. Neither *Helling* nor *Talal* imposes hospitalization as the threshold for an environmental-risk claim. *Helling*, 509 U.S. at 33-36; *Talal*, 403 F.3d at 426-27. In *Bailey*, the Sixth Circuit specifically rejected the argument that the severe mold exposure alleged there amounted only to ordinary prison discomfort and held the allegations sufficient under the objective Eighth Amendment component. No. 25-1608, slip op. at 7-8. Here, unlike that pleading-stage determination, the Court must weigh the live testimony, admitted medical records, and disputed WHV environmental evidence to determine whether Clark has shown a sufficiently serious risk warranting prospective relief.

35. The consultant's report does not establish that WHV is mold-free: it describes detected airborne fungal material and limited surface findings addressed through cleaning. Its generalized environmental conclusions do not independently answer whether

return to WHV is consistent with Clark's individualized mold-avoidance recommendation. (Def. Ex. 2; ECF No. 253-3, PageID.5941-5942; Pl. Ex. F, Bates 000752.)

36. The constitutional inquiry is individualized. The environmental data must be considered together with the medical evidence concerning Clark's particular conditions and the meaning and continued applicability of Dr. Bet's mold-avoidance instruction. See *Helling*, 509 U.S. at 35-36; *Talal*, 403 F.3d at 426-27. (Hrg. Tr. 65:1-66:13, 86:1-87:6, 90:1-11, 163:21-167:23, ECF No. 274.)

37. The Court need not adopt Koche's generalized health-risk conclusion as an individualized medical opinion concerning Clark; the parties expressly preserved an objection to individualized medical-causation or health-risk opinions outside Koche's qualifications. (ECF No. 268, PageID.6805.)

**B. Subjective component / current official response**

38. The record establishes that Defendants and responsible MDOC medical/placement officials had actual notice of Clark's asserted risk and treatment plan no later than the filing and

litigation of the July 6 motion, including Dr. Bet's mold-avoidance instruction, the ongoing antifungal treatment, and the medical records exchanged and litigated in this proceeding. (ECF Nos. 242, 253, 264, 268; Pl. Ex. F.)

39. Defendants' temporary transfer of Clark to DWH pending the motion confirms awareness of the asserted placement issue, even though Defendants expressly denied that the transfer was a concession of medical necessity. (ECF No. 253, PageID.5882.)

40. Defendants' current position remains that WHV is appropriate and that Clark may be returned there after the Court rules. (ECF No. 264, PageID.6726.)

41. The record places the responsible MDOC decisionmakers on notice of Clark's documented medical precautions, continued treatment, and specific concern about returning to WHV. A prospective placement decision that disregards a known, sufficiently serious individualized risk may support deliberate-indifference relief under Helling and Farmer. Clark requests protection directed to that decision, not an order that prison officials adopt a particular diagnosis or relinquish ordinary

placement discretion. *Farmer v. Brennan*, 511 U.S. 825, 837, 844 (1994); Helling v. McKinney, 509 U.S. 25, 35-37 (1993); Bailey *v. Michigan Department of Corrections*, No. 25-1608, slip op. at 8-13 (6th Cir. Oct. 15, 2026).

42. On the present record, Clark has shown a sufficient likelihood of satisfying the subjective component for preliminary-relief purposes if MDOC returns her to WHV without an individualized medical determination addressing her still-operative mold-avoidance instruction, ongoing treatment, and the conditions at the proposed placement. The prospective concern is a return decision that disregards a known, medically documented precaution without determining whether it can be honored.

43. The prospective decisionmakers have notice of Clark's treatment history, recorded symptoms, and express mold-avoidance recommendation. Continuing to treat WHV as an appropriate default placement without adequately addressing that individualized medical risk may satisfy Farmer's subjective component. *Farmer*, 511 U.S. at 837, 842, 844; *Pl.* Ex. F, Bates 000752; ECF No. 264, PageID.6726.

**C. Defendants' principal "no emergency / no hospitalization" theory does not resolve the merits**

44. Defendants' argument that no witness testified that Clark's ears required hospitalization addresses a standard Clark was not required to meet. The motion requested secure medical placement outside WHV and continuity of treatment; it did not request acute hospital admission. (ECF No. 242, PageID.5176-77.)

45. DWH itself is described by Defendants as an ambulatory/outpatient facility with an infirmary below inpatient-hospital level. (Def. Ex. 6; ECF No. 253-7, PageID.5988.)

46. The relevant merits question is whether anticipated return to WHV presents a sufficiently serious prospective risk given Clark's individualized medical condition and whether Defendants' proposed response to that risk would be reasonable. Whether her ears independently met hospital-admission criteria is not the constitutional test. *Helling*, 509 U.S. at 33-36; *Farmer*, 511 U.S. at 844.

47. The absence of an acute hospitalization order does not resolve the individualized risk analysis under *Helling* and *Farmer*. Unlike the medical record described in Miles-El, Clark has an

express treating-physician instruction to avoid mold exposure, ongoing systemic antifungal treatment, and independently observed ear abnormalities. Helling, 509 U.S. at 35-37; Farmer, 511 U.S. at 837, 844; *Miles-El* v. Michigan, No. 25-1140, slip op. at 5-7 (6th Cir. Oct. 9, 2026); Pl. Ex. F, Bates 000752.

48. Clark's treating-provider instruction, objective medical findings, and Defendants' stated willingness to return her to WHV provide a concrete basis for assessing a prospective health risk requiring individualized protective action. Helling, 509 U.S. at 35-37; *Farmer*, 511 U.S. at 837, 844; *E*CF No. 264, PageID.6726; Pl. Ex. F, Bates 000752.

**V. Clark Has Shown a Likelihood of Irreparable Harm Absent Prospective Relief**

49. Irreparable harm must be likely and sufficiently immediate. D.T., 942 F.3d at 326-27.

50. Clark is presently outside WHV only because Defendants agreed to keep her at DWH pending the Court's decision. Defendants have not agreed that she will remain outside WHV

after that decision and affirmatively maintain that WHV is appropriate. (ECF No. 264, PageID.6726.)

51. The threatened return is therefore materially different from a speculative possibility untethered to any current placement position. It is the placement Defendants contend is proper once the litigation-based temporary arrangement ends. (Id.)

52. As of the hearing, Clark remained on an active systemic antifungal course, continued to receive DWH wound care, and had follow-up extending beyond the hearing date. (Pl. Ex. E-2, Bates 000928-000929, 000078-000079.)

53. Dr. Bet's treatment plan included an express instruction to avoid mold exposure because such exposure could further exacerbate symptoms. (Pl. Ex. F, Bates 000752.)

54. Clark faces the prospect of return to WHV when the temporary DWH arrangement ends, while her records document continuing treatment and an express precaution against exposure to mold that may worsen her symptoms. The requested injunction addresses that foreseeable placement risk before a serious aggravation occurs. ECF No. 264, PageID.6726; Pl. Ex. F, Bates

000752; Pl. Ex. E-2, Bates 000928-000929; Helling, 509 U.S. at 33-37.

55. Defendants have committed to Clark's DWH placement only through disposition of her motion and continue to maintain that WHV is appropriate. The absence of protection governing her post-ruling placement leaves the central prospective dispute unresolved. *(*ECF No. 264, PageID.6726.*)*

56. MDOC's temporary DWH placement did not resolve whether a return to WHV would be medically appropriate during Clark's still-active treatment and exposure-avoidance precautions. The Court should address that prospective risk through appropriately narrow relief. (ECF No. 264, PageID.6726; Pl. Ex. E-2, Bates 000928-000929.)

## VI. The Balance of Equities and Public Interest Favor Narrow Relief

57. The proposed relief does not seek a transfer to a particular institution, or broad management of MDOC. It permits MDOC to select any lawful secure placement outside WHV that is medically appropriate. (ECF No. 242, PageID.5176-77.)

58. MDOC has already demonstrated that such placement is operationally feasible by housing Clark at DWH during the pendency of the motion. (ECF No. 264, PageID.6726-27.)

59. The requested injunction would preserve secure outside-WHV protection of the sort MDOC has already provided temporarily, without dictating a particular institution, medication, or medical procedure. (ECF Nos. 242, 264.)

60. The public has a strong interest in constitutional prison administration, continuity of necessary medical care, and avoidance of preventable serious harm, while also respecting prison administrators' discretion over the precise secure placement. See *Farmer*, 511 U.S. at 832-34; 18 U.S.C. § 3626(a)(2).

61. The balance of equities and public interest favor preventing avoidable serious harm while preserving MDOC's ability to choose a lawful, secure, medically appropriate location outside WHV. Clark seeks continuity of necessary treatment, not release or a court-directed medical regimen. (ECF No. 242, PageID.5176-5177; 18 U.S.C. § 3626(a)(2).)

## VII. The Requested Relief Can Be Tailored to the PLRA

62. The proposed relief is limited to Clark's demonstrated exposure-avoidance and continuing-treatment needs and does not request judicial supervision of unrelated medical complaints. That narrow focus is consistent with the PLRA. 18 U.S.C. § 3626(a)(2).

63. The Prison Litigation Reform Act permits preliminary injunctive relief in prison-conditions cases but requires that such relief be narrowly drawn, extend no further than necessary to correct the harm requiring preliminary relief, and be the least intrusive means necessary; the Court must give substantial weight to any adverse impact on public safety or operation of the criminal justice system. 18 U.S.C. § 3626(a)(2).

64. Clark's requested relief can satisfy those requirements because it is plaintiff-specific, does not require release, does not dictate a particular institution, and preserves MDOC's discretion to choose the secure outside-WHV placement. (ECF No. 242, PageID.5176-77.)

65. Treatment-continuity language can likewise be limited to requiring continuation of care already ordered or medically

determined appropriate by treating providers, without the Court selecting particular medications or substituting its judgment for treating clinicians. (Id.)

66. Clark respectfully requests express findings that a temporary, individualized outside-WHV placement and treatment-continuity requirement reaches no further than necessary to prevent the medically documented prospective harm and is the least intrusive effective relief. 18 U.S.C. § 3626(a)(2).

67. The PLRA permits preliminary relief tailored to the specific risk presented. Clark respectfully seeks protection against return to WHV and continuity of medically indicated care through an order that is narrowly drawn, no more intrusive than necessary, and effective for the period authorized by law. 18 U.S.C. § 3626(a)(2).

68. A temporary order maintaining Clark at a secure, medically appropriate placement outside WHV, with continuity of prescribed and medically indicated care, would address the specific prospective harm without requiring the Court to select a prison,

hospital, medication, or procedure. 18 U.S.C. § 3626(a)(2); ECF No. 242, PageID.5176-5177.

**VIII. The TRO's Mootness Does Not Resolve the Preliminary-Injunction Request**

69. The Court has already determined the procedural effect of Clark's present DWH placement: the TRO component is moot, but the preliminary-injunction request remains for decision. (ECF No. 272, PageID.7018.)

70. Accordingly, no further ruling is necessary on whether the TRO remains live. The remaining question is prospective preliminary relief governing Clark's placement and medical protection after the Court rules. (Id.)

71. Defendants' stated position that WHV remains appropriate and the absence of a commitment to keep Clark outside WHV after decision preserve a concrete dispute over prospective placement. (ECF No. 264, PageID.6726.)

## IX. Defendants' Oral Motion for the Equivalent of a Directed Verdict Should Be Denied

72. Defendants described their oral request as the "equivalent of a directed verdict." Rule 50 governs jury trials. Rule 52(c) addresses partial findings in a nonjury trial, but a preliminary-injunction hearing is not necessarily a trial on the merits. The Court need not adopt either label; it should decide the Rule 65 request on the record as completed under ECF No. 272. Fed. R. Civ. P. 50(a), 52(a)(2), (c), 65.

73. Rule 52(c) allows findings in a nonjury trial once a party has been fully heard, but this proceeding concerns preliminary relief under Rule 65. The Court declined to terminate the September 24 evidentiary hearing when Defendants made their oral request, received Dr. Malik's testimony, and subsequently authorized supplemental evidence. (Hrg. Tr. 145:1-23; ECF No. 272, PageID.7017-7018.)

74. Defendants orally moved for the "equivalent of a directed verdict." The Court construed the request as seeking denial of the preliminary injunction without further evidence and stated that it was "not prepared to do that right now," then heard Dr. Malik and

later authorized supplemental written testimony. (Hrg. Tr. 145:1-23; ECF No. 272, PageID.7017-18.)

75. On the developed record, Plaintiff has presented objective contemporaneous medical evidence, treating-provider evidence, and an express exposure-avoidance instruction sufficient to require resolution of the preliminary-injunction factors on the complete record rather than judgment based on the premise that no witness required hospitalization for Clark's ears. (See Proposed Findings §§ III-V, VII-VIII, XI-XIII.)

76. Defendants' request to dispose of the preliminary-injunction motion before the hearing record was complete should be denied. The developed record supports deciding Clark's request on the treating-provider evidence, objective medical findings, environmental materials, and the applicable Rule 65 factors. (Hrg. Tr. 145:1-23; ECF No. 272, PageID.7017-7018.)

## X. Proposed Preliminary Injunction

77. Clark respectfully requests a narrowly tailored preliminary injunction maintaining her in a lawful, secure, medically appropriate placement outside WHV while requiring continuity of

medically indicated care, subject to the outside-WHV protection necessary to address the risk established by the record. (ECF No. 242, PageID.5176-5177; 18 U.S.C. § 3626(a)(2).)

78. The injunction should require continuity of infectious-disease follow-up, prescribed systemic antifungal treatment, associated laboratory monitoring, wound care, ordered diagnostic follow-up, and other treatment that Clark's treating providers determine remains medically indicated. The Court need not prescribe a medication, dosage, or diagnostic test itself.

79. Any such determination should be documented in Clark's medical record and should address the actual prospective risk; it should not rest solely on claims that Clark does not require acute hospitalization or is clinically stable at a particular examination.

80. Clark requests an order specifying the required outside-WHV placement protection and continuity of medically indicated care with the particularity required by Rule 65(d)(1), accompanied by the findings required for preliminary relief under 18 U.S.C. § 3626(a)(2).

DATED: October 16, 2026 Respectfully submitted,

**Shiraz Law Firm, PLLC**
***/s/ Shiraz K. Khan***
**Shiraz K. Khan (P78359)**
Shiraz Law Firm, PLLC
30400 Telegraph Rd., Suite 380
Bingham Farms, MI 48025
Tel: (248) 419-0678
**shiraz@justicebyjurytrials.com**
*Counsel for Plaintiff Krystal Clark*

## CERTIFICATE OF SERVICE

I, SHIRAZ K. KHAN (P78359), certify that on October 16, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of the United States District Court of the Eastern District of Michigan, using the CM/ECF system, which will send notification of such filing to all counsel of record at the email addresses that they have provided to the Court.

Dated: October 16, 2026 Respectfully submitted,

**Shiraz Law Firm, PLLC**
***/s/ Shiraz K. Khan***
**Shiraz K. Khan (P78359)**
Shiraz Law Firm, PLLC
30400 Telegraph Rd., Suite 380
Bingham Farms, MI 48025
Tel: (248) 419-0678
**shiraz@justicebyjurytrials.com**
*Counsel for Plaintiff Krystal Clark ONLY.*